No. _____

SUPREME COURT OF NORTH CAROLINA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JEFFERSON GRIFFIN,<br><br>        Petitioner,<br><br>    v.<br><br>NORTH CAROLINA BOARD OF ELECTIONS,<br><br>       Respondent, | <u>From the North Carolina</u><br><u>State Board of Elections</u> |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PETITION FOR WRIT OF PROHIBITION OF
THE HONORABLE JEFFERSON GRIFFIN**

**IMMEDIATE ACTION REQUESTED BEFORE
MONDAY, 23 DECEMBER 2024**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# INDEX

TABLE OF CASES AND AUTHORITIES ..................................... v

SUMMARY OF REQUEST FOR RELIEF ........................................1

INTRODUCTION ............................................................. 2

STATEMENT OF THE FACTS .................................................5

    A.    The Election Protests ....................................5

    B.    Further Proceedings .................................... 8

MOTION FOR TEMPORARY STAY ............................................ 9

THE COURT'S POWER TO ISSUE THE WRIT OF
PROHIBITION ...............................................................14

I.    The Constitution Empowers the Court to Issue Writs
to Inferior Tribunals. .............................................14

II.    The Standard for a Writ of Prohibition .................................17

ISSUES PRESENTED ........................................................18

REASONS WHY THE WRIT SHOULD ISSUE ..........................18

I.    It's Unlawful to Count the Votes of People Who Did
Not Lawfully Register to Vote. ........................................ 20

    A.    State law prohibits anyone from voting unless
he has provided a drivers license or social
security number when registering to vote................. 20

    B.    The State Board admits that it broke the law. ............23

    C.    The unlawful registrations haven't been
"cured." .................................................... 24

    D.    Judge Griffin's protests do not implicate federal
election laws................................................27

II.    The Boards of Election Cannot Count the Votes of
       People Who Have Never Lived Here. ...................................31

       A.    The state constitution forbids counting the
             votes of Never Residents. .............................................. 31

       B.    The residency clause is not preempted by the
             federal constitution. ......................................................32

       C.    If UMOVA permits these votes to be counted,
             it is unconstitutional as applied to these
             circumstances. ...............................................................34

       D.    This argument has no impact on votes cast for
             federal elections, military voters, or North
             Carolina residents living overseas................................37

       E.    Residency isn't inheritable under the state
             constitution's voter qualifications. ..............................38

III.   Overseas Voters Who Did Not Provide Photo
       Identification Cannot Cast a Ballot in State Elections.......... 40

       A.    Article 21A, which governs overseas absentee
             voters, incorporates Article 20's requirements
             for absentee voters. ...................................................... 41

       B.    Nothing in Article 21A excuses overseas voters
             from providing photo identification............................43

       C.    The fact that the Board issued a rule excusing
             overseas voters from providing photo
             identification does not immunize the Board's
             decision from judicial review. ................................... 44

       D.    Federal law has no bearing on the photo-
             identification requirement. .........................................46

IV.    The State Board Manufactured Procedural Defects. ............47

       A.    The protests should not have been filed as voter
             challenges......................................................................47

B. The Board wrongly dismissed the protests for lack of service..............................................49

C. Judge Griffin timely filed his protests........................52

V. No Other Federal Statute Bars the Protests. ........................54

A. The Civil Rights Act does not impact the protests. ........................................................54

B. The Voting Rights Act does not impact the protests. ........................................................55

VI. The Protests Comport with Equal Protection and Substantive Due Process........................................56

A. The *Anderson-Burdick* test. ...........................................56

B. The protests do not seek to impose severe limitations on voting. ...................................57

C. The laws at issue are tailored to compelling state interests. ...........................................60

VII. The Appropriate Remedy Is Discounting the Illegal Ballots. ..................................................62

A. To succeed, Judge Griffin need only provide substantial evidence of an outcome-determinative violation of election law......................62

B. Judge Griffin provided substantial evidence of outcome-determinative election-law violations..........64

C. The Board tried to cast doubts about its own data................................................66

D. The Court should order the ineligible votes discounted and the election results retabulated. ........68

REQUESTED RULINGS AND RELIEF .......................................70

CONCLUSION ....................................................71

VERIFICATION ............................................................................... 73

CERTIFICATE OF SERVICE ......................................................... 74

# TABLE OF CASES AND AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) .................................................................51

*Adams v. N.C. Dep't of Nat. & Econ. Res.*,
    295 N.C. 683, 249 S.E.2d 402 (1978) ....................................51

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) .................................................................65

*Appeal of Ramseur*,
    120 N.C. App. 521, 463 S.E.2d 254 (1995) ...........................22

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013) .....................................................................13

*Askew v. City of Kinston*,
    906 S.E.2d 500 (N.C. Ct. App. 2024) ....................................53

*Bayard v. Singleton*,
    1 N.C. (Mart.) 5 (1787) ..........................................................45

*Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*,
    363 N.C. 500, 681 S.E.2d 278 (2009) ....................................20

*Bouvier v. Porter*,
    279 N.C. App. 528, 865 S.E.2d 732 (2024) ...........................54

*Bouvier v. Porter*,
    386 N.C. 1, 900 S.E.2d 838 (2024) .................................*passim*

*Brnovich v. Democratic Nat'l Comm.*,
    594 U.S. 647 (2021) .................................................................64

*Broyles v. Texas*,
    618 F. Supp. 2d 661 (S.D. Tex. 2009) ...................................33

*Bush v. Gore*,
    531 U.S. 98 (2000). ...........................................................69, 78

*Cohoon v. Swain,*
    216 N.C. 317, 5 S.E.2d 1 (1939) ...............................................12

*Colon-Marrero v. Velez,*
    813 F.3d 1 (1st Cir. 2016) ........................................................13

*Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.,*
    376 N.C. 558, 853 S.E.2d 698 (2021) .....................................17

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008)..........................................................*passim*

*Dobrovolny v. Nebraska,*
    100 F. Supp. 2d 1012 (D. Neb. 2000) ....................................33

*Dunn v. Blumstein,*
    405 U.S. 330 (1972).........................................................*passim*

*EchoStar Commc'ns Corp. v. FCC,*
    292 F.3d 749 (D.C. Cir. 2002) ................................................73

*Fla. State Conf. of NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ........................................*passim*

*Graham v. Nw. Bank,*
    16 N.C. App. 287, 192 S.E.2d 109 (1972)...............................61

*Greene v. Charlotte Chem. Lab'ys, Inc.,*
    254 N.C. 680, 120 S.E.2d 82 (1961)........................................19

*Harper v. Hall,*
    379 N.C. 656, 865 S.E.2d 301 (2021). ....................................15

*Harper v. Hall,*
    384 N.C. 292, 886 S.E.2d 393 (2023) .....................................71

*In re Arthur,*
    291 N.C. 640, 231 S.E.2d 614 (1977)......................................41

*In re Chastain,*
    No. 283A22-2, 2024 WL 5100940 (N.C. Dec. 13, 2024) ..... 42

*In re Election Protest of Fletcher*,
175 N.C. App. 755, 625 S.E.2d 564 (2006) ............................12

*In re Protest of Whittacre*,
228 N.C. App. 58, 743 S.E.2d 68 (2013)................................ 11

*James v. Bartlett*,
359 N.C. 260,607 S.E.2d 638 (2005) .......................................5

*Kinsey v. Garver*,
91 N.E.2d 54 (Ohio Com. Pl. 1950) ......................................23

*La. Public Service Comm'n v. FERC*,
20 F.4th 1 (D.C. Cir. 2021) ....................................................73

*Lackey v. Dept. of Human Resources*,
306 N.C. 231, 293 S.E.2d 171 (1982)................................ 73, 75

*Libertarian Party of N.C. v. State*,
365 N.C. 41, 707 S.E.2d 199 (2011)...................................... 64

*Lloyd v. Babb*,
296 N.C. 416, 251 S.E.2d 843 (1979) .............................. *passim*

*Mansfield v. McShurley*,
911 N.E.2d 581 (Ind. Ct. App. 2009) ....................................23

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ................................................ 46

*Mayo v. James*,
53 Va. (12 Gratt.) 17 (1855) ..................................................18

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019)................................................73

*Moses v. State Highway Comm'n*,
261 N.C. 316, 134 S.E.2d 664 (1964)................................ 17, 19

*Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*,
183 N.C. 43, 110 S.E. 524 (1922)...........................................16

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ................................................................. 59

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986) ................................................................. 70

*N.C. Bar & Tavern Ass'n v. Cooper*,
    901 S.E.2d 355 (N.C. Ct. App. 2024) .................................... 53

*N.C. State Bd. of Educ. v. State*,
    371 N.C. 149, 814 S.E.2d 54 (2018) ...................................... 41

*N.C. State Conf. of NAACP v. Moore*,
    382 N.C. 129, 876 S.E.2d 513 (2022) .................................... 14

*Orange Cnty. v. N.C. Dep't of Transp.*,
    46 N.C. App. 350, 265 S.E.2d 890 (1980) ............................ 68

*Overton v. Mayor & City Comm'rs of City of Hendersonville*,
    253 N.C. 306, 116 S.E.2d 808 (1960) .................................... 67

*Park Terrace, Inc. v. Phoenix Indem. Co.*,
    243 N.C. 595, 91 S.E.2d 584 (1956) ...................................... 20

*Perloff v. Edington*,
    293 Ala. 277, 302 So. 2d 92 (1974) ........................................ 23

*Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.*,
    472 F.2d 121 (8th Cir. 1973) .................................................. 68

*Pollock v. Parnell*,
    126 N.C. App. 358, 484 S.E.2d 864 (1997) ............................ 61

*Powell v. Power*,
    436 F.2d 84 (2d Cir. 1970) ............................................. 63, 68

*Pree v. D.C. Bd. of Elections & Ethics*,
    645 A.2d 603 (D.C. 1994) ...................................................... 33

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) .................................................................... 69

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ................................................................77

*Singleton v. N.C. Dep't of Health & Hum. Servs.*,
    906 S.E.2d 806 (N.C. 2024) ..................................................43

*State v. Allen*,
    24 N.C. (2 Ired.) 183 (1841) .................................................. 20

*State v. Butler*,
    356 N.C. 141, 567 S.E.2d 137 (2002).....................................72

*State v. Ellis*,
    361 N.C. 200, 639 S.E.2d 425 (2007) ..............................19, 20

*State v. Harris*,
    216 N.C. 746, 6 S.E.2d 854 (1940).........................................52

*State v. Hunt*,
    357 N.C. 454, 591 S.E.2d 502 (2003) .................................... 11

*State v. McElrath*,
    351 S.E.2d 557 (N.C. 1986) ................................................... 11

*State v. Stanley*,
    288 N.C. 19, 215 S.E.2d 589 (1975) ...................................... 20

*State v. Taylor*,
    379 N.C. 589, 866 S.E.2d 740 (2021).....................................72

*State v. Whitaker*,
    114 N.C. 818, 19 S.E. 376 (1894) .......................................11, 16

*Storer v. Brown*,
    415 U.S. 724 (1974) ............................................................... 64

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ...............................................................65

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ...............................................................14

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ..................................................................52

*White v. Willett*,
    456 S.W.3d 810 (Ky. 2015) ...................................................20

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..................................................................52

*Woodall v. W. Wake Highway Comm'n*,
    176 N.C. 377, 97 S.E. 226 (1918) ...........................................67

**Statutes**

28 U.S.C. § 1443 ........................................................................12

28 U.S.C. § 1447 ........................................................................12

52 U.S.C. § 10101 ......................................................................54

52 U.S.C. § 10307 ......................................................................56

52 U.S.C. § 20302 ...............................................................37, 46

52 U.S.C. § 20501 ...............................................................11, 28

52 U.S.C. § 20507 .............................................................*passim*

52 U.S.C. § 21081 .............................................................*passim*

52 U.S.C. § 21083 .............................................................*passim*

N.C. Gen. Stat. § 163-54 ..................................................*passim*

N.C. Gen. Stat. § 163-82.1 .................................................6, 21

N.C. Gen. Stat. § 163-82.3 ....................................................21

N.C. Gen. Stat. § 163-82.4 ...............................................*passim*

N.C. Gen. Stat. § 163-82.8 ....................................................51

N.C. Gen. Stat. § 163-82.11 ..................................................21

N.C. Gen. Stat. § 163-82.12 ...................................................... 25, 55

N.C. Gen. Stat. § 163-132.5G ..................................................... 43

N.C. Gen. Stat. § 163-166.12 ...................................................... 24, 25

N.C. Gen. Stat. § 163-166.16 ...................................................... 7, 26, 41

N.C. Gen. Stat. § 163-182.9 ....................................................... *passim*

N.C. Gen. Stat. § 163-182.10 ...................................................... *passim*

N.C. Gen. Stat. § 163-182.12 ...................................................... 6

N.C. Gen. Stat. § 163-182.14 ...................................................... *passim*

N.C. Gen. Stat. § 163-182.19 ...................................................... 63, 66

N.C. Gen. Stat. § 163-230.1 ....................................................... 7, 41, 42

N.C. Gen. Stat. § 163-231 ......................................................... *passim*

N.C. Gen. Stat. § 163-234 ......................................................... 43

N.C. Gen. Stat. § 163-258.17 ...................................................... 43, 44

N.C. Gen. Stat. § 163-258.2 ....................................................... *passim*

N.C. Gen. Stat. § 163-258.3 ....................................................... 34

N.C. Gen. Stat. § 163-258.4 ....................................................... 43

N.C. Gen. Stat. § 163-258.6 ....................................................... 34

N.C. Sess. Law 2003-226 .......................................................... 6, 21

N.C. Sess. Law 2011-182 .......................................................... 34, 41

N.C. Sess. Law 2019-239 .......................................................... 41

## Other Authorities

33 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8306 (2d ed. Westlaw June 2024 update) ........... 15

Canon 3, N.C. Canon of Judicial Ethics ............................................. 8

Guide to Judiciary Policy, Vol. 2B, Ch. 2, § 220, Ethics Advisory
    Opinion No. 58 .............................................................................. 8

H.R. Rep. No. 107-329, pt. 1 (2001), 2001 WL 1579545 ................... 11

Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional
    Requirement?*, 78 Yale L.J. 816 (1969) .................................... 15

**Rules**

8 N.C. Admin. Code § 02.0111 ........................................................ 49

8 N.C. Admin. Code § 17.0109 ........................................................ 44

N.C. R. App. P. 2 ............................................................................. 18

N.C. R. App. P. 22, Drafting Committee Note (1975) ..................... 15

N.C. R. App. P. 23 ........................................................................... 13

N.C. R. Civ. P. 42 ........................................................................... 37

**Constitutional Provisions**

N.C. Const. art. I, § 10 .................................................................... 62

N.C. Const. art. I, § 19 .................................................................... 46

N.C. Const. art. IV, § 1 ............................................................... *passim*

N.C. Const. art. IV, § 12 ............................................................. *passim*

N.C. Const. art. VI, § 2 ............................................................... *passim*

N.C. Const. art. VI, § 3 ............................................................... *passim*

N.C. Const. of 1776, art. VIII ........................................................ 32

U.S. Const. art. I, § 4 ................................................................. 12, 28

No. _____

SUPREME COURT OF NORTH CAROLINA
*********************************************

JEFFERSON GRIFFIN,

        Petitioner,

  v.

