IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | ) |
| | ) |
| Respondent. | ) |

**PETITIONER'S MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Petitioner Judge Jefferson Griffin respectfully requests that this Court enter a temporary restraining order enjoining the North Carolina State Board of Elections from certifying the November 2024 general election results for Seat 6 of the North Carolina Supreme Court. That order is necessary to preserve the status quo here. Judge Griffin has filed three categories of election protests, challenging ballots that were cast in violation of state law. The Board has now denied those protests and is poised to certify the election results in a matter of days. Once those results are certified, Judge Griffin will lose any opportunity to obtain judicial review of the Board's erroneous decision. A temporary restraining order, on the other hand, will simply stay the Board's hand while a court determines whether its decision was valid. The Board will not be harmed by such an order—indeed, North Carolina law contemplates delays in election certifications while judicial review is pending. By contrast, Judge Griffin will be irreparably harmed absent the order: he will lose the election. And preventing certification from mooting Judge Griffin's challenges to

unlawful ballots will serve the important public interests in election integrity and the franchise. This Court should therefore grant Judge Griffin's motion for a temporary restraining order.

## STATEMENT OF FACTS

This case involves—and almost entirely turns upon—significant and novel issues of North Carolina election law. Since 1776, North Carolina's Constitution has required voters to be bona fide residents of the state. N.C. Const. of 1776, art. VIII; N.C. Const. art. VI, § 2(1). Since 2004, the General Statutes have required voters to provide their drivers license or social security numbers to be legally registered to vote. N.C. Sess. Law 2003-226, §§ 2, 9; *see* N.C. Gen. Stat. § 163-82.4(a)(11). And since 2018, both the state constitution and various statutory provisions have required all North Carolina voters to present photo identification when they vote, whether in person or by absentee ballot. N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1); *See id.* § 163-166.16(a); N.C. Const. art. VI, §§ 2(4), 3(2). None of these requirements are new. Indeed, they were all well-established at the time of the November 2024 general election. Yet the North Carolina State Board of Elections (the "Board") has in this case refused to enforce them.

During that election, Petitioner Judge Jefferson Griffin ran as the Republican candidate for Seat 6 of the North Carolina Supreme Court. In a closely contested race with his Democratic opponent, Justice Allison Riggs, only a few hundred votes ultimately separated Judge Griffin from victory, out of more than 5.5 million cast. But as the county boards of elections canvassed the vote, Judge Griffin became aware of numerous irregularities with ballots cast during the election, implicating the constitutional and statutory provisions outlined above. Accordingly, he filed several election protests in county boards of election across the state, seeking to prohibit the counting of ballots cast in violation of state law.

Ultimately, the Board assumed jurisdiction over three categories of protests, involving more than 60,000 ballots cast across the state. *See* D.E. 1-5 at 4. In the first, Judge Griffin challenged ballots cast by thousands of individuals who failed to verify their identity by providing a drivers license number or social security number with their voter registration, in violation of the General Statutes. *Id.* at 10-14. In the second, he argued that hundreds of ballots were cast by non-residents, in violation of the North Carolina Constitution's residency requirement. *Id.* at 14-26. And in the third, he contended that the county boards of elections had accepted, processed, and counted absentee ballots cast by thousands of overseas and military individuals who had failed to provide a copy of their photo identification (or an exception form), in violation of state law. *Id.* at 26-30. In conjunction with these protests, Judge Griffin sent notice to the thousands of individuals whose votes they affected by sending postcards to their addresses, which indicated that he was challenging the validity of their votes. *Id.* at 174-78.

On December 11, 2024, the Board held a public meeting to consider Judge Griffin's protests, at which it denied them. Two days later, the Board issued a written order explaining the reasons for its decision. *Id.* at 41-80. The Board held that each of Judge Griffin's protests failed under state law. *Id.* Alternatively, the Board reasoned that sustaining his protests would violate various federal laws. *Id.*

Following the Board's decision, Judge Griffin petitioned the North Carolina Supreme Court for writ of prohibition. *See* D.E. 1-4. Specifically, Judge Griffin sought to preserve his right to judicial review of the Board's decision by requesting the Supreme Court to prohibit the Board from certifying the election results. (Once the Board certifies the results, all of Judge Griffin's protests will become moot, denying him any opportunity to challenge the unlawfully cast ballots.) Judge Griffin also sought an extension of time to file petitions for judicial review of the Board's

3

Case 5:24-cv-00724-M-RN    Document 14    Filed 12/20/24    Page 3 of 19

decision in state Superior Court. *See* D.E. 1-4 at 14. The writ also asked the Supreme Court to prohibit the counting of ineligible ballots. *Id.*

In an unprecedented move, the Board has now removed Judge Griffin's petition from North Carolina's highest court to this one. D.E. 1. (Despite removal, that Petition remains pending before this Court and contains a detailed analyses of the issues discussed herein. Local Rule 5.3(c).) Judge Griffin now seeks a temporary restraining order.

