# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

JEFFERSON GRIFFIN,

    Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

    Defendant.

Case No. 5:24-cv-00724-M

---

**MEMORANDUM BRIEF IN SUPPORT OF THE NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S MOTION TO INTERVENE AS DEFENDANTS**

i

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

    I.    After the North Carolina Supreme Court election concluded, Judge Jefferson Griffin filed hundreds of election protests. ...................................................................... 2

    II.    Judge Griffin did not sufficiently notify challenged voters. ................................ 5

    III.    The State Board rejected Judge Griffin's challenges. ......................................... 6

    IV.    Judge Griffin sought to stay certification of the election and deadlines to appeal the State Board's determinations. ........................................................................... 8

    V.    Proposed Intervenor-Defendants are harmed by Judge Griffin's efforts to disenfranchise voters. ...................................................................................... 9

ARGUMENT ................................................................................................................ 14

    I.    Proposed Intervenors are entitled to intervene as of right under Rule 24(a) ................... 14

        A.  The motion is timely. ................................................................................. 14

        B.  The disposition of this case threatens to impair Proposed Intervenors' significantly protectable interests. ............................................................... 15

        C.  Proposed Intervenors' interests are not adequately represented by the existing parties in this case. .................................................................................. 19

    II.    Alternatively, Proposed Intervenors should be granted permissive intervention under Rule 24(b). ................................................................................................... 21

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Berger v. North Carolina State Conference of the NAACP*,
  597 U.S. 179 (2022) ........................................................................................... 19, 20

*Bost v. Illinois State Board of Elections*,
  75 F.4th 682 (7th Cir. 2023) ...................................................................................... 20

*Carcaño v. McCrory*,
  315 F.R.D. 176 (M.D.N.C. 2016) ............................................................................... 15

*Commonwealth of Virginia v. Westinghouse Electric Corp.*,
  542 F.2d 214 (4th Cir. 1976) ................................................................................. 20, 21

*County of San Miguel v. MacDonald*,
  244 F.R.D. 36 (D.D.C. 2007) ..................................................................................... 18

*Democracy North Carolina v. North Carolina State Board of Elections*,
  476 F. Supp. 3d 158 (M.D.N.C. Aug. 4, 2020) ...................................................... 16, 18

*Dowdy v. City of Durham*,
  689 F. Supp. 3d 143 (M.D.N.C. 2023) ....................................................................... 15

*Feller v. Brock*,
  802 F.2d 722 (4th Cir. 1986) ...................................................................................... 14

*Fund for Animals, Inc. v. Norton*,
  322 F.3d 728 (D.C. Cir. 2003) .................................................................................... 19

*Hengle v. Curry*,
  No. 3:18-CV-100, 2018 WL 3016289 (E.D. Va. June 15, 2018) ..................................... 21

*Illinois State Board of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979) .................................................................................................. 15

*In re Sierra Club*,
  945 F.2d 776 (4th Cir. 1991) ...................................................................................... 21

*Issa v. Newsom*,
  No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351
  (E.D. Cal. June 10, 2020) .......................................................................................... 16

*Kleissler v. U.S. Forest Service*,
  157 F.3d 964 (3d Cir. 1998) ....................................................................................... 19

*Kobach v. U.S. Election Assistance Commission*,
  No. 13-CV-4095-EFM-DJW ....................................................................................... 22

ii

*League of United Latin American Citizens, Dist. 19 v. City of Boerne,*
    659 F.3d 421 (5th Cir. 2011) ......................................................................... 16

*League of Women Voters of North Carolina v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) ......................................................................... 18

*League of Women Voters of North Carolina v. North Carolina,*
    No. 1:13CV660, 2014 WL 12770081 (M.D.N.C. Jan. 27, 2014) .......................... 22

*Moore v. Circosta,*
    No. 1:20CV911, 2020 WL 6597291 (M.D.N.C. Oct. 8, 2020) ......................... 10, 15, 17, 22

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) ...................................................................................... 7

*North Carolina Green Party v. North Carolina State Board of Elections,*
    619 F. Supp. 3d 547 (E.D.N.C. 2022) ............................................................ 16

*Paher v. Cegavske,*
    No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365
    (D. Nev. Apr. 28, 2020) ................................................................................ 16

*Public Interest Legal Foundation, Inc. v. Winfrey,*
    463 F. Supp. 3d 795 (E.D. Mich. 2020) .......................................................... 22

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ...................................................................................... 18

*Sandusky County Democratic Party v. Blackwell,*
    387 F.3d 565 (6th Cir. 2004) ......................................................................... 16

*Spring Construction Co. v. Harris,*
    614 F.2d 374 (4th Cir. 1980) ......................................................................... 14

*Stuart v. Huff,*
    706 F.3d 345 (4th Cir. 2013) ......................................................................... 21

*Students for Fair Admissions Inc. v. University of North Carolina,*
    319 F.R.D. 490 (M.D.N.C. 2017) ................................................................... 22

*Teague v. Bakker,*
    931 F.2d 259 (4th Cir. 1991) ..................................................................... 14, 15, 18

*Trbovich v. United Mine Workers of America,*
    404 U.S. 528 (1972) .................................................................................. 19, 20

*Voto Latino v. Hirsch,*
    712 F. Supp. 3d 637 (M.D.N.C. 2024) ........................................................... 16

*Wasserberg v. North Carolina State Board of Elections,*
    2024 No. 5:24-CV-00578-M (E.D.N.C. Oct. 16, 2024) ................................. 10, 17

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ...................................................................................... 15

iii

## U.S. CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ............................................................................................ 17

U.S. Const. amend. XIV ...................................................................................... 17

## STATUTES & REGULATIONS

8 N.C. Admin. Code 2.0111 ................................................................................... 5

8 N.C. Admin. Code 17.0109 ................................................................................. 4

52 U.S.C. § 10101 .............................................................................................. 14

52 U.S.C. § 10307 .............................................................................................. 14

52 U.S.C. § 20302 .......................................................................................... 14, 17

52 U.S.C. § 20501 .......................................................................................... 14, 17

52 U.S.C. § 20901 .......................................................................................... 14, 17

52 U.S.C. § 21083(a)(5)(A) ................................................................................... 3

N.C. Gen. Stat. § 163-82.4 ............................................................................... 3, 17

