IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | ) |
| | ) |
| Respondent. | ) |

## PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Petitioner Judge Jefferson Griffin respectfully requests that this Court, not later than January 6, 2025,[1] enter a preliminary injunction enjoining the North Carolina State Board of Elections from certifying the November 2024 general election results for Seat 6 of the North Carolina Supreme Court. That order is necessary to preserve the status quo here. Judge Griffin has filed three categories of election protests, challenging ballots that were cast in violation of state law. The Board has now denied those three protests and has stated to this Court that it may certify the election results as early as January 7, 2025. *See* D.E. 1 at 3-4. Once those results are certified, Judge Griffin's election protests will become moot.

Without a preliminary injunction, mootness will deprive the Court of jurisdiction to consider any of the issues presented in this matter. A preliminary injunction, however, will simply

---

[1] If the Board issues its final decision regarding Judge Griffin's remaining protests on a date later than December 23, 2024, Petitioner respectfully requests that the Court enter a preliminary injunction not later than 24 hours prior to the date on which the Board indicates it will issue the certificate of election.

stay the Board's hand while this Court determines whether it can retain jurisdiction over this removed action and, if so, determine whether the Board's decision denying Judge Griffin's protests was valid. The Board will not be harmed by that injunction—indeed, North Carolina law contemplates delays in election certifications while judicial review is pending. By contrast, Judge Griffin will be irreparably harmed absent the injunction: his protests will be mooted, and he will lose the election. And preventing the Board's certification from mooting Judge Griffin's challenges to unlawful ballots will serve the important public interests in election integrity and the franchise, among others. This Court should therefore grant Judge Griffin's motion for a preliminary injunction.

## STATEMENT OF FACTS

This case involves—and almost entirely turns upon—significant and novel issues of North Carolina election law. Indeed, the Board's order admitted that his protests "present[] legal questions of statewide significance." D.E. 1-5 at 44.

Since 1776, North Carolina's Constitution has required voters to be bona fide residents of the state. N.C. Const. of 1776, art. VIII; N.C. Const. art. VI, § 2(1). Since 2004, the General Statutes have required voters to provide their drivers license or social security numbers to be legally registered to vote. N.C. Sess. Law 2003-226, §§ 2, 9; *see* N.C. Gen. Stat. § 163-82.4(a)(11). And since 2018, both the state constitution and various statutory provisions have required all North Carolina voters to present photo identification when they vote, whether in person or by absentee ballot. N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1); *See id.* § 163-166.16(a); N.C. Const. art. VI, §§ 2(4), 3(2). None of these requirements are new. Indeed, they were all well-established at the time of the November 2024 general election. Yet the North

Carolina State Board of Elections (the "Board") refused to enforce these laws in the election. That refusal changed the outcome of the Seat 6 race for the Supreme Court.

Judge Griffin is currently a Judge on the North Carolina Court of Appeals. During the election, Petitioner Judge Jefferson Griffin ran as the Republican candidate for Seat 6. D.E. 1-4 at 16.[2] In a closely contested race with his Democratic opponent, Justice Allison Riggs, only a few hundred votes ultimately separated Judge Griffin from victory, out of more than 5.5 million cast. *Id.* at 18. But as the county boards of elections canvassed the vote, Judge Griffin became aware of numerous irregularities with ballots cast during the election, implicating the constitutional and statutory provisions outlined above. *Id.* at 18-21. Accordingly, he filed election protests in county boards of election across the state, seeking to prohibit the counting of ballots cast in violation of state law. *Id.*; *see, e.g.*, D.E. 1-5 at 180-346, 379-98, 407-14, 439-45, 454-66, 491-97 (excerpts of various county protests).

