# EXHIBIT A

(Brief of Amici Curiae Bipartisan Former
Members of Congress Who Voted in Favor
of HAVA in Opposition to Remand)

## TO

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN OPPOSITION TO REMAND

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

JEFFERSON GRIFFIN,        )   NO. 5:24CV724
                             )
       Plaintiff,        )
v.                         )
                             )
NORTH CAROLINA STATE     )
BOARD OF ELECTIONS,      )
                             )
       Defendant.      )

---

## BRIEF OF AMICI CURIAE BIPARTISAN FORMER MEMBERS OF CONGRESS WHO VOTED IN FAVOR OF HAVA IN OPPOSITION TO REMAND

---

1

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ 2

TABLE OF AUTHORITIES ................................................................................ 3

STATEMENT OF INTEREST OF AMICI CURIAE ........................................... 4

INTRODUCTION ............................................................................................... 5

ARGUMENT ...................................................................................................... 7

I. THIS CASE PRESENTS A SUBSTANTIAL FEDERAL QUESTION BECAUSE DECIDING ...

THIS CASE REQUIRES THE COURT TO INTERPRET HAVA ...................................... 7

II. WHEN IT PASSED HAVA, CONGRESS INTENDED FOR CASES LIKE THE ONE AT BAR

TO BE DECIDED IN FEDERAL COURT .................................................................. 11

CONCLUSION ................................................................................................. 14

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 27-28 (1983)......................................................................................................................................7

*Gunn v. Minton*, 568 U.S. 251, 258 (2013)......................................................................................4, 7

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00547-M, 2024 WL 4523912, at *12 (E.D.N.C. Oct. 17, 2024), *rev'd and remanded on other grounds*, 120 F.4th 390 (4th Cir. 2024) .................................................................................................................................6, 7, 11

**Statutes**

28 U.S.C.A. § 1331 (West) .................................................................................................................7

52 U.S.C. § 20507 .............................................................................................................................9

52 U.S.C. § 20507(d) ........................................................................................................................9

52 U.S.C. § 21083(a)(5)...................................................................................................................11

52 U.S.C. § 21083(a)(5)(A) ...............................................................................................................8

Ariz. Rev. Stat. § 16-161 .................................................................................................................10

N.C. Gen. Stat. §163-82.11(a) .....................................................................................................6, 10

N.C. Gen. Stat. §163-82.14(a)-(a1)...............................................................................................6,10

N.C. Gen. Stat. §163-82.3(a) .......................................................................................................6, 10

N.C. Gen. Stat. §163-82.4(a)(11); 2003-226 (session law) ..............................................................8

National Voter Registration Act of 1993 ..........................................................................................9

NVRA. 52 U.S.C. § 21083(a)(1)–(2)..................................................................................................9

**Other Authorities**

52 U.S.C. Subtitle II Ch. 209 Subch. III; Daniel P. Tokaji, *Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 Geo. Wash. L. Rev. 1206, 1214 (2005)........11

Charles Stewart, *What Hath HAVA Wrought? Consequences, intended and Not, of the Post-Bush v. Gore Reforms*, Caltech/MIT Voting Technology at 13 (April 7, 2011)........................................................12

Gabrielle B. Ruda, *Picture Perfect: A Critical Analysis of the Debate on the 2002 Help America Vote Act*, 31 Fordham Urb. L.J. 235, 246 (2003) (citing 148 Cong. Rec. S1175 (statement of Senator Bond).....12

Help America Vote Act of 2002, H.R. 3295, 107th Cong (2002) ......................................................12

N.C. State Bd. of Elections, *North Carolina Voter Registration Application* (last accessed Dec. 31, 2024), *available at* https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf...............................9

Orion de Nevers, W*hat Happened to HAVA? The Help America Vote Act Twenty Years on and Lessons for the Future,* 110 Geo. L.J. Online 168, 174 (2022) ..........................................................................11

S. Rep. No. 136-107 (2002) .........................................................................................................12, 13

