# EXHIBIT A

STATE OF NORTH CAROLINA
WAKE COUNTY

BEFORE THE STATE BOARD OF ELECTIONS

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE ELECTION PROTESTS OF | ) | |
| JEFFERSON GRIFFIN, ASHLEE | ) | **DECISION AND ORDER** |
| ADAMS, FRANK SOSSAMON, AND | ) | |
| STACIE McGINN | ) | |
| | ) | |
| | ) | |

At a public meeting held on December 20, 2024,[1] the State Board of Elections ("State Board") considered election protests filed by four candidates in the 2024 General Election: Jefferson Griffin, a Republican candidate for associate justice of the Supreme Court of North Carolina; Ashlee Adams, a Republican candidate for N.C. Senate District 18; Stacie McGinn, a Republican candidate for N.C. Senate District 42; and Frank Sossamon, a Republican candidate for N.C. House District 32 (collectively, the "Protesters").

Upon consideration of the record materials from and decisions of the county boards of elections that conducted evidentiary hearings on the protests; protest materials, including appeals, submitted by the Protesters; briefs submitted by the Protesters and opposing candidates; and the oral argument presented to the State Board by counsel for the candidates, the State Board concluded that the protests addressed in this written decision (1) did not substantially comply with the service requirements;[2] and (2) presuming without deciding that all voters with ballots in

---

[1] The recording of the Board's meeting is available at:
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-12-20/.
[2] This conclusion regarding service pertained only to the "Deceased," "Felon," and "Not Registered" protests filed by the Protesters, and does not pertain to the "Residency" protest filed by McGinn or the "Recount" protest filed by Griffin.

the count who were challenged on appeal, potentially subject to appeal, or were referred to the State Board by the county boards of elections were in fact ineligible, their numbers were insufficient to affect the outcome of the election in those contests. Based on those conclusions, the State Board dismissed the protests.

## I.    BACKGROUND

On November 19, 2024, the Protesters filed over 300 protests across the state challenging the apparent results of their elections. After the county boards of elections conducted recounts in all of these contests, the final canvassed results are as follows:

| CONTEST | CANDIDATE | PARTY | BALLOT COUNT | PERCENT |
|---|---|---|---|---|
| Supreme Court Associate Justice | Allison Riggs | DEM | 2,770,412 | 50.01% |
| | Jefferson G. Griffin | REP | 2,769,678 | 49.99% |
| NC Senate District 18 | Terence Everitt | DEM | 59,667 | 48.47% |
| | Ashlee Bryan Adams | REP | 59,539 | 48.36% |
| | Brad Hessel | LIB | 3,906 | 3.17% |
| NC Senate District 42 | Mrs. Woodson Bradley | DEM | 62,260 | 50.08% |
| | Stacie McGinn | REP | 62,051 | 49.92% |
| NC House District 32 | Bryan Cohn | DEM | 21,215 | 48.95% |
| | Frank Sossamon | REP | 20,987 | 48.42% |
| | Ryan Brown | LIB | 1,140 | 2.63% |

Protests were filed in almost every county in the state.[3] Those protests are based on six categories of allegations that certain general election voters' ballots were invalid. On Wednesday, November 20, 2024, the State Board held a meeting, noticed on an emergency basis under N.C.G.S. § 143-318.12, to consider whether to take jurisdiction over some of the protests pursuant to its statutory authority under N.C.G.S. § 163-182.12. The Board voted unanimously to take jurisdiction over three categories of protests, which presented legal questions of statewide significance.[4] By written decision issued December 13, 2024, the State Board dismissed the three categories of protests that it had assumed jurisdiction over.[5]

The State Board's November 20, 2024, order also instructed the county boards of elections to consider the remaining three categories of protests, which were focused on individual, fact-specific determinations of voter eligibility. These protests are labeled by the Protesters as the "Deceased" protests, "Felon" protests, and "Not Registered" protests.

- The Deceased protests challenge the eligibility of ballots cast by voters who were allegedly deceased on Election Day.

- The Felon protests challenge the eligibility of ballots cast by voters who allegedly were serving a felony sentence as of Election Day.

- The Not Registered protests challenge the eligibility of ballots cast by voters whose registration was allegedly denied or removed on Election Day (*i.e.*, they were not a registered voter in the county on Election Day).