NORTH CAROLINA BOARD OF
ELECTIONS,

        Respondent,

From the North Carolina
State Board of Elections

***********************************

**PETITION FOR WRIT OF PROHIBITION OF
THE HONORABLE JEFFERSON GRIFFIN**

**IMMEDIATE ACTION REQUESTED BEFORE
MONDAY, 23 DECEMBER 2024**
***********************************

TO THE HONORABLE SUPREME COURT OF NORTH CAROLINA:

    The Honorable Jefferson Griffin respectfully petitions this Court to issue a writ of prohibition to stop the State Board of Elections from counting unlawful ballots cast in the 2024 general election. In addition, Judge Griffin also requests a temporary stay from the Court before Monday, 23 December 2024. That stay is necessary to enable the Court to consider and rule on Judge Griffin's petition for a writ of prohibition.

## SUMMARY OF REQUEST FOR RELIEF

    Judge Griffin first moves the Court to **immediately issue a temporary stay** of (1) the State Board's certification of the election for Seat 6 of the North Carolina Supreme

Court and (2) the requirement that Judge Griffin file a petition for judicial review within 10 days of service of the State Board's decision. As explained below, a temporary stay will protect this Court's jurisdiction to decide the questions of law that are raised in Judge Griffin's election protests—questions that our nation's system of federalism reserves for state courts, not federal courts.

Second, Judge Griffin asks the Court to exercise its power—as granted by the North Carolina Constitution—to supervise inferior tribunals, such as the State Board. Judge Griffin asks the Court to issue a writ of prohibition that prohibits the State Board from counting ballots cast in violation of North Carolina's statutes and constitution. As explained below, the State Board has continued to issue rulings and administer our elections in violation of North Carolina law, and the Board's lawlessness cannot be allowed to continue.

## INTRODUCTION

Judge Griffin seeks a writ of prohibition to stop the counting of unlawful ballots by the State Board of Elections. The State Board is an administrative agency that has knowingly broken the law and refused to do anything about it. Indeed, the Board has been breaking our election laws for decades. This lawlessness was brought to the Board's attention back in 2023, before the 2024 general election, but the Board refused to correct its errors. Now those chickens have come home to roost. In the 2024 general election, the Board's errors changed the outcome of the election for the open seat on this Court. When those errors were raised again in valid election protests, the Board then claimed that it was too late to fix its law-breaking.

At bottom, this case presents a fundamental question: who decides our election laws? Is it the people and their elected representatives, or the unelected bureaucrats sitting on the State Board of Elections? If the Board gets its way, then it is the real sovereign here. It can ignore the election statutes and constitutional provisions, while administering an election however it wants.

Judge Griffin, currently a judge of the North Carolina Court of Appeals and candidate for Seat 6 on the Supreme Court of North Carolina, seeks to restore the supremacy of the democratic process and the preeminence of the rule of law. He filed election protests across all North Carolina counties to challenge the State Board's lawless administration of his electoral contest. With this petition for a writ of prohibition, there are three types of election protests at issue.

First, the Board intends to count ballots that were cast by people who did not lawfully register to vote. Since 2004, state law has required voter applicants to provide their drivers license or social security number before lawfully registering to vote. However, the State Board chose to ignore this law for decades. Thus, approximately 60,000 people cast votes in the protested judicial race without providing that statutorily required information on their voter applications. These voters were not allowed to cast a ballot in this race because they were not "'legally registered' to vote." *Bouvier v. Porter*, 386 N.C. 1, 4 n.2, 900 S.E.2d 838, 843 n.2 (2024) (quoting N.C. Gen. Stat. § 163-54).

Second, the State Board decided to count ballots cast by voters who have, by their own admission, never resided in North Carolina or anywhere else in the United States.

Since 1776, our state constitution has limited eligible voters in state races to bona fide North Carolina residents. *See id.* ("Certain categories of individuals are also categorically ineligible to vote, such as . . . nonresidents . . . ."). But ballots were accepted in the Supreme Court race from people who were born outside the United States and have never lived *anywhere* in the United States. Counting the votes of these "Never Residents" was illegal.

Third, the Board has accepted absentee ballots cast by people who failed to provide photo identification with their ballots. Thousands of overseas voters cast ballots without providing their photo identification. But state law requires all voters to provide photo identification to vote; overseas voters casting absentee ballots do not get special treatment. The Board likewise broke the law by counting these ballots.

In response to these protests, the State Board and the opposing candidate, Justice Allison Riggs, have claimed that Judge Griffin is seeking a retroactive change in the election laws. That flatly mischaracterizes the timeline. Our registration statutes required drivers license or social security numbers back in 2004. Our state constitution has imposed a residency requirement since 1776. And photo identification has been required for absentee voting since at least 2018. The laws that *should* have governed this election were, therefore, established long before this election. The State Board simply chose to break the law.

But the State Board of Elections is no super-legislature. It doesn't get to make up its own rules, disregard state statutes, or rewrite the state constitution. Rather, the Board was required to discount votes that were cast in violation of state law. Like this Court explained twenty years ago, in an identical situation, "[t]o permit unlawful votes to be counted along

with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *James v. Bartlett*, 359 N.C. 260, 270, 607 S.E.2d 638, 644 (2005).

Through its lawlessness, the State Board of Elections is attempting to change the outcome of this election. Such threatened misconduct should be prohibited. Given the public's interest in reaching finality on this contested race, and the lack of alternative remedies given the need for an expeditious and final determination, issuance of the writ of prohibition is a proper exercise of this Court's constitutional duty to supervise and control the exercise of judicial power in the state. N.C. Const. art. IV, § 12(1).

## STATEMENT OF THE FACTS

On Election Day, Judge Griffin maintained a sizeable lead over Justice Riggs. However, as ballots continued to trickle in over the next week, Justice Riggs took the lead. As of today, Justice Riggs leads by 734 votes.

### A.    The Election Protests

On 19 November 2024, Judge Griffin filed election protests in each of North Carolina's 100 counties.[1] In total, Judge Griffin filed six categories of election protests. However, only three categories of protests are relevant here. Those three relevant categories are described briefly below, as well as the likely impact of each on the outcome of the election.

---

**1**    Three candidates for the state legislature filed similar protests for their respective districts. Although the State Board rejected their protests on the same grounds, the appeal for state legislative candidates goes to the respective houses of the General Assembly for a final decision. N.C. Gen. Stat. § 163-182.14(c).

Election protests matter when they change the outcome of an election. *Bouvier*, 386 N.C. at 4, 900 S.E.2d at 843 (discussing N.C. Gen. Stat. § 163-182.12).

*Incomplete Voter Registrations*. Since 2004, the General Assembly has required someone registering to vote to provide his drivers license or last four digits of his social security number on his voter registration application. N.C. Sess. Law 2003-226, § 9 (codified as amended at N.C. Gen. Stat. § 163-82.4). However, until December 2023, the State Board of Elections chose not to enforce this law. And even when the Board admitted its decades of lawlessness, it refused to cure the improper registrations, and only began requiring the information from new registrants. In the race for Seat 6 of this Court, over 60,000 people cast ballots, even though they had never provided the statutorily required information to become lawful voter registrants. Under state law, unless someone is lawfully registered to vote, he cannot vote. N.C. Const. art. VI, § 3(1); N.C. Gen. Stat. § 163-82.1(a).

The form of the protests that Judge Griffin filed with the county boards is the same, except for attachments that identify particular voters in the county. A sample of the protest for incomplete voter registrations can be found at appendix pages 1745-1830, for Guilford County.

Judge Griffin anticipates that, if these unlawful ballots are excluded, then he will have won the contest.

*Never Residents*. Our state constitution limits voters for state offices to people who actually reside in North Carolina. N.C. Const. art. VI, § 2(1); *Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2 (explaining that "nonresidents" are "categorically ineligible to vote"

for state offices). Nonetheless, the State Board allowed approximately 267 people to vote in the protested election who have never resided in North Carolina or anywhere else in the United States. These voters self-identified themselves as such, stating on a form "I am a U.S. citizen living outside the country, and I have never lived in the United States." Counting these ballots is unlawful. An example of this type of protest can be found in the appendix at pages 1729-1744.

It is unknown whether this category of election protests will affect the outcome of the election, standing alone. As it stands, fewer than 300 Never Residents voted in the election, and the current margin between the candidates is over 700 votes. Judge Griffin filed other categories of election protests that are currently making their way through the administrative process, including protests targeting deceased voters, felon voters, and voters who had their registrations denied. The impact on the outcome of the election from those other protests, which target considerably fewer voters, is presently unknown. These other protests only affect about 817 voters. App. 40 n.3.

*No Photo ID*. It's well known that photo identification is required for all voters, both those voting absentee ballots and those voting in person. N.C. Gen. Stat. § 163-230.1(a)(4), (b)(4), (e)(3), (f1) (absentee ballots); *id.* § 163-166.16(a) (in-person voting); N.C. Const. art. VI, §§ 2(4), 3(2) (same). Yet the State Board decided not to require photo identification for absentee ballots cast by voters who live overseas. State law, however, doesn't exempt overseas voters from the photo-identification requirement. An example of this type of protest can be found in the appendix at pages 1831-1878.

Thousands of such ballots were unlawfully cast in the election. Judge Griffin anticipates that, if these unlawful ballots are excluded, he will win the election.

### B.     Further Proceedings

After Judge Griffin filed his protests, the State Board took over jurisdiction from the county boards for the three categories of protests just described. App. 1-2.

On 26 November 2024, Judge Griffin filed a motion to disqualify a Board member, Siobhan Millen, from participating in the Board's adjudication of his protests. App. 81-90. Siobhan Millen is married to Justice Riggs' lead attorney at Womble Bond Dickinson ("Womble"). Womble has been Justice Riggs' legal counsel both before and after Election Day. Pressley Millen is a partner at Womble; and, leading up to Election Day, he held himself out as Justice Riggs' lead attorney. App. 93-94. Admittedly, Mr. Millen has disappeared from Justice Riggs' legal team. But the Millen family's ownership of a partnership share of Womble, App. 101, nonetheless disqualifies Ms. Millen from ruling on Judge Griffin's protests. *See* Canon 3(C)-(D)(iii), N.C. Canon of Judicial Ethics; *see also* Guide to Judiciary Policy, Vol. 2B, Ch. 2, § 220, Ethics Advisory Opinion No. 58 (Disqualification When Relative Is Employed by a Participating Law Firm). The State Board, however, refused to disqualify Ms. Millen and, instead, allowed her to be the deciding vote on many of two of the three categories of protests. App. 117-18.

Meanwhile, on 6 December 2024, the North Carolina Democratic Party (NCDP) preemptively filed a lawsuit inviting the federal courts to decide Judge Griffin's protests. The NCDP, acting as a surrogate for its nominee Justice Riggs, and purporting to act on

behalf of all voters in the state, filed a federal lawsuit against the individual members of the State Board of Elections. App. 131-56. The NCDP has brought four claims for relief. The complaint alleges (1) a violation of the National Voter Registration Act by removing voters from the voter rolls after an election; (2) a violation of procedural due process under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution because of risk of discounting illegally cast ballots; (3) a further violation of § 1983 and the fundamental right to vote; and (4) a violation of the Help America Vote Act by discounting unlawful ballots.

Because the NCDP chose not to name Judge Griffin as a party, he has moved to intervene in the NCDP's federal action. Otherwise, nothing has happened in the case. A copy of the current federal docket is included in the appendix. App. 157-61.

Back at the State Board, the parties filed briefs, and the State Board heard arguments on the protests on 11 December 2024. On 13 December 2024, the Board emailed the parties a copy of its final decision on these categories of protests. App. 38-77.

This decision consolidated the Board's treatment of a number of the protests. The decision is a final decision as to hundreds of protests. Although voluminous, the protests dismissed by the State Board's order are included in the appendix to this petition for completeness. App. 352-3902.

## MOTION FOR TEMPORARY STAY

Pursuant to Appellate Rule 23(e), Judge Griffin respectfully applies to the Court for a temporary stay. A petition for a writ of prohibition, like with supersedeas, is generally

paired with a temporary stay of inferior court proceedings. *State v. Whitaker*, 114 N.C. 818, 822, 19 S.E. 376, 377 (1894) ("When entertained, the usual course, unless prior notice of the petition has been given, is to issue a notice to the lower court to show cause why the writ should not issue, and to order a stay of proceedings in the meantime."); *State v. McElrath*, 351 S.E.2d 557 (N.C. 1986) (issuing temporary stay of proceedings pending this Court's consideration of the petition); *State v. Hunt*, 357 N.C. 454, 456, 591 S.E.2d 502, 503 (2003) (staying further proceedings).