## LEGAL STANDARD

"The substantive standard for granting either a temporary restraining order or a preliminary injunction is the same." *Patel v. Moron*, 897 F. Supp. 2d 389, 395 (E.D.N.C. 2012). To obtain either, a party must establish: "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Id.*; Fed. R. Civ. P. 65(b).

## ARGUMENT

Judge Griffin is entitled to a temporary restraining order. First, absent a temporary restraining order, state law requires the Board to certify the election results within ten days of service of its decision on a protest; and state law affords a candidate only ten days to secure a stay of certification before the right to a stay (and judicial review) is forever lost. Denying Judge Griffin a stay within those ten days will irreparably harm Judge Griffin by denying him any chance to obtain judicial review of the Board's erroneous decision thereby costing him the election. Second, the Board will suffer no harm if this Court orders it not to certify the election results until Judge Griffin's petition is decided. Indeed, state law contemplates exactly this sort of delay when the Board's decision on an election protest is under review. The balance of the equities therefore favors Judge Griffin. And enjoining the Board from certifying the election results will permit

judicial review and thus serve the important interests the public has in election integrity and in preventing voter disenfranchisement through the counting of unlawful votes. Third, the Board erroneously applied state and federal law when it denied his election protests. Under North Carolina law, the writ of prohibition is designed to correct exactly that sort of legal error. Judge Griffin is therefore likely to succeed on the merits of his petition.

I. **Absent a temporary restraining order, Judge Griffin will be irreparably harmed.**

If this Court fails to enjoin the Board from certifying the election results, Judge Griffin will forever lose the ability to challenge the Board's decision. State law requires the Board to certify election results 10 days after the Board's final decision on an election protest. N.C. Gen. Stat. § 163-182.15(b)(1). Moreover, The State Board "shall" certify the election "unless an appealing party obtains a stay of the certification . . . within ten days after the date of service." *Id.* § 163-182.14(b). Thus, if Judge Griffin is unable to stay certification within 10 days, he will forever lose his ability to stay the Board's certification of the election. And once the Board certifies the election results, Judge Griffin's protests will become moot. *In re Protest of Whittacre,* 228 N.C. App. 58, 59, 743 S.E.2d 68, 69 (2013); *In re Election Protest of Fletcher,* 175 N.C. App. 755, 759, 625 S.E.2d 564, 567 (2006). Certification, then, will remove once and for all any chance for Judge Griffin to obtain judicial review of the Board's unlawful decision. And without judicial review, Judge Griffin will lose the election. He will therefore be irreparably harmed unless this Court stays the Board's hand.

II. **The balance of the equities favors Judge Griffin, and a temporary restraining order will serve the public interest.**

By contrast to Judge Griffin, the Board will not be harmed if this Court enters a temporary restraining order. Indeed, state law expressly contemplates that election certifications will often be stayed pending judicial review. *See* N.C. Gen. Stat. § 163-182.15. And requiring the Board to

stay its hand while a court determines whether its order was lawful will not prejudice that agency. Indeed, the Board has not yet certified the election, and granting a temporary restraining order will simply maintain the status quo until a preliminary injunction hearing can be held. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). (Indeed, there are significant questions whether removal to this Court is proper, especially given the novel state law issues upon which this petition turns and the likely inapplicability of any federal law to the issues presented here—the Court may therefore enter a temporary restraining order to preserve existing conditions pending a determination of its own jurisdiction. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947).) The balance of the equities therefore favors Judge Griffin.

Additionally, issuing a temporary restraining order here will serve the public's interest. Again, enjoining the Board from certifying the election results will permit judicial review to determine whether the Board allowed unlawful ballots to influence the outcome of this election. The public manifestly has an interest in preserving the integrity of its election process. *See Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006). And it also has an interest in ensuring that unlawful votes are not permitted to dilute and disenfranchise the votes of those who lawfully cast ballots. *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Simply put, a temporary restraining order will permit judicial review which will ultimately ensure that no cloud of illegitimacy surrounds the candidate who ascends to the North Carolina Supreme Court. Such an order is therefore in the public interest.