N.C. Gen. Stat. § 163-182.12 ........................................................................... 6, 21

N.C. Gen. Stat. § 163-230.1 ................................................................................... 3

N.C. Gen. Stat. § 163-258.1 ................................................................................... 4

N.C. Gen. Stat. 163-258.2(1)(e) ............................................................................ 4

## OTHER AUTHORITIES

Fed. R. Civ. P. 24(a) ............................................................................ 1, 2, 14, 23

Fed. R. Civ. P. 24(b) ................................................................................ 1, 2, 23

Fed. R. Civ. P. 24(c) ............................................................................................ 14

Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed. 2024) ........................... 20

Pursuant to Rule 24(a), the North Carolina Alliance for Retired Americans ("the Alliance"), VoteVets Action Fund ("VoteVets"), Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (together, "Proposed Intervenors") move to intervene as a matter of right. Alternatively, the Proposed Intervenors move to intervene permissively under Rule 24(b). Their motion should be granted for the reasons below.

## INTRODUCTION

Before voting began in the 2024 election, the rules of the road for casting and counting ballots were set and clear. Only after voting had ended, votes had been counted, and it became evident that Judge Jefferson Griffin lost the race for North Carolina Associate Supreme Court Justice, did Judge Griffin choose to file mass challenges to tens of thousands of voters across the state—demanding retroactive changes to election rules and the disenfranchisement of tens of thousands of voters based on these new rules. In other words, after playing the game and losing, Judge Griffin wants to rewrite the rulebook.

Judge Griffin's gambit is now before this Court. He claims that North Carolinians who have been registered and voted for years were in fact ineligible to vote all along, that overseas voters who lawfully obtained North Carolina residency through their parents or guardians are no longer permitted to vote in the state, and that military and overseas voters that submitted their ballots as instructed nevertheless should have their votes thrown out after the fact. In short, Judge Griffin seeks to disenfranchise unsuspecting voters who followed the law as it existed before the election and did nothing wrong. Worse still, his requested relief would violate several federal statutes and the United States Constitution.

Proposed Intervenors seek to intervene in this case to protect themselves from this outright assault on their and their members' rights. The Alliance and VoteVets—organizations that

represent communities disproportionately impacted by Judge Griffin's challenges—seek to protect the fundamental right to vote of their members and constituents, as well as the organizations' own interests in supporting and engaging voters for the election. And the individual Intervenor-Defendants—Alliance members Tanya Webster-Durham, Sarah Smith, and Juanita Anderson—have each been challenged by Judge Griffin and will be disenfranchised if Judge Griffin succeeds in his quest to change election rules long after the election has concluded. No party adequately represents Proposed Intervenors' interests—they are the only proposed parties before the Court who are themselves voters or representatives of the voters whose ballots may be tossed out as result of this litigation. So that the Proposed Intervenors can protect those sacred interests, the Court should grant intervention as a matter of right under Fed. R. Civ. P. 24(a) or, alternatively, permissively under Rule 24(b).

## **BACKGROUND**

I. **After the North Carolina Supreme Court election concluded, Judge Jefferson Griffin filed hundreds of election protests.**

This fall, millions of voters across North Carolina made their voices heard by casting a ballot in the election for Associate Justice on the North Carolia Supreme Court. The race was hard fought and the results close. After the votes were counted, however, it became clear that Justice Riggs prevailed over Judge Griffin. Judge Griffin requested a recount, which was completed on December 3 and again confirmed Justice Riggs's victory.[1] Dissatisfied with these results, Judge Griffin filed over 300 election protests in almost every county across the state. These sweeping

---

[1] Judge Griffin subsequently requested a partial hand-to-eye recount, which involves hand counting ballots from randomly selected precincts and early voting sites to determine whether there are sufficient discrepancies from the machine recount to require a full hand-to-eye recount of all ballots cast in the contest. This second recount was completed on December 10 and found no significant discrepancies. In fact, Justice Riggs picked up more votes through this recount than Judge Griffin.

2

protests collectively seek to disenfranchise over 60,000 North Carolinians who cast ballots in the Supreme Court race.

Judge Griffin's protests seek to discard votes falling into six different categories. The first and largest category targets 60,273 registered voters who cast absentee ballots or who voted early based on information allegedly missing in their registration file ("HAVA Challenge"). *See* NCSBE Order at 3 (App. 40), ECF No. 1-5. Under the Help America Vote Act ("HAVA"), when a person registers to vote, states attempt to collect either the applicant's driver's license number or the last four digits of the applicant's social security number. *See* 52 U.S.C. § 21083(a)(5)(A). If the voter does not have either number, states must instead assign them a unique voter registration identification number. *See id*. North Carolina law mirrors these requirements. *See* N.C. Gen. Stat. § 163-82.4(a), (b). In the past, however, North Carolina's registration forms did not explicitly require voters to provide their driver's license or Social Security number when registering and the state accepted their otherwise complete applications. *See* NCSBE Order at 25–27 (App. 62–64) (discussing how voters in this challenge category would have to be retroactively removed from the list of eligible voters). In many cases, these voters have been registered and have voted without incident *for decades*. *See infra* Background Section V. Many other active North Carolina voters also registered to vote *before* federal or state law required the provision of such numbers. Even though these voters have long been registered to vote—and have complied with North Carolina's strict photo identification law when casting their ballots, N.C. Gen. Stat. § 163-230.1(f1)—Judge Griffin now seeks to invalidate their votes after-the-fact if their registration files lack a driver's license or social security number. *See* Griffin Br. at 2–6 (App. 7–11), ECF No. 1-5; NCSBE Order at 3 (App. 40).