Ultimately, the Board assumed initial jurisdiction over three categories of protests, involving more than 60,000 ballots cast across the state. *See* D.E. 1-5 at 4. In the first, Judge Griffin challenged ballots cast by thousands of individuals who failed to verify their identity by providing a drivers license number or social security number with their voter registration, in violation of the General Statutes. *Id.* at 10-14. In the second, he argued that hundreds of ballots were cast by non-residents, in violation of the North Carolina Constitution's residency requirement. *Id.* at 14-26. And in the third, he contended that the county boards of elections had

---

[2] All facts in the Petition for Writ of Prohibition were verified by counsel as part of the filing submitted to the Supreme Court of North Carolina. *See* D.E. 1-4 at 86 ("Verification of Counsel"). And the Appendix to the Petition, which the Board has filed at D.E. 1-5, was part of that verified pleading. To remove any doubt, however, Judge Griffin has filed as an exhibit to this Memorandum a declaration under 28 U.S.C. § 1746, attesting to the same verification contained in the original state-court filing. *See* Ex. A.

accepted, processed, and counted absentee ballots cast by thousands of overseas individuals who had failed to provide a copy of their photo identification (or an exception form), in violation of state law. *Id.* at 26-30. In conjunction with these protests, Judge Griffin sent notice to the thousands of individuals whose votes they affected by sending postcards to their addresses, which indicated that he was challenging the validity of their votes. *Id.* at 174-78.

On December 11, 2024, the Board denied Judge Griffin's protests at a public meeting. Two days later, the Board issued a written order explaining the reasons for its decision. *Id.* at 41-80. Following the Board's decision, on December 18, 2024, Judge Griffin petitioned the North Carolina Supreme Court for writ of prohibition. *See* D.E. 1-4. As required by the North Carolina Rules of Appellate Procedure, Judge Griffin's petition was verified. *See id.* at 86 ("Verification of Counsel"). In that verified petition, Judge Griffin sought to preserve his right to judicial review of the Board's decision by requesting that the Supreme Court stay the Board from certifying the election results. *See id.* at 14-15. Judge Griffin also sought an extension of time to file petitions for judicial review of the Board's decision in state Superior Court. *See* D.E. 1-4 at 14. The writ also asked the Supreme Court to decide the merits of his election protests and to prohibit the Board from counting the unlawful ballots. D.E. 1-4 at 14.

In an unprecedented move, the Board removed Judge Griffin's petition from North Carolina's highest court to this one. D.E. 1. Once the Board removed the Petition, however, Judge Griffin nonetheless filed three separate petitions for judicial review in that court on December 20, 2024, to preserve his right of review; on the same day, the Board removed those three petitions to this Court as a single action. *See Griffin v. N.C. State Bd. of Elections*, Case No. 5:24-cv-00731 (E.D.N.C.).

Also on December 20, 2024, Judge Griffin moved in this Court for a temporary restraining order to enjoin the Board from certifying the election results. The Court denied Judge Griffin's motion by text order, citing the statements in the Board's unverified removal notice that it would not certify the election results until, at the earliest, January 3 or January 7, 2025, and that the Board should therefore have an opportunity to respond to Judge Griffin's request before the Court grants his requested relief.

That same day, the Board held a public meeting to determine whether to deny Judge Griffin's remaining protests (the merits of which are not at issue here). *See* North Carolina State Board of Election, *State Board Meeting: December 20, 2024*, available at https://www.ncsbe.gov/news/press-releases/2024/12/18/state-board-meeting-december-20-2024 (last visited December 23, 2024). Judge Griffin understands that, at that meeting, the Board dismissed his remaining protests. Although the Board has not yet issued its written decision regarding those protests, both its Notice of Removal and an email from the Board's counsel state that the Board is now poised to certify the election as early as January 7, 2025, though that certification date could occur a few days after January 7, 2025, depending on when the Board issues its final decision on the remaining protests. *See* D.E. 1-4 at 3-4; Ex. B at 2.[3]

From December 20 to 23, 2024, in an effort to preserve party and judicial resources, Judge Griffin's counsel conferred with the Board's counsel in an attempt to obtain the Board's consent to a stay of certification until a court decides this proceeding on the merits. But the Board refused to consent to a stay. Because the Board's written decision could issue as early as today, Judge

---

[3] Just prior to filing this Motion, the Board's counsel indicated that the Board may not issue the certificate of election until Friday, December 27, 2024. When the Board files its written decision denying Judge Griffin's remaining protests—whether on December 23, 2024, or at a later date—Judge Griffin will file a notice with the Court indicating the anticipated date for issuance of a certificate of election.

Griffin now moves for a preliminary injunction to enjoin the Board from certifying the election results on January 7, 2025, or a date soon thereafter. The timing of this motion will allow the parties to fully brief this matter and conserve judicial resources by positioning the Court to rule on this motion before the looming certification date.