3

## STATEMENT OF INTEREST OF AMICI CURIAE

Former Members of Congress Senate Majority Leader Thomas Daschle, House Majority Leader Richard Gephardt, and former Representatives Steve Israel, Christopher Shays, Robert Wexler, James Greenwood, and Wayne Gilchrest respectfully submit this amicus brief in opposition to any prospective order to remand. Amici are a bipartisan group of former Congressional representatives who were serving in 2002 when the Help America Vote Act ("HAVA" or the "Act") was passed. Each of these former representatives voted in favor of HAVA and helped to secure its passage. They are interested in the issue of whether this case should be remanded back to state court. As former Representatives who voted to pass HAVA, they are uniquely situated to discuss Congress's intent in passing the Act, specifically as it relates to "Congress's intended division of labor between state and federal courts" which is an essential factor for the court to consider as it determines whether to remand. *Gunn v. Minton*, 568 U.S. 251, 258 (2013). Amici are listed below:

- **Thomas Daschle**, Democrat, Senate Majority Leader from 2001 to 2003. Senator from South Dakota from 1987 to 2005. Representative from South Dakota's 1st Congressional District from 1979 to 1983 and at-large Representative from 1983 to 1987.

- **Richard Gephardt**, Democrat, House Majority Leader from 1989 to 1995. House Minority Leader from 1995 to 2003. Representative from Missouri's 3rd Congressional District from 1977 to 2005.

- **Wayne Gilchrest**, Republican, Representative from Maryland's 1st Congressional District from 1991 to 2009.

4

- **Jim Greenwood**, Republican, Representative from Pennsylvania's 8th Congressional District from 1993 to 2005.

- **Steve Israel**, Democrat, Representative from New York's 2nd Congressional District from 2001 to 2013 and 3rd Congressional District from 2013 to 2017.

- **Christopher Shays**, Republican, Representative from Connecticut's 4th Congressional District from 1987 to 2009.

- **Robert Wexler**, Democrat, Representative from Florida's 19th Congressional District from 1997 to 2010.

## INTRODUCTION

This case presents a substantial federal question, which Congress intended to be addressed by a federal Court when it passed HAVA in 2002. In this lawsuit, Plaintiff Judge Jefferson Griffin seeks a preliminary injunction that would prevent the North Carolina State Board of Elections from counting approximately 60,000 votes in the election for Seat 6 on the North Carolina Supreme Court. Judge Griffin alleges that these ballots were cast by individuals who failed to provide a driver's license number or the last four digits of their social security number, under voter registration forms that did not require this information.[1] Judge Griffin further alleges that the failure to include this information in their registration forms means that those 60,000 voters were not legally registered under North Carolina law when they cast their ballots and (on his theory) their votes should be thrown out. (Pet. for Writ of Prohibition 20, ECF No. 1-4). Notably, Judge

---

[1] Amici acknowledge that the parties dispute whether these voters in fact failed to provide this information on their voter registration forms. *See In Re Election Protests of Jefferson Griffin*, Decision and Order (N.C. State Bd. of Elec. Dec. 13th, 2024). Amici lack sufficient information to take a position on that factual question.

Griffin did not raise any issue concerning the eligibility of these voters—all of whom registered to vote before December 2023—until two weeks after voters had already cast their ballots.

Judge Griffin's claims turn on an interpretation of federal law, namely HAVA. This matter should therefore be addressed by a federal court. As this Court recently found, where a complaint implicates "an individual's capability to cast a vote, a fundamental right secured by the Fourteenth Amendment, the federal interest is near its zenith." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00547-M, 2024 WL 4523912, at \*12 (E.D.N.C. Oct. 17, 2024), *rev'd and remanded on other grounds*, 120 F.4th 390 (4th Cir. 2024).

The fact that this case concerns a state election is immaterial. To be sure, HAVA, by its terms, only applies to federal elections. But the North Carolina General Assembly has structured its election laws to require HAVA adherence in both federal *and state* elections. North Carolina has a "unified registration system." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024). This means that the State Board of Elections uses a single voter registration form, irrespective of the office on the ballot. N.C. Gen. Stat. §163-82.3(a). It also maintains a single voter registration list for both state and federal elections. N.C. Gen. Stat. §163-82.11(a) ("The system shall serve as the single system for storing and managing the official list of registered voters in the State. The system shall serve as the official voter registration list for the conduct of all elections in the State."); *see also* N.C. Gen. Stat. §163-82.14(a)–(a1). In other words, any ruling on whether the 60,000 voters in question are entitled to vote in state elections will also dictate whether they can vote in federal elections, and vice versa.