---

[3] The legislative candidates filed protests in only those counties within the jurisdiction of their legislative contests.

[4] The State Board's November 20, 2024, order is available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2024%20Order%20on%20Jurisdiction%20over%20Griffin%20Protests.pdf.

[5] The State Board's December 13, 2024, decision is available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Protest%20Appeals/Griffin-Adams-McGinn-Sossamon_2024.pdf.

3

Across all counties and among the four Protesters, the protests alleging the same category of allegedly ineligible voters are structured and pleaded in the same fashion. The only differences among county protests of the same category are the identities of the voters being challenged—*i.e.*, only voters registered in the county receiving the protest are part of a protest that the county board received. As instructed in the State Board's November 20, 2024, Order, the county boards conducted evidentiary hearings on these protests in accordance with N.C.G.S. § 163-182.10, to determine the eligibility of the voters in question as of Election Day and whether they had a ballot in the count.

In addition to these three categories of protests filed by all Protesters, McGinn timely filed a protest claiming that certain voters resided outside of NC Senate District 42 and were therefore ineligible to vote in the contest (referred to hereafter as the "Residency" protest). The issues presented in the Residency protest were heard by the Mecklenburg County Board of Elections along with the other categories of protests within that county board's jurisdiction. Following two evidentiary hearings on December 2 and December 5, 2024, the county board issued two decisions on December 6, 2024, dismissing the Residency protest. In its decisions, the county board unanimously concluded that the protest lacked substantial evidence to support the protest. McGinn timely appealed the county board's decisions on the Residency protest to the State Board.

Finally, Griffin filed a protest based on the conduct of the machine recount in Randolph County (referred to hereafter as the "Recount" protest). In Griffin's Recount protest, he asserted that the change of the vote count by 103 votes in the county following the machine recount (92 fewer for Griffin and 11 fewer for his opponent, Allison Riggs), which was much higher than any other county, "circumstantially suggest errors or defects occurred in the Randolph County

4

recount to a much greater extent than elsewhere." The protest alleged that "Upon information and belief, the large number of discounted votes may have been caused by an issue with the tabulation machines used by Randolph County in counting absentee ballots, which led to votes being counted twice." And the protest requested a complete hand-to-eye recount of all ballots cast in the contest in Randolph County. On December 5, 2024, the county board conducted a preliminary consideration of the recount protest pursuant to N.C.G.S. § 163-182.10(a) and unanimously concluded that the Recount protest was untimely because it raised issues with the original count of ballots in the contest, rather than the machine recount of the ballots. As a separate ground for dismissal, the county board determined, again unanimously, that the protest failed to meet the probable cause standard, because again, the protest was, in the county board's view, taking issue with the original count and not the recount. Griffin timely appealed the county board's decision on the Recount protest to the State Board.

This decision of the State Board concerns the Deceased protests, Felon protests, and Not Registered protests filed by all Protesters, as well as the Residency protest filed by McGinn and the Recount protest filed by Griffin. These are the only protests that remain pending in each respective contest under protest.

These protests are before the State Board in different procedural postures depending on how the county boards decided the matters before them: (1) untimely protests referred to the State Board by the county boards; (2) referrals to the State Board after evidentiary hearings because the county board found at least one ineligible voter has a ballot in the count in a multicounty contest; (3) appeals by some of the Protesters, taking issue with the county boards' decisions on some of the protests, including the boards' decisions as to the eligibility of the voters called into question in the protests; and (4) protests very recently decided by the county

5

boards for which the time to appeal had not yet run. Pursuant to its authority in N.C.G.S. § 163-182.12, and the intent of N.C.G.S. § 163-182.10(d)(2)d. to facilitate a single decision on protests in a multicounty contest, the State Board, by a 3–2 vote, assumed jurisdiction and consolidated for decision all protests filed by each Protester that have been considered by the county boards, referred to the State Board, or otherwise appealed, into one combined protest per protested contest. Accordingly, for the purposes of this decision, the State Board has consolidated into four separate protests all protests filed by Griffin ("Griffin protests"), all protests filed by Adams ("Adams protests"), all protests filed by Sossamon ("Sossamon protests"), and all protests filed by McGinn ("McGinn protests").

## II.  ANALYSIS

The Deceased, Felon, and Not Registered protests for each candidate were not served on affected voters in accordance with law. Additionally, for all remaining protests, the Protesters have failed to establish substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in those contests. The protests are therefore dismissed.