A temporary stay is necessary here to perform two functions: (1) stay the issuance of a certificate of election by the State Board, and (2) stay the deadline for Judge Griffin to file a petition for judicial review in the superior court. Both stays are necessary for this Court to be able to exercise jurisdiction over the petition itself.

As to the first point, once the certificate of election issues, election protests, like those here, become moot. *In re Protest of Whittacre*, 228 N.C. App. 58, 59, 743 S.E.2d 68, 69 (2013) (dismissing appeal as moot because "[t]he declaration of election as contained in the certificate conclusively settles *prima facie* the right of the person so ascertained and declared to be elected to be inducted into, and exercise the duties of the office"(quoting *Cohoon v. Swain*, 216 N.C. 317, 319, 5 S.E.2d 1, 3 (1939))); *In re Election Protest of Fletcher*, 175 N.C. App. 755, 759, 625 S.E.2d 564, 567 (2006) (same). A temporary stay, therefore, preserves this Court's jurisdiction to decide the petition.

On the second point, absent a stay, Judge Griffin will have to file a petition in superior court within 10 days of service of the Board's final decision. N.C. Gen. Stat. § 163-

182.14(b). But the State Board and Justice Riggs have given every indication that, upon the filing of a petition for judicial review, they will try to strip state courts of jurisdiction to decide this case by improperly removing it to federal court. Judge Griffin's election protests raise only questions of state law. However, the State Board, following the argument of Justice Riggs, has injected various federal statutes into this case, even though those federal statutes, by their own terms, do not apply. The federal statutes on which they have relied in this action, as well as in Justice Riggs's duplicative federal action, are the Help America Vote Act (HAVA) and the National Voter Registration Act (NVRA).

As explained in more detail below, *infra* Argument §§ I.D, the State Board and Justice Riggs have repeatedly relied on HAVA and the NVRA to excuse the State Board's lawlessness. Yet each of these statutes state that they only apply to "an election for Federal office." 52 U.S.C. § 21081(a) (HAVA); *id.* § 21083(A)(1)(a)(viii) (HAVA); *James*, 359 N.C. at 268, 607 S.E.2d at 643 ("HAVA, ***which does not apply to state and local elections***, was initiated in the wake of allegations of irregularity and fraud in the 2000 presidential election." (emphasis added)); 52 U.S.C. § 20507(c)(2)(A) (NVRA); *id.* § 20501(b)(1)-(2) (NVRA).

Even setting aside the plain language, it's impossible for these federal laws to apply to this case. Congress enacted HAVA and the NVRA under the federal constitution's elections clause. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 15 (2013) (NVRA); H.R. Rep. No. 107-329, pt. 1, at 57 (2001), 2001 WL 1579545 (explaining the constitutional authority for HAVA); *Colon-Marrero v. Velez*, 813 F.3d 1, 19 (1st Cir. 2016) (same). But

under the elections clause, Congress can only create rules for elections to federal office, not state office. *See* U.S. Const. Art. I, § 4, cl. 1; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (elections clause makes clear that states have "control over the election process for state offices").

Once Judge Griffin files his petition for judicial review in superior court from the State Board's dismissal of his election protests, the Board and Justice Riggs will remove the case to federal court. An eventual remand back to state court from federal court is inevitable because these federal statutes cannot apply to an election for state office. Nonetheless, it will take considerable time before a remand motion is briefed and ruled on, and then the Board and Justice Riggs are certain to delay the matter further by taking an appeal. *See* 28 U.S.C. § 1447(d) (permitting appeal of remand orders for cases removed under 28 U.S.C. § 1443(2)). It could be 2026 before those proceedings end and the case returns to state court. Although Justice Riggs would holdover in her office until her successor is determined, this Court has expressed grave concern about letting an improperly elected official exercise the duties of her office in cases of great public significance. *See N.C. State Conf. of NAACP v. Moore*, 382 N.C. 129, 165, 876 S.E.2d 513, 539 (2022).

By issuing a temporary stay of Judge Griffin's deadline to file his petition for judicial review, this can all be avoided. The Court that has the final say on questions of state law will be able to exercise its lawful jurisdiction without an illegitimate detour through federal court. Conversely, without a temporary stay that tolls the deadline for filing a petition for judicial review, Judge Griffin will have to file his petition by 23 December 2024 to have a

right to seek judicial review in state court of the dismissal of his election protests. N.C. Gen. Stat. § 163-182.14 (petition must be filed within 10 days' of service of Board's final decision). And then the Board and Justice Riggs will remove that petition to federal court. In fact, just a few months ago, the State Board used this same removal tactic to place a state lawsuit concerning the Board's incomplete-voter registrations in the hands of the federal courts. *See infra* Argument § I.D.3.

This Court can and has exercised its powers to change deadlines of this sort. For instance, in *Harper v. Hall* this Court changed the date of the state's primary elections from March to May as well as the candidate-filing deadline, and then stated that it had the power to make "other administrative adjustments" as well. 379 N.C. 656, 658, 865 S.E.2d 301, 302 (2021). The Court justified the exercise of these extraordinary powers by pointing to "the great public interest in the subject matter of these cases, the importance of the issues to the constitutional jurisprudence of this State, and the need for urgency in reaching a final resolution on the merits at the earliest possible opportunity." *Id.* Here, the need for this Court's intervention is at least as pressing.

For these reasons, Judge Griffin respectfully requests a temporary stay that (1) stays the issuance of a certificate of election by the State Board, and (2) stays the deadline for Judge Griffin to file a petition for judicial review in the superior court. Judge Griffin respectfully requests that this Court grant the temporary stay without awaiting a response, given the time-sensitive nature of the request. *See* N.C. R. App. P. 23(e).

## THE COURT'S POWER TO ISSUE THE WRIT OF PROHIBITION

This Court has the power to issue a writ of prohibition to stop the State Board from counting unlawful ballots. A writ of prohibition issues from this Court to an inferior tribunal to halt threatened, unlawful action, especially in matters of great public significance.

## I. The Constitution Empowers the Court to Issue Writs to Inferior Tribunals.

This Court "may issue any remedial writs necessary to give it general supervision and control over the proceedings of the other courts." N.C. Const. art. IV, § 12(1). Those "other courts" include all kinds of judicial and quasi-judicial bodies. For example, this Court has explained that it may issue a writ of prohibition to "inferior courts" and quasi-judicial officers below the superior court, such as "probate court," "justices of the peace," and the clerk of superior court. *Whitaker*, 114 N.C. at 820-22, 19 S.E. at 376-77; *Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*, 183 N.C. 43, 45, 110 S.E. 524, 525 (1922).

The writ also extends to administrative agencies. As this Court has explained, the Court's constitutional power and duty to control and supervise the exercise of judicial power in the state extends to issuing writs that "will aid State agencies in the performance of their duties." *Moses v. State Highway Comm'n*, 261 N.C. 316, 317, 134 S.E.2d 664, 665 (1964). The prerogative writs have historically been "used to regulate administrative agencies performing judicial functions." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*,

376 N.C. 558, 568 n.11, 853 S.E.2d 698, 708 n.11 (2021) (citing Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 Yale L.J. 816, 821-22 (1969)).[2]

This Court's power to issue such writs to quasi-judicial agencies is not an anomaly. Federal courts likewise have the power to issue writs to administrative agencies. The leading treatise on federal procedure, Wright and Miller, explains that the writ is a "tradition-bound technique for seeking judicial review of agency action. Courts may use this writ to enjoin a judicial or quasi-judicial action." 33 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8306 & n.14 (2d ed. Westlaw June 2024 update).

The writ of prohibition is unique. It is not a civil action, pitting parties against each other. Instead, "[i]t is, in effect, a proceeding between two courts—a superior and an inferior—and is the means whereby the superior exercises its due superintendence over the inferior, and keeps it within the limits and bounds of the jurisdiction prescribed to it by law." *Mayo v. James*, 53 Va. (12 Gratt.) 17, 23 (1855). For that reason, as this Court has explained, "[t]he main feature of the traditional form [of the writ] is the opportunity it provides for the affected judicial officer to participate directly. This feature may be important when the conduct drawn in question is alleged to contain elements of abuse of power, or to reflect a recurring pattern in similar cases." N.C. R. App. P. 22, Drafting Committee Note (1975), *reprinted at* 287 N.C. 671, 732.

---

2    This influential law review article explained that the writs of certiorari and prohibition were both used to control administrative agencies at common law. Berger, *supra*, at 821-22.

The writ falls within this Court's constitutional duty to supervise and control the exercise of judicial power by inferior tribunals. N.C. Const. art. IV, § 12(1). Because this Court's general supervisory powers spring from the state constitution, they can't be limited by statute. *State v. Ellis*, 361 N.C. 200, 639 S.E.2d 425 (2007).[3] This Court will use its constitutional supervisory powers in cases like this one. For instance, this Court will use its "general supervisory authority when necessary to promote the expeditious administration of justice, and may do so to consider questions which are not properly presented according to its rules." *Id.* at 205, 639 S.E.2d at 428. The Court will even exercise its supervisory power in the middle of a proceeding when "the parties desire an answer to a question which is fundamental in determining their rights, is also of public importance, and when decided will aid State agencies in the performance of their duties." *Moses*, 261 N.C. at 317, 134 S.E.2d at 665. Such immediate intervention is warranted so that a case of great public significance "may be tried on the correct theory below and unnecessary delay in the administration of justice be thereby prevented." *Greene v. Charlotte Chem. Lab'ys, Inc.*, 254 N.C. 680, 694, 120 S.E.2d 82, 91 (1961).

Although Judge Griffin believes the applicable law here is clear, the writ of prohibition will issue "to promptly resolve a novel issue of great import," even if the law was unclear when passed upon below. *Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*,

---

**3**    Which makes sense: "The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government." N.C. Const. art. IV, § 1.

363 N.C. 500, 506-07, 681 S.E.2d 278, 283 (2009). Indeed, the appellate courts "will not hesitate to exercise" this supervisory power when, as here, there is a need for "the expeditious administration of justice." *Park Terrace, Inc. v. Phoenix Indem. Co.*, 243 N.C. 595, 597, 91 S.E.2d 584, 586 (1956); *see also, e.g.*, *Ellis*, 361 N.C. at 205, 639 S.E.2d at 428; *State v. Stanley*, 288 N.C. 19, 26, 215 S.E.2d 589, 594 (1975).

## II.    The Standard for a Writ of Prohibition.

This Court has explained that a writ of prohibition is an appropriate remedy in any of three instances: "[1] to restrain other Courts either from proceeding in a matter not within their jurisdiction, or [2] from acting in a matter, whereof they have jurisdiction, by rules at variance with those which the law of the land prescribes, or [3] from proceeding therein after a manner which will defeat a legal right." *State v. Allen*, 24 N.C. (2 Ired.) 183, 188-89 (1841); *see also White v. Willett*, 456 S.W.3d 810, 812 (Ky. 2015) ("An appellate court has discretion to grant a writ where a trial court is proceeding within its jurisdiction upon a showing that the court is (1) acting or is about to act erroneously, (2) there exists no adequate remedy by appeal or otherwise, and (3) great injustice and irreparable injury will result if the petition is not granted.").

The State Board has acted under rules that violate the law of North Carolina, and in a way that will defeat the right of Judge Griffin and the public to an accurate counting of ballots. Under the state constitution and the General Assembly's enactments, the State Board was not permitted to count the votes of unlawful registrants, Never Residents, or voters who did not present photo identification. Yet the State Board has said that is exactly

what it plans to do. The Board has determined that it can ignore registration information mandated by the legislature. The Board is also giving state statutes an interpretation that plainly conflicts with the state constitution. And the Board says that it will follow its own administrative rules, despite their conflict with statutes.

When a state agency acts lawlessly on a matter of such great public importance, and when there is such need for judicial expediency, the only adequate remedy is in this Court, which holds the fullness of the judicial power. N.C. Const. art. IV. §§ 1, 12(1); *see also* N.C. R. App. P. 2 (this Court has the power to suspend the rules to "prevent manifest injustice to a party, or to expedite decision in the public interest").

## ISSUES PRESENTED

Whether the Court should issue a writ of prohibition, ordering the State Board of Elections not to count ballots from people who failed to complete their registrations, from Never Residents, and from overseas absentee voters who did not provide photo identification.

## REASONS WHY THE WRIT SHOULD ISSUE

The writ of prohibition should issue because the State Board intends to count unlawful ballots, and thereby change the outcome of the election.

The merits of each of the three categories of election protests are addressed below, as well as the grave errors committed by the State Board. All the issues presented in this petition are questions of law that are reviewed de novo. *See, e.g.*, *Appeal of Ramseur*, 120

N.C. App. 521, 523-24, 463 S.E.2d 254, 256 (1995). As the State Board agreed, these protests present "legal questions of statewide significance." App. 41.

After addressing the merits, the brief addresses the State Board's attempt to dismiss the protests, on alternative grounds, for procedural defaults. But it is easy to see that the Board had no justification for trying to disqualify Judge Griffin from challenging the election results. Judge Griffin's protests complied with all of the relevant procedural requirements.

Next, Justice Riggs raised a hodgepodge of federal laws that, she has argued, requires the State Board to count illegal ballots and declare her the winner of this race. But federal law has nothing to say about the issues in Judge Griffin's protests.

Finally, Judge Griffin addresses the objections of the State Board and Justice Riggs that, because the ballots of ineligible voters have already been counted, it's too late to do anything about it. While voting is a constitutional right, the U.S. Supreme Court has long explained that the right must be balanced with the State's duty to protect the integrity of elections.