### III. Judge Griffin is likely to succeed on the merits of his petition.

Judge Griffin has petitioned the Supreme Court of North Carolina for a writ of prohibition. D.E. 1-4. The Supreme Court will issue the writ where a state agency's order erroneously applies the law, there is no adequate remedy by appeal or otherwise, and great injustice or irreparable injury will result if the writ is not granted. *See State v. Allen*, 24 N.C. (2 Ired.) 183, 188-89 (1841);

*see also Moses v. State Highway Comm'n*, 261 N.C. 316, 317, 134 S.E.2d 664, 665 (1964); *White v. Willett*, 456 S.W.3d 810, 812 (Ky. 2015).  Here, Judge Griffin can satisfy all those factors, and he is therefore likely to succeed on the merits of his petition.

### A. The Board erroneously applied state and federal law to deny Judge Griffin's protests.

Judge Griffin has filed three election protests contending that, during the November 2024 general election for Seat 6 on the North Carolina Supreme Court, more than 60,000 individuals cast ballots in violation of state law.  But when the Board ruled on his protests, it incorrectly applied state and federal law to deny them.

#### i. The Board erred when it decided to count votes cast by individuals who never properly registered to vote.

Article VI of the North Carolina Constitution allows residents to vote in state elections only if they are "legally registered" under state law.  N.C. Const. art. VI, § 3(1); *see also* N.C. Gen. Stat. § 163-82.1(a) (making registration a "Prerequisite to Voting"); *see also id.* § 163-54 ("Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter").

Since 2004, state law has required voter registrants to provide their drivers license or social security numbers in their voter applications.  N.C. Sess. Law 2003-226, §§ 2, 9; *see* N.C. Gen. Stat. § 163-82.4(a)(11) (providing that the state's voter registration form must require an applicant to provide his "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number").  This information is critical because it is used with a statewide computer registration system to verify the voter's identity and important details about the voter.  *See, e.g.*, N.C. Gen. Stat. § 163-82.11.

Here, Judge Griffin's protest points out that 60,273 individuals who were not legally registered to vote cast ballots in the election for Seat 6 of the North Carolina Supreme Court. *See* D.E. 1-4 at 78. Specifically, data obtained from the Board shows that those individuals did not provide their drivers license or social security numbers with their voter registration applications. Indeed, the Board has admitted that it allowed individuals to register to vote without providing that information. *See* D.E. 1-4 at 36-37 (citing Order at 4, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023)). Accordingly, those individuals never legally registered to vote and it is therefore unlawful to count their ballots in this election. N.C. Const. art. VI, § 3(1); N.C. Gen. Stat. § 163-82.4(a)(11).

The Board's order does not assert that the individuals Judge Griffin has identified complied with these provisions of North Carolina law when they registered to vote. Instead, it reimagines the state's election laws to excuse their illegal registrations, reasoning that those errors are harmless because the individuals that did not properly register cured their application defects by providing additional documents, which, the Board says, state law permits. *See* D.E. 1-5 at 56. Not so.

There is no state law permitting a "cure" by providing additional documents. Indeed, the General Assembly has provided precisely one method to cure an improper registration, N.C. Gen. Stat. § 163-82.4(f), but the individuals whose ballots Judge Griffin challenges did not use this statutory cure process.

In the alternative, the Board also rejected Judge Griffin's protest on federal-law grounds, claiming that the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA") compel this result. *See* D.E. 1-5 at 65-67. But neither of those federal statutes apply to *state* elections, like the one at issue here. As for HAVA, the plain language of the Act states that

the registration systems it mandates apply only to "an election for Federal office." 52 U.S.C. §§ 21081(a), 21083(A)(1)(a)(viii).

So too with the NVRA. That Act, by its own terms, applies only to "elections for federal office." *Id.* §§ 20501(b)(1)-(2). And Congress enacted the NVRA under the federal constitution's Elections Clause, and that clause only allows Congress to regulate the "Times, Places, and Manner" of selecting Senators and Representatives for Congress. U.S. Const. art. I, § 4, cl. 1. Thus, courts must construe the NVRA not to regulate state elections to avoid an unconstitutional interpretation of the Act. *See, e.g.*, *Dobrovolny v. Nebraska,* 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000)*; Broyles v. Texas,* 618 F. Supp. 2d 661, 691 (S.D. Tex. 2009)*, aff'd,* 381 Fed. App'x 370 (5th Cir. 2010); *see also Pree v. D.C. Bd. of Elections & Ethics*, 645 A.2d 603, 605 (D.C. 1994).