The second category of challenges—the Non-Resident Challenge—brought by Judge Griffin targets ballots cast by 266 citizens living overseas, who are expressly entitled to vote under the plain terms of North Carolina's Uniform Military and Overseas Voters Act ("UMOVA"), enacted by the General Assembly in 2011. *See* N.C. Gen. Stat. § 163-258.1, *et seq*. UMOVA guarantees dependents and children of North Carolinians living overseas, including those serving in the Armed Forces, the right to vote in North Carolina elections under the circumstances described in the Act. *Id.* § 163-258.2(1)(e). Voters who fall into this category have participated in dozens of past elections without issue. But Judge Griffin now believes these citizens should not be allowed to vote because, in his view, they are not residents of North Carolina. *See* Griffin Br. at 6–18 (App. 11–23); NCSBE Order at 3 (App. 40).

The third category of voters targeted by Judge Griffin's protests include 1,409 overseas voters who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and who, in doing so, complied with all relevant federal and state laws for returning their absentee ballot. *See* Griffin Br. at 18–22 (App. 23–27); NCSBE Order at 3 (App. 40). Judge Griffin argues these voters' ballots should be discarded because he believes that they should have provided a copy of their photo identification with their ballot, notwithstanding that the State Board has prescribed rules for UOCAVA voters that exempt them from this requirement ("UOCAVA ID Challenge"). *See* 8 N.C. Admin. Code 17.0109.[2]

The remaining three categories of protests are: (1) the "Felon Voter Challenges," which consistent of challenges to ballots cast by 240 voters who Judge Griffin claims are ineligible to

_____

[2] As the State Board noted, Judge Griffin attempted to supplement this second category and third category of challenges with additional voter names, but because the State Board determined these protests were legally deficient, it chose not to determine whether such supplementations would be allowable. *See* NCSBE Order at 3 n.2 (App. 40).

4

vote due to felony conviction; (2) the "Deceased Voter Challenges," which challenge 156 ballots cast by voters who Judge Griffin alleges were deceased as of election day; and (3) the "Unregistered Voter Challenges," which challenge 572 ballots cast by voters who Judge Griffin argues are not registered to vote in North Carolina at all. NCSBE Order at 3 (App. 40).

## II.    Judge Griffin did not sufficiently notify challenged voters.

Judge Griffin was expressly required to "serve copies of all filings on every person with a direct stake in the outcome of this protest," including "all such voters" the protestor is seeking to disenfranchise. 8 N.C. Admin. Code 2.0111. In other words, each of the more than 60,000 voters challenged by Judge Griffin "*must be served*" with "all filings" relevant to the challenge. *Id.* (emphasis added).

Judge Griffin did no such thing. Instead, he purported to notify each challenged voter by sending them a postcard. The card—which was addressed to the voter "or current resident"— contained a QR code that mobile smartphone users could scan and then be redirected to the North Carolina Republican Party webpage. Griffin Postcard (App. 175), ECF No. 1-5. This meant that, even if they had received them, recipients without internet access, smartphones, or familiarity with QR Code technology could not access additional information, including any of the protest filings made against their ballots. *See infra* Background Section V (describing these obstacles for several Proposed Intervenors).

If a voter received the notice and was able to navigate through the QR code, they were led to a website containing over *three hundred* links to each of Judge Griffin's various protests. But neither the postcard nor webpage provided the voter with any information about the basis upon which their ballot was being challenged—they could only guess. *See* Griffin Postcard (App. 175). Likewise, the postcard sent to voters merely informed them the website could tell them "what protest *may* relate to you," without providing any further details about the protest or explaining

5

that the voter may be disenfranchised—never mind providing "all filings" relevant to the protest. *See id.* (emphasis added). In fact, Judge Griffin's postcard did not even clearly say that the voter *was* challenged, it merely stated that a voter's vote "*may be affected*" by "one or more" protests. *Id.* (emphasis added). Instead of providing the required notice to challenged voters, Judge Griffin's half-baked efforts put the burden on *voters* to determine—weeks after they cast their ballots—whether and how their votes are being challenged.

### III. The State Board rejected Judge Griffin's challenges.

On November 19, 2024, after Judge Griffin filed his hundreds of challenges, he requested that the State Board take jurisdiction over all of his protests pursuant to N.C. Gen. Stat. § 163-182.12, which grants the State Board the power to "initiate and consider complaints on its own motion" and "take any . . . action necessary to assure that an election is determined without taint . . . and without irregularities that may have changed the result of an election." The State Board ultimately agreed to take jurisdiction over three of the six categories of challenges, including the HAVA Challenge, Non-Resident Challenge, and UOCAVA ID Challenge. The State Board further concluded that the remaining three categories of challenges—Felon Voter Challenges, Deceased Voter Challenges, and Unregistered Voter Challenges—were best left to the counties to adjudicate in the first instance.[3]

On December 11, the State Board heard arguments from each candidate about the protests over which it had taken jurisdiction, and conducted a vote on the issue of proper service, as well

---

[3] On December 20, the State Board considered appeals that had been filed by Judge Griffin to review the determinations counties had made to count votes identified in these three categories of protests. Upon determining that only 292 votes were at issue (largely because some protests had been withdrawn and some protests implicated multiple voters), a majority of the State Board voted to dismiss the appeals because the total number of votes at issue was far below the 734-vote margin between the two candidates and therefore not outcome determinative.

as on each of the three categories of protests. The State Board rejected all of Judge Griffin's protests and issued its written opinion on December 13.

On the issue of service, a majority of the State Board determined that Judge Griffin had not properly served notice to each challenged voter "in a manner that would comply with the North Carolina Administrative Code and be consistent with the requirements of constitutional due process." NCSBE Order at 6 (App. 43). The postcard was not clearly addressed to the relevant voter and contained only a QR code that many voters would not know how to use, nor did it provide sufficient information to understand the protest against their vote. *Id.* at 8 (App. 45). The majority thus concluded that Judge Griffin's "chosen method of service is not reasonably calculated under the circumstances to inform the challenged voters as to what action is pending, nor does it provide enough information for the voters to determine what they can even do about it," and thus failed to meet "elementary and fundamental requirement[s] of due process." *Id.* at 13–14 (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)) (App. 50–51).