## LEGAL STANDARD

To obtain a preliminary injunction, a party must establish: "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Patel v. Moron*, 897 F. Supp. 2d 389, 395 (E.D.N.C. 2012); Fed. R. Civ. P. 65(b).

Alternatively, state law calls for a related standard: "The court shall not issue a stay of certification unless the petitioner shows the court that the petitioner has appealed the decision of the State Board of Elections, that the petitioner is an aggrieved party, and that the petitioner is likely to prevail in the appeal." N.C. Gen. Stat. § 163-182.14(b).

## ARGUMENT

Judge Griffin is entitled to a preliminary injunction. All the necessary facts are substantiated by his verified petition. *See* D.E. 1-4.

The Court should grant the injunction for four reasons. First, absent a preliminary injunction, state law requires the Board to certify the election results within thirteen days of service of its decision on a protest—here, which may occur as early as January 7, 2025. Once those results are certified, Judge Griffin's protests will all become moot. Denying Judge Griffin a preliminary

injunction will therefore irreparably harm him by denying him any chance to obtain judicial review of the Board's erroneous decision, thereby costing him the election.

Second, the Board will suffer no harm if this Court orders it not to certify the election results until Judge Griffin's petition is decided. Indeed, state law contemplates exactly this sort of delay when the Board's decision on an election protest is under review. The balance of the equities therefore favors Judge Griffin. And enjoining the Board from certifying the election results will permit judicial review of the Board's order and thus serve the important interests the public has in election integrity and in preventing voter disenfranchisement through the counting of unlawful votes. Third, enjoining the Board from certifying the election will maintain the status quo while the Court considers, as a threshold matter, whether it has jurisdiction over of the removed writ of prohibition. Finally, the Board erroneously applied state and federal law when it denied his election protests. Under North Carolina law, the writ of prohibition is designed to correct exactly that sort of legal error. Judge Griffin is therefore likely to succeed on the merits of his petition.

## I.     __Absent a preliminary injunction, Judge Griffin will be irreparably harmed.__

If this Court fails to enjoin the Board from certifying the election results, Judge Griffin will lose the ability to challenge the Board's erroneous decision. State law requires the Board to certify election results 13 days after the Board's final decision on an election protest. N.C. Gen. Stat. § 163-182.15(b)(1); *see id.* § 163-182.14(b); N.C. R. Civ. P. 6(e). Here, the Board has indicated that it will certify the election results as early as January 7, 2025. *See* D.E. 1 at 3-4; Ex. B at 2. And once the Board certifies those results, Judge Griffin's protests will become moot. *In re Protest of Whittacre,* 228 N.C. App. 58, 59, 743 S.E.2d 68, 69 (2013); *In re Election Protest of Fletcher,* 175 N.C. App. 755, 759, 625 S.E.2d 564, 567 (2006). Certification, then, will remove any chance for Judge Griffin to obtain judicial review of the Board's unlawful decision. Indeed, this situation is

exactly why preliminary injunctive relief exists: "the most compelling reason in favor of issuing a preliminary injunction is the need to prevent the judicial process from being rendered futile by defendant's action." *Ortho Pharma. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989) (cleaned up); *see In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003) ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits"), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2005). And without judicial review, Judge Griffin will lose the election. He will therefore be irreparably harmed unless this Court stays the Board's hand.

## II. The balance of the equities favors Judge Griffin, and a preliminary injunction will serve the public interest.

By contrast to Judge Griffin, the Board will not be harmed if this Court enters a preliminary injunction. Indeed, state law expressly contemplates that courts may stay election certifications pending judicial review. *See* N.C. Gen. Stat. § 163-182.15. And requiring the Board to stay its hand while a court determines (1) it has jurisdiction over this removed proceeding, and (2) whether the Board's order was lawful will not prejudice that agency. Indeed, the Board has not yet certified the election, and granting a preliminary injunction will simply maintain the status quo until a court can decide these proceedings on the merits. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) ("a preliminary injunction preserves the status quo pending a final trial on the merits"). The balance of the equities therefore favors Judge Griffin.