As former members of Congress who supported HAVA and helped secure its passage, Amici have a strong interest in the proper implementation and interpretation of the Act. Amici

believe that this action presents a substantial federal question and therefore that this court has subject matter jurisdiction over the case.

## ARGUMENT

### I.     This Case Presents a Substantial Federal Question

District courts in the United States have original jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.A. § 1331. The Supreme Court has interpreted this to mean that Congress has given district courts jurisdiction to hear "cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 27-28 (1983). A state-law claim poses a substantial question of federal law if the federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Republican Nat'l Comm.*, 120 F.4th at 400. (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)) (internal quotation marks omitted). A federal court can resolve a state-law claim that meets all four of these criteria because "there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Gunn*, 568 U.S. at 258.

Amici have a strong interest in the resolution of the final *Gunn* factor, which compels a district court to consider "whether the exercise of federal jurisdiction over [a state-law claim] would 'disrupt[] the federal-state balance approved by Congress.'" *Republican Nat'l Comm.*, 120 F.4th at 400 (citing *Gunn*, 568 U.S at 258). As a group of bipartisan legislators who voted to pass

HAVA in 2002, Amici are uniquely qualified to weigh in on the congressional intent behind the Act.

### A. Deciding this case requires the Court to interpret HAVA

Judge Griffin claims that, under North Carolina law, a county board may not process a voter registration form if the voter does not provide a driver's license number or the last four digits of their social security number (if they have either number). (ECF No. 1-4 at 6); *see* N.C. Gen. Stat. §163-82.4(a)(11). Under North Carolina law, Judge Griffin argues, the State Board should discount any ballot cast by someone who registered without providing this information. (ECF No. 1-4 at 18-19).

Judge Griffin's argument is flawed, however, because North Carolina law does not *require* that voter registrants with a driver's license or social security number provide that information on their application. The State's legislation implementing HAVA, originally enacted in 2003, states that the voter registration application shall "request," among other things, a "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." N.C. Gen. Stat. §163-82.4(a)(11); 2003-226 (session law). Consistent with the statute, North Carolina's post-HAVA voter registration forms until December 2023 *requested* that information but did not *require* it. Brief of Jefferson Griffin et al., *In Re Protests of Jefferson Griffin* at 5 (Nov. 27, 2024) (ECF 1-4).

North Carolina's HAVA implementation statute *requests* what HAVA *requires*. HAVA states that "an application for voter registration for an election for Federal office *may not be accepted or processed* by a State unless the application includes" a driver's license number or the last four of the applicant's social security number. 52 U.S.C. § 21083(a)(5)(A) (emphasis added). HAVA also provides an alternative for registrants without either of those pieces of information—

8

that "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.* at (a)(5)(A)(iii).[2]

Judge Griffin's claim runs directly through these HAVA requirements. In order to decide this case, the Court must determine whether an alleged failure by a voter to provide the information required by HAVA results in the vote being discounted. This places the federal question front and center.

Relatedly, Judge Griffin's argument implicates another federal law, the National Voter Registration Act of 1993 ("NVRA"). In conjunction with the NVRA, HAVA contains detailed provisions of how states are to maintain their voter lists and under what circumstances voters can be removed from the rolls due to ineligibility. *Id.* at (a)(2)(A) (citing 52 U.S.C. § 20501 *et seq.*); *see also* 52 U.S.C. § 20507. Specifically, HAVA provides that (in any state with a voter registration requirement) a state authority must maintain a computerized list of registered voters and, "if an individual is to be removed from the computerized list," it must be done in accordance with the NVRA. 52 U.S.C. § 21083(a)(1)–(2). The NVRA in turn, provides that a state must complete any systematic removal of voters from their computerized list no later than 90 days before a federal election, unless removed for death or incapacity, a criminal conviction, or at the voter's request. 52 U.S.C. § 20507(d). It also provides an exhaustive list of circumstances in which a state is permitted to remove a voter from the list. *Id.* at (a)(3)–(4).