### A.  Certain Protests Were Not Timely Filed

As an initial, matter, the Adams protests filed in Wake County and the Griffin protests filed in Anson, Moore, Orange, and Richmond counties were not timely filed under N.C.G.S. § 163-182.9(b)(4).

For the November 2024 general election, the county canvass was on November 15, 2024, ten days after Election Day. *See* N.C.G.S. § 163-182.5(b). Protests are required to be filed by a certain date and time, depending on the allegations within the protest, and when, as here, "the protest concerns an irregularity other than vote counting or result tabulation, the protest *shall be*

6

*filed* no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results." N.C.G.S. § 163-182.9(b)(4)c. (emphasis added). If a protest filing is not timely, the administrative code directs the county board to proceed as follows: "The county board shall not consider election protests not timely filed, but shall refer, in the same manner and within the time period provided in [08 NCAC 02 .0110(a)], all such untimely protests, along with copies of the protest and attachments, to the State Board office for consideration under G.S. 163-182.12. For the purposes of this Rule, timely means within the time specified in G.S. 163-182.9." 08 NCAC 02 .0110(b).

For the November 2024 general election, the deadline to file a protest that concerned an irregularity other than vote counting or result tabulation in a contest was November 19, 2024. *See* N.C.G.S. § 163-182.9(b)(4) ("the second business day after the county board has completed its canvass and declared the results"). The Adams protests and the Griffin protests filed in Moore, Orange, and Richmond counties were filed by email, yet those emails were not received by the respective county boards of elections until shortly after 5:00 P.M. on November 19, 2024. The Griffin protest in Anson County, also filed by email, was not received until the following day. As a result of the untimely filing, those counties referred those protests to the State Board pursuant to 08 NCAC 02 .0110(b), so that the State Board could determine whether to exercise its discretionary authority under N.C.G.S. § 163-182.12 to "consider protests that were not filed in compliance with G.S. 163-182.9."

Although the emails provided by the county boards of elections show a "sent" date and time that was after the statutory deadline of 5:00 P.M. on December 19, Adams and Griffin contend those emails were actually sent prior to the deadline. The Griffin protests in Anson County were originally sent prior to the deadline, but they were sent to an outdated email

7

address, as Griffin's counsel acknowledged at the December 20, 2024, hearing.[6] Once that error was realized, the protests were sent to the correct email address on November 20, 2024.

Despite the conflicting evidence regarding when the emails were *sent*, that is beside the point. The plain language of the statutory filing deadlines in N.C.G.S. § 163-182.9(b)(4) is best construed as prescribing deadlines for when a protest filing must be *received* by the county board of elections, at which point in time the act of filing is complete. *See* N.C.G.S. § 163-182.9(b)(4)c. ("the protest *shall be filed no later than* . . ." (emphasis added)). The emails attempting to file the protests were received after 5:00 P.M. on the second business day following the county canvass, and the county boards of elections receiving those emails were correct that those protests were not timely filed by the statutory deadline.

Nevertheless, while the State Board has concluded that these particular protests were not timely filed, the Board by a 4–1 vote has chosen to exercise its discretionary authority under N.C.G.S. § 163-182.12 to consider such untimely protests, taking into account that attempts were made to file the protests prior to or right at the deadline. As such, these protests are part of the Adams protests and Griffin protests addressed in this decision.

**B.  Service of the Protests on Challenged Voters**

The State Board concludes, for the same reasons as stated in the Board's December 13, 2024, decision, that the Protesters failed to serve the registered voters they seek to challenge in their Deceased, Felon, and Not Registered protests in a manner that complies with the North Carolina Administrative Code or in a manner consistent with the requirements of constitutional due process.

---

[6] See meeting recording, starting at the 1:36:55 timestamp.

The Protesters used the same method of service for these categories of protests—a postcard with vague language and a QR code to "serve" the challenged voters. As the Board concluded in its December 13, 2024, decision, and does so again here, the Protesters have failed to show substantial compliance with the requirement of 08 NCAC 02 .0111 to "serve" the voters they are challenging with "copies of all filings," and their decision to employ the postcard QR code method of service was not reasonably certain to inform the affected voters of the matter such that they could choose for themselves how to respond.