Judge Griffin respectfully requests that the Court rule on each of the issues addressed in this brief. The candidates and the public have a vital interest in this election receiving finality as expeditiously as possible. *See, e.g.*, *Perloff v. Edington*, 293 Ala. 277, 281, 302 So. 2d 92, 96 (1974) ("The public has an interest in the speedy determination of election contests . . . ."); *Kinsey v. Garver*, 91 N.E.2d 54, 56 (Ohio Com. Pl. 1950) ("an interest in the public exists in the speedy determination of election results"); *Mansfield v.*

*McShurley*, 911 N.E.2d 581, 585 (Ind. Ct. App. 2009) ("The public has an interest in the speedy determination of controversies affecting elections . . . ."). By ruling on each of these issues, including issues of federal law, this Court can ensure finality across all litigation, for cases pending both in state and federal tribunals.

## I. It's Unlawful to Count the Votes of People Who Did Not Lawfully Register to Vote.

Before someone can vote for in a state race in North Carolina, he must be lawfully registered to vote. To lawfully register, a person must, by statute, provide his drivers license or social security numbers in his voter registration application. This information is used to verify the voter's residence and identity via government databases. But our election boards have been registering people to vote who never provided this statutorily required information for decades. The ballots cast by these improper registrants lack statutory authorization because no one can vote if he is improperly registered.

### A. State law prohibits anyone from voting unless he has provided a drivers license or social security number when registering to vote.

Under state law, a person must provide his drivers license or social security number at the time of registration before he can lawfully cast a ballot.

Before voting in an election, a person must lawfully register to vote. Under article VI of the state constitution, "[e]very person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law." N.C. Const. art. VI, § 3(1). That's also true by statute: "No person shall be permitted to vote who has not been registered under" the state's registration statutes. *See* N.C. Gen. Stat. § 163-

82.1(a) (making registration a "prerequisite to voting"); *see also id.* § 163-54 ("Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter.").

The protests here involve people who were not legally registered to vote in a manner provided by law, section 163-82.4, because they failed to provide statutorily required application information. Since January 2004, state law has required voter registrants to provide their drivers license or social security number in their voter application. N.C. Sess. Law 2003-226, § 9 (amending N.C. Gen. Stat. § 163-82.4), § 22 (amendment effective 1 January 2004). This information is used with a statewide computer registration system to verify the voter's identity and important details about the voter. *See, e.g.*, N.C. Gen. Stat. § 163-82.11.

The State Board of Elections is required to create an application form for voter registration. *Id.* § 163-82.3(a). From 2004 onward, the General Assembly commanded that the form require an applicant to provide his "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." *Id.* § 163-82.4(a)(11). However, a board can accept an application without a drivers license or social security number only if the applicant "has *not been issued* either a current and valid drivers license or a social security number." *Id.* § 163-82.4(b) (emphasis added).

There's a statutory cure process for somebody who omits their drivers license and social security numbers, but the omissions raised in these protests have never been cured by this process. If a person has a drivers license or social security number, but fails to provide those numbers on their voter application, then the election board shall not allow the

person to vote unless the voter cures the deficient application before the county canvass deadline. *Id.* § 163-82.4(f). The statutory cure procedure applies to a voter who "fails to complete any required item on the voter registration form." *Id.* The board shall notify the voter of the omission and request completion of a corrected application before the county canvass. *Id.* Only if the required information is delivered by that time will the voter's ballot be counted. *Id.* ("If the correct information is provided to the county board of elections by at least 5:00 P.M. on the day before the county canvass, the board shall count any portion of the provisional official ballot that the voter is eligible to vote."). No state law, however, permits a board of elections to count a ballot for a person who never provided a drivers license or social security number on his voter registration form.

Mandating such information from voter registrants is not unique to North Carolina. For elections to federal offices, Congress, through HAVA, also requires the states to collect the drivers license or social security number from registrants. 52 U.S.C. § 21083(a)(5)(A)(i). If a person with a drivers license or social security card fails to provide those identifiers on a voter application form, then the application "may not be accepted or processed by a State." *Id.*

Although HAVA and federal law don't apply to elections for state offices—such as the election at issue here—this federal prerequisite to voting in federal elections corroborates the importance of collecting such information from would-be voters. In other words, the information required by the General Assembly is not some new law designed to burden voters but a decades-old feature of election law that protects the integrity of our elections.

**B.** **The State Board admits that it broke the law.**

No one thinks that the State Board actually complied with the law. Instead, it's clear that the Board broke the law for twenty years.

Despite the clarity in the law since enactment in 2003, the State Board did not require voters to provide a drivers license or social security number when people registered to vote. Before December 2023, the voter application form appeared like this:



As this image reveals, the application did not tell registrants that these identifiers were required because it was not in red text. Yet this information is required. N.C. Gen. Stat. § 163-82.4(a)(11).

The Board admitted that it allowed voters to register in violation of the law when it entered an order on an administrative complaint from 2023 that raised the issue. In that order, the Board concluded that similar provisions of HAVA could be violated "as a result of the current North Carolina voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number." Order at 4, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6,

2023) [App. 165]. The Board ordered its staff to revise the form going forward.[4] *Id.* But the Board refused to remedy its past legal violations.

Now, however, the issue has caused irregularities in the protested election, and those irregularities are outcome dispositive.

## C.    The unlawful registrations haven't been "cured."

The State Board said nothing in its final decision to suggest it followed the law. Instead, the State Board sought to excuse its lawlessness by reimagining the election laws. The Board reasoned that any error by a voter was harmless because the people who did not properly register cured their defects by providing additional documents as allowed by state law. *See* App. 55-56. The Board's logic is rejected by the relevant statutes' plain language.

First, there is no state law permitting a "cure" by providing additional documents. The only state law to which the State Board could possibly cite would be subsections (a) and (b) of N.C. Gen. Stat. § 163-166.12.[5] Both of these provisions plainly require a person "who *has registered* to vote by mail" to provide additional documentation when they actually vote. N.C. Gen. Stat. § 163-166.12(a), (b) (emphasis added); *see Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1169 (11th Cir. 2008) (holding that HAVA's identical

---

[4]    In light of this order, the Board's counsel has advised county boards that they cannot register new voter applicants who fail to provide a drivers license or social security number and who also fail to "state in writing that they lack these numbers." Email of Paul Cox, N.C. State Bd. of Elections, to Directors of County Bds. of Election (Sept. 4, 2024) [App. 167-68].

[5]    Strangely, the State Board cited the provisions of HAVA—which govern federal elections, *e.g.*, 52 U.S.C. § 21081(a)—rather than the similar provisions found in North Carolina law—which govern this state election. *See* App. 55.

requirements "impos[e] additional restrictions on those individuals who registered by mail before they can vote either a regular or a provisional ballot"). Again, to be registered, a person must first provide a drivers license or social security number. *See* N.C. Gen. Stat. § 163-82.4(a)(11). A statute that places an additional obligation on a voter who is registered (by mail) cannot be a "cure" for somebody who failed to register properly.

Moreover, subsections (a) and (b) cannot be a cure for somebody who failed to provide a drivers license or social security number because the additional documentation required by these subsections is not a substitute for providing a drivers license or social security number. At the time of registration, the State Board is supposed to verify the identity of the registrant by matching the registrant's drivers license or social security number to other government databases. *See id.* § 163-82.12(6), (8), (9). And if the drivers license or social security numbers don't result in a match, the Board must take additional steps to verify the applicant's identity. *Id.* § 163-166.12(d). [6] In contrast, subsections (a) and (b) let a registered voter provide ***any*** of the following documents: current and valid photo identification, a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's address. *Id.* § 163-166.12(a)-(b). The mere presentation of those documents is not the equivalent of an identity match with government databases. They are apples and oranges. The people who cast the ballots at issue here never

---

**6**     Subsection (d) can't carry the weight Justice Riggs wishes to put on it. It only applies to people who actually provided these digits when they registered to vote, and Judge Griffin is not challenging such voters—he's only challenging voters who never provided either number.

went through that verification procedure, and the fact that they might have provided additional documents when they voted does nothing to remedy the registration defect.

This is also why Justice Riggs was wrong to argue to the State Board that the unlawful registrants cured their registration defects when they presented a photo identification in 2024. *See generally id.* § 163-166.16. This theory fails for at least two reasons. First, although voter identification laws were in place in 2024, the laws allowed a plethora of alternative forms of photo identification (e.g., student, teacher, and tribal identification cards) and even permitted voters to provide *no identification at all* in certain circumstances. *See id.* § 163-166.16(a), (d). Second, photo identification guards against voter impersonation (i.e., an imposter claiming to be a person who is a registered voter); it does not guard against somebody registering by manufacturing a fake identity. Absent a drivers license or social security number, the State Board simply cannot verify the identity of somebody registering to vote. Photo identification requirements are not a substitute for providing a drivers license or social security number.[7]

Nor did the General Assembly provide that these provisions can cure an improper voter registration. The General Assembly has decided that there is precisely one way to cure an improper registration. *Id.* § 163-82.4(f). The individuals challenged by Judge

---

[7]  Indeed, even if a voter provided a drivers license when voting, *see id.* § 163-166.16(a)(1)(a), the poll worker simply looked at the picture and handed the voter a ballot. The poll worker certainly did not write down the drivers license number, turn the number over to the State Board, and wait for the State Board to perform a match against government databases.

Griffin did not use this statutory cure process. The State Board doesn't have the authority to reinvent state law to create its own "cure" procedures. It has a duty to follow state law, not make law.

### D. Judge Griffin's protests do not implicate federal election laws.

The State Board plainly rejected Judge Griffin's interpretation of state laws and, therefore, dismissed his protests on that basis alone. However, as an alternative ground for the Board's outcome, the Board attempted to inject federal law—the Help America Vote Act (HAVA) and the National Voter Registration Act (NVRA)—into a state-law election issue. App. 54-57. But HAVA and the NVRA have nothing to do with this case.

#### 1. HAVA has no bearing on state elections.

Judge Griffin has protested ballots cast in a *state election* by people who sought to register in violation of *state law*, as the above discussion showed. The State Board, however, attempts to rely on HAVA as justification for flouting state law. Invoking HAVA makes no sense here because HAVA does not apply to elections for state offices, as this Court has held. *James*, 359 N.C. at 268, 607 S.E.2d at 643 ("HAVA, ***which does not apply to state and local elections***, was initiated in the wake of allegations of irregularity and fraud in the 2000 presidential election." (emphasis added)). The plain language of HAVA leaves no doubt. The registration systems mandated by HAVA apply only to "an election for Federal office." 52 U.S.C. § 21081(a); *id.* § 21083(A)(1)(a)(viii). Thus, no one can claim a HAVA violation related to an election for state office. *James*, 359 N.C. at 268, 607 S.E.2d at 643. As in *James*, the issue is controlled by "state law." *Id.*

### 2. The NVRA has no bearing on votes counted in state elections.

The State Board also reasons that, as an alternative basis for its ruling, the NVRA prohibits Judge Griffin's election protests. *See* App. 62-64. But the NVRA has nothing to do with this case because this federal law doesn't apply to elections for state offices, nor does it apply to election protests.

The NVRA, by its own terms, applies only to elections for federal offices and not elections to state offices. The stated purpose of the law is just to affect participation in "elections for Federal office." 52 U.S.C. § 20501(b)(1)-(2). Indeed, Congress enacted the NVRA under the federal constitution's elections clause, and that clause, by its own terms, only lets Congress regulate the "Times, Places, and Manner" of selecting Senators and Representatives to Congress. U.S. Const. art. I, § 4, cl. 1.[8]

That's equally true of the particular provision cited by the Board. In its order, the State Board explains that the NVRA "restricts the removal of voters from 'the official list of eligible voters' in an election." App. 62 (quoting 52 U.S.C. § 20507(a)(3)). The State Board knowingly omitted that these restrictions apply "to voter registration for elections

---

[8] If the NVRA purported to regulate elections for state offices—which it doesn't—then it would exceed Congress's authority under the federal constitution's election clause. Many courts have therefore acknowledged the only reasonable conclusion from the text of the NVRA: it cannot apply when the argument is about an election to a state office. *See, e.g.*, *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000); *Broyles v. Texas*, 618 F. Supp. 2d 661, 691 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010); *Pree v. D.C. Bd. of Elections & Ethics*, 645 A.2d 603, 605 (D.C. 1994). Thus, no one can complain about NVRA issues in a state election.

**for Federal office**." 52 U.S.C. § 20507(a) (emphasis added). Judge Griffin did not stand for election to a federal office.

Relying on the NVRA presents another threshold problem: the statute applies only to state efforts to remove voters from the voter rolls. 52 U.S.C. § 20507(a)(3), (c). But Judge Griffin has not requested in his protests for anyone to be removed from the voter rolls. Indeed, his election protest challenges only the outcome of *his* election—it doesn't even affect an ineligible voter's vote in *another* race in 2024 elections, much less cause that voter to be removed from the voter rolls.

As explained below, the function of an election protest is to challenge the results of an election, not to remove anyone from the voter rolls. *See infra* Argument § IV.A. By law, a successful election protest does not result in anyone being removed from the voter rolls. Instead, it results in inaccurate results being corrected, or vote being recounted. N.C. Gen. Stat. § 163-182.10(d)(2)(e)(1)-(2). As *Bouvier* explained, "[w]here the irregularity affects the accuracy of the election results, the county board of elections may order the ineligible ballots excluded from the vote total, and in some instances, may order a full recount." 386 N.C. at 4, 900 S.E.2d at 843.

> **3.** **The issues raised in Judge Griffin's protests have not been decided by the federal courts' rulings in the ongoing *RNC* case.**

To buttress its attempt to inject HAVA and the NVRA into a state-election dispute, the State Board sought to manufacture connections between Judge Griffin's protests and *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-547

(E.D.N.C.) (the "*RNC* case"), which is a case pending in U.S. District Court for the Eastern District of North Carolina. *See* App. 57. The State Board reasoned that the federal courts in the *RNC* case have already resolved Judge Griffin's claims here. The Board is wrong.