The Board's attempted reliance on the NVRA is flawed for another reason: the provisions of the Act to which the Board cites, 52 U.S.C. § 20507(a)(3), (c), only prohibit states from removing voters from their voter rolls. But Judge Griffin's protests only challenge the results of his election, and he nowhere requests that the state remove any voters from its registration rolls. *See* D.E. 1-5 at 31. Indeed, a successful election protest cannot result in anyone being removed from the voter rolls—it can only lead to the correction of inaccurate results or a recount. N.C. Gen. Stat. § 163-182.10(d)(2)(e)(1)-(2); *Bouvier v. Porter*, 386 N.C. 1, 4, 900 S.E.2d 838, 843 (2024).

The Board, in its order, also sought to buttress its conclusions regarding the HAVA and the NVRA by manufacturing connections between Judge Griffin's protests and *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-547 (E.D.N.C.) (the "*RNC* case"). D.E. 1-5 at 67. In that case, the RNC sought a writ of mandamus in state court, requiring the state to remove voters from the state's registration rolls. The Board removed the state

proceedings to this Court, which ordered remand. In an interlocutory appeal of that decision, the Fourth Circuit reversed, characterizing the case as one about the interplay between federal and state laws as they apply to the state's maintenance of voter rolls. But that case is inapposite here, for obvious reasons. It did not involve, as here, a request to correct a vote count in a state race based on a violation of state law. The rulings in the *RNC* case therefore did not consider, much less adjudicate, any of the questions presented here.

        **ii.**        **The Board erroneously decided to count votes cast by "Never Residents."**

The North Carolina Constitution contains a bona fide residency requirement, providing that only those individuals who have "resided in the State of North Carolina for one year . . . next preceding an election" may vote in elections for state offices. N.C. Const. art. VI, § 2(1). This residency requirement is nothing new—it has been a requirement since North Carolina ratified its original constitution in 1776. *See* N.C. Const. of 1776, art. VIII. And bona fide residency requirements are permissible under the United States Constitution. *See Dunn v. Blumstein*, 405 U.S. 330, 344 (1972); *see also Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2; *Lloyd v. Babb*, 296 N.C. 416, 439, 251 S.E.2d 843, 858 (1979).

Here, Judge Griffin, using data provided by the Board, has identified 267 individuals who voted in his election who have *never* resided in North Carolina. *See* D.E. 1-4 at 78. But under the North Carolina Constitution, those voters were not permitted to cast those ballots, and the Board must therefore correct the vote count to fix this error.

The Board denied this protest, reasoning that a state statute, the Uniform Military and Overseas Voters Act ("UMOVA"), N.C. Gen. Stat. §§ 163-258.1, *et seq.*, nonetheless permits it to count those votes. But interpreting UMOVA to provide an exception to the state constitution's bona fide residency requirement renders it unconstitutional and invalid. Judge Griffin therefore

argued that the Board should interpret UMOVA to avoid this serious constitutional question. *See N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160, 814 S.E.2d 54, 62 (2018). The Board, however, refused, inexplicably reasoning that it was incompetent to hold a state statute unconstitutional—something Judge Griffin did not request it to do. D.E. 1-5 at 69.

The Board also reasoned that if UMOVA violated the state constitution, that the federal constitution's substantive-due-process doctrine would reinstate the law. Apparently, the Board thought that applying our state constitution to this election in the manner Judge Griffin had requested would amount to applying a "newly announced rule of law." *Id.* at 72. But the Board has confused the chronology. For the state constitution's residency requirement has existed and persisted since the Revolutionary War.

### iii. The Board incorrectly decided to count absentee ballots submitted without photo identification.

Since 2018, North Carolina law has required individuals submitting absentee ballots to submit a photocopy of their photo identification in a "sealed container-return envelope" along with their ballot. N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1). To be sure, voters who fail to include a photo identification along with their ballot may cure that deficiency, but only if the proper identification is received the day before the county canvass. *Id.* § 163-230.1(e). These provisions equalize the burden of voting: both in-person voters and absentee voters must show photo identification to cast a ballot. *See id.* § 163-166.16(a); N.C. Const. art. VI, §§ 2(4), 2(2).