The State Board then considered the merits of each of the three protests before it. A majority of the State Board first rejected the HAVA Challenge, concluding that counting ballots cast by voters challenged in this category is not a violation, irregularity, or misconduct in the conduct of the election. *Id.* at 17 (App. 54). In doing so, the majority emphasized the fundamental unfairness—rising to the level of a violation of due process and federal law—of disenfranchising voters who have been told for years that they are lawfully registered to vote. *Id.* at 18–29 (App. 55–66) (citing, among other things, HAVA, the National Voter Registration Act ("NVRA"), and state and federal case law).

A majority of the State Board next rejected Judge Griffin's Non-Resident Challenge, concluding that the General Assembly explicitly authorized these individuals to vote in state

elections. *Id.* at 29–31 (App. 66–68). The State Board further noted that such voters had previously been permitted to vote for 13 years and in 43 elections, undercutting Judge Griffin's demand to nix the rule after-the-fact, particularly given the "clear instructions" from the General Assembly permitting such votes. *Id.* at 31 (App. 68).

Finally, the State Board unanimously rejected Judge Griffin's UOCAVA ID Challenge. The State Board laid out how state law and relevant regulations explicitly exempt military and overseas voters from providing identification when returning their absentee ballot. The State Board also noted that there is no doubt this regulation is directly applicable and enforceable, especially where Judge Griffin failed to object to this regulation during the rulemaking process and the rule was unanimously approved by the Rules Review Commission, an agency appointed by the leadership of the General Assembly, at the time of enactment. *Id.* at 32–37 (App. 69–74).

**IV.    Judge Griffin sought to stay certification of the election and deadlines to appeal the State Board's determinations.**

On December 18, Judge Griffin filed a petition for writ of prohibition with the North Carolina Supreme Court. *See generally* Notice of Removal Ex. A, ECF No. 1-4. In his petition, Judge Griffin asked the Court to immediately issue a temporary stay of both the State Board's certification of the election for Seat 6 of the North Carolina Supreme Court and the requirement that Judge Griffin file an appeal of the State Board's decision within 10 days of service of the State Board's decision. *Id.* at 1–2. Judge Griffin requested a decision by December 23, the day by which he must file his appeal of the State Board's decision. *Id.* at 1.

The next day, the State Board removed the action to this Court. *See generally* Notice of Removal, ECF No. 1. The State Board's notice of removal states that Judge Griffin's petition seeks declaratory rulings interpreting several federal voting laws, including HAVA, UOCAVA, NVRA, the Voting Rights Act of 1965 ("VRA"), the Civil Rights Act of 1964 ("CRA"), and the Fourteenth

8

Amendment to the United States Constitution. *Id.* at 1–2; *see also id.* at 2 (citing Judge Griffin's request that the North Carolina Supreme Court issue an order that "[a]ll arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin are rejected" and "all arguments under the state or federal constitution . . . are rejected"). The State Board further argues that removal is warranted because Judge Griffin seeks relief requiring the State Board to perform an act that violates federal law. *Id.* at 2.

## V. Proposed Intervenor-Defendants are harmed by Judge Griffin's efforts to disenfranchise voters.

Judge Griffin's sweeping effort at mass disenfranchisement directly harms each of the Proposed Intervenors. As to the organizational Intervenors the Alliance and VoteVets, Judge Griffin seeks to disenfranchise their members and the communities these organizations serve. As to the individual Intervenors, Alliance members Tanya Webster-Durham, Sarah Smith, and Juanita Anderson, Judge Griffin seeks to toss out their votes, denying them their fundamental right to vote.

***The Alliance***. The North Carolina Alliance for Retired Americans (the "Alliance") is a 501(c)(4) nonprofit social welfare organization incorporated in North Carolina. *See* Ex. 1, Decl. of William Dworkin ¶ 2 ("Dworkin Decl."). It is a chartered state affiliate of the Alliance for Retired Americans, a nationwide grassroots organization with more than 4.3 million members. *Id.* The Alliance has approximately 58,000 members across North Carolina, most of whom are retirees over the age of 65. *Id.* ¶¶ 2, 8. The Alliance's mission is to ensure social and economic justice and full civil rights for retirees. *Id.* ¶ 3. To further that mission, the Alliance works to protect the rights of its members to vote and to have their votes counted. *Id.* The Alliance has strong interests in ensuring that the greatest number of its members are allowed to vote and have their votes counted and in advocating for policies that make voting safe, easy, and reliable for its members. *Id.*

The Alliance undertakes a broad range of initiatives to protect its members' right to vote. As the Alliance engages members and the larger community of retired North Carolinians, it answers questions regarding voting requirements and procedures. *Id.* ¶ 6. During Alliance meetings, members discuss and learn about key issues affecting retirees—such as Social Security and Medicare—as well as candidates' positions on those issues. *Id.* The Alliance also develops and circulates a newsletter to educate its members on changes to the voting process and how older and retired Americans might be affected by such changes. *Id.* ¶ 7. Alliance members tend to be civically engaged and tend to vote at higher rates than the general public. *Id.* ¶ 8. Given their advanced age, many Alliance members have been registered to vote for decades, including prior to the enactment of HAVA and its North Carolina analog. *Id.* The Alliance has previously initiated and intervened in litigation in North Carolina courts to protect the ability of its members—and the ability of all retirees—to vote and have their votes counted.[4] *Id.* ¶ 5.