Additionally, issuing a preliminary injunction here will serve the public's interest. Again, enjoining the Board from certifying the election results will permit judicial review to determine whether the Board allowed unlawful ballots to influence the outcome of this election. Judge Griffin argues in his petition that state laws aimed at ensuring election integrity render unlawful

the ballots he has challenged. And the public manifestly has an interest in preserving the integrity of its election process. *See Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006). The public also has an interest in ensuring that unlawful votes are not permitted to dilute and disenfranchise the votes of those who lawfully cast ballots. *See Bush v. Gore*, 531 U.S. 98, 105 (2000); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *James v. Bartlett*, 359 N.C. 260, 270 (2005). Simply put, a preliminary injunction will permit judicial review, which will ultimately ensure that these important interests are served and that no cloud of illegitimacy surrounds the candidate who ascends to the North Carolina Supreme Court. Granting a preliminary injunction is therefore in the public interest.

### III. The Court should maintain the status quo as it considers whether it can exercise jurisdiction over the removed petition.

There are significant questions whether removal to this Court is proper. The petition to the North Carolina Supreme Court raised state-law issues that will determine the outcome of a state election. In our system of federalism, federal courts are loath to interfere with a state's control over its own elections. *See Hutchinson v. Miller*, 797 F.2d 1279, 1280 (4th Cir. 1986) ("Our constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for . . . state . . . office. The conduct of elections is instead a matter committed primarily to the control of states"); *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985) (under our federal system, "states are primarily responsible for regulating their own elections").

The statutes the Board cites are clearly inapplicable to a state election and cannot serve as the basis of removal. *See infra* Section IV. Indeed, the Board's invocation of those inapplicable federal laws here—to which Judge Griffin was forced to respond in his petition—appears to be a species of disfavored artful pleading designed to secure this Court's jurisdiction.

Additionally, *Pullman* abstention applies here because, were the North Carolina Supreme Court to agree with the Board's interpretation of the currently unsettled state-law issues

undergirding Judge Griffin's protests and petition, that decision would moot the federal constitutional problems the Board has raised in its order. *See Educational Servs., Inc. v. Md. State Bd. for Higher Educ.,* 710 F.2d 170, 174 (4th Cir. 1983) (setting out the test for determining when *Pullman* abstention is appropriate). And because Judge Griffin seeks discretionary equitable relief in his petition, remand based on abstention principles is appropriate. *See, e.g.*, *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730 (1996).

For these and other reasons, Judge Griffin will in short order file a motion to remand. And the Court may enter a preliminary injunction to preserve existing conditions pending a determination of its own jurisdiction. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947) (holding that the district court "unquestionably had the power to issue a temporary restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction").

**IV.  <u>Judge Griffin is likely to succeed on the merits of his petition.</u>**

Judge Griffin has petitioned the Supreme Court of North Carolina for a writ of prohibition. D.E. 1-4. The Supreme Court will issue the writ where a state agency's order erroneously applies the law, where there is no adequate remedy by appeal or otherwise, and where great injustice or irreparable injury will result if the writ is not granted. *See State v. Allen*, 24 N.C. (2 Ired.) 183, 188-89 (1841); *see also Moses v. State Highway Comm'n*, 261 N.C. 316, 317 (1964); *White v. Willett*, 456 S.W.3d 810, 812 (Ky. 2015). Here, Judge Griffin can likely satisfy all those factors, and he is therefore likely to succeed on the merits of his petition.

Judge Griffin's petition to the North Carolina Supreme Court laid out in great detail the merits of his arguments. Those merits are summarized below to fall within this Court's word-limit requirement.

**A.** <u>**The Board erroneously applied state and federal law to deny Judge Griffin's protests.**</u>

Judge Griffin has filed three election protests contending that, during the November 2024 general election for Seat 6 on the North Carolina Supreme Court, more than 60,000 individuals cast ballots in violation of state law. But when the Board ruled on his protests, it incorrectly applied state and federal law to deny them.

        **i.**      <u>**The Board erred when it decided to count votes cast by individuals who never properly registered to vote.**</u>

Article VI of the North Carolina Constitution allows residents to vote in state elections only if they are "legally registered" under state law. N.C. Const. art. VI, § 3(1); *see also* N.C. Gen. Stat. § 163-82.1(a) (making legal registration a "Prerequisite to Voting"); *see also id.* § 163-54 ("Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter").