---

[2] In December 2023, the State Board of Elections modified the voter registration form to comply with HAVA, not the North Carolina voter registration law. *See* Order, *In re Protests of Jefferson Griffin* at 18–21(N.C. State Bd. of Elections Dec. 13, 2024). The form now requires applicants with a DMV ID to provide that number. If they do not have that number, they are to provide the last four digits of their social security number. If they do not have either number, they must check a box stating as much. N.C. State Bd. of Elections, *North Carolina Voter Registration Application* (last accessed Dec. 31, 2024).

In light of this, the question now becomes whether it is appropriate or permissible under HAVA and the NVRA to invalidate the votes of 60,000 voters based on an alleged defect in their registrations, despite the lack of any awareness on their part that an error had occurred. That question implicates both federal statutes and is nearly certain to be in dispute in this case.

**B. Because North Carolina has a unified voter registration system, the eligibility of the 60,000 voters in question implicates federal law**

It makes no difference to this analysis that this case involves an election for a state, rather than federal, office. North Carolina has a unified system for voter registration. While certain states separate their state and federal registration systems, *see, e.g.,* Ariz. Rev. Stat. § 16-161, North Carolina does not. *RNC*, 120 F.4th at 401 (4th Cir. 2024). Instead, North Carolina voters need only fill out a single form to become eligible to vote in state and federal elections in North Carolina and, once registered, their names are maintained on a single database. *See* N.C. Gen. Stat. §163-82.3(a) (maintaining single voter registration form for state and federal elections); N.C. Gen. Stat. §163-82.11(a) ("The system shall serve as the single system for storing and managing the official list of registered voters in the State. The system shall serve as the official voter registration list for the conduct of all elections in the State."); *see also* N.C. Gen. Stat. §163-82.14(a)-(a1). This uniform, statewide list was created as part of the North Carolina's HAVA implementation statute in 2003. S.L. 2003-226, § 6, eff. June 27, 2003. As a result, any relief Judge Griffin could attain in this case will inevitably impact voters' eligibility to participate in federal elections in the future. Judge Griffin therefore cannot escape HAVA by adverting to the fact that this dispute concerns a state election.

10

**II.** **When it Passed HAVA, Congress Intended for Cases Like the One at Bar to Be Decided in Federal Court**

It is clear that Congress intended, at a minimum, for federal courts to be an available forum for deciding disputes under HAVA—and likely the preferred forum. As this Court recently held in another dispute related to HAVA, "Congress did grant states discretion in implementing [the Act]. But implementation is distinct from interpretation, and consideration of the entire statutory scheme leads to the conclusion that Congress intended for federal courts to resolve core questions of statutory interpretation." *Republican Nat'l Comm.* 2024 WL 4523912, at *16 (E.D.N.C. Oct. 17, 2024) (citations omitted), *rev'd and remanded on other grounds*, 120 F.4th 390 (4th Cir. 2024).

To understand the intent behind HAVA, one must understand the crisis that prompted it. The 2000 election was rife with controversy. History has cast its focus on the dispute over the vote in Florida, but problems in the 2000 election were more widespread than that single incident. Among other things, many localities throughout the country inappropriately turned away voters due to issues in voter registration and list maintenance. Orion de Nevers, W*hat Happened to HAVA? The Help America Vote Act Twenty Years on and Lessons for the Future,* 110 Geo. L.J. Online 168, 174 (2022). Issues with voter registration led to an estimated 1.5 to 3 million lost votes in the 2000 election alone. *Id.* With HAVA, Congress sought to correct the issues underlying states' voter registration systems. *Id.* In doing so, it hoped to restore confidence in the electoral system and improve access to the ballot. *Id.* at 171.

One of HAVA's signature reforms was a set of minimum voter registration standards for all states and localities to adhere to. *See* 52 U.S.C. Subtitle II Ch. 209 Subch. III; Daniel P. Tokaji, *Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 Geo. Wash. L. Rev. 1206, 1214 (2005). That includes the requirement at issue in this case. 52 U.S.C. § 21083(a)(5).

Throughout the text of the statute itself and in the legislative debates that led to its passage, emphasis is placed on uniformity in the Act's implementation. The preamble to the Act specifies that the law sought "to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Help America Vote Act of 2002, H.R. 3295, 107th Cong (2002). The subchapter that houses the requirements at issue in this case is entitled "UNIFORM AND NONDISCRIMINATORY ELECTION TECHNOLOGY AND ADMINISTRATION REQUIREMENTS" 52 U.S.C. Subtitle II Ch. 209 Subch. iii.