Separately, it is undisputed that the McGinn Residency protests were never served on the affected voters at all.

For these reasons, and incorporating the Board's reasoning in its December 13, 2024, decision into this written decision, the State Board concludes, by a vote of 3 to 2, that copies of protests were not properly served on affected parties and therefore the protests do not substantially comply with N.C.G.S. § 163-182.9. The Board will nonetheless address the merits of the protests.

### C. Merits of the Protests

The Protests filed by Griffin, Adams, Sossamon, and McGinn ask that ballots should be removed from. Following hundreds of hours of diligent work, by hundreds of election officials at county boards of elections throughout the state some voters were found to be ineligible and removed from the count, others were found to be eligible, and a small number of ballots were left to review. The undisputed fact is that the number of ballots in question in each contest's protests is, in aggregate, less than the vote margin in each of the protested contests. During the State Board's December 20 meeting, the Protesters' counsel effectively conceded that point. Accordingly, the State Board concludes that the Protesters have failed to establish substantial

9

evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in any of these contests.

To succeed in an election protest, a protester must establish that any irregularities in the election were "sufficiently serious to cast doubt on the apparent results of the election." N.C.G.S. § 163-182.10(d)(2)e. Absent such a showing, the protest must be dismissed. *Id.* § 163-182.10(d)(2)c. Likewise, the State Board has independent authority to adjudicate election contests to ensure no irregularities occurred "that may have changed the result of an election." *Id.* § 163-182.12. In sum, a successful election protest must prove that any irregularities in an election might have actually changed the ultimate outcome of the election.

Our courts agree. "North Carolina law on this issue is well settled. An election or referendum result will not be disturbed for irregularities absent a showing that the irregularities are sufficient to alter the result. The burden of proof is upon the unsuccessful candidate or the opponents of a referendum to show that they *would* have been successful had the irregularities not occurred." *In re Appeal of Ramseur*, 120 N.C. App. 521, 525, 463 S.E.2d 254, 256 (1995) (citations omitted) (emphasis in original). "Clearly, if an unsuccessful candidate seeks to invalidate an election, he must be able to show that he would have been successful had the irregularities not occurred." *In re Cleveland Cty. Comrs: Protest of Crawford*, 56 N.C. App. 187, 191, 287 S.E.2d 451, 455 (1982) (quoting *In re Judicial Review by Republican Candidates for Election in Clay Cty.*, 45 N.C. App. 556, 570, 264 S.E.2d 338, 346 (1980)).

Because these protests do not meet this burden, they must be dismissed.

10

*i.   Griffin Protests*

The number of voters whose eligibility is called into question by Griffin's Deceased, Felon, and Not Registered protests, and the number of ballots to which Griffin takes issue in the Recount protest, is far below the 734 vote margin in this contest.

In the three categories of protests that are based solely on voters' eligibility, the total number of voters challenged by Griffin per category are: Felon—240 voters challenged; Deceased—156 voters challenged; and Not Registered—572 voters challenged. While these three types of protests together appear at first glance to total 968 voters, these three categories of protests actually challenge a combined 817 voters, because Griffin occasionally challenged the same voter in two protests filed in the same county (*e.g.*, voters removed after dying before Election Day may be in both the deceased and not registered protests), and he withdrew his protests in a few counties.

As the evidence was developed through the hearings conducted by the county boards of elections on these three categories of protests, the number of potentially ineligible voters with ballots in the count was significantly lower than Griffin had alleged. First, the county boards cumulatively determined that 329 challenged voters do not even have a ballot in the count, because their ballot was already challenged by their county board and removed from the count during the canvass period. This is because Griffin's protests are largely based on data from the State Board's own post-election voter eligibility audit, in which the State Board sent lists of voters to the county boards where State Board records showed those voters had voted early or absentee-by-mail yet may have been ineligible for the same reasons identified in Griffin's Deceased, Felon, and Not Registered protests. As part of that process, the county boards reviewed those lists and, entered challenges as appropriate, and followed the appropriate notice

11

Case 5:24-cv-00724-M-RN   Document 38-1   Filed 12/31/24   Page 12 of 22

and hearing process.[7] If the challenge was upheld, then the voter's ballot was retrieved and removed from the count before the county board finalized its canvass and certified the results. If the county board concluded otherwise, based on the evidence presented at the hearing, then the voter's ballot would remain in the count.