Before the 2024 general election, the RNC filed a two-count complaint against the State Board in state court. Count one sought a writ of mandamus directing the State Board to comply with HAVA and its analogous state-law provision. Count two alleged that the State Board violated the equal protection clause of the North Carolina Constitution through violations of HAVA. The gravamen of RNC's request for relief was to remove certain ineligible voters from the voter rolls ahead of the election.

After the State Board and NCDP removed the case to federal court, the federal district court dismissed the first count on the grounds that the relevant statutes didn't provide for a private right of action. The district court then declined to exercise supplemental jurisdiction over the second count (the state constitutional claim) and remanded it to state court. The Fourth Circuit, though, reversed the district court's remand order, holding that the state constitutional claim contained an embedded federal question related to HAVA and the NVRA, over which the district court had jurisdiction. The case is still pending.

Critically, the *RNC* case, according to the Fourth Circuit, was about the interplay between federal and state law as they apply to the state's maintenance of voter rolls. The *RNC* case did not involve a request to correct a vote count in a state race based on a

violation of state law—which is what Judge Griffin does in this case. The rulings in the *RNC* case did not consider, much less adjudicate, any of the questions presented here.

## II. The Boards of Election Cannot Count the Votes of People Who Have Never Lived Here.

Although United States citizenship may be a birthright, the right to vote in North Carolina elections for state offices is not. Instead, it is a right granted only to those who reside here. Our state constitution restricts voting rights to people who reside in North Carolina "to preserve the basic conception of a political community." *Lloyd v. Babb*, 296 N.C. 416, 449, 251 S.E.2d 843, 864 (1979). That is why, just months ago, this Court confirmed that "nonresidents" are "categorically ineligible to vote" for state offices. *Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2.

Yet people voted in the 2024 general election who, by their own admission, were born overseas and have never resided in North Carolina or anywhere else in the United States. These overseas voters are United States citizens, but they aren't residents of North Carolina who can vote for state contests. It's unlawful to count the votes of these Never Residents.

### A. The state constitution forbids counting the votes of Never Residents.

The North Carolina Constitution defines the political community for purposes of voting in our elections. No one can vote in a state election unless they meet the "qualifications" in article VI of the constitution. N.C. Const. art. VI, § 1. The constitution then sets out the first of the qualifications in the voter residency clause. Under that clause, to vote in

an election for a state office, a person must have "resided in the State of North Carolina for one year . . . next preceding an election." *Id.* § 2(1). This requirement is nothing new. In our original constitution, a person could vote for a legislator only in the county in which he "reside[d]." *See* N.C. Const. of 1776, art. VIII.

Despite the constitution's plain language, the election boards permitted people to vote in the general election who have never resided in North Carolina or anywhere else in the United States. The State Board, in response to a public records request, identified overseas voters who voted in the 2024 general election but who self-identified as having never lived in the United States. App. 1736-37 ¶¶ 10-13. The Board identified a list of voters who, the Board explained, checked a box on a federal post card application that stated, "I am a U.S. citizen living outside the country, and I have never lived in the United States." App. 1736-37, 1741 (sample FPCA).

Someone who has never lived in the United States has never resided in North Carolina. These people, therefore, were not qualified to vote in our state elections under the voter residency clause. Yet the State Board chose to count their votes anyway. That was unlawful.

### B. The residency clause is not preempted by the federal constitution.

Proponents of Never Resident voting have argued that our state constitution violates the federal constitution. But this broadside attack on the state constitution cannot prevail.

In *Dunn v. Blumstein*, the U.S. Supreme Court considered whether a one-year durational residency requirement, as a prerequisite to registering to vote, violated the equal

protection clause of the Fourteenth Amendment. 405 U.S. 330, 334 (1972). The Court held that a one-year residency requirement was too long to comply with the equal protection clause. *Id.* at 334. In so holding, the Court made clear that it was not ruling on whether Tennessee could "restrict the vote to bona fide Tennessee residents." *Id.* Indeed, the Court emphasized that its prior precedent had already established the constitutionality of "bona fide residence requirements." *See id.* at 343-44.

This Court has since considered the impact of *Dunn* on the residency requirement of our own state constitution and explained that *Dunn* drew a "careful distinction . . . between durational residence requirements and bona fide residence requirements." *Lloyd*, 296 N.C. at 439, 251 S.E.2d at 858. Therefore, "[a]ppropriately defined and [u]niformly applied bona fide residence requirements are permissible" under the federal constitution. *Id.* at 440, 251 S.E.2d at 859. And just a few months ago, this Court confirmed that "nonresidents" are "categorically ineligible to vote" under the residency clause of the state constitution. *Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2 (citing N.C. Const. art. VI, §§ 1-2).

As these cases show, *Dunn* does not invalidate the state constitution's bona fide residency requirement. The voters at issue with this protest have told the election boards that they have *never* resided in North Carolina or anywhere else in the United States. They've never been bona fide state residents. Therefore, counting the votes of Never Residents violates the North Carolina Constitution.

**C.  If UMOVA permits these votes to be counted, it is unconstitutional as applied to these circumstances.**

The State Board turned to a state statute, UMOVA, to justify Never Resident voting. Of course, if the statute permits voting by those ineligible to vote under the constitution, it violates the constitution. UMOVA, therefore, should not be read to conflict with the state constitution.

In 2011, the General Assembly enacted the Uniform Military and Overseas Voters Act (UMOVA). N.C. Sess. Law 2011-182 (enacting N.C. Gen. Stat. §§ 163-258.1 to -258.20). As the name suggests, this bill was originally drafted by the Uniform Law Commission, which recommended its adoption among the states.

UMOVA lets a "covered voter" register to vote in various ways for elections for federal and state offices. *See* N.C. Gen. Stat. § 163-258.3 (defining elections covered by UMOVA); *id.* § 163-258.6 (setting out methods of registration). At issue is who counts as a "covered voter." The relevant definition is provided here in full:

> (1) "Covered voter" means any of the following:
>
> a. A uniformed-service voter or an overseas voter who is registered to vote in this State.
>
> b. A uniformed-service voter defined in subdivision (7) of this section whose voting residence is in this State and who otherwise satisfies this State's voter eligibility requirements.
>
> c. An overseas voter who, before leaving the United States, was last eligible to vote in this State and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements.

d. An overseas voter who, before leaving the United States, would have been last eligible to vote in this State had the voter then been of voting age and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements.

e. An overseas voter who was born outside the United States, is not described in sub-subdivision c. or d. of this subdivision, and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements, if:

1. The last place where a parent or legal guardian of the voter was, or under this Article would have been, eligible to vote before leaving the United States is within this State; and

2. The voter has not previously registered to vote in any other state.

*Id.* § 163-258.2(1).

Judge Griffin is challenging ballots cast by overseas voters who identified themselves as United States citizens who have never resided in the United States. Such voters could only plausibly count as UMOVA "covered voters" under subsection (1)(e).

UMOVA doesn't define the phrase "State residency requirement" that such a voter needs to comply with. The term is not defined anywhere in the Act. As it stands, the phrase is ambiguous as to whether it means a durational residency requirement or a bona fide residency requirement. If the ambiguous phrase were interpreted to mean just a durational residency requirement, it's possible that UMOVA would, at least in some circumstances, be constitutional under the residency clause, as that clause is limited by *Dunn*. But if, on the other hand, the ambiguous clause were interpreted to let someone vote who has *never* been a resident, it would be unenforceable under the bona fide residency requirement of the state constitution.

The canon of constitutional avoidance requires the Court to interpret N.C. Gen. Stat. § 163-258.2(1)(e) as exempting overseas voters only from a durational residency requirement, and not a bona fide residency requirement. Only such an interpretation could save the statute from being invalidated. "[W]here one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted." *N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160, 814 S.E.2d 54, 62 (2018) (quoting *In re Arthur*, 291 N.C. 640, 642, 231 S.E.2d 614, 616 (1977)).

Before the State Board, Judge Griffin asked the Board to apply the canon of constitutional avoidance to this subsection of UMOVA. But the State Board just misconstrued that as a request to find the provision unconstitutional. App. 66. The State Board held that it was incompetent to hold a state statute unconstitutional. App. 68-69. The Board then decided to opine on the constitutional question anyway, stating in one sentence that, if this subsubsection of UMOVA violated the state constitution, then the federal constitution's doctrine of substantive due process would reinstate the state law. App. 69. The theory appears to be that applying our state constitution to this election would be applying a "newly announced rule of law." App. 62. The Board, however, has confused the chronology. The residency requirement in the state constitution has existed and persisted since the Revolutionary War. UMOVA was enacted 235 years later. Not exactly a new rule of law.

Even setting aside the statute of constitutional avoidance, if the Court does not believe section 163-258.2(1)(e) is reasonably susceptible to Judge Griffin's proposed interpretation, then the Court should refuse to enforce the statute as it applies to Never Residents.

When "there is a conflict between a statute and the Constitution, this Court must determine the rights and liabilities or duties of the litigants before it in accordance with the Constitution, because the Constitution is the superior rule of law in that situation." *In re Chastain*, No. 283A22-2, 2024 WL 5100940, at *6 (N.C. Dec. 13, 2024) (Riggs, J.) [App. 128]. And the constitution is clear: only bona fide residents can vote for state offices.[9]

### D. This argument has no impact on votes cast for federal elections, military voters, or North Carolina residents living overseas.

To be clear, Judge Griffin is not challenging the votes of military voters, nor is he challenging any vote cast for federal contests.

Judge Griffin was not a candidate for federal office. And federal statutory law, which imposes duties on states for uniformed services voters and other overseas voters, applies only to "elections for Federal office." *See* 52 U.S.C. § 20302(a). Besides, it's highly unlikely the Never Residents includes servicemembers, because these are people who were born abroad and have never lived anywhere in the United States.[10]

---

9  This argument is not required to be decided by a three-judge panel in superior court. First, UMOVA can and should be interpreted not to permit Never Resident voting. Second, this is not a facial challenge to UMOVA but is at most an as-applied challenge. Even accepting the Board's interpretation of UMOVA, Judge Griffin is challenging only a small subset of UMOVA-covered voters, and he's not seeking relief "far beyond the particular circumstances" of this election protest. *Singleton v. N.C. Dep't of Health & Hum. Servs.*, 906 S.E.2d 806, 808 (N.C. 2024). Finally, an appellate petition never requires transfer. Transfer is appropriate only if the "complaint," "answer," or "responsive pleading" contains a facial challenge to a state statute. N.C. R. Civ. P. 42(b)(4). This filing is none of those things.

10  Because this case does not involve an election for a federal office, other provisions of the state constitution are not implicated. Article VI of the North Carolina Constitution lets the General Assembly reduce the residency requirement, but such short-

UMOVA also distinguishes between, on one hand, uniformed-service voters and overseas voters who have resided in this state, N.C. Gen. Stat. § 163-258.2(1)(a)-(d), and, on the other hand, overseas voters who were born abroad and have never resided in this state, *id.* § 163-258.2(1)(e). Judge Griffin has challenged the votes of this latter group *only*.

Anyway, a servicemember who previously resided in North Carolina but is deployed overseas does not lose his North Carolina residency. Unless a servicemember leaves the state and intends never to return, he remains a resident of the state. *See Lloyd*, 296 N.C. at 444, 251 S.E.2d at 861 (student who leaves for college becomes resident at the place of his college unless he intends to return to his former home after graduation). Unless the servicemember has "abandoned" his home in North Carolina, he remains a resident here for voting purposes. *Id.* at 449, 251 S.E.2d at 864. By contrast, the Never Residents never had a home in North Carolina that they could abandon.

### E. Residency isn't inheritable under the state constitution's voter qualifications.

Justice Riggs has argued that Never Residents inherit the residences of their parents. She analogizes to the law of domiciliary for infants. Yet the analogy crumbles upon inspection because infants can't vote. N.C. Const. art. VI, § 1 (voting rights limited to those at least "18 years of age"). Unlike an infant, an 18-year-old *chooses* where he resides. If he wishes to become a member of North Carolina's political community, he must decide, as

---

term residents can only vote for president and vice president. N.C. Const. art. VI, § 2(2).

an adult, to reside in North Carolina. Otherwise, he is not a member of our political community entitled to vote. There is no such thing as "birthright residency" for purposes of voting in our state.

Inherited voting rights also make no sense when applied to the circumstances of the Never Residents. Under Justice Riggs' theory, a child's residence or domicile is the same as his parents. But recall that the Never Residents were born abroad and have never lived in the United States. That means that the parents of the Never Residents have been abroad for all eighteen years of the Never Resident's childhood. But a person can only establish residency in a place in which they have actually lived. When the Never Resident turned 18, his residence was where his parents had set up their international abode. Wherever that was, it wasn't in North Carolina.

By its own terms, UMOVA doesn't care whether the Never Residents' parents set up a fixed habitation somewhere abroad. Instead, it ascribes to the parent a North Carolina residency, even when the parent has settled down in a foreign country eighteen years ago. *See* N.C. Gen. Stat. § 163-258.2(1)(e). Justice Riggs argues that this is constitutional because the legislature can ascribe a fictional residency to a person by statute. That is true when the residency matters for other statutory or common law purposes. But the legislature is powerless to rewrite the meaning of "residency" as it's set out in the North Carolina Constitution. The ratifiers of our constitution would not have imposed a residency requirement in our charter of government just so the legislature can override it. The word "residency" continues to carry the original public meaning that it has carried through our state's

history. To suggest that the legislature could ignore this meaning or change it by statute is an affront to judicial review. *Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78 (1803).