Here, Judge Griffin—again using the Board's own data—has identified in his protests 5,509 overseas absentee voters who failed to submit photo identification along with their ballot. None of those voters cured this deficiency under section 163-230.1(e). North Carolina law therefore prohibits counting those ballots.

The Board, however, disagreed. It reasoned that section 163-258.17(b) established the exclusive means to authenticate the identity of an overseas absentee voter and excused such voters from providing photo identification. D.E. 1-5 at 73. But subsection (b) says no such thing. It instead refers to the "authentication" required for "execution of a document" for overseas voters. N.C. Gen. Stat. § 163-258.17(b). But North Carolina's photo-identification requirement is an entirely separate requirement found in another statute and is used to verify the voter's identity, not to authenticate a document.

The Board also defended its decision to excuse overseas voters from the photo-identification requirement on the grounds that the Board had already issued a rule to that effect. D.E. 1-5 at 76-77. But the General Assembly never delegated to the Board the power to override state constitutional and statutory requirements. Nor does the state constitution permit the Board to impose a greater burden—photo identification—on those living in North Carolina than it imposes on those living abroad.

Finally, the Board's attempt to rely on federal law to support its reasoning in this regard fails. The Board cited 52 U.S.C. § 20302 as part of its justification for permitting these ballots to be counted. *Id.* at 77. But, as with the HAVA and the NVRA, that statute is in applicable for it provide that it only applies to "elections for Federal office." 52 U.S.C. § 20302 (a)(1)-(3), (6)-(8), (b)(1), (c).

    iv. **<u>The Board's other reasons for denying Judge Griffin's protests fail.</u>**

The Board relied on several other reasons to deny Judge Griffin's protests, but these all fail as well. First, the Board reasoned that it should dismiss the protests because, it said, they were untimely voter challenges. But that position contravenes not only the Board's previous orders, *see* D.E. 1-4 at 60-61, but also the North Carolina Supreme Court's decision in *Bouvier*. Those

authorities stand for the proposition that "an election protest may address any 'irregularity' or 'misconduct' in the election process, including the counting and tabulation of ballots cast by ineligible voters." *Bouvier*, 386 N.C. at 4, 900 S.E.2d at 843. And that is exactly what Judge Griffin's protests do here.

Next, the Board purported to dismiss Judge Griffin's protests for lack of service. To reach this decision, the Board partially relied on rules it had promulgated requiring protestors to serve by mail copies of all filings in an election protest on every person with a direct stake in the protest within one business day of filing the protest. 8 N.C. Admin. Code § 02.0111. But the Board has no statutory authority to burden protestors with onerous processes for providing notice to affected parties. And that is especially so where the protest statutes expressly burden the county boards of elections—not the protestors—with the duty to provide notice to affected parties. N.C. Gen. Stat. § 163-182.10(b).

Moreover, Judge Griffin nonetheless complied with the Board's service demand: he mailed postcards to over 60,000 voters at their addresses of record. That postcard notified those individuals that their vote may be affected by his protests and provided a QR-code link to the protest filings and the county boards of elections website. D.E. 1-5 at 174-78. Indeed, that postcard mirrored the mailers that the Board itself uses to notify voters of certain requirements. *See* N.C. Gen. Stat. §§ 163-82.8(c), 163-82.14(d)(2); *See* N.C. State Bd. of Elections, *Press Release: State Board Launches Photo ID Educational Campaign* (Feb. 13, 2024), available at https://www.ncsbe.gov/news/press-releases/2024/02/13/state-board-launches-photo-id-educational-campaign.

Judge Griffin's mailers also satisfy the constitutional standard for notice because they were "reasonably certain to inform those affected." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S.

306, 315, 319 (1950). Judge Griffin served over 60,000 voters in this way, and the interests of each "is identical with that of a class" and, therefore, "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any sustained would inure to the benefit of all." *Id.* at 319. Given that Judge Griffin's service on 60,000 voters replicates the Board's own methods of notifying voters, the Board had no grounds to claim his method of notice and service was deficient.