Because of Judge Griffin's shoddy effort to inform challenged voters that their votes may not count, the Alliance had to dedicate its own limited time and resources to identifying potentially impacted members. *Id.* ¶¶ 11–12. Based on an initial review of the voters challenged by Judge Griffin, it appears that at least 41 members of the Alliance are at risk of having their ballots tossed out if the protests are successful, including Tanya Webster-Durham, Sarah Smith, and Juanita

---

[4] *See, e.g.*, *Wasserberg v. N.C. State Bd. of Elections*, No. 5:24-CV-00578-M (E.D.N.C. Oct. 16, 2024) (granting the Alliance's motion to intervene in case concerning whether certain absentee ballots would count); *N.C. All. for Retired Ams. v. N.C. State Bd. of Elections*, Case No. 20-CVS-8881 (Wake Cnty. Super. Ct. Aug. 10, 2020) (challenge brought by the Alliance against restrictive election procedures implemented during the COVID-19 pandemic); *see also Deas v. N.C. State Bd. of Elections*, Case No. 22-CVS-11290 (Wake Cnty. Super. Ct. Oct. 26, 2022) (granting intervention to the Alliance in case involving voting rules)*; In re Appeal of Declaratory Ruling from the State Bd. of Elections*, Case No. 22-CVS-10520 (Wake Cnty. Super. Ct. Dec. 19, 2022) (same); *Moore v. Circosta*, No. 1:20CV911, 2020 WL 6597291, at *2 (M.D.N.C. Oct. 8, 2020) (same).

10

Anderson. *Id.* ¶ 12. This is a conservative estimate, and many other Alliance members are likely to be at risk as well given the remarkable sweep of Judge Griffin's challenges. *Id.* ¶ 11.

Moreover, the Alliance's members in particular are likely to have acute difficulty responding to Judge Griffin's protests. *Id.* ¶ 12. Because the Alliance is an organization of retirees, its members are generally older individuals, with an average age between 60 and 70 years of age. *Id.* ¶ 8. As such, many Alliance members have limited familiarity and fluency with new technology, including QR codes like those included on Judge Griffin's postcards. *Id.* ¶ 12. Indeed, many Alliance members, including the individual proposed intervenors, do not have the mobile smartphones necessary to access QR codes. *Id.*; *see also* Ex. 2, Decl. of Tanya Webster-Durham. ¶ 9 ("Webster-Durham Decl."); Ex. 3, Decl. of Sarah Smith ¶ 8 ("Smith Decl."); Ex. 4, Decl. of Juanita Anderson ¶ 8 ("Anderson Decl."). Alliance members therefore face a heightened risk of never even learning whether—or on what basis—their votes are being challenged. Dworkin Decl. ¶ 12. Moreover, because most Alliance members are over the age of 65, many have been registered to vote for decades and are therefore disproportionately likely to have registered before HAVA and its North Carolina analog were enacted. As a result, they are more likely to be subject to Judge Griffin's HAVA Challenge, despite having been registered and voting for decades. *Id.* ¶¶ 8–10.

***Individual Alliance Members.*** Tanya Webster-Durham, Sarah Smith, and Juanita Anderson are each Alliance members whose votes are being challenged by Judge Griffin's protests. Webster-Durham Decl. ¶¶ 3, 8; Smith Decl. ¶¶ 3, 7; Anderson Decl. ¶¶ 3, 7. Not one of these individuals was aware of Judge Griffin's effort to toss out their votes until made aware by the Alliance itself. Webster-Durham Decl. ¶ 8; Smith Decl. ¶ 7; Anderson Decl. ¶ 7. Neither Ms. Webster-Durham, Ms. Smith, nor Ms. Anderson recalls receiving any correspondence from the North Carolina Republican Party or Judge Griffin informing them that their ballots were being challenged.

Webster-Durham Decl. ¶ 8; Smith Decl. ¶ 7; Anderson Decl. ¶ 7. Even if they had received such correspondence, these voters would not have been able to use the QR code on Judge Griffin's postcard to learn more about the protests, either because they lack a smartphone or are unfamiliar with QR codes and how they work. Webster-Durham Decl. ¶ 9; Smith Decl. ¶ 8; Anderson Decl. ¶ 8.

Each of these voters has been registered to vote at their current residence in North Carolina for at least four years and has voted in nearly every state and federal election for which they were eligible without any issue. Webster-Durham Decl. ¶¶ 4, 6; Smith Decl. ¶¶ 4–5; Anderson Decl. ¶¶ 4, 6. In the 2024 general election, Ms. Webster-Durham, Ms. Smith, and Ms. Anderson each presented their driver's license at their polling locations, had their registrations confirmed, and cast their ballots, including in the election for North Carolina Supreme Court Associate Justice. Webster-Durham Decl. ¶ 7; Smith Decl. ¶ 6; Anderson Decl. ¶ 6. Nonetheless, Judge Griffin insists that their voter registrations are incomplete and that their votes should be discarded. Griffin Br. at 6–7 (App. 11–12). Voting is critically important to each of these voters, and they are extremely concerned that if Judge Griffin's protests are successful, their votes will be discarded and their registrations may be invalidated. Webster-Durham Decl. ¶ 10; Smith Decl. ¶ 9; Anderson Decl. ¶ 9.

*__VoteVets__*. VoteVets is a national non-profit organization dedicated to elevating the voices of veterans and their families on issues that affect the lives of those who serve and have served in the Armed Forces, including on issues like veterans' care. *See* Ex. 5, Decl. of Peter Mellman ¶ 3 ("Mellman Decl."). VoteVets serves all active servicemembers, including those North Carolinians deployed away from home, as well as veterans. *Id.* ¶ 5. Over 1.5 million subscribers receive VoteVets' communications, including thousands of North Carolinians. *Id.* ¶ 4. Increasing voter

turnout among military and veteran voters, and their families, especially those who are overseas, is critical to VoteVets' mission. *Id.* ¶ 6. Furthermore, VoteVets believes that turning out the veteran vote benefits all Americans by engaging people who have served their country in the civic process, and aims to promote turnout among all veterans, regardless of their political beliefs. *Id.*

Many of VoteVets' constituents are service members and their families who reside outside of North Carolina and are fully reliant on laws like UOCAVA and UMOVA to exercise the franchise. *Id.* ¶ 10. VoteVets dedicates significant resources, including funding, personnel time, and volunteer effort, to ensure these voters can participate in the franchise. *Id.* ¶ 7. Working with its partners, VoteVets has developed a first-of-its kind military voter file containing approximately 14 million records of veterans and military family members, including records for thousands of voters in North Carolina. *Id.* ¶ 8. VoteVets uses this voter file to contact military voters and ensure they cast valid ballots. *Id.* In the 2024 general election, VoteVets sent over 2.5 million texts to 1.5 million military voters, including those overseas, and saw a substantial increase in turnout participation among contacted voters. *Id.* ¶ 9. Given the importance of laws like UOCAVA and UMOVA to VoteVets' constituencies, these efforts often focused on educating military voters about how to properly submit their ballots under these laws, such that their votes will be counted. *Id.* ¶ 12.