Since 2004, state law has required voter registrants to provide their drivers license or social security numbers in their voter applications. N.C. Sess. Law 2003-226, §§ 2, 9; *see* N.C. Gen. Stat. § 163-82.4(a)(11). This information is critical because it is used with a statewide computer registration system to verify the voter's identity and important details about the voter. *See, e.g.*, N.C. Gen. Stat. § 163-82.11. The law is therefore aimed at ensuring election integrity.

Here, Judge Griffin's protest points out that 60,273 individuals cast ballots in the election for Seat 6 of the North Carolina Supreme Court despite no being legally allowed to do so. *See* D.E. 1-4 at 78. Specifically, data obtained from the Board shows that those individuals did not provide their drivers license or social security numbers with their voter registration applications. *Id.* at 77-78. Indeed, the Board has admitted that it allowed individuals to register to vote without providing that information; the Board's violation of law was identified a year before the election.

*See* D.E. 1-4 at 36-37 (citing Order at 4, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023)).  Accordingly, those individuals never legally registered to vote and it is therefore unlawful to count their ballots in this election.  N.C. Const. art. VI, § 3(1); N.C. Gen. Stat. § 163-82.4(a)(11).

The Board's order does not assert that the individuals Judge Griffin has identified complied with these provisions of North Carolina law when they registered to vote.  Instead, it reimagines the state's election laws to excuse their illegal registrations, reasoning that those errors are harmless because the individuals who did not properly register cured their application defects by providing additional documents, which, the Board says, state law permits.  *See* D.E. 1-5 at 56.  Not so.

There is no state law permitting a "cure" by providing additional documents in this way.  Indeed, the General Assembly has provided precisely one method to cure an improper registration, N.C. Gen. Stat. § 163-82.4(f) (allowing voters to correct omissions in their registrations by at least 5:00 p.m. on the day before the county canvass), but the individuals whose ballots Judge Griffin challenges did not use this statutory cure process.

In the alternative, the Board also rejected Judge Griffin's protest on federal-law grounds, claiming that the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA") compel this result.  *See* D.E. 1-5 at 65-67.  But neither of those federal statutes apply to *state* elections, like the one at issue here.  As for HAVA, the plain language of the Act states that the registration systems it mandates apply only to "an election for Federal office."  52 U.S.C. §§ 21081(a), 21083(A)(1)(a)(viii).

So too with the NVRA.  That Act, by its own terms, applies only to "elections for federal office."  *Id.* §§ 20501(b)(1)-(2).  And Congress enacted the NVRA under the federal constitution's Elections Clause, which only allows Congress to regulate the "Times, Places, and Manner" of

selecting Senators and Representatives for Congress.  U.S. Const. art. I, § 4, cl. 1.  Thus, courts must construe the NVRA not to regulate state elections to avoid an unconstitutional interpretation of the Act.  *See, e.g.*, *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000)*; Broyles v. Texas,* 618 F. Supp. 2d 661, 691 (S.D. Tex. 2009)*, aff'd,* 381 F. App'x 370 (5th Cir. 2010) (unpublished); *see also Pree v. D.C. Bd. of Elections & Ethics*, 645 A.2d 603, 605 (D.C. 1994).

The Board's attempted reliance on HAVA and the NVRA is flawed for another reason:  the provisions of those acts to which the Board cites, 52 U.S.C. § 20507(a)(3), (c); *id.* § 21083(a)(2)(B), only prohibit states from removing voters from their voter rolls.  But Judge Griffin's protests only challenge the results of his election, and he nowhere requests that the state remove any voters from its registration rolls.  *See* D.E. 1-5 at 31.  Indeed, a successful election protest cannot result in anyone being removed from the voter rolls—it can only lead to the correction of inaccurate results or a recount.  N.C. Gen. Stat. § 163-182.10(d)(2)(e)(1)-(2); *Bouvier v. Porter*, 386 N.C. 1, 4 (2024).  The Board recognizes that Judge Griffin is only seeking to correct the vote count, stating in its order that if his protest is "successful," that will mean that those individuals found to have voted unlawfully will only have their votes "discard[ed]."  D.E. 1-5 at 52; *id.* at 55 ("the Protestors request that these voters' ballots be removed from the official count").