Senator Kit Bond introduced the provisions at issue in this case as part of a "push for the establishment of a uniform system of identity verification for voter registration during the creation of HAVA." Gabrielle B. Ruda, *Picture Perfect: A Critical Analysis of the Debate on the 2002 Help America Vote Act*, 31 Fordham Urb. L.J. 235, 246 (2003) (citing 148 Cong. Rec. S1175 (statement of Senator Bond)); Charles Stewart, *What Hath HAVA Wrought? Consequences, intended and Not, of the Post-Bush v. Gore Reforms*, Caltech/MIT Voting Technology at 13 (April 7, 2011). In his remarks to the Senate concerning the conference report on HAVA, Bond explained "it [was] the intent of the conferees to impose a new Federal mandate for voter registration." S. Rep. No. 136-107 (2002). He also sought to assuage concerns that identification requirements would be applied arbitrarily by noting that "Congress explicitly provided that the identification requirements are to be administered in a uniform and nondiscriminatory manner." *Id.*; 52 U.S.C. § 21083 (each state "shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list") (emphasis added). Likewise, Senator Orrin Hatch remarked "I appreciate the intent underlying this legislation, which is that the system must be uniform in nature across the entire country, if it is to be successful in

accomplishing the goal of election reform." S. Rep. No. 136-107 (2002). Senator John Kerry stated that HAVA "will enable more people to exercise their fundamental right to vote by setting uniform, minimum standards for Federal elections." *Id*.

If HAVA is to achieve Congress's goal of uniformity across the country, federal courts must have an opportunity to interpret the statute. Allowing a state court to interpret HAVA could lead to the judicial creation of 50 different versions of HAVA across the United States. Allowing federal courts to decide these issues, by contrast, ensures that Congress's "federal mandate for voter registration"[3] speaks with a single voice. To be clear, it is not the position of Amici that states and their courts no longer have the authority to regulate their own election systems—HAVA clearly preserves that. Nor is it the position of the Amici that state courts may never decide cases implicating the statute—HAVA does not create exclusive jurisdiction in federal courts. However, it is the position of Amici that when Congress passed HAVA, they intended at a minimum for federal courts to have the opportunity to weigh in on disputes concerning the statute's implementation. This is especially the case where, as here, a state election authority—the very entity charged with implementing HAVA—has sought to move the dispute to a federal court. *RNC*, 2024 WL 4523912, at *16 (quoting *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 288 (4th Cir. 2022) ("If anything . . . the removal [in this action] could best be said to have righted the intended division between state and federal courts.") (cleaned up). Making a federal court available to decide disputes under HAVA helps to preserve the federal-state balance struck by the statute, while at the same time ensuring uniformity in the Act's application.

---

[3] S. Rep. No. 136-107 (2002).

## CONCLUSION

For the reasons set forth above, and for those given by Defendants, this Court should not issue an order to remand this case to the North Carolina Supreme Court.

/s/ William C. McKinney
William C. McKinney, Fed ID: 15580
N.C. State Bar No. 046254
Haynsworth Sinkler Boyd, P.A.
ONE North Main, 2nd Floor
Greenville, South Carolina 29601
Telephone: (864) 240-3200
wmckinney@hsblawfirm.com

*Local Civil Rule 83.1(d) Attorney for Amicus Curiae*

/s/Tianna Mays
Tianna Mays
*Pro hac vice application forthcoming*
State Democracy Defenders Fund
600 Pennsylvania Avenue SE
#15180
Washington, DC 20003
tianna@statedemocracydefenders.org

/s/Jon Greenbaum
Jon Greenbaum
*Pro hac vice application forthcoming*
Justice Legal Strategies PLLC
1455 Pennsylvania Avenue
Suite 400
Washington, DC 20004
jgreenbaum@justicels.com

/s/Spencer Klein
Spencer Klein
*Pro hac vice application forthcoming*
 Klein Law PC
1328 Florida Ave NW
Washington, DC 20009
spencer@statedemocracydefenders.org
*Counsel for Amici Curiae*