As a result of this work by the county boards during the canvass period, 329 of the 817 voters challenged by Griffin had already been determined to be ineligible to vote as of Election Day, and the canvassed results already reflect that their ballot had been removed from the count prior to the filing of the protests..

As for the remaining voters challenged in Griffin's protests, the county boards determined in the protest hearings that 370 of the remaining 488 voters with a ballot in the count should have their ballot remain in the count. This is either because the voters were found to be eligible, oftentimes with that finding already having been made during the canvass period challenge process, or, in a handful of instances, the county dismissed the appeal on alternative grounds (e.g., lack of proper service). An additional 5 voters were determined to have never cast a ballot at all. Griffin has appealed 19 county board decisions to the State Board, reflecting 81 voters.. Additionally, a total of 68 voters with a ballot in the count were found ineligible by the county boards during the protest hearings and those protests were referred to the State Board. **This means Griffin's protests remaining under these three categories are challenging only 149 voters who have a ballot in the count.**

---

[7] *See* Numbered Memo 2022-05, available at:
https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2022/Numbered%20Memo%202022-05_Absentee%20Voter%20Challenges%20by%20County%20Board.pdf.

Eight county boards did not issue their written decision on the Griffin protests until shortly before the State Board's December 20, 2024, hearing on these protests.[8] The county boards' findings were that of the 52 voters collectively challenged in those eight counties, 43 of them had either already been challenged during the canvass and been removed from the count or were referred to the State Board because they were deemed ineligible and were included in the count (*i.e.*, were part of the 68 ineligible voters discussed above). Only 9 of these voters were eligible and had a ballot in the count, meaning that **at most only 9 more voters with a ballot in the count could potentially be added to the number still under challenge, in the event Griffin appealed the eligibility decisions on those voters and was successful on appeal.**

As to the protests in four counties that were referred to the State Board as untimely filed, those protests together challenge 28 voters as having a ballot in the count despite being allegedly ineligible. And in Yancey County, where the county board had not yet issued a decision on the protests filed with it, 3 voters were similarly challenged. That means that, **assuming all of these voters have a ballot in the count and were not eligible, at most only 31 more voters could be added to the number challenged.**

Therefore, the **maximum number of voters called into question by Griffin's Deceased, Felon, and Not Registered protests is 189 voters (149 voters found ineligible or challenged on appeal by Griffin, 9 potentially still subject to appeal, and 31 whose eligibility had not been determined by a county board). Assuming for argument's sake that all the voters still in question in these three categories were not eligible, 189 is far less than the 734 votes separating Griffin and Riggs.**

---

[8] These counties are Graham, Henderson, Lenoir, Surry, Vance, Warren, Wilkes, and Wilson counties.

Finally, in regard to the Recount protest that was dismissed by the Randolph County board at preliminary consideration, the protest largely, if not solely, relies on an inference that a relatively large change in the vote totals (losses of 11 votes for Riggs and 92 votes for Griffin) shows there was an issue with the recount. Assuming, without deciding, that the allegations in the Recount protest were sufficient to meet the probable cause standard to advance that protest to an evidentiary hearing, the net 81-vote change for Griffin resulting from the recount is still not enough to bring into question enough ballots collectively challenged in the Griffin protests.

For all these reasons, the State Board concludes, by a vote of 3 to 2, that the Griffin protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the Supreme Court Associate Justice, Seat 6, contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

ii.    *Adams Protests (Granville and Wake Counties)*

The number of voters whose eligibility is called into question by the Adams protests is far below the 128-vote margin in this contest.

In these three categories of protests that are based solely on voters' eligibility, the total number of voters challenged by Adams per category are: Felon—11 voters challenged; Deceased—2 voters challenged; and Not Registered—24 voters challenged. While these three types of protests together appear to total 37 voters, these three kinds of protests actually challenge a combined 36 voters, because Adams challenged the same voter in two protests filed in Wake county. Accordingly, if Adams was correct and all challenged voters were indeed ineligible and had a ballot in the count, then the number of "irregularities" (*i.e.*, ineligible voters participating in the election) *could not be* sufficient to affect the outcome.