*    *    *

The original public meaning of "residency" as used of voting rights in our constitution has always required the would-be voter to, at a minimum, live in North Carolina. That commonsense requirement of physical presence cannot be eliminated by statute. It is fundamental to the identity of our political community, and our constitution does not let the General Assembly change our community by granting voting rights to Never Residents. UMOVA doesn't do that because doing so would be unconstitutional.

If the Board counts the votes of people who have *never* been members of our political community, it will violate our state constitution. That harms not only Judge Griffin, but also the true members of our state's political community.

## III. Overseas Voters Who Did Not Provide Photo Identification Cannot Cast a Ballot in State Elections.

The final category of protests before the State Board involved ballots cast by overseas voters more generally. State law requires these voters to submit photo identification along with their absentee ballots, just like all other voters. But the State Board decided to accept overseas absentee ballots without accompanying identification, in violation of state law.

### A. Article 21A, which governs overseas absentee voters, incorporates Article 20's requirements for absentee voters.

Subchapter VII of Chapter 163 of the General Statutes contains the requirements for all types of absentee-ballot voting in North Carolina. Article 20 of that subchapter sets out the general rules for absentee voting. *See* N.C. Gen. Stat. §§ 163-226 to -239. Article 21A (which is UMOVA) layers on additional rules for absentee voting by military and overseas voters. *See id.* §§ 163-258.1 to -258.31. The general absentee voting provisions of Article 20 apply to overseas absentee voting under Article 21A, and not vice versa. Section 163-239 states, "Except as otherwise provided therein, Article 21A of this Chapter [for overseas absentee voting] shall not apply to or modify the provisions of this Article [20]."

One of the key provisions of Article 20 is the requirement of photo identification for absentee voting. N.C. Gen. Stat. § 163-230.1(a)(4), (b)(4), (e)(3), (f1). These provisions equalize the burden of voting: both in-person voters and absentee voters must show photo identification to cast a ballot. *See id.* § 163-166.16(a) (requiring photo identification for in-person voting); N.C. Const. art. VI, §§ 2(4), 3(2) (same). The General Assembly first enacted UMOVA in 2011 to regulate absentee ballots cast by overseas voters. *See* N.C. Sess. Law 2011-182. The General Assembly then added legislation to require photo identification for absentee ballots. *See, e.g.*, N.C. Sess. Law 2019-239, § 1.2(b). When it did so, it did not exempt overseas voters. If our legislature intended to exempt overseas absentee voters from the photo identification requirement, it would have said so explicitly.

But overseas voters are not exempt from this equalization requirement and must provide photo identification to vote. All absentee ballots—cast under either Article 20 or Article 21A—must be transmitted to the relevant county board of elections by placing it in a "sealed container-return envelope." N.C. Gen. Stat. § 163-231(b)(1). This reference to a sealed container-return envelope applies expressly to absentee ballots cast under both Articles 20 and 21A. To understand what an overseas voter must put in the "sealed container-return envelope," the voter must look at the requirements under Article 20, since Article 21A does not answer the question. *See id.* §§ 163-258.1 to -258.31.

Article 20 is clear that the "sealed container-return envelope" exists, in part, to hold the photo identification of *all* absentee ballots. The container-return envelope must contain a valid photo identification: "Each container-return envelope returned to the county board with application and voted ballots under this section shall be accompanied by a photocopy of identification . . . ." *Id.* § 163-230.1(f1). The failure to include a photo identification in the container-return envelope is a curable deficiency, but only if the proper identification is received the day before the county canvass. *Id.* § 163-230.1(e). None of the challenged ballots were cured.

Even at a more general level, absentee ballots cast both within and without the United States (Article 20 and Article 21A absentee ballots) are generally treated alike and are all considered absentee ballots:

- "The county board shall report ballots cast during early voting under Part 5 of Article 14A of this Chapter separately from mail-in absentee ballots cast under Article 20 or 21A of this Chapter." *Id.* § 163-132.5G(a1)(4).

- "The sealed container-return envelope in which executed absentee ballots have been placed shall be transmitted to the county board of elections who issued those ballots as follows . . . All ballots issued under the provisions of this Article and Article 21A of this Chapter shall be transmitted by one of the following means . . . ." *Id.* § 163-231(b).

- The lawful procedure for counting absentee ballots cast under both Article 20 and Article 21A are set out in Article 20. *Id.* § 163-234.

**B.   Nothing in Article 21A excuses overseas voters from providing photo identification.**

The State Board reasoned that Article 21A excused overseas voters from providing photo identification because section 163-258.17(b) established the exclusive means to authenticate the identity of the voter. App. 70-71. But subsection (b) says no such thing.

That subsection states that the lone "authentication" required "for *execution of a document*" for overseas voters are the declarations permitted for overseas voters. N.C. Gen. Stat. § 163-258.17(b) (emphasis added); *see id.* § 163-258.4 (describing declaration that acknowledges misstatements are grounds for perjury). Subsection (b) cannot exempt an overseas voter from the photo-identification requirement because photo identification is not the "authentication" of a document—it's the authentication of the voter's identity.

This conclusion is easily confirmed by looking at Article 20. Similar to section 163-258.17(b)'s authentication requirement, Article 20 also requires absentee ballots to be authenticated by notarization or a witness. *See id.* § 163-231. Notably, the photo identification requirement is an entirely separate requirement found in another statute within Article 20. *Id.* § 163-230.1. Why? Because photo identification is not an "authentication" of a document.

Justice Riggs argued to the Board that Article 21A prohibits a photo identification requirement because section 163-258.17(a) permits the counting of improper ballots cast by overseas voters if the ballots are missing "nonessential" information. *Id.* § 163-258.17(a). The statute gives examples of nonessential requirements that can be ignored: failing to use "paper or envelopes of a specified size or weight." *Id.* Photo identification is a material requirement; it isn't "nonessential." Anyone suggesting that photo identification is immaterial must have missed the last decade and a half of legislation, litigation, and constitutional amendments surrounding photo identification. Notably, the Board declined to adopt Justice Riggs' argument.

### C. The fact that the Board issued a rule excusing overseas voters from providing photo identification does not immunize the Board's decision from judicial review.

The State Board also defended its decision to excuse overseas voters from the photo-identification requirement on the grounds that the Board had already issued a rule saying so. App. 73-74 (citing 8 N.C. Admin. Code 17.0109(d)). But the General Assembly never delegated to the State Board the power to make the major policy decision of whether to

require photo identification from a class of voters. Photo identification was a decision made by the legislature (and even the voters, through a constitutional amendment).

Indeed, the delegation of such an important question would be unconstitutional. An administrative agency cannot be "asked to make important policy choices which might just as easily be made by the elected representatives in the legislature." *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 697-98, 249 S.E.2d 402, 411 (1978). If such legislative power could be delegated, it would be "delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (administrative delegation held unconstitutional under non-delegation doctrine); *see also State v. Harris*, 216 N.C. 746, 6 S.E.2d 854, 860 (1940) (same).

As the Supreme Court of the United States has observed, when an administrative agency makes an extraordinary claim of authority with "political significance," that gives courts a "reason to hesitate" before concluding that the legislature meant to confer the claimed authority. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Under the major questions doctrine, courts recognize that the legislature does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.). "[S]eparation of powers principles" caution against such unrestrained readings of administrative authority. *West Virginia*, 597 U.S. at 723.

There is no textual indication that the General Assembly ever intended for the State Board to decide whether to require photo identification for any kind of voter, much less

overseas voters. And even if there were some "colorable textual basis," *id.*, the major questions doctrine would caution the Court to interpret the statutes against a delegation.

The rule would also collapse under the state constitution. If voters are to be treated differently, there must be a rational basis for differential treatment. *See* N.C. Const. art. I, § 19 ("No person shall be denied the equal protection of the laws . . . ."); *Lloyd*, 296 N.C. at 439, 251 S.E.2d at 858 ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." (quoting *Dunn*, 405 U.S. at 336); *N.C. Bar & Tavern Ass'n v. Cooper*, 901 S.E.2d 355, 373 (N.C. Ct. App.), *review allowed*, 901 S.E.2d 232 (N.C. 2024); *Askew v. City of Kinston*, 906 S.E.2d 500, 507 (N.C. Ct. App. 2024). But there is no legitimate reason to impose a greater burden—photo identification—on those living in North Carolina than is imposed on those living abroad. There is no reason to think that the General Assembly intended that bizarre, differential treatment, which could violate the state constitution's equal protection clause.

**D.    Federal law has no bearing on the photo-identification requirement.**

Because state law offered by the State Board provides no refuge, the Board also sought to intertwine its reasoning with federal law, citing 52 U.S.C. § 20302. App. 74-76. But, as with HAVA and the NVRA, federal law has no application here. The statute on which the Board relies, by its own terms, only applies "elections for Federal office." *E.g.*, 52 U.S.C. § 20302(a)(1)-(3), (6)-(8), (b)(1), (c).

\*    \*    \*

Ultimately, it would make no sense to require photo identification for voters present in the United States, but not for overseas voters. The General Assembly did not require photo identification for one category of voter and not the other. Rather, *everyone* voting in a North Carolina election, whether voting in person or by any kind of absentee ballot, must submit a photo identification to vote.

Therefore, these absentee ballots, submitted under Article 21A, cannot be counted for the contests that are the subject of these election protests.

## IV.    The State Board Manufactured Procedural Defects.

To reject Judge Griffin's protests, the State Board not only misconstrued North Carolina law, it also tried to disqualify the protests on procedural technicalities. It is clear, however, that Judge Griffin's protests complied with all relevant procedural requirements.

### A.    The protests should not have been filed as voter challenges.

The Board reasoned that it should dismiss the protests because they were untimely voter challenges. App. 64-66. But the State Board had already rejected its own argument in 2016, and this Court said the same thing earlier this year.

In 2016, an election protest was filed by the Pat McCrory campaign in the governor's race, challenging the eligibility of certain voters to cast ballots in that election. *Bouvier*, 386 N.C. at 5-6, 900 S.E.2d at 843-44. McCrory's opponent, Roy Cooper, argued that the protests should be dismissed because they merely challenged the eligibility of certain voters, and therefore should have been brought as voter challenges instead. *See Bouvier v. Porter*,

279 N.C. App. 528, 542, 865 S.E.2d 732, 741-42, *rev'd in part and remanded,* 386 N.C. 1, 900 S.E.2d 838 (2024); *In re Consideration of Certain Legal Questions Affecting the Authentication of the 2016 General Election* (N.C. State Bd. of Elections Nov. 28, 2016) [App. 344-45].

The State Board rejected Cooper's argument. App. 334-45. In an order on Cooper's request to dismiss the protests, the Board explained that an election protest "must prove the occurrence of an outcome-determinative violation of election law, irregularity, or misconduct." App. 344 ¶ 3. Although an election protest "may not merely dispute the eligibility of a voter," an election protest may challenge a voter's eligibility if the "claims regarding the eligibility of certain voters" are presented "as evidence that an outcome-determinative violation of election law, irregularity, or misconduct has occurred." App. 345 ¶ 5. Thus, an election board may "discount a ballot cast by an unqualified voter" if an election protest shows "that ineligible voters participated in number sufficient to change the outcome of the election." App. 345 ¶ 7.

The McCrory election protest spun off collateral litigation that wound up at this Court as *Bouvier v. Porter*, 386 N.C. 1, 900 S.E.2d 838 (2024). One of the issues in *Bouvier* continued to be whether an election protest can challenge the eligibility of certain voters. The Court affirmed the logic of the Board's 2016 order, explaining that "an election protest may address any 'irregularity' or 'misconduct' in the election process, including the counting and tabulation of ballots cast by ineligible voters." *Id.* at 4, 900 S.E.2d at 843 (citations omitted). Such ineligible voters, who could be targeted by an election protest, include

"nonresidents," who are "categorically ineligible to vote." *Id.* at 4 n.2, 900 S.E.2d at 843 n.2. It also includes people who are not "'legally registered' to vote." *Id.* (quoting N.C. Gen. Stat. § 163-54).

The Board's final decision on Judge Griffin's protests made no effort to reconcile its reasoning with its prior 2016 order or *Bouvier*. It is but another example of the State Board ignoring the law and exercising power untethered to principle.

### B.    The Board wrongly dismissed the protests for lack of service.

Before addressing the merits of the three categories of protests, the State Board alternatively dismissed Judge Griffin's protests because he did not properly serve the protests on affected voters. The State Board's ruling is wrong because (1) the Board does not have statutory authority to impose a service obligation on protestors and (2), even if it did, Judge Griffin's service satisfied the Board's service demands.

The State Board promulgated a protest template that includes a demand that protestors "must serve copies of all filings on every person with a direct stake in the outcome of this protest." 8 N.C. Admin. Code § 02.0111 (the protest-form template). The service can be accomplished by "transmittal through U.S. Mail" and has to "occur within one (1) business day" of filing a protest. *Id.*

First, there is no statutory authority for the Board to force protestors to serve copies of protests on affected parties. The State Board claims that it can compel protestors to serve parties because the Board has the power to "prescribe forms for filing protests." App. 43-44 (citing N.C. Gen. Stat. § 163-182.9(c)). But the power *to merely create a template* for a

protest does not include the power to burden protestors with providing notice to affected parties. That is especially so when the protest statutes explicitly burden someone else with the duty to provide notice to affected parties: the county boards. *See* N.C. Gen. Stat. § 163-182.10(b). The General Assembly never authorized the State Board to outsource the county boards' notice obligations to protestors and then penalize those protestors for failing to do the county boards' jobs for them. The Board acted beyond its authority in dismissing protests on service grounds.

Second, Judge Griffin nevertheless complied with the Board's service demand by mailing a postcard by U.S. First-Class Mail to over 60,000 voters at the voters' addresses of record. The postcard stated the following:

> * * * NOTICE * * *
> [[First Name]] [[Middle Name]] [[Last Name]], your vote may be affected by one of more protests filed in the 2024 general elections. Please scan this QR code to view the protests filings. Please check under the county in which you cast a ballot to see what protest may related to you…. For more information on when your County Board of Elections will hold a hearing on this matter, please visit the State Board of Elections' website link found on the Protest Cite (via the QR code).