The Board also suggested in passing that Judge Griffin's protests may have been untimely filed. To be sure, the General Statutes require that protests be filed "no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results." N.C. Gen. Stat. § 163-182.9(b)(4)(c). The General Statutes, however, also expressly provide that only "substantial compliance" with those deadlines is required. *Id.* § 163-182.10(a)(1). And here, Judge Griffin's protests were all submitted by email to the county boards of elections before the 5:00 P.M. deadline. D.E. 1-5 at 174-78. It is possible that some of those emails might have hit election officials' inboxes a few minutes after 5:00 P.M., but that scenario clearly demonstrates "substantial compliance" with the deadline requirement. *See, e.g.*, *Graham v. Nw. Bank,* 16 N.C. App. 287, 291-92, 192 S.E.2d 109, 112 (1972).

Finally, the Board suggests that sustaining Judge Griffin's protests may violate the federal constitution's substantive due process doctrine, ostensibly invoking the *Anderson-Burdick* test, though it never mentions that test by name. That test requires that a regulation imposing a severe burden on voting be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But here, none of Judge Griffin's protests ask the Board to enforce laws that would severely burden voting. For asking the Board to enforce the lawful registration, residency, and photo-identification requirements enshrined in the state

constitution and General Statutes merely requires it to apply an evenhanded trio of voter qualifications requirements which cannot, as a matter of law, severely burden the right to vote. *See Crawford v. Marion Cnty. Elec. Bd*, 553 U.S. 181, 189-98 (2008) (plurality opinion).

The Board also suggests that where voters complied with its instructions to disregard certain registration or voting requirements, that sustaining the protests would violate substantive due process. But this is not a situation in which an election official's error prevented eligible voters from casting their ballots. Rather, this is an instance in which, after the Board decided to not inform individuals of certain requirements, the individuals' ignorance of those requirements resulted in them failing to take the steps necessary to become eligible voters. But, in this situation, it is not unconstitutional to require the public to be as knowledgeable of election laws as other laws. *See, e.g.*, *Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.,* 472 F.2d 121, 122 (8th Cir. 1973); *Powell v. Bower,* 436 F.2d 84, 88 (2d Cir. 1970).

Moreover, even if the Court were to conclude that enforcing these laws severely burdened the right to vote, they are nonetheless tailored to compelling state interests. *See Crawford*, 553 U.S. at 194-97; *Purcell,* 549 U.S. at 4; *Bush v. Gore,* 531 U.S. 98, 105 (2000); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986). The state is therefore well justified in enforcing them.

\* \* \*

For these reasons, Judge Griffin is likely to show that the Board erroneously applied state and federal law when it denied his protests. And given that Judge Griffin stands to suffer irreparable harm—i.e., losing the election—absent the writ, and that the Board is acting lawlessly on a matter of great public importance, there is a need for judicial expediency and the only adequate

15

Case 5:24-cv-00724-M-RN     Document 14     Filed 12/20/24     Page 15 of 19

remedy is a writ of prohibition. Judge Griffin has therefore demonstrated that he likely to succeed on the merits of his petition.

## IV. The Court should waive the bond requirement or set bond at a nominal amount.

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," it is well established "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Here, Respondent will not suffer costs and damages from the proposed restraining order, so Petitioner should not be required to post security, or should be required to post only a nominal amount.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court enter a temporary restraining order enjoining the State Board of Elections from certifying the election results for the November 2024 general election for Seat 6 of the North Carolina Supreme Court. Petitioner further requests that the temporary restraining order last until such time as the parties shall brief, and the Court shall decide, a motion for a preliminary injunction.

Dated: December 20, 2024

Craig D. Schauer
41571 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
cschauer@dowlingfirm.com

Troy D. Shelton
48070 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
tshelton@dowlingfirm.com

W. Michael Dowling
42790 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
mike@dowlingfirm.com

*Local Rule 83.1(d) special appearance forthcoming*

Respectfully submitted,

/s/ Mark M. Rothrock
Mark M. Rothrock
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

William T. Thompson*
24088531 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

*Attorneys for Petitioner*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)

I hereby certify that this Petitioner's Memorandum in Support of His Motion for Temporary Restraining Order is in compliance with Local Rule 7.2(f)(2), as the document, including headings, footnotes, citations, and quotations, contains no more than 8400 words, as indicated by the word count generated by word processing software.

/s/ *Mark M. Rothrock*
Mark M. Rothrock

# CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing Petitioner's Memorandum in Support of His Motion For Temporary Restraining Order with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the Respondent, the North Carolina State Board of Elections.

/s/ *Mark M. Rothrock*
Mark M. Rothrock