Judge Griffin challenges more than 1,600 votes cast by such North Carolinians. *Id.* ¶ 13. These challenges threaten to disenfranchise VoteVets' constituents who participated in the 2024 election according to UOCAVA and UMOVA with the rightful expectation that their ballots would be counted. *Id.* Moreover, by seeking to change the rules of the game after the election is over, Judge Griffin's challenges frustrate VoteVets' ability to reliably provide military voters and their families with accurate information about to how to vote. *Id.* ¶ 12. VoteVets cannot reliably educate

military voters and their families about how to vote if those rules are subject to challenge after-the-fact. *Id.* ¶¶ 12–13.

## ARGUMENT

### I.     Proposed Intervenors are entitled to intervene as of right under Rule 24(a)

Rule 24(a) permits a party, upon timely motion, to intervene as of right when they show "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991); *see also* Fed R. Civ. P. 24(a). Within the Fourth Circuit, "liberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (citation omitted). Proposed Intervenors satisfy each requirement for intervention as of right.[5]

### A.     The motion is timely.

This motion is clearly timely. The State Board removed this case to federal court on

---

[5] Rule 24(c) ordinarily requires a putative intervenor to provide "a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). However, because Judge Griffin initiated this litigation by filing a petition for writ of prohibition directly with the North Carolina Supreme Court—rather than an ordinary civil complaint—is not clear what pleading Proposed Intervenors should file alongside this motion. The Fourth Circuit has made clear that the lack of any such pleading is not a basis for denying intervention, so long as the motion to intervene "set[s] forth sufficient facts and allegations to apprise [the parties]" of the proposed intervenor's defenses. *See Spring Constr. Co. v. Harris*, 614 F.2d 374, 376–77 (4th Cir. 1980). Proposed Intervenors seek intervention to ensure they and their members and constituents can have their votes counted. Proposed Intervenors intend to assert defenses under the First and Fourteenth Amendments to the United States Constitution and several federal laws—including 52 U.S.C. § 20901, *et seq.* (HAVA); 52 U.S.C. § 20501, *et seq.* (NVRA); 52 U.S.C. § 10307 (VRA); 52 U.S.C. § 10101 (CRA), and 52 U.S.C. § 20302 (UOCAVA) —as well as equitable defenses, including the doctrine of laches. Moreover, Proposed Intervenors are prepared to file any such proposed pleading—including a substantive response to Judge Griffin's petition—at the Court's direction and on any schedule the Court sets.

14

December 19. This motion follows just two days later, before any substantive briefing has occurred in the case. Moreover, Proposed Intervenors agree to abide by any case schedule set by the Court or agreed to by the existing parties. Given that these proceedings are truly at the outset and because there is no possible risk of prejudice to the other parties, Proposed Intervenors have clearly met the timeliness requirement. *See Moore*, 2020 WL 6597291, at *1 (finding the Alliance's motion timely when filed within six days of plaintiffs' complaint and four days after their motion for temporary restraining order and "before the original Defendants submitted any substantive responses to the Complaints and motions"); *see also Dowdy v. City of Durham*, 689 F. Supp. 3d 143, 146 (M.D.N.C. 2023) (similar); *Carcaño v. McCrory*, 315 F.R.D. 176, 178 (M.D.N.C. 2016) (similar).

> **B.** **The disposition of this case threatens to impair Proposed Intervenors' significantly protectable interests.**

The stakes of this case for each of the Proposed Intervenors is clear. For Ms. Webster-Durham, Ms. Smith, and Ms. Anderson, the resolution of this case will determine whether their votes in the 2024 election for North Carolina Supreme Court Associate Justice are counted. *See* Griffin Br. at 2–6 (App. 7–11). Similarly, the disposition of this case will determine whether dozens of members of the Alliance have their votes tossed out, as well as whether VoteVets' constituents—overseas military voters and their families—are disenfranchised. *See generally id.* The Alliance and VoteVets also have institutional interests in ensuring the members can vote, furthering their missions, and preventing unnecessary use of their organizational resources.

The right to vote and have that vote counted is unquestionably a "significantly protectable interest" that satisfies Rule 24(a). *Teague*, 931 F.2d at 261. "[V]oting is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("The

political franchise of voting . . . is regarded as a fundamental political right" because it is "preservative of all rights"). Courts have therefore widely recognized that voters have a significantly protectable interest in preserving their constitutional right to vote. *See, e.g.*, *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (collecting cases). Indeed, risk to such an interest suffices to establish Article III standing, never mind the more modest burden necessary to show an interest under Rule 24. *See, e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 180 (M.D.N.C. Aug. 4, 2020) ("In the voting context, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue.'" (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)); *see also N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547, 562 (E.D.N.C. 2022) (observing that while "intervenors need not establish Article III standing to demonstrate they have a protectable interest" under Rule 24, "an interest sufficient to demonstrate injury-in-fact for standing purposes likely suffices to show a protectable interest under Rule 24(a)(2)"). Accordingly, there is no serious dispute that Ms. Webster-Durham, Ms. Smith, and Ms. Anderson have an extraordinarily significant interest in this action for purposes of Rule 24.