The Board, in its order, also sought to buttress its conclusions regarding the HAVA and the NVRA by manufacturing connections between Judge Griffin's protests and *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-547 (E.D.N.C.) (the "*RNC* case").  D.E. 1-5 at 67.  In that case, the RNC sought a writ of mandamus in state court, requiring the state to remove voters from the state's registration rolls.  The Board removed the state proceedings to this Court, which dismissed one claim and remanded the other.  In an interlocutory appeal of that decision, the Fourth Circuit reversed, characterizing the case as one about the

13

interplay between federal and state laws as they apply to the state's maintenance of voter rolls during federal elections. But that means that case is inapposite here, for it did not involve a request to correct a vote count in a state race based on a violation of state law. The rulings in the *RNC* case therefore did not consider, much less adjudicate, the questions presented here.

ii. **The Board erroneously decided to count votes cast by "Never Residents."**

The North Carolina Constitution contains a bona fide residency requirement, providing that only those individuals yet have "resided in the State of North Carolina for one year . . . next preceding an election" may vote in elections for state offices. N.C. Const. art. VI, § 2(1). This residency requirement is nothing new—it has been a requirement since North Carolina ratified its original constitution in 1776. *See* N.C. Const. of 1776, art. VIII. And bona fide residency requirements are permissible under the United States Constitution. *See Dunn v. Blumstein*, 405 U.S. 330, 344 (1972); *see also Bouvier*, 386 N.C. at 4 n.2; *Lloyd v. Babb*, 296 N.C. 416, 439 (1979).

Here, Judge Griffin, using data provided by the Board, has identified 267 individuals who voted in his election who have *never* resided in North Carolina. *See* D.E. 1-4 at 77-78. But under the North Carolina Constitution, those voters were not permitted to cast those ballots, and the Board must therefore correct the vote count to fix this error.

The Board denied this protest, reasoning that a state statute, the Uniform Military and Overseas Voters Act ("UMOVA"), N.C. Gen. Stat. §§ 163-258.1, *et seq.*, nonetheless permits it to count those votes. But misinterpreting UMOVA to provide an exception to the state constitution's bona fide residency requirement renders it unconstitutional and invalid. Judge Griffin therefore argued that the Board should interpret UMOVA to avoid this serious constitutional defect. *See N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160 (2018). The Board, however, refused,

inexplicably reasoning that it was incompetent to hold a state statute unconstitutional—something Judge Griffin did not request. D.E. 1-5 at 69.

The Board also reasoned that if UMOVA violated the state constitution, that the federal constitution's substantive-due-process doctrine would reinstate the law. Apparently, the Board thought that applying our state constitution to this election in the manner Judge Griffin had requested would amount to applying a "newly announced rule of law." *Id.* at 72. But the Board has confused the chronology. For the state constitution's residency requirement has existed and persisted since the Revolutionary War.

      iii.    **The Board incorrectly decided to count absentee ballots submitted without photo identification.**

Since 2018, North Carolina law has required individuals submitting absentee ballots to submit a photocopy of their photo identification in a "sealed container-return envelope" along with their ballot. N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1). To be sure, voters who fail to include a photo identification along with their ballot may cure that deficiency, but only if the proper identification is received the day before the county canvass. *Id.* § 163-230.1(e). These provisions equalize the burden of voting: both in-person voters and absentee voters must show photo identification to cast a ballot. *See id.* § 163-166.16(a); N.C. Const. art. VI, §§ 2(4), 2(2).

Here, Judge Griffin—again using the Board's own data—has identified in his protests 5,509 overseas absentee voters who failed to submit photo identification along with their ballot. D.E. 1-4 at 77-78. None of those voters cured this deficiency under section 163-230.1(e). North Carolina law therefore prohibits counting those ballots.

The Board, however, disagreed. It reasoned that section 163-258.17(b) established the exclusive means to authenticate the identity of an overseas absentee voter and excused such voters

from providing photo identification. D.E. 1-5 at 73. Subsection (b) says no such thing. It instead refers to the "authentication" required for "execution of a document" for overseas voters. N.C. Gen. Stat. § 163-258.17(b). But North Carolina's photo-identification requirement is an entirely separate requirement found in another statute and is used to verify the voter's identity, not to authenticate a document.