14

The Wake County board, because it properly referred the Adams's protests to the State Board as untimely filed, made no findings as to the eligibility of the voters in question. Adams appealed that decision, meaning 31 voters are called into question by the appeal and could potentially be ineligible yet have a ballot in the count.

The Granville County board conducted an evidentiary hearing on the Adams protests filed in that county. At the conclusion of the hearing, the county board determined that 2 voters have ballots in the count but were found ineligible and referred those findings to the State Board because this is a multicounty contest. The county board also concluded that 3 voters with a ballot in the count were eligible, and Adams has not appealed that conclusion.

Accordingly, 2 voters with a ballot in the count have been found ineligible and another 31 are called into question by Adams's appeal. Therefore, the maximum number of voters called into question by Adams's protests is 33 voters. Assuming for argument's sake that all voters called into question in Adams's protests were not eligible, the total sum of alleged irregularities in the election were not sufficient to change the outcome of this contest. Simply put, 33 is less than the 128 votes that separate Adams and Everitt.

For these reasons, the State Board concludes, by a vote of 3 to 2, that the Adams protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the North Carolina Senate District 18 contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

### iii. *Sossamon Protests (Granville and Vance Counties)*

The number of voters whose eligibility is called into question by Sossamon's protests is far below the 228-vote margin in this contest.

The only remaining category of protest filed by Sossamon that is based solely on voters' eligibility are Deceased protests which challenge 5 voters. Accordingly, if Sossamon was correct and all challenged voters were indeed ineligible and had a ballot in the count, then the number of "irregularities" (*i.e.*, ineligible voters participating in the election) could not be sufficient to affect the outcome.

The Granville County board conducted an evidentiary hearing on the Deceased protest filed in that county and determined that 1 voter has a ballot in the count but was ineligible, because the voter died before Election Day. That decision was then referred to the State Board because this is a multicounty contest.

Similarly, the Vance County board conducted an evidentiary hearing on the Deceased protest filed in that county and determined that 4 voters have a ballot in the count but were ineligible, because they died before Election Day. That decision was then referred to the State Board because this is a multicounty contest.

Accordingly, 5 voters with a ballot in the count have been found ineligible in the Sossamon protests, but, as a result, the total sum of alleged irregularities in the election were not sufficient to change the outcome of this contest. Simply put, 5 is much less than the 228 votes that separate Sossamon and Cohn.

For all these reasons, the State Board concludes, by a vote of 3 to 2, that the Sossamon protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the North Carolina House District 32 contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

16

iv. *McGinn Protests (Mecklenburg County)*

The number of voters whose eligibility is called into question by the McGinn protests is far below the 209-vote margin in this contest.

In the Deceased, Felon, and Not Registered protests that are based solely on voters' eligibility and are similar to those filed by the other Protesters, the total number of voters challenged by McGinn per category are: Felon—45 voters challenged; Deceased—28 voters challenged; and Not Registered—45 voters challenged. While these three types of protests together appear to total 118 voters, these three kinds of protests actually challenge a combined 117 voters, because McGinn challenged the same voter in two protests filed in the county. In McGinn's Residency protest, the protest originally challenged 202 voters.

Accordingly, if McGinn was correct and all challenged voters in these four categories of protests were indeed ineligible and had a ballot in the count, then the number of "irregularities" (*i.e.*, ineligible voters participating in the election) would total 319 voters, and that number *could have been* sufficient to affect the outcome.

However, as the evidence developed through the hearings conducted by Mecklenburg County Board of Elections, the number of potentially ineligible voters with ballots in the count is much lower than McGinn alleged. First, as with the Griffin protests discussed above, the vast majority of voters challenged in McGinn's Deceased, Felon, and Not Registered protests were already addressed in the county's canvass, either through the canvass period challenge process or through a review of the voters' provisional ballot applications. In fact, only 1 voter was found to

17

be ineligible and have a ballot in the count.[9] McGinn did not appeal the county board's findings on the other 116 voters challenged in the Deceased, Felon, and Not Registered protests.

Second, following the county board's dismissal of the Residency protest after two evidentiary hearings, McGinn's appeal only challenges the eligibility of, at most, 185 voters. Of the 202 voters under the county board's consideration, McGinn maintains a challenge to the eligibility of only 154 of those voters on appeal. Additionally, at the conclusion of the county board's hearings on the Residency protest, the McGinn requested to add 31 names to the protest. That request was denied by the county board as an untimely oral amendment to the protest, and McGinn seeks to have those voters added to her protest on appeal to the State Board. Again, as noted earlier, McGinn never served any of the voters challenged in her protests.