App. 175 (Offerman Aff., Attach. 1).

The State Board criticized Judge Griffin's service efforts as "junk mail" because it was (1) a postcard that (2) didn't announce that the protests were "challenging the voter's eligibility" and (3) used a QR code to provide access to the filed materials. App. 45-51. The Board concluded that such postcards did not properly inform voters of the protests and provide them an opportunity to object. App. 49.

The Board's critique of Judge Griffin's service efforts is misplaced. First, the State Board cannot belittle postcards as "junk mail" when the Board itself routinely mails cards to voters. *See* N.C. Gen. Stat. § 163-82.8(c) (mailing of voter registration cards); *id.* § 163-82.14(d)(2) (confirming address by mailing cards). Second, the postcard states that "your vote may be affected by one of more protests" and instructs voters to contact their county boards for information on "a hearing on this matter." App. 175. The postcard, thus, notifies voters that their vote is being implicated by a legal proceeding and, appropriately, directs them to find more information on the proceeding. Finally, the Board's distrust of QR codes is belied by the Board's own use of QR codes in the "Voter Photo ID" mailers that it recently distributed across the state. *See* N.C. State Bd. of Elections, *Press Release: State Board Launches Photo ID Educational Campaign* (Feb. 13, 2024) [App. 346-49], *available at* https://www.ncsbe.gov/news/press-releases/2024/02/13/state-board-launches-photo-id-educational-campaign (visit the link "Voter Photo ID Mailer (PDF)").[11]

To be clear, the constitutional standard for notice is that it be "reasonably certain to inform those affected." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950). The standard does not demand perfection. *See id.* at 319 ("We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are

---

[11]    The Board's press release boasted that its new voter ID "campaign is designed to *reach every corner of North Carolina*, including rural and urban areas, in as many ways as possible." *Id.* (emphasis added). The Board posted the "Voter Photo ID Mailer (PDF)" at https://s3.amazonaws.com/dl.ncsbe.gov/Voter%20ID/Voter-ID-Mailer.pdf. It is available in the appendix at pages 350-51.

justifiable."). Moreover, Judge Griffin served over 60,000 voters. The interests of each voter "is identical with that of a class" and, therefore, "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any sustained would inure to the benefit of all." *Id.* Given that Judge Griffin's service on 60,000 voters replicates the State Board's own methods of notifying voters, the Board had no grounds to claim his method of service was deficient.

### C.    Judge Griffin timely filed his protests.

The Board mentions, in passing, that some of Judge Griffin's protests might have been untimely filed and, therefore, could be subject to dismissal. App. 6 n.4. This is baseless. The General Statutes are explicit that only "substantial compliance" is required with the filing deadlines for election protests; and Judge Griffin's protests substantially complied with the protest-filing deadline.

Section 163-182.9 sets forth the requirements of an election protest. In addition to a protest being in writing and containing certain information, the section sets forth deadlines for filing a protest. N.C. Gen. Stat. § 163-182.9(b). "If the protest concerns an irregularity other than vote counting or result tabulation, the protest shall be filed no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results." *Id.* § 163-182.9(b)(4)(c).

The next statute, section 163-182.10, then dictates an elections board's review of whether a protest complies with these requirements. Section 163-182.10 explicitly states that a board shall "determine whether the protest *substantially complies* with G.S. 163-182.9

and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." *Id.* § 163-182.10(a)(1) (emphasis added). Therefore, for a protest to proceed to a review of its merits, the protest must substantially comply with the 5:00 P.M. filing deadline.

The affidavit of Kyle Offerman establishes that all of Judge Griffin's protests were submitted via email to the county board before the 5:00 P.M. deadline. App. 172 (Offerman Aff. ¶¶ 8-9). The possibility that some of these protests might have hit election officials' inboxes a few minutes after 5:00 P.M. is irrelevant. The protests would have nonetheless been filed in substantial compliance with the statutory filing deadline.

North Carolina courts have, for decades, explained what is required when a statute demands only substantial compliance with certain requirements. In such statutes, substantial means "[i]n a substantial manner, in substance, essentially. It does not mean an accurate or exact copy." *Graham v. Nw. Bank*, 16 N.C. App. 287, 291, 192 S.E.2d 109, 112 (1972) (cleaned up). In other words, substantial compliance with a requirement is something less than precise satisfaction of the requirement.

This standard of leniency is not uncommon. It also appears in litigation. For example, the North Carolina Court of Appeals applies a substantial compliance standard to the application of the appellate rules: "[T]his court has held that when a litigant exercises 'substantial compliance' with the appellate rules, the appeal may not be dismissed for a technical violation of the rules." *Pollock v. Parnell*, 126 N.C. App. 358, 362, 484 S.E.2d 864, 866

(1997). Thus, a substantial-compliance standard precludes a judicial body from dismissing a filing for mere failure to comply with the technical rules.

There is no doubt that a filing received by the board of elections within minutes of the deadline in section 163-182.9 is in "substantial compliance" with the deadline. The filing of a protest within minutes of a deadline would be "essentially" or "in substance" complying with the deadline, even if it is not technically complying with the deadline. Under section 163-182.10(a)(1), any such protest must, as a matter of law, be allowed to proceed to the merits.

## V.    No Other Federal Statute Bars the Protests.

Justice Riggs argued that additional federal statutes preclude Judge Griffin's protests from succeeding. The Board did not address these statutes because they are irrelevant to the protests at issue.

### A.    The Civil Rights Act does not impact the protests.

Justice Riggs argued to the State Board that the "materiality provision" of the federal Civil Rights Act of 1964 barred Judge Griffin's election protests based on ballots cast by people with incomplete voter registrations. But her argument has already been rejected by other courts.

The Civil Rights Act's materiality provision prohibits any "person acting under color of law" from denying an individual's vote due to an error or omission "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The Eleventh Circuit has already

determined that a drivers license or social security number is material in determining whether an individual is qualified by law to vote. *See Browning*, 522 F.3d at 1174 n.22 ("because Congress required the identification numbers [drivers license numbers or partial social security numbers] to be on voter registration applications, they are *per se* material under [the Civil Rights Act's materiality provision]").

Indeed, the materiality provision only applies to the provision of "trivial information" that serves no purpose other than "inducing voter-generated errors that could be used to justify rejecting applicants." *Id.* at 1173. The General Assembly has determined that some information on the voter application form is immaterial and can be lawfully omitted—like "race, ethnicity, gender, or telephone number." N.C. Gen. Stat. § 163-82.4(a). But drivers license and social security numbers are far from immaterial. The information at issue is used to validate the identity of the applicant. *Id.* § 163-82.12(8), (9). Thus, the Eleventh Circuit described such information as "per se" material under the Civil Rights Act. *Browning*, 522 F.3d at 1174 n.22. The court was skeptical that the government "would mandate the gathering of information—indeed, that it would make that a precondition for accepting registration application—that it also deems immaterial." *Id.* at 1174.

## B. The Voting Rights Act does not impact the protests.

At the State Board, Justice Riggs claimed that the Voting Rights Act of 1965 (VRA) prevents the State Board from enforcing the election laws identified in Judge Griffin's protests. That is wrong.

The Voting Rights Act prohibits refusing to count the vote of anyone "who is entitled to vote under any provision of this Act or is otherwise qualified to vote." 52 U.S.C. § 10307(a). Justice Riggs never pointed to any provision of the Act that the election protests purportedly violate. Indeed, the enforcement provision of the VRA exists just to enforce "the Act's comprehensive scheme to eliminate racial discrimination in the conduct of public elections." *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970). Absent racial discrimination, "the Act provides no remedy." *Id.* at 87. As the U.S. Supreme Court has recently explained, the VRA is Congress's effort to bring to "an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 655 (2021). No one has ever suggested that this case involves racial discrimination—it quite obviously doesn't. So the Voting Rights Act is irrelevant.

## VI. The Protests Comport with Equal Protection and Substantive Due Process.

The right to vote is fundamental. But like all fundamental rights, voting is not an absolute right. The U.S. Supreme Court has established a test that balances the right to vote with a state's interest in ensuring election integrity. The protests, which seek to enforce laws that go to the heart of election integrity, satisfy this balancing test.

### A. The *Anderson-Burdick* test.

Voting is a fundamental right. *E.g., Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Yet, the U.S. Supreme Court has recognized that "[t]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

The U.S. Supreme Court has established the *Anderson-Burdick* test to strike a balance between the right to vote and the need for fair elections. *See Libertarian Party of N.C. v. State*, 365 N.C. 41, 47-48, 707 S.E.2d 199, 203-04 (2011) (discussing test). The test requires that a regulation imposing a severe burden on voting be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). Severe burdens are defined as invidious restrictions that "are unrelated to voter qualifications." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008).

The test also accounts for non-severe burdens, which include "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'" *Id.* at 189-90 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)). These lesser burdens are subject to a flexible balancing standard, which "weigh[s] 'the character and magnitude of the asserted injury'" against "'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Such burdens are usually justified by "a State's important regulatory interests." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997).

**B.    The protests do not seek to impose severe limitations on voting.**

Judge Griffin is not asking the State Borad to enforce laws that would severely burden voting.

To start, the North Carolina Constitution establishes that both lawful registration and residency are voter qualifications. N.C. Const. art. VI, §§ 2(1), 3(1). And anybody who wants to vote in North Carolina must be a resident and lawfully registered—no exceptions

are allowed. Judge Griffin's request that the State Board enforce this *evenhanded* pair of voter *qualifications* cannot, as a matter of law, severely burden the right to vote. *See Crawford*, 553 U.S. at 189-90.

The third law that Judge Griffin asked the State Board to enforce (overseas voters providing photo identification) is enshrined in the General Statutes. *See supra* Argument § III. Like registration and residency, this requirement is also evenhanded—applying to all voters equally. Indeed, Judge Griffin filed the protest because the State Board unlawfully exempted one demographic of voters—those living overseas—from this universal requirement. The U.S. Supreme Court has already concluded that reasonable photo-identification requirements do not impose "a substantial burden on the right to vote." *Crawford*, 553 U.S. 191-98.

The State Board never mentions the *Anderson-Burdick* test anywhere in its order. Rather, in discussing the incomplete-registration protests, the Board defends its dismissal of those protests on the grounds that the individuals "did everything they were told to do to register." App. 57. The Board then relies on this Court's decisions in *Overton v. Mayor & City Commissioners of City of Hendersonville*, 253 N.C. 306, 116 S.E.2d 808 (1960), and *Woodall v. W. Wake Highway Commission*, 176 N.C. 377, 97 S.E. 226 (1918), for the Board's conclusion that "error by election officials in the processing of voter registration cannot be used to discount a voter's ballot." App. 59-60. But the decisions in *Woodall* and *Overton* do not hold such. Rather, those decisions reasoned that, because registrars had a duty to issue oaths (while voters had no obligation to take an oath), a *registrar's failure* of his *personal*

duty could not result in a voter being disqualified. *See Overton*, 253 N.C. at 315, 116 S.E.2d at 815; *Woodall*, 176 N.C. 377, 97 S.E. at 232.

Here, in contrast, a North Carolina statute imposes a duty on applicants to provide a drivers license or social security number that validates the applicants' identities. *See* N.C. Gen. Stat. § 162-82.4(a)(11), (d), (f). The Board's willingness to register applicants without this information does not excuse applicants of their duty to provide it. Moreover, *Woodall* and *Overton* cannot stand for an absolute rule that election-official errors can never result in the disqualification of voters because the Court plainly held otherwise in *James*, 359 N.C. at 270, 607 S.E.2d at 644, where the Court disqualified thousands of voters who (unlawfully) voted out of precinct at the instruction of poll workers. *James* even cited to *Burdick* to justify its result, seeing no conflict with this remedy and the *Anderson-Burdick* framework. *Id.*

Unlike in *Woodall*, *Overton*, and *James*, this is not an instance in which an election official's error prevented eligible voters from casting their ballots. This is an instance in which, after the State Board decided to not inform individuals of certain requirements, the individuals' ignorance resulted in them failing to take the steps necessary to become eligible voters. As courts have often held, "ignorance of the law is no excuse for a failure to comply with the law." *Orange Cnty. v. N.C. Dep't of Transp.*, 46 N.C. App. 350, 377, 265 S.E.2d

890, 908 (1980). It's not unconstitutional to require the public to be as knowledgeable of election laws as other laws.[12]

### C. The laws at issue are tailored to compelling state interests.

But even if the Court were to find that the enforcement of the laws at issue severely burdened the right to vote, North Carolina is well justified in enforcing these laws.

The State has an undeniable interest in restricting voting to only those who are eligible to vote, thereby ensuring that the votes of eligible voters are not diluted by ineligible ballots. *Bush v. Gore*, 531 U.S. 98, 105 (2000). Indeed, counting only eligible ballots is the ultimate means of accomplishing the State's "compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (cleaned up). Demanding that only qualified voters—those lawfully registered, residing in North Carolina, and producing photo identification—be allowed to cast a ballot is perfectly tailored to protecting eligible voters from vote dilution.

The State's compelling interest in election integrity also empowers the States to enact protections against possible voter fraud, because such protections assuage the public's

---

[12] Even assuming citizens could blame the State Board for their failure to become eligible to vote, human error by government employees does not automatically create a constitutional violation. *See Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.*, 472 F.2d 121, 122 (8th Cir. 1973) (holding no constitutional violation absent "aggravating factors such as denying the right of citizens to vote for reasons of race, or fraudulent interference with a free election by stuffing of the ballot box, or other unlawful conduct which interferes with the individual's right to vote" (citations omitted)); *Powell*, 436 F.2d at 88 (holding that neither the Equal Protection and Due Process Clauses of the Fourteenth Amendment "guarantee against errors in the administration of an election").