The same is true for the Alliance and VoteVets which, as organizations, have significantly protectable interests in ensuring that their members and the communities they serve can participate in the franchise and have their votes counted. *See, e.g.*, *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020); *Issa v. Newsom*, No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020); *see also Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (similar as to standing); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 657–58 (M.D.N.C. 2024) (same). Indeed, North Carolina

courts—which apply an identical intervention standard in both federal and state court—have routinely permitted the Alliance to intervene in similar circumstances for that very reason.[6]

Proposed Intervenors have particularly strong interests in this case because the relief Judge Griffin seeks will disproportionately burden the communities served by both the Alliance and VoteVets. Judge Griffin challenges registered voters who lack a driver's license number or social security number in their voter file—a requirement that was adopted in 2004 long after many of the Alliance's members had already registered to vote. *See* Dworkin Decl. ¶ 8; *see also* N.C. Sess. Law 2003-226, § 9 (amending N.C. Gen. Stat. § 163-82.4). Similarly, Judge Griffin seeks to disenfranchise VoteVets' constituents who rely on UOCAVA and UMOVA to cast their ballots, Mellman Decl. ¶¶ 10, 12–13, even though legislators plainly meant to enfranchise overseas servicemembers, *see* Griffin Br. at 13–16 (App. 18–21), 19–22 (App. 24-27).

Proposed Intervenors also have significant interests in defending against the mass post-election challenges pursued by Judge Griffin here, especially where the request for relief conflicts with the First and Fourteenth Amendment and various federal laws. *See, e.g.*, 52 U.S.C. § 20901, *et seq.* (HAVA), 52 U.S.C. § 20501, *et seq.* (NVRA); 52 U.S.C. § 20302 (UOCAVA); U.S. Const. amends. I, XIV. Both the Alliance and VoteVets commit significant resources to educating their members and constituents about how to vote and ensuring they are able to do so. Dworkin Decl. ¶¶ 4, 6–7; Mellman Decl. ¶¶ 7–12. Their efforts will be in vain if losing candidates can change election rules and disenfranchise voters *after* the election has already occurred. That is particularly so here, where Judge Griffin failed to provide meaningful notice to impacted voters, leaving it to

---

[6] *See, e.g.*, *Wasserberg v. N.C. State Bd. of Elections*, No. 5:24-CV-00578-M (E.D.N.C. Oct. 16, 2024) (granting Alliance intervention); *Deas v. N.C. State Bd. of Elections*, Case No. 22-CVS-11290 (Wake Cnty. Super. Ct. Oct. 26, 2022) (same); *In re Appeal of Declaratory Ruling from the State Bd. of Elections*, Case No. 22-CVS-10520 (Wake Cnty. Super. Ct. Dec. 19, 2022) (same); *cf. Moore*, 2020 WL 6597291, at *2 (same).

17

organizations like the Alliance to assist challenged voters. Dworkin Decl. ¶ 12; *see also County of San Miguel v. MacDonald*, 244 F.R.D. 36, 47 (D.D.C. 2007) (granting intervention where plaintiffs' requested relief would require "the expenditure of additional time and resources" by intervenors) (internal citation omitted); *cf. Democracy N.C.*, 476 F. Supp. 3d at 182–83 (finding organizational standing where an organization would have to divert resources to warn voters about the risks of absentee voting and where efforts spent encouraging voter participation would be obviated by inadvertent disenfranchisement). Both the Alliance and VoteVets therefore have yet a further significant protectable interest in ensuring that their voter education efforts are not in vain, and that the resources they commit to these efforts are not wasted or undermined.

Finally, there can be little dispute that resolution of this case will impair the Proposed Intervenors' ability to protect these significant interests. If Judge Griffin is successful, Ms. Webster-Durham, Ms. Smith, and Ms. Anderson will have their votes tossed out. *Cf. League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury." (collecting cases)). So too will many of the Alliance's and VoteVets' members and constituents. Dworkin Decl. ¶¶ 10–14; Mellman Decl. ¶ 13. Because "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society," such an outcome "strike[s] at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). And as this case threatens both organizations' missions and resources, they each "stand to gain or lose by the direct legal operation of the district court's judgment on [Plaintiffs'] complaint." *Teague*, 931 F.2d at 261; *see also* Dworkin Decl. ¶ 14; Mellman Decl. ¶¶ 12–14.

### C.   Proposed Intervenors' interests are not adequately represented by the existing parties in this case.

Proposed Intervenors cannot rely on the existing parties to adequately represent their significant interests threatened by this litigation. Demonstrating inadequate representation generally "present[s] proposed intervenors with only a minimal challenge." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195–96 (2022). All that is required is the "minimal" burden of showing that the representation "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *accord* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1909 (3d ed. 2024) (noting courts are "liberal in finding" this requirement met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests."). Proposed Intervenors make that minimal showing here—indeed, they are the only proposed parties who are the very voters who stand to be disenfranchised by this litigation.

To start, Proposed Intervenors' interests are plainly not represented by Judge Griffin, who seeks to disenfranchise Proposed Intervenors, their members, and their constituents. While the State Board opposes the relief sought by Judge Griffin, they do not adequately represent Proposed Intervenors' interests. Whereas Proposed Intervenors seek to preserve their own voting rights and to ensure their ballots are counted, the State Board is bound to serve a broader public interest and to administer the law impartially. Courts have therefore "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors," *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003), because their interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it," *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (explaining that the burden in these circumstances is "comparatively light"). Indeed, the Supreme

Court emphasized this point recently in *Berger* when discussing its prior decision in *Trbovich*, explaining that public officials must "bear in mind broader public-policy implications," whereas private litigants—like Proposed Intervenors—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 196 (citing *Trbovich*, 404 U.S. at 538–39).

Likewise, while Justice Riggs, who has sought intervention, opposes the relief requested by Judge Griffin, her stated interest lies in preserving her apparent election victory. *See* Riggs Consent Mot. Intervene Mem. at 6, ECF No. 8 ("Justice Riggs seeks intervention to protect her election win."). In contrast, Proposed Intervenors seek to preserve their own votes and the votes of their members, regardless of candidate preference. *See* Dworkin Decl. ¶¶ 10–14; Mellman Decl. ¶¶ 13–14; Webster-Durham Decl. ¶ 10; Smith Decl. ¶ 9; Anderson Decl. ¶ 9.