The Board also defended its decision to excuse overseas voters from the photo-identification requirement on the grounds that the Board had already issued a rule to that effect. D.E. 1-5 at 76-77. But the General Assembly never delegated to the Board the power to override state constitutional and statutory requirements. Nor does the state constitution permit the Board to impose a greater burden—photo identification—on those living in North Carolina than it imposes on those living abroad.

Additionally, the Board's attempt to rely on federal law to support its reasoning in this regard fails. The Board cited 52 U.S.C. § 20302 as part of its justification for permitting these ballots to be counted. *Id.* at 77. But, as with HAVA and the NVRA, that statute is inapplicable because it applies only to "elections for Federal office." 52 U.S.C. § 20302 (a)(1)-(3), (6)-(8), (b)(1), (c).

Finally, as with Judge Griffin's Never Residents protest, the Board claims that if state law were interpreted to require a photo identification for overseas absentee ballots, that would amount to a "newly announced rule" of law, violating the federal constitution's substantive due process doctrine. D.E. 1-5 at 79. But again, the Board has confused the chronology. Since 2018, North Carolina law has required all voters to submit a photo identification when they vote.

### iv. The Board's other reasons for denying Judge Griffin's protests fail.

The Board relied on several other reasons to deny Judge Griffin's protests, but these all fail as well. First, the Board reasoned that it should dismiss the protests because, it said, they were untimely voter challenges. But that position contravenes not only the Board's previous orders, *see* D.E. 1-4 at 60-61, but also the North Carolina Supreme Court's decision in *Bouvier*. Those authorities stand for the proposition that "an election protest may address any 'irregularity' or 'misconduct' in the election process, including the counting and tabulation of ballots cast by ineligible voters." *Bouvier*, 386 N.C. at 4. And that is exactly what Judge Griffin's protests do here.

Next, the Board purported to dismiss Judge Griffin's protests for lack of service. To reach this decision, the Board partially relied on rules it had promulgated requiring protestors to serve by mail copies of all filings in an election protest on every person with a direct stake in the protest within one business day of filing the protest. 8 N.C. Admin. Code § 02.0111. But that regulation only permits the Board to prescribe the form used for election protests. *Id.* More to the point, the Board has no statutory authority to burden protestors with onerous processes for providing notice to affected parties. And that is especially so where the protest statutes expressly burden the county boards of elections—not the protestors—with the duty to provide notice to affected parties. N.C. Gen. Stat. § 163-182.10(b).

Moreover, Judge Griffin nonetheless complied with the Board's service demand: he not only notified the county boards of elections of his protests, but also mailed postcards to over 60,000 voters at their addresses of record. Those postcards notified those individuals that their vote may be affected by his protests and provided a QR-code link to the protest filings and the county boards of elections website. D.E. 1-5 at 174-78. Indeed, those postcards mirrored the mailers that the

Board itself uses to notify voters of certain requirements. *See* N.C. Gen. Stat. §§ 163-82.8(c), 163-82.14(d)(2); *See* N.C. State Bd. of Elections, *Press Release: State Board Launches Photo ID Educational Campaign* (Feb. 13, 2024), available at https://www.ncsbe.gov/news/press-releases/2024/02/13/state-board-launches-photo-id-educational-campaign.

Judge Griffin's postcards also satisfy the constitutional standard for notice because they were "reasonably certain to inform those affected." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315, 319 (1950). Judge Griffin served over 60,000 voters in this way, and the interests of each of those voters "is identical with that of a class" and, therefore, "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any sustained would inure to the benefit of all." *Id.* at 319. Given that Judge Griffin's service on 60,000 voters replicates the Board's own methods of notifying voters, the Board had no grounds to claim his method of notice and service was deficient.