The county board based its unanimous conclusion that the Residency protest lacked substantial evidence to support the protest on the findings that the protest does not establish the voters established a fixed residence outside of the district prior to Election Day. The county board's order shows that the evidence presented about the challenged voter's residency was based on reviews of the voters' information on various websites, including their information on Whitepages.com and employment history on LinkedIn, and a private investigator's visit to some of their residences.

Assuming, without deciding, that the evidence proffered by McGinn was sufficient to support a conclusion that there is substantial evidence to believe that a violation of the election law or other irregularity or misconduct did occur, McGinn has nonetheless failed to establish a sufficient number of irregularities to affect the outcome of the election. This is not disputed by

---

[9] The finding on the 1 ineligible voter was not referred to the State Board for action on it because this contest is under the jurisdiction of the county board.

McGinn. As stated by McGinn in her brief supporting her appeal, "Since the current margin is 209 votes, these 154 votes now at issue in this protest are not, by themselves, sufficient to change the result. But they could become decisive depending on the resolution by the courts of Ms. McGinn's other pending protests (i.e. the ones previously adjudicated by the State Board in its Dec. 13, 2024 order)." As noted above, those other protests have been dismissed by the State Board.

As found by the Mecklenburg County board, 1 voter with a ballot in the count has been found ineligible. McGinn challenges only another 185 on appeal, if including the 31 she requests to be added to the Residency protest. Therefore, the maximum number of voters called into question by McGinn's protests is 186 voters. Assuming for argument's sake that all voters called into question in McGinn's protests were not eligible, the total sum of alleged irregularities in the election were not sufficient to change the outcome of this contest. Simply put, 186 is less than the 209 votes that separate McGinn and Bradley.

For all these reasons, the State Board concludes, by a vote of 3 to 2, that the McGinn protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the North Carolina Senate District 42 contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

III.    CONCLUSION

When a person challenges the results of an election by alleging that certain voters cast ineligible ballots, our law requires that person to provide adequate notice to these voters. That was not done for all the voter-eligibility protests addressed in this decision, and those protests therefore fail to substantially comply with the requirements to initiate a protest under N.C.G.S. § 163-182.9. Even if the voters challenged in these protests had received adequate notice, all the

19

remaining Griffin protests, Adams protests, Sossamon protests, and McGinn protests failed to establish substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in those contests for the reasons outlined in this decision.

The protests are DISMISSED.

This 27th day of December, 2024.

_____
Alan Hirsch, Chair
STATE BOARD OF ELECTIONS

<u>CERTIFICATE OF SERVICE</u>

I, Adam Steele, Associate General Counsel for the State Board of Elections, today caused

the forgoing document to be served on the following individuals via FedEx and email:

Craig D. Schauer
cschauer@dowlingfirm.com
Troy D. Shelton
tshelton@dowlingfirm.com
W. Michael Dowling
mike@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
*Counsel for Jefferson Griffin, Ashlee Adams, and Stacie McGinn*

Philip R. Thomas
pthomas@chalmersadams.com
Chalmers, Adams, Backer &
Kaufman, PLLC
204 N Person St.
Raleigh, NC 27601
*Counsel for Jefferson Griffin*

Phillip J. Strach
phil.strach@nelsonmullins.com
Alyssa M. Riggins
alyssa.riggins@nelsonmullins.com
Cassie A. Holt
cassie.holt@nelsonmullins.com
Jordan A. Koonts
jordan.koonts@nelsonmullins.com
NELSON MULLINS RILEY &

SCARBOROUGH, LLP
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
*Counsel for Frank Sossamon*

Raymond M. Bennett
ray.bennett@wbd-us.com
Samuel B. Hartzell
sam.hartzell@wbd-us.com
Womble Bond Dickinson (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
*Counsel for Allison Riggs*

Shana L. Fulton
sfulton@brookspierce.com
William A. Robertson
wrobertsone@brookspierce.com
James W. Whalen
jwhalen@brookspierce.com
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, NC 27601
*Counsel for Woodson Bradley, Terence Everitt, and Bryan Cohn*

This 27th day of December, 2024.

21