"fear [that] legitimate votes will be outweighed by fraudulent ones." *Id.* Thus, the State is justified in requiring that all voters provide photo identification as a means of identity verification. Moreover, the *Anderson-Burdick* standard does not demand an "elaborate, empirical verification" of efforts to counteract voter fraud. *Timmons*, 520 U.S. at 364. Rather, the State is free to protect against voter fraud "with foresight rather than reactively," so long as the protections are "reasonable" and don't "significantly impinge" constitutional rights. *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).

It is no longer debatable that universal photo-identification requirements are a constitutionally acceptable way to guard against impersonation of registered voters. *See Crawford*, 553 U.S. at 194-97 (Stevens, J.); *see also id.* at 209 (Scalia, J., concurring) ("The universally applicable requirements of Indiana's voter-identification law are eminently reasonable.").

It is equally established that North Carolina's requirement that individuals, in order to be qualified to vote, verify their identities via a drivers license or social security number guards against fraudulent registrations. *See Browning*, 522 F.3d at 1168 (describing HAVA's mirror requirement for such information as being "Congress's attempt to . . . prevent[] voter impersonation fraud"). "'The electoral system cannot inspire public confidence if no safeguards exist . . . to confirm the identity of voters.'" *Crawford*, 553 U.S. at 194 (quoting Building Confidence in U.S. Elections § 2.5 (Sept. 2005)).

## VII. The Appropriate Remedy Is Discounting the Illegal Ballots.

In the end, the State Board and Justice Riggs do not disagree with Judge Griffin's reading of the law—they simply believe it's too late to comply with the law. But the results of an election cannot be tainted by ballots unlawfully cast. Judge Griffin's protests satisfy the legal standards established in the election-protest statutes and, therefore, the Court should order that any unlawful vote be discounted.

### A. To succeed, Judge Griffin need only provide substantial evidence of an outcome-determinative violation of election law.

To ensure that no election is subject to the taint of inaccurate results, the General Assembly provided a lenient standard for the success of an election protest.

Our state constitution requires that elections be "free." N.C. Const. art. I, § 10. An election is free only if "the votes are *accurately* counted. Inherently, votes are not accurately counted if ineligible voters' ballots are included in the election results." *Bouvier*, 386 N.C. at 3, 900 S.E.2d at 842 (quoting *Harper v. Hall*, 384 N.C. 292, 363, 886 S.E.2d 393, 439 (2023)).

The election-protest process is the legislature's recognition that free—and, thus, accurate—elections "are vital to maintaining the public's trust and confidence in our system of self-government." *Id.* at 4, 900 S.E.2d at 842. The election-protests process is meant "to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election." *Id.* at 4, 900 S.E.2d at 843.

Given the critical role that protests play in ensuring the public's confidence in the democratic process, the General Assembly provided for a lenient standard for a successful protest. This is because election boards "must expeditiously resolve election protests to facilitate appeals and the timely certification of elections." *Id.* at 16, 900 S.E.2d at 850. Election protests, therefore, "proceed rapidly, and the process does not lend itself to exhaustive discovery and absolute precision." *Id.*

For an election protest to succeed, the election protest only needs to present "**substantial evidence to believe** that a violation of the election law or other irregularity or misconduct did occur and that it was sufficiently serious to cast doubt on the apparent results of the election." N.C. Gen. Stat. § 163-182.19(d)(2)(d), (e) (emphasis added). If an election protest is successful, the statutes authorize the elections board to correct the vote count and declare new results. *Id.* § 163-182.19(d)(2)(d), (e).

This Court has described the "substantial evidence" standard as creating a "low" bar. *State v. Taylor*, 379 N.C. 589, 611, 866 S.E.2d 740, 757 (2021). Thus, in *State v. Butler*, this Court stated: "To be substantial, the evidence need not be irrefutable or uncontroverted; it need only be such as would satisfy a reasonable mind as being adequate to support a conclusion." 356 N.C. 141, 145, 567 S.E.2d 137, 139 (2002) (quotation omitted). In plain terms, "substantial evidence is simply evidence that is "more than a scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lackey v. Dept. of Human Resources*, 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982).

Courts routinely apply the "substantial evidence" standard, and have recognized for decades that "uncorroborated and untested testimony and hearsay testimony" can constitute substantial evidence, as long as that evidence is reliable and trustworthy. *EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002). It is also generally accepted that the "substantial evidence" standard can be satisfied by something less than a preponderance of the evidence, *La. Public Service Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021), and that the possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence, *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019).

### B. Judge Griffin provided substantial evidence of outcome-determinative election-law violations.

For the reasons already discussed, Judge Griffin's protests identify three categories of voters who, as a matter of law, are ineligible to vote in the 2024 elections. There is no doubt that North Carolina law prohibited these three categories of voters to cast ballots for Seat 6 of the North Carolina Supreme Court. The State Board's willingness to allow these voters to potentially determine the outcome of the election is a clear violation of election law.

In addition to establishing election-law violations, Judge Griffin's protests provide the identities of the ineligible voters. Judge Griffin's protests were each accompanied by an affidavit that (1) explained how the identities of these ineligible voters were determined **based on data from the State Board** and (2) attached the resulting lists of the voters'

identities. In the aggregate, the affidavits and lists that accompany the protests establish the following numbers of ineligible voters by category:

- Incomplete voter registration: 60,273.

- Never residents: 267.[13]

- Overseas voters without photo IDs: 5,509.[14]

Judge Griffin currently trails Justice Riggs by only 734 votes. There is no question that the State Board's unlawful decision to permit 5,509 overseas voters to cast ballots without providing photo identification is of a magnitude that it casts doubt on the outcome of the election. That is all the more true of the State Board's unlawful decision to allow 60,273 individuals to cast ballots despite the individuals never completing registration. While the Never Residents are, in isolation, insufficient to change the outcome of the election, those 267 voters could become outcome-determinative after the results are adjusted for the other categories of unlawful voters.

---

[13]    Judge Griffin was able to identify Never Residents who had submitted materials to the State Board. There are additional Never Residents who cast ballots but submitted their materials to the county boards of elections. Although Judge Griffin is not certain that these additional Never Residents are sufficient in number to change the outcome of his election, Judge Griffin ask that the Court's relief make clear that all Never Residents—whether they submitted materials to the State Board or a county board—be ineligible to vote in a state election.

[14]    Judge Griffin filed protests challenging no-ID overseas voters in six counties. Before filing the protest, counsel to Judge Griffin requested the list of such voters from six counties. App. 176. When the protests were originally filed, only one county (Guilford) had provided a list of such voters, and this list was included with the protest filed in Guilford County. App. 1831-78. Since filing the protests, Durham, Forsyth, Buncombe counties have provided the lists as well, and the lists were filed as supplements to Judge Griffin's protests. App. 177-343.

Again, the General Statutes require only "substantial evidence" of an outcome-determinative election-law violation. N.C. Gen. Stat. § 163-182.19(d)(2)(d), (e). This is a "low" bar, *Taylor*, 379 N.C. at 611, 866 S.E.2d at 757, that does not require "irrefutable or uncontroverted" evidence—it requires only that "a reasonable mind" might find the evidence to be adequate, *Butler*, 356 N.C. at 145, 567 S.E.2d at 139. The affidavits and lists constitute "substantial evidence" of outcome-determinative election-law violations because the affidavits and lists are, as a matter of law, sufficient to support a reasonable mind's conclusion that such voters were ineligible to vote. *See Lackey*, 306 N.C. at 238, 293 S.E.2d at 176.

### C. The Board tried to cast doubts about its own data.

In its decision, the Board cast doubt on the unrebutted evidence offered in support of Judge Griffin's protests. Namely, the Board questioned whether the 60,000 voters identified in the protests had failed to provide their drivers license or social security numbers. App. 52.

As a threshold matter, the affidavits that accompany Judge Griffin's protest explain that the list identifying the incomplete registrants was **provided by the State Board itself** in response to a public records request. App. 1754-55 ¶¶ 9-11. The fact that the Board is now attempting to impeach its own data should make the Court suspicious of the Board's purported factual concerns. But the Court can also quickly dispense with these concerns on the merits.

To try to create doubt about the list provided by the State Board, the Board now speculates that the list could be over inclusive.

The State Board first speculates that the list might include individuals who were never issued a drivers license or social security number. *See* App. 52-53. But the Board—which certainly knows the answer to its own question—stops short of alleging that a single individual on the list falls within this category.

Second, the Board theorizes that some individuals might appear on the Board's list because, despite providing a drivers license or social security number with their application, the number was removed from "the voter's registration record" after the number failed the validation process. App. 53-54. But the Board concedes that, while the number is no longer in the "voter's registration record," "the *data is still retained* elsewhere in the system." App. 54 (emphasis added). The Board, moreover, provided a list of voters for which the Board's records did "not contain **data**" of either a drivers license number or social security numbers. App. 1754-55 (emphasis added).[15] According to the Board itself, the Board provided a list of voters for which the Board had no data of a drivers license or social security numbers. Notably, the Board never alleges that a single individual on the list provided a drivers license or social security number.

---

[15]    Mr. Bonifay explains in his affidavit that he screened the Board's list for individuals who lacked data for both a drivers license number and a social security number, and then he matched that subset against a list of individuals who voted by absentee or provisional ballot. App. 1755.

None of the Board's speculation undermines the reality that Judge Griffin's incomplete-registration protests provide substantial evidence of an outcome-determinative election-law violation.

### D. The Court should order the ineligible votes discounted and the election results retabulated.

Like this Court held decades ago, "To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *James*, 359 N.C. at 270, 607 S.E.2d at 644. And the U.S. Supreme Court made the same point decades before that, reconfirming it in *Bush v. Gore*: "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), *quoted by Bush v. Gore*, 531 U.S. 98, 105 (2000).

This case is not the first time that an election protest has caught the State Board violating the law and counting unlawful ballots. In the 2004 general election, the Board "improperly counted provisional ballots cast outside voters' precincts of residence on election day." *James*, 359 N.C. at 269, 607 S.E.2d at 644. As this Court held, state law did not allow these voters to cast ballots. The issue came to the Court from an election protest. *Id.* at 263, 607 S.E.2d at 640. And like the violation of law here, that one too was "statutorily unauthorized" and resulted in "thousands of citizens" being denied "the right to vote on election day." *Id.* at 269, 607 S.E.2d at 644. Nonetheless, this Court unanimously held that

the error could not be remedied in a way to ensure the votes were counted: "This Court is without power to rectify the Board's unilateral decision to instruct voters to cast provisional ballots in a manner not authorized by State law." *Id.* at 270, 607 S.E.2d at 644. If the Court had simply permitted the State Board to count the statutorily unauthorized ballots, it would have disenfranchised those who cast lawful ballots: "To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *Id.*

Of course, Judge Griffin filed his election protests because unlawful votes have been counted, which has likely determined the election's outcome. Under *James*, the Board was required to discount the unlawful ballots. That is the normal result of a successful election protest. *See Bouvier*, 386 N.C. at 4, 900 S.E.2d at 843 ("Where the irregularity affects the accuracy of the election results, the county board of elections may order the ineligible ballots excluded from the vote total . . . .").

Before the State Board of Elections, there was discussion of whether the Board could order a post-election cure period for some of Judge Griffin's protests. But Justice Riggs's counsel adamantly opposed a cure opportunity, calling it unconstitutional and *ultra vires*. If there is to be no post-election cure opportunity, then the only remedy left is the *James* remedy: excluding the ineligible ballots.

## REQUESTED RULINGS AND RELIEF

In the interests of finality and expediency, Judge Griffin respectfully requests that the Court's order on the petition a writ of prohibition address every issue that has been raised in this proceeding. To summarize the preceding points, Judge Griffin requests that the Court hold:

(a)     Ballots cast by people who failed to provide their drivers license number or social security number when they registered to vote cannot be counted for this electoral contest.

(b)     Ballots cast by people who represented that "I am a U.S. citizen living outside the country, and I have never lived in the United States" cannot be counted for this electoral contest.

(c)     Ballots cast by overseas voters who did not present a photo identification cannot be counted for this electoral contest.

(d)     Judge Griffin's election protests were properly brought as election protests and were not required to be brought as voter challenges.

(e)     Judge Griffin's election protests do not require the removal of any person from the voter rolls.

(f)     All arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin are rejected.

(g)     All arguments under the state or federal constitution that affected persons who cast ballots were improperly served or are due additional process are rejected.

(h)     All other arguments that the ballots cannot be discounted without violating the federal or state constitution are rejected.

(i)     This State Board is prohibited from counting the above-identified ballots, which were not lawfully cast.

## CONCLUSION

Judge Griffin respectfully requests that the Court issue a writ of prohibition prohibiting the Board from counting the unlawful ballots in the election for Seat 6 of the North Carolina Supreme Court and ordering the State Board correct the vote count.

This the 18th day of December, 2024.

Electronically submitted
Troy D. Shelton
N.C. State Bar No. 48070
tshelton@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351

N.C. App. R. 33(b) Certification: I certify that the attorneys listed below have authorized me to list their names on this document as if they had personally signed.

Craig D. Schauer
N.C. State Bar No. 41571

cschauer@dowlingfirm.com
W. Michael Dowling
N.C. State Bar No. 42790
mike@dowlingfirm.com

Philip R. Thomas
N.C. State Bar No. 53751
pthomas@chalmersadams.com
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person Street
Raleigh, North Carolina 27601
Telephone: (919) 670-5185

*Counsel for the Honorable Jefferson Griffin*

## VERIFICATION OF COUNSEL

Pursuant to N.C. Gen. Stat. § 7A-98, counsel submits the following declaration:

I declare under penalty of perjury under the laws of North Carolina that the statements of fact in the foregoing document are true and correct to the best of my knowledge.

Executed on December 18, 2024.

_____
Craig D. Schauer