While the Fourth Circuit has suggested that a presumption of adequacy may arise "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit," *Commonwealth of Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976), this is not such a case. The mere fact that some existing parties also oppose Judge Griffin's requested relief does not mean they share the same objective as Proposed Intervenors. As the Seventh Circuit recently explained, for a "potential intervenor and the named party to have 'the same goal,' it is not enough that they seek the same outcome in the case." *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 688 (7th Cir. 2023). Such a rule would all but eliminate the prospect of intervention. After all, "a prospective intervenor must intervene on one side of the 'v.' or the other and will have the same general goal as the party on that side. If that's all it takes to defeat intervention, then intervention as of right will almost always fail." *Id.* (citation omitted). Instead, such a presumption of adequacy should apply "only when interests overlap fully." *Berger*, 597 U.S. at 197 (cleaned up); *accord* Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed. 2024). As explained, none

20

of the existing parties share Proposed Intervenors' singular focus on defending their own voting rights regardless of candidate preference, serving their specific missions, and preserving their resources. In short, no other party has interests that fully overlap with Proposed Intervenors and accordingly no such existing party adequately represents them.

Even if the Court applies a presumption of adequacy, there is an "adversity of interest" between Proposed Intervenors and the existing and other proposed parties. *Westinghouse Elec. Corp.*, 542 F.2d at 216. While the State Board has a general duty to administer elections lawfully and count eligible votes, in the context of the protests at issue in this case, the State Board must "assure that an election is determined . . . without irregularities that may have changed the result of [the] election." N.C. Gen. Stat. § 163-182.12. Judge Griffin's protests allege precisely such irregularities with Proposed Intervenors and their members and constituents, which could require the State Board to disenfranchise them. And of course, both candidates have an interest in ensuring their own election, not an interest in ensuring all voters—including Proposed Intervenors and their members and constituents—have their ballots counted.

## II. Alternatively, Proposed Intervenors should be granted permissive intervention under Rule 24(b).

Proposed Intervenors alternatively satisfy the requirements for permissive intervention. Rule 24(b) affords permissive intervention upon timely application when the "applicant's . . . defense and the main action have a question of law or fact in common." *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (quoting Fed. R. Civ. P. 24(b)). In exercising their discretion to permit permissive intervention, courts consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting Fed. R. Civ. P. 24(b)(3)). And "the Fourth Circuit generally takes a liberal approach towards permissive intervention," *Hengle v. Curry*, No. 3:18-CV-100, 2018 WL

21

3016289, at *4 (E.D. Va. June 15, 2018) (quoting *Feller*, 802 F.2d at 729), as "[p]ermissive intervention is desirable and in line with the Fourth Circuit's policy of favoring liberal intervention," *Students for Fair Admissions Inc. v. Univ. of N.C.*, 319 F.R.D. 490, 497 (M.D.N.C. 2017).

Each of these considerations weighs in favor of granting permissive intervention here. Proposed Intervenors' defenses in this case concern common questions of law to those presented by Judge Griffin's petition and election protests. NCSBE Order at 3 (App. 40). Their timely motion to intervene will result in no conceivable prejudice to any existing party, nor will it cause delay, particularly as Proposed Intervenors agree to be bound by any case schedule set by the Court or principal parties. And the stakes of this lawsuit illustrate precisely why the Fourth Circuit has long found "liberal intervention" rules to be "desirable." *Feller*, 802 F.2d at 729. Judge Griffin's complaint seeks to discard tens of thousands of ballots, depriving many North Carolina voters—including Proposed Intervenors, their members, and constituents—of a sacred constitutional right. Such extraordinary and dramatic relief weighs strongly in favor of ensuring that the voters and communities at risk of disenfranchisement have their voices heard in this suit. Indeed, courts routinely grant permissive intervention in such circumstances. *See, e.g.*, *Moore*, 2020 WL 6597291, at *2 (permitting the Alliance to permissively intervene in litigation involving absentee ballot and in-person voting rules); *League of Women Voters of N.C. v. North Carolina*, No. 1:13CV660, 2014 WL 12770081, at *3 (M.D.N.C. Jan. 27, 2014) (granting permissive intervention to 20-year-old registered North Carolina voters who seek to challenge state restrictions on early voting, same day registration, and out-of-precinct voting); *see also Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020) (similar); *Kobach v.*

*U.S. Election Assistance Comm'n*, No. 13-CV-4095-EFM-DJW, 2013 WL 6511874, at *4–5 (D. Kan. Dec. 12, 2013) (similar).

## **CONCLUSION**

For the reasons stated above, Proposed Intervenors respectfully request that the Court grant their motion to intervene as a matter of right under Rule 24(a)(2) or, in the alternative, permit them to intervene under Rule 24(b).

Dated: December 21, 2024          Respectfully submitted,

/s/ Narendra K. Ghosh
Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

Lalitha D. Madduri**
Christopher D. Dodge*
Tina Meng Morrison**
Makeba A.K. Rutahindurwa**
Julie Zuckerbrod*
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
mrutahindurwa@elias.law
jzuckerbrod@elias.law

*Participating via Notice of Special Appearance*
***Notice of Special Appearance Forthcoming*

*Counsel for Proposed-Intervenors the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

24

**CERTIFICATE OF WORD COUNT PURSUANT TO LOCAL RULE 7.3(d)**

Undersigned counsel certifies that this Response complies with Local Rule 7.3(d), in that the word count function of Microsoft Word shows the brief to contain 6,835 words, excluding those portions of the brief permitted to be excluded by the Rule.


This 21st day of December, 2024

/s/ Narendra K. Ghosh
Narendra K. Ghosh

*Counsel for Proposed-Intervenors the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*