The Board also suggested in passing that Judge Griffin's protests may have been untimely filed. *See* D.E. 1-5 at 46 n.4. To be sure, the General Statutes require that protests be filed "no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results." N.C. Gen. Stat. § 163-182.9(b)(4)(c). But the General Statutes also expressly provide that only "substantial compliance" with those deadlines is required. *Id.* § 163-182.10(a)(1). And here, Judge Griffin's protests were all submitted by email to the county boards of elections before the 5:00 P.M. deadline. D.E. 1-5 at 174-78. It is possible that some of those emails might have hit election officials' inboxes a few minutes after 5:00 P.M., but that scenario clearly demonstrates "substantial compliance" with the deadline requirement. *See, e.g.*, *Graham v. Nw. Bank*, 16 N.C. App. 287, 291-92, 192 S.E.2d 109, 112 (1972).

Finally, the Board suggests that sustaining Judge Griffin's protests may violate the federal constitution's substantive due process doctrine, ostensibly invoking the *Anderson-Burdick* test, though the Board never mentions that test by name in its order. That test requires that a regulation imposing a "severe burden" on voting be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But here, none of Judge Griffin's protests ask the Board to enforce laws that would severely burden voting. For asking the Board to enforce the lawful registration, residency, and photo-identification requirements enshrined in the state constitution and the General Statutes merely requires it to apply an evenhanded trio of voter qualifications requirements which cannot, as a matter of law, severely burden the right to vote. *See Crawford v. Marion Cnty. Elec. Bd*, 553 U.S. 181, 189-98 (2008) (plurality opinion).

The Board also suggests that where voters complied with its instructions to disregard certain registration or voting requirements, sustaining the protests would violate substantive due process. But this is not a situation in which an election official's error prevented eligible voters from casting their ballots. Rather, this is an instance in which, after the Board decided to not inform individuals of certain requirements, the individuals' ignorance of those requirements resulted in them failing to take the steps necessary to become eligible voters. But, in this situation, it is not unconstitutional to require the public to be as knowledgeable of election laws as other laws. *See, e.g.*, *Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.,* 472 F.2d 121, 122 (8th Cir. 1973); *Powell v. Bower,* 436 F.2d 84, 88 (2d Cir. 1970).

Moreover, even if the Court were to conclude that enforcing these laws severely burdened the right to vote, they are nonetheless tailored to compelling state interests. *See Crawford*, 553 U.S. at 194-97; *Purcell*, 549 U.S. at 4; *Bush,* 531 U.S. at 105; *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986). The state is therefore well justified in enforcing them.

*   *   *

For these reasons, Judge Griffin is likely to show that the Board erroneously applied state and federal law when it denied his protests.  And given that Judge Griffin stands to suffer irreparable harm—*i.e.*, losing his opportunity for judicial review and losing the election—absent the writ and that the Board is acting lawlessly on a matter of great public importance, there is a need for judicial expediency and the only adequate remedy is a writ of prohibition.  Judge Griffin has therefore demonstrated that he likely to succeed on the merits of his petition.

**V.**      **The Court should waive the bond requirement or set bond at a nominal amount.**

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," it is well established "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Here, the Board will not suffer costs and damages from the proposed preliminary injunction, so Judge Griffin should not be required to post security, or should be required to post only a nominal amount.  *See Doe v. Pittsylvania Cnty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (requiring no bond because the defendant would suffer "no monetary damages or other harm").

**CONCLUSION**

For the foregoing reasons, Judge Griffin respectfully requests that the Court enter, not later than January 6, 2025, a preliminary injunction enjoining the Board from certifying the election results for the November 2024 general election for Seat 6 of the North Carolina Supreme Court until these proceedings are decided on the merits.

20

Dated: December 23, 2024

Respectfully submitted,

/s/ Mark M. Rothrock

Craig D. Schauer
41571 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
cschauer@dowlingfirm.com

Mark M. Rothrock
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

Troy D. Shelton
48070 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
tshelton@dowlingfirm.com

William T. Thompson*
24088531 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

W. Michael Dowling
42790 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
mike@dowlingfirm.com

*Local Rule 83.1(d) special appearance
forthcoming*

*Attorneys for Petitioner*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)

I hereby certify that this Petitioner's Memorandum in Support of Motion for Preliminary Injunction is in compliance with Local Rule 7.2(f)(2), as the document, including headings, footnotes, citations, and quotations, contains no more than 8400 words, as indicated by the word count generated by word processing software.

/s/ *Mark M. Rothrock*
Mark M. Rothrock

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing Petitioner's Memorandum in Support of Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ *Mark M. Rothrock*
Mark M. Rothrock