# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
### No. 5:24-cv-00724-M

JEFFERSON GRIFFIN,

        Petitioner,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

        Respondent,

and

ALLISON RIGGS, et al.,

        Intervenor-Respondents.

**STATE BOARD'S RESPONSE
TO PETITIONER'S MOTION FOR
PRELIMINARY INJUNCTION AND THE
COURT'S SHOW CAUSE ORDER**

**NOW COMES** Respondent North Carolina State Board of Elections, by and through undersigned counsel, to provide this response to Petitioner's Motion for Preliminary Injunction [D.E. 31, 32] and the Court's December 26, 2024 Order to Show Cause.

## INTRODUCTION

In this lawsuit, Petitioner makes an astonishing request: to change longstanding election rules *after* an election has already taken place and, by doing so, disenfranchise more than 60,000 voters— voters who followed the rules in place at the time of that election. This requested relief confers jurisdiction on this Court several times over. It squarely raises substantial federal questions under the United States Constitution, the Help America Vote Act, and other federal statutes. Indeed, Petitioner himself asks for a judicial decree that his requested relief does *not* violate these statutes or the U.S. Constitution. Given this request, it is hard to envision a lawsuit that more squarely implicates federal law. *See* 28 U.S.C. § 1441. Federal jurisdiction is also proper because granting Petitioner's

requested relief would require the State Board of Elections to violate federal civil-rights laws. *See id.* § 1443. Among other things, Petitioner seeks relief that would violate the National Voter Registration Act's limits on how States may remove voters from the rolls.

After exercising jurisdiction, this Court should deny Petitioner's request for a preliminary injunction. The Board does not contest that, under the timing rules established by state law, it must now certify the election in question by January 10, 2024—and that doing so will moot Petitioner's lawsuit. But irreparable harm alone cannot justify an injunction. Petitioner's claims stand no chance of success on the merits. First of all, granting the requested relief would violate procedural due process, because Petitioner failed to give the challenged voters adequate notice. It would also violate federal civil-rights laws and the Fourteenth Amendment to change the rules of the election months after it has taken place—and thereby disenfranchise tens of thousands of lawful North Carolina voters. Notably, for the vast majority of those voters, Petitioner does not claim that they are actually ineligible to vote in North Carolina state elections. Finally, each of his arguments for invalidating those votes fails on the merits. He has not made a credible showing—let alone the clear showing required to sustain a preliminary injunction—that the Board erred by following the State's longstanding election rules and counting these votes.

## STATEMENT OF FACTS

### A. Statutory Background

#### 1. The Help America Vote Act

The Help America Vote Act ("HAVA") seeks to establish "uniform and nondiscriminatory election technology and administration requirements" across the States to govern federal elections. Pub. L. No. 107-252, §§ 301-12, 116 Stat. 1666 (2002). Among other things, HAVA directs States to establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list" to "serve as the official voter registration list" for all federal elections. 52 U.S.C. §§ 21083(a)(1)(A), (a)(1)(A)(viii).

2

HAVA also imposes voter-list-maintenance and registration requirements on States. As for voter-list maintenance, HAVA directs States to maintain voter lists "on a regular basis." *Id.* § 21083(a)(2)(A). But HAVA limits how they may do so. For example, States may only remove individuals from the voter list consistent with the requirements in the National Voter Registration Act ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (1993). *Id.* §§ 21083(a)(2)(A)(i)-(ii).

As for voter-registration applications, HAVA prohibits States from "accept[ing] or process[ing]" any application unless it includes the applicant's driver's license number or the last four digits of the applicant's social security number, if the applicant possesses such information. *Id.* §§ 21083(a)(5)(A)(i)–(ii). HAVA instructs State election officials to establish a system to attempt to "match" the identification number provided in an application with existing government records, *id.* § 21083(a)(5)(B)(i), and to establish state-law procedures to address registrations that do not match with such records, *see id.* § 21083(a)(5)(A)(iii). HAVA does not make a match a prerequisite to accepting an application. *See id.* §§ 21083(a)(5)(A), (b).

In certain circumstances, HAVA allows voters who do not provide a driver's license number or the last four digits of their social security number in a registration application to register to vote. For applicants who have not been "issued" either number, HAVA instructs States to instead assign "a number which will serve to identify the applicant for voter registration purposes." *Id.* § 21083(a)(5)(A)(ii). And if the State did not have a system complying with the requirement to collect a driver's license number or last four digits of a social security number, HAVA provides that a new voter registration applicant by mail may vote by providing an alternative form of identification before or upon voting for the first time. *See id.* §§ 21083(b)(1)-(3). This identification may include "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." *Id.* §§ 21083(b)(2)(A)(i)-(ii).

3

Although HAVA only applies to federal elections, in 2003, the North Carolina General Assembly enacted a statute that applied HAVA's federal rules to state elections. The law's express purpose was to "ensure that the State of North Carolina has a system for all North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002." N.C. Sess. Law 2003-226, § 1. The law specifically instructed the Board to ensure "compliance with federal law" by "updat[ing] the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." *Id.* § 6 (codified at N.C. Gen. Stat. § 163-82.11(c)).

Through this statute, the General Assembly amended several of North Carolina's voter registration and list-maintenance statutory provisions to incorporate HAVA's requirements. For example, section 163-82.4(a) now requires all voter registration applications to request that voters provide their driver's license number or the last four digits of their social security number. N.C. Gen. Stat. § 163-82.4(a)(11). Like HAVA, however, the statute allows voters who have not been issued one of those numbers to receive a "unique identifier number" from the Board for registration. *Id.* § 163-82.4(b). Like HAVA, North Carolina law also requires voters who register by mail and who have not had their driver's license or social security number validated beforehand to present a HAVA ID when they vote for the first time. *Id.* §§ 163-166.12(a)-(b), (f). And although state law directs county boards to attempt to match an identification number provided on a registration form with an existing government database, *id.* §§ 163-82.12(6)-(9), when the information provided by the voter does not match, voters may vote by providing a HAVA ID before voting for the first time, *id.* § 163-166.12(d); *see also* Voting Site Station Guide, p. 24, https://s3.amazonaws.com/dl.ncsbe.gov/Voter%20ID/County%20Board%20Training%20and%20Resources/Check%20In%20Station%20Guide_2024%20FINAL.pdf (last visited January 1, 2025) (same).

The result is that, like most States, North Carolina has a single voter registration system for both federal and state elections that incorporates HAVA's requirements. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 401 (4th Cir. 2024) ("North Carolina has a unified registration system for both state and federal elections."); N.C. Gen. Stat. § 163-82.11(a) ("The system shall serve as the single . . . official list of registered voters . . . for the conduct of all elections in the State."). North Carolina "thus is bound by" provisions of federal law, like HAVA, governing voter registration and list maintenance. *See RNC*, 120 F.4th at 401.

###### 2.     UOCAVA and UMOVA

In addition to HAVA registration, military and overseas voters may register and vote under a separate federal statute, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). 52 U.S.C. §§ 20301-11. UOCAVA requires that all States allow military members and their families and other United States citizens living abroad to register to vote and vote absentee in federal elections. *Id.* § 20302. For federal elections, States must accept certain federally designated absentee ballots and applications to register to vote. *Id.* §§ 20302(a)(3), (4). Federal law does not require voters to provide a photocopy of their identification when they vote.

Under North Carolina's Uniform Military and Overseas Voter Act ("UMOVA"), N.C. Gen. Stat. § 163-258.1 *et seq.*, located in Article 21A of the General Statutes, state law extends UOCAVA's provisions for federal elections to all elections in North Carolina. N.C. Gen. Stat. § 163-258.3(1). Like federal law, state law does not require these voters to provide a photocopy of their identification to vote. *Id.* §§ 163-258.13 and -258.17(a)-(b). For *other* voters, however, North Carolina law does require voters to present a photo ID to vote, with certain exceptions. *Id.* § 163-166.16.

North Carolina law allows certain other overseas individuals to vote as well. Under a separate provision of UMOVA, state law authorizes certain overseas voters "who [were] born outside the United States" and never resided in North Carolina to vote if their parents would have been eligible to vote in North Carolina before leaving the country. *See id.* § 163-258.2(1)(e).

5

3. **Statutory provisions governing voter-list maintenance and vote counting.**

Once voters are registered, several other federal laws govern how States maintain their voter lists and calculate election results.

*First*, both HAVA and North Carolina law require any voter-registration list maintenance to be performed in accordance with the NVRA. 52 U.S.C. § 21083(a)(2)(A); N.C. Gen. Stat. § 163-82.14. The NVRA only allows the removal of voters from the rolls in specific, enumerated circumstances: (1) at the request of the registrant, (2) for criminal conviction or mental incapacity, as provided by State law, (3) for death or a change in residence, and (4) if an individual has not participated or responded to a notice in two consecutive federal general elections. 52 U.S.C. §§ 20507(a)(3), (a)(4), (b)(2). In addition, systematic removals, other than by registrant request, felony conviction, or death, must be completed "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A).

*Second*, the Civil Rights Act curtails the ability of election officials to bar individuals from voting based on mistakes in the registration process. Election officials may not "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting," so long as the mistake "is not material" to the individual's qualification to vote. *Id.* § 10101(a)(2)(B).

*Third*, the Voting Rights Act ("VRA") prohibits election officials from discounting ballots that have been cast in an election. Under the VRA, election officials may not "fail or refuse to permit any person to vote who is entitled to vote" or otherwise "willfully fail or refuse to tabulate, count, and report such person's vote." *Id.* § 10307(a).

B. **Procedural History**

Petitioner Judge Jefferson Griffin and Intervenor Associate Justice Allison Riggs were candidates in the statewide 2024 General Election for associate justice on the North Carolina Supreme Court. The vast majority of in-person voters—99.9%—presented a photo ID to election

6

officials prior to voting.  *See* N.C. State Bd. of Elections, *Provisional Voters* (Nov. 5, 2024), https://tinyurl.com/mscy8vcv, (last visited January 1, 2025).[1]  After the county boards of elections conducted a full count of the votes, a full machine recount of the votes, and a partial hand recount of the votes, final canvassed results of the election show Justice Riggs to be in the lead.

On November 19, 2024, Petitioner filed hundreds of election protests throughout the State challenging the election results.  Petitioner's protests were based on six categories of allegations that certain voters' ballots were invalid.  D.E. 1-5 at 43.  Following a public meeting, the Board voted unanimously to take jurisdiction over the first three categories of protests, which "presented legal questions of statewide significance": (1) ballots cast by registered voters with alleged incomplete voter registrations (60,273 votes); (2) ballots cast by overseas citizens who have never resided in the United States (266 votes); and (3) ballots cast by military and overseas-citizen voters who did not include a photocopy of a photo ID with their absentee ballots (1,409 votes).  D.E. 1-5 at 43-44; *see also id.*, n.2 (explaining the small discrepancies between the number of voters Petitioner asserts he challenged and the number Petitioner actually timely challenged).  The Board instructed county boards of elections to consider the remaining three categories of protests, "which were focused on individual, fact-specific determinations of voter eligibility."[2]  *Id.* at 44.

---

[1]     Provisional voting generally applies to in-person voting only.  The State Board does not have readily available figures on photo ID for absentee voters, who do not vote provisionally when claiming an exception to the ID requirement. *See* N.C. Gen. Stat. § 163-230.1(f1). However, all absentee voters are required to provide either their driver's license number or the last four digits of their social security number *each time* they submit a request for an absentee ballot, and if they claim an exception to the photo ID requirement, they must provide one of those numbers *again* when they vote.  *Id.* §§ 163-230.2(a)(4), -230.1(g)(2).

[2]     The remaining three categories of protests challenged ballots cast by voters (1) who were serving a felony sentence; (2) who were deceased; and (3) whose registration was denied or removed. D.E. 1-5 at 43. On December 27, 2024, the Board dismissed these protests for failure to substantially comply with service requirements and because they challenged an inadequate number of votes to change the outcome of the contest.  D.E. 38-1.  If Petitioner does not obtain a stay of the certification of election by January 9, 2024, the certification will issue the following day.  *See* N.C. Gen. Stat.

The State Board held a public meeting on December 11 to consider Petitioner's three protests. Two days later, the Board dismissed the protests, concluding that they "were not served on affected voters in accordance with law" and were also "legally deficient." *Id.* at 46.

On the first protest, the Board noted that this Court had held, in considering the same HAVA arguments here, that equitable principles "prohibit[] granting Plaintiffs relief in connection with the most recent election." D.E. 1-5 at 60 (alteration in original) (quoting *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-00547, Dkt. Entry 1-4 at 4 (E.D.N.C.)). The Board similarly concluded that votes cannot be invalidated after an election when eligible voters complied with all the instructions they had been given when they registered and voted—particularly when their identities were confirmed by the alternative means set forth in HAVA before they first voted. D.E. 1-5 at 60-62. Doing so, the Board held, would violate the Fourteenth Amendment as well as the NVRA, which prohibits en masse removal of voters from the rolls within 90 days of a general election. *Id.* at 64-66.

The Board also rejected Petitioner's protests as to overseas voters who have never resided in the United States but whose parents had been North Carolina residents. The Board noted that the state legislature had passed a statute explicitly allowing these persons to vote in North Carolina elections. *Id.* at 70-71 (citing N.C. Gen. Stat. §§ 163-258.6 through -258.15).

Finally, the Board rejected Petitioner's protests to cancel the votes of military and overseas voters who did not include a copy of a photo ID with their ballot. The Board noted that the North Carolina General Assembly had passed a statute covering these voters that does not require these voters to send a copy of their photo ID to vote. *Id.* at 72-75. The Board also relied on state

---

§ 163-182.14(b). After certification issues, as Petitioner agrees, the election results are final, and his protests are rendered moot. D.E. 1-4 at 23; *see also* N.C. Gen. Stat. § 163-182(2) (providing that a "certificate of election" is the document "conferring upon a candidate the right to assume an elective office as a result of being elected to it").

regulations which provide explicitly that photo ID requirements do not apply to military and overseas voters. *Id.* at 72-75. And the Board reasoned that imposing a requirement on uniformed and overseas voters that is inconsistent with federal law would likely violate the Supremacy Clause of the U.S. Constitution. *Id.* at 75-76.

On December 18, 2024, Petitioner filed an original action, framed as a petition for writ of prohibition, in the North Carolina Supreme Court challenging Respondent's final decision. D.E. 1-4. The petition seeks declaratory rulings interpreting HAVA, 52 U.S.C. § 20901, *et seq*.; the NVRA, 52 U.S.C. § 20501, *et seq.*, the VRA, 52 U.S.C. § 10307; the Civil Rights Act, 52 U.S.C. § 10101; UOCAVA, 52 U.S.C. § 20301, *et seq*.; and the Fourteenth Amendment. D.E. 1-4. The Board removed to this Court. D.E. 1.[3] On December 23, 2024, Petitioner filed a motion for preliminary injunction seeking to enjoin the Board from issuing the certificate of election. Mot. for Prelim. Inj. (D.E. 31). On December 26, this Court directed the Board to respond to this motion, and further to show cause why this case should not be remanded back to the North Carolina Supreme Court.

## RESPONSE TO SHOW CAUSE ORDER

### I.  Legal Standard

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed" to federal district court. 28 U.S.C. § 1441(a). Separately, "[a]ny . . . civil action[] . . . commenced in a State court may be removed" if it is based on a "refus[al] to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." *Id.* § 1443(2).

Petitioner's writ of prohibition is a "civil action" under § 1441 and § 1443—it is a civil proceeding seeking judicial relief of a civil nature. *See, e.g., Ponder v. Joslin*, 262 N.C. 496, 497,

---

[3]  Petitioner separately filed three petitions for judicial review in state trial court on his three categories of election protests. *See Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00731, Dkt. Entries 1-4, 1-5, 1-6 (E.D.N.C.). The Board again removed to this Court. *Id.*, Dkt. Entry 1.

9

138 S.E.2d 143, 144 (N.C. 1964) (holding that a lawsuit seeking a "writ of mandamus" against the State Board of Elections concerning an election protest was a "civil action"); *cf. In re Smith*, 114 F.3d 1247, 1250 (D.C. Cir. 1997) ("Although Congress did not define the term 'civil action' for purposes of the PLRA, we conclude that it includes a petition for a writ of prohibition that . . . includes underlying claims that are civil in nature."). Petitions seeking extraordinary writs under state law are therefore removable if they otherwise meet the requirements for federal removal jurisdiction. *See, e.g.*, *Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 276, 278 (9th Cir. 2018) (holding that "a petition for a writ of mandamus" under state law was properly removed because petition raised "federal question[s]").

In addition, because the federal removal statutes speak broadly of removing "any civil action brought in" or "commenced in" "a State court," 28 U.S.C. §§ 1441(a), 1443, cases pending in state appellate courts are also removable. *See, e.g.*, *Harris v. U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 422-24 (D.C. Cir. 2024); *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 969 (7th Cir. 2013); *Resol. Tr. Corp. v. Allen*, 16 F.3d 568, 572 n.4 (4th Cir. 1994).

## II. Removal Is Proper Under § 1441 Because the Petition Raises Federal Questions.

Removal of the petition is proper under 28 U.S.C. § 1441(a) because this Court would have had original jurisdiction over the issues raised here. Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* § 1331; *see also* U.S. Const., art. III, § 2, cl. 1.

A suit that contains only state-law claims can "arise under" federal law where vindication of an alleged state-law right "turns on some construction of federal law." *North Carolina ex. rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017) (cleaned up). It is "common[] sense" that federal courts "ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The relevant test is whether the state-law claim

10

implicates a federal issue that is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Here, Petitioner seeks judicial relief that "prohibits the State Board from counting ballots cast in violation of North Carolina's statutes and constitution." D.E. 1-4 at 15. Because that request implicates numerous substantial federal issues, this Court has jurisdiction.

### A. The Court must construe multiple federal laws to resolve the petition.

Substantial issues of federal law pervade the petition. The petition asks, most notably, to throw out ballots cast by eligible voters who, it claims, registered in violation of HAVA. It also asks for a decree rejecting "[a]ll arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act," as well as under the "federal constitution" that would bar his requested relief. D.E. 1-4 at 83-84. It would be hard to fashion a claim that more clearly turns on federal law.

#### i. The Petition requires construction of HAVA.

Petitioner first seeks to cancel the votes of eligible voters who he claims improperly registered by failing to provide their driver's license or social security number on their registration application. D.E. 1-4 at 33-37. Deciding whether these voters were properly registered necessarily requires this Court to construe HAVA. HAVA directs States to ask voters to provide a driver's license or social security number at registration. 52 U.S.C. § 21083(a)(5)(A)(i). HAVA also instructs States to create a uniform voter list that elections officials are to regularly maintain. *Id.* §§ 21083(a)(1), (2). Just a year after Congress enacted HAVA, the North Carolina legislature passed a law whose express purpose was to "ensure that the State of North Carolina has a system for North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002." N.C. Sess. Law 2003-226, § 1. In keeping with this purpose, the General Assembly updated state law on voter registration and voter-list maintenance to incorporate HAVA's requirements and establish a single voter-registration system for federal and state elections. *See supra* pp 4-5.

11

Here, Petitioner claims that certain voters were improperly registered because they did not provide a driver's license or social-security number on their voter-registration form. D.E. 1-4 at 34. As the Fourth Circuit has held, a "federal question[] [is] essential to resolving" this state-law issue: whether "North Carolina's previous voter registration form violate[d] HAVA." *RNC*, 120 F.4th at 400. As this issue "contains no articulation of a state [law] violation separate and apart from an alleged HAVA violation," it is a "state cause of action in name only." *Id.* at 401. Petitioner attempts to distinguish *RNC* by noting that HAVA itself "does not apply to elections for state offices." D.E. 1-4 at 40. As the Fourth Circuit has held, this misunderstands the law. North Carolina law fully incorporates and applies HAVA's federal rules for state elections as well. As a result, "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal registration law—including HAVA—for *both* state and federal elections. *RNC*, 120 F.4th at 401-02. Federal law thus controls on this issue.

### ii. The Petition also requires this Court to construe UOCAVA.

Petitioner also asks this Court to cancel the votes of overseas voters who did not include a copy of a photo ID with their absentee ballot. This question requires this Court to interpret a federal statute: UOCAVA. A state statute, UMOVA, implements UOCAVA's requirement that States establish procedures allowing military and other overseas voters to register to vote and to vote absentee. *See* N.C. Gen. Stat. § 163-258.3(1). UMOVA also requires North Carolina election officials to accept voter registration applications and absentee ballot applications from military and other overseas voters as "prescribed" in that federal law. *Id.* §§ 163-258.6, 163-258.7. Given this incorporation of federal law into the relevant state law, this Court must necessarily construe federal law to determine voting procedures for military and overseas voters in North Carolina state elections.

Petitioner argues otherwise, noting again that UOCAVA itself applies only to federal elections. D.E. 1-4 at 59. But again, state law makes clear that UOCAVA rules apply to military or overseas voting in *all elections*—including state races. Specifically, the General Assembly mandated

12

that "the voting procedures in [UMOVA] apply to" a "primary, general, or special election for federal or State office" for these voters.  N.C. Gen. Stat. § 163-258.3(1).  And state law allows military or overseas voters to use ballots "in accordance with [UOCAVA] . . . to vote for all offices and ballot measures" in an election.  *Id.* § 163-258.11.  Thus, because state law expressly incorporates federal standards, the state-law issues raised by Petitioner turn on federal law.

### iii.    The Petition specifically asks for relief under the NVRA, the Voting Rights Act, the Civil Rights Act, and the Fourteenth Amendment.

The petition specifically requests a judicial decree declaring that its requested relief does not violate four federal statutes—the NVRA, HAVA, the Voting Rights Act, and the Civil Rights Act—as well as the Fourteenth Amendment.  D.E. 1-4 at 83-84.  By doing so, the petition necessarily raises substantial issues of federal law.  Federal courts, of course, have jurisdiction over concrete cases and controversies requesting judgments about whether and how federal law applies.  *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 & n.14 (1983).  It is difficult to think of a clearer invocation of federal law than a party asking for a judgment about how a federal statute or the federal constitution applies.

### B.    The State Board disagrees with Petitioner's construction of federal law.

The federal questions raised in the petition are also "actually disputed."  *Gunn*, 568 U.S. at 258.  The Board does not read HAVA or UOCAVA as requiring it to cancel the challenged votes.  D.E. 1-5 at 57-60.  In addition, the Board reads federal law to prevent it from canceling the votes as Petitioner demands.  *Id.* at 65-67, 77, 79.

### C.    The federal-law disputes here are substantial.

A federal question underlying a state-law claim is sufficiently substantial to trigger federal-court jurisdiction when it is "importan[t] . . . to the federal system as a whole."  *RNC*, 120 F.4th at 404 (quoting *Gunn*, 568 U.S. at 260).  The federal issues raised in this petition are undoubtedly substantial.  Petitioner aims to cancel more than 60,000 votes by changing the rules *after* an election.  A decision based on federal law that could have such wide-ranging consequences to the fundamental

13

rights of voters is "substantial" under any understanding of the word. Thus, the Fourth Circuit recently had "no hesitation concluding that this issue is of substantial importance to the federal system as a whole." *Id.*

> **D.      Federal jurisdiction appropriately respects the federal-state balance.**

Federal court review is appropriate when there is no danger that hearing a case will "attract[] a horde of original filings and removal cases raising other state claims." *Grable*, 545 U.S. at 318. But "it will be the rare state equal protection case that turns on a violation of HAVA or the NVRA." *RNC*, 120 F.4th at 404-05. It will also be the rare case that would seek to cancel votes after an election, in relief that turns on five federal statutes and the Fourteenth Amendment. Moreover, because the petition, while "cloaked in state [law] garb," raises only federal questions, it is appropriate for federal courts to answer those questions. *Id.* at 405. As the Fourth Circuit held in *RNC*, Congress could not have intended to bar federal courts from deciding cases where interpretation of a federal statute decides whether thousands of voters can vote in an election. *Id.* "The mere invocation" of state law should not prevent federal courts from hearing this case. *Id.*

## III.    Removal Is Proper Under § 1443 Because the Petition Asks the Board to Violate Federal Civil-Rights Laws.

This Court also has jurisdiction under the civil-rights removal statute, 28 U.S.C. § 1443(2). That statute permits removal to federal court of any suit brought against a state official "for refusing to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." *Id.* Petitioner demands that the Board cancel more than 60,000 votes cast during the recent election. D.E. 1-4 at 78, 81-84. The Board has refused to do so because it would run afoul of the NVRA, the VRA, and the Fourteenth Amendment. D.E. 1-4 at 24-25; D.E. 1 at 2. Since all these laws are "law[s] providing for equal rights," removal is appropriate under § 1443(2).

For purposes of § 1443, a "law providing for equal rights" is one that concerns racial equality. *Georgia v. Rachel*, 384 U.S. 780, 792 (1966). To satisfy this standard, the specific statutory

14

provision at issue need not mention race. All that is required is that the "basis for removal" be a *statute as a whole* that addresses racial equality. *Id.* at 792-93; *see RNC*, 120 F.4th at 407 (same). Applying this standard here, the relevant laws that the Board has refused to violate—the NVRA, the VRA, and the Fourteenth Amendment—allow for civil-rights removal.

### A. Civil-rights removal is proper under the NVRA.

The NVRA precludes the Board from discounting the votes of people who did not provide a driver's license or social security number at registration. Under the NVRA, once a person is registered to vote, they may be removed from the rolls only in narrow, enumerated circumstances that are indisputably not present here. 52 U.S.C. §§ 20507(a)(3), (a)(4), (b)(2), (c)(1); *see supra* pp 5-6. The NVRA also prohibits officials from "systematically remov[ing]" voters from the rolls within 90 days of an election, again except in narrow, enumerated circumstances that are indisputably not present here. *Id.* § 20507(c)(2)(A); *see supra* p 6.

Moreover, as the Fourth Circuit has recently held, the NVRA is a "law providing for equal rights" under § 1443(2). One of the NVRA's central purposes is to promote racial equality. "The text of the NVRA, including its lead provision, reveals that it is a law 'providing for specific civil rights stated in terms of racial equality.'" *RNC*, 120 F.4th at 407-08 (quoting *Rachel*, 384 U.S. at 792). Specifically, the NVRA states expressly that the law was enacted to eliminate "discriminatory and unfair registration laws and procedures" that "have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

Here, the NVRA clearly prohibits the Board from canceling more than 60,000 votes that have already been cast. Again, Petitioner does not assert that his basis for canceling these votes falls among the narrow, enumerated reasons that the NVRA allows for removing voters from the rolls. *See* D.E. 1-4 at 41-42. The NVRA therefore squarely forecloses Petitioner's requested relief. *See*

*RNC*, 120 F.4th at 402-03 (concluding that the NVRA does not authorize removal from voter rolls based on this same allegation of HAVA non-compliance).

In addition, the NVRA forecloses Petitioner's relief for a separate reason as well:  while we are not technically within the NVRA's 90-day quiet period barring the State from removing voters *en masse* from the rolls, requiring the Board to do so now would completely undermine the quiet period's purpose.  *See* 52 U.S.C. § 20507(c)(2)(A).  Congress enacted the quiet period to "prevent the discriminatory nature of periodic voter purges, which . . . appear to affect [B]lacks and minorities more than others."  S. Rep. No. 103-6, at 20 (1993).  It would be strange indeed for Congress to institute a prophylactic prohibition against voter purges for the 90-day period before an election only for the State to implement mass voter purges *after* an election has occurred and apply that purge to the already-conducted election.  If Petitioner were right, the NVRA's protections against pre-election voter purges would be a dead letter.

In response, Petitioner claims that the NVRA only bars the Board from canceling voter registrations, not canceling votes.  D.E. 1-4 at 41-42.  This tortured logic fails.  Petitioner argues that certain voters are ineligible to vote *because* they did not properly register.  *Id.* at 33.  His challenge is therefore an attack on the challenged voters' *registrations*—not just their ballots.  As the Board explained, "having a list of voters who are eligible to vote" makes no sense if "the government [then] removes their ballot[s]."  D.E. 1-5 at 66-67 n.17.  The petition therefore squarely implicates the NVRA's limits on removing registered voters from the rolls.  After all, "[t]he right to vote encompasses the right to register."  *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).

In sum, because the Board has refused to grant Petitioner's requested relief on the ground that it would violate the NVRA, removal is proper under § 1443.

## B.    Removal is appropriate under the Voting Rights Act.

Petitioner's demand that the Board invalidate more than 60,000 votes also would require it to violate the VRA, which prohibits officials from "willfully fail[ing] or refus[ing] to tabulate, count,

16

and report" the votes of individuals who were qualified to vote in the election. 52 U.S.C. § 10307(a). Because the VRA is a quintessential "law providing for equal rights," courts have consistently permitted removal under § 1443(2) when a state official refuses to take an act that is inconsistent with the VRA. *See, e.g.*, *Smith v. Winter*, 717 F.2d 191, 194 (5th Cir. 1983); *see also RNC*, 120 F.4th at 406 n.5 (observing that courts have held that § 1443 removal under § 10307 of the VRA is proper). Because all three of the categories of challenged voters are qualified to vote under federal and state law, the VRA prohibits the Board from refusing to count their votes. Civil-rights removal is thus proper on this basis as well.

## C. Removal is appropriate under the Equal Protection Clause.

Finally, civil-rights removal is also proper under the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court has foreclosed civil-rights removal based on the Fourteenth Amendment's Due Process Clause because that clause is "phrased in terms of general application available to all persons or citizens, rather than in the specific language of racial equality that § 1443 demands." *Rachel*, 384 U.S. at 792. By contrast, the Equal Protection Clause *is* a law providing for equal civil rights based in racial equality. *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (observing that the "central purpose" of the Equal Protection Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race"). If the Board were to nullify the challenged votes, it would violate this constitutional guarantee. *See infra* pp 24. The Board's refusal to do so also forms an appropriate basis for removal.

## RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

## I. Legal Standard

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Mandatory injunctive relief is especially "disfavored, and warranted only in the most extraordinary circumstances." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). To obtain a preliminary injunction, Petitioner

must show: (1) a likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. Petitioner "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). "*Each* of these four factors must be satisfied to obtain preliminary injunctive relief," and it is "unnecessary to address all four factors when one or more ha[ve] not been satisfied." *Henderson v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018); *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) ("[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor.").

Petitioner contends that an injunction is needed because his protests will become moot once the Board issues a certificate of election—currently scheduled for January 10, 2025. The Board does not dispute that certification will moot Petitioner's protests, and that this eventuality constitutes irreparable harm. However, the Board submits that an injunction is not appropriate here because Petitioner cannot establish any of the other three required factors.

First and most importantly, Petitioner cannot establish a likelihood of success on the merits. For an injunction to issue, Petitioner must make a "clear showing" he is likely to succeed on the merits. *Dewhurst v. Century Alum. Co.,* 649 F.3d 287, 293 (4th Cir. 2011) (quoting *Winter*, 555 U.S. at 22). Here, for the reasons described below, Petitioner has failed to make this showing; his request for an injunction should be denied on that basis alone. *See infra* pp 19-29.

Petitioner also cannot establish the third and fourth *Winter* factors—that the equities tip in his favor and an injunction is in the public interest. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (noting that when a State is a defendant, these two factors merge). In this case, the public interest in orderly and fair elections favors denial of the injunction. It is true that Petitioner seeks only a limited stay until the federal courts can decide the merits of his claims. However, he is wrong that certification would alter the status quo. The status quo is North Carolina's prevailing system for registration and voting—under rules that have been on the books for numerous

18

election cycles, without challenge. Because voters rely on established election rules when deciding how and when to cast their ballots, "altering state election rules in the period close to an election" is strongly disfavored. *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring). This principle applies with even greater force *after* ballots have already been cast and counted. *See id.* at 9-10 (staying injunction of state election rule, while ordering that ballots cast before the stay "may not be rejected for failing to comply" with the rule). As this Court has itself recognized, given the unfairness of retroactively disenfranchising voters who complied with the rules in place on election day, any flaws identified by Petitioner must be resolved prospectively alone. *See RNC*, No. 5:24-cv-00547, Dkt. Entry 73, Order at 4 (E.D.N.C. Nov. 22, 2024).

## II. Petitioner Has Not Made a Clear Showing of Likelihood of Succeed on the Merits.

A preliminary injunction should also be denied because Petitioner's arguments are bound to fail on the merits. Granting Petitioner's requested relief to throw out more than 60,000 votes after an election would be unconstitutional several times over. And in any event, Petitioner's three arguments for why those votes should be canceled are meritless.

### A. Petitioner's requested relief would deny procedural due process because he failed to give voters adequate notice that he was challenging their votes.

Petitioner's protests fail because he did not provide voters sufficient notice of his protests. This failure denied voters procedural due process. Voters have a "constitutionally protected liberty interest" in their right to vote. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020). As a result, when a voter's "ballot [is] challenged," due process requires that voters be "given notice," so they can protect their vote. *Id.* at 228. This notice must be "reasonably calculated, under all the circumstances, to apprise" voters of the challenge to their votes. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

Here, Petitioner failed to adequately apprise voters of his protests. Petitioner did not send physical copies of the protests to voters' addresses. Instead, his political party mailed voters a

postcard stating that their "vote *may* be affected by one or more protests filed in relation to the 2024 General Election." D.E. 1-5 at 178 (emphasis added). The postcard did not inform voters whether their vote *was* actually under protest. It also did not inform voters that it was meant to effect formal service of an election protest. *Id.* Instead, the postcard merely directed voters "to scan [a] QR code to view the protest filings." *Id.* This code, when scanned with a smartphone, took users to a website where hundreds of protests were listed. *Id.* at 81-82 (showing smartphone screenshots). Voters then, to find out if any protests concerned them, had to hunt among the hundreds of protests and try to find their names on attached spreadsheets. These spreadsheets listed voters' names in small print, out of alphabetical order. Some spreadsheets contained hundreds of pages, listing thousands of names. *Id.*

Neither the postcard nor its QR code were "reasonably calculated . . . to apprise" voters that their votes were under protest. *Mullane*, 339 U.S. at 314. The postcard, for example, did not even inform voters that their votes had *actually* been challenged. Vague, equivocal notice of this kind, which does not "specifically" disclose that a person's rights will be impaired, does not give "adequate notice." *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993); *see Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) (if a "notice is unclear," it is not adequate).

This lack of specificity, moreover, was not cured by the QR code. Many voters do not own smartphones. *See* Pew, *Mobile Fact Sheet* (Nov. 13, 2024), https://tinyurl.com/yeywjxfn (noting that one in five senior citizens do not have a smartphone) (last visited January 1, 2025). These voters would therefore not have been able to scan the code to learn if a protest affected them. As a result, in "a significant number of instances," notice by QR code would not "provide [voters with] actual notice" of protests. *Greene v. Lindsey*, 456 U.S. 444, 453 (1982). And as the Supreme Court has held, where a chosen form of notice will not notify a "significant number" of persons, it does not satisfy "due process." *Id.* Despite this authority, Petitioner suggests that the Supreme Court has held that notice is sufficient so long as most affected persons receive notice. D.E. 1-4 at 65. He is mistaken. It has actually held repeatedly that where service of papers via "the mails" is possible,

then that form of notice is *required*. *Mullane*, 339 U.S. at 319; *see also Greene*, 456 U.S. at 455. Petitioner failed to provide such notice here.

Finally, even if a QR code could theoretically provide adequate notice, it did not do so here. The Fourth Circuit recently held that an eviction warning provided inadequate notice when "it [was] time-consuming to wade through" the entire form at issue in order to locate the warning, which was listed "in small print two-thirds of the way down the back of a form." *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 488-89 (4th Cir. 2024). Here, for voters to find out if protests affected them, they had to "wade through" hundreds of protests, some of which listed thousands of names "in small print." *Id.* This kind of needle-in-a-haystack notice offends due process because it is not "reasonably calculated" to convey notice. *Id.* at 488.

### B. Granting Petitioner's requested relief would violate several federal civil-rights laws and the Fourteenth Amendment.

Petitioner seeks to cancel 60,000 votes after an election, even though those votes were cast under rules that had long been in place at the time of the election. As explained *supra* pp 14-17, granting this relief would violate multiple federal civil rights statutes, including the NVRA and the Voting Rights Act. It would also violate the Fourteenth Amendment. Simply put, Petitioner wants to change the rules of the game after it has already been played. Doing so is "patently and fundamentally unfair." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (cleaned up); *see also Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983).

The Fourteenth Amendment's Due Process Clause bars the systematic, "retroactive invalidation" of votes. *Griffin*, 570 F.2d at 1079-80. The seminal case on this point is *Griffin v. Burns*. There, election officials in Rhode Island issued absentee ballots in a party primary—a practice which had been in place for seven years, and which the officials believed was authorized by state law. *Id.* at 1067. After the primary, the losing candidate asserted that the use of such ballots was unlawful. *Id.* The state supreme court agreed, invalidated those ballots, and changed the

outcome of the election. *Id.* The First Circuit held that this abrupt reversal violated voters' due process rights. *Id.* at 1078. As the court explained, because absentee voters had cast their ballots in an "officially-endorsed manner," invalidating their ballots *en masse* resulted in "broad-gauged unfairness." *Id.* at 1073, 1077. The constitution forbids a state from discounting votes that had been cast in accordance with "longstanding practice" and "the instructions of the officials charged with running the election." *Id.* at 1075-76.

That principle applies fully here. The challenged election rules have long been in place without challenge—in election after election. Voters whose registration information may lack a driver's license or social security number have been permitted to vote in North Carolina elections for twenty years. *See* N.C. Sess. Law. 2003-226, §§ 9, 16, 22; N.C. Gen. Stat. §§ 163-82.4, -166.12. The same is true for UOCAVA voters, who also have been able to vote without providing a photo ID in North Carolina state elections since 2003, including after the legislature's passed general photo ID laws. *See* N.C. Gen. Stat. §§ 163-258.1. And since 2011, overseas citizens who are the children of former residents of North Carolina have been free to vote in North Carolina elections. *Id.* § 163-258.2(1)(e). None of these longstanding elections rules *ever* elicited a challenge until the current election cycle—and all of those recent challenges were unsuccessful in state and federal court prior to the election.

It is unconstitutional to punish voters for voting in accordance with prevailing election laws. Yet that is the relief Petitioner seeks: "massive *ex post* disenfranchisement," for reasons that would have been a "total surprise to the typical voter." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). Had the challenged voters had *any reason* to doubt that their ballots would be counted, they could have acted accordingly—say, in the case of the UMOVA voters, by providing a copy of their photo ID. Indeed, other than the handful of overseas voters who have never lived in the United States, Petitioner has never suggested that the more than 60,000 voters he challenges are *actually* ineligible to vote in North Carolina elections. *See* N.C. Gen. Stat. § 163-55 (outlining statutory

qualifications to vote); N.C. Const. art. VI, § 2 (same, constitutional). Moreover, all persons who register to vote, including those challenged here, are required to affirm that they meet all the qualifications to vote, under penalty of a Class I felony. *See* N.C. Gen. Stat. § 163-82.4(c)(1), (e); *see also* North Carolina Voter Registration Form, Section 11, https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06.pdf (last visited January 1, 2025). Petitioner thus seeks to use technicalities to disenfranchise tens of thousands of lawful North Carolina voters—again, the vast majority of whom he does not dispute are lawfully eligible to vote—because he lost an election. The federal constitution forbids this audacious request.

The *Anderson-Burdick* test yields the same answer. Under that test, state actions that "impose a severe burden on ballot access" are "subject to strict scrutiny." *Pisano v. Strach,* 743 F.3d 927, 933 (4th Cir. 2014). The relief Petitioner seeks would impose the most severe possible burden—mass disenfranchisement—while advancing only peripheral state interests at best. Petitioner says that he prevails under *Anderson-Burdick* because he is merely asking the Board to enforce evenhanded state laws. *See* D.E. 1-4 at 70-71. That framing is deeply misleading. Asking voters to append a driver's license or social security number to their registration would perhaps impose a "modest burden" *before an election takes place*. But the relevant action here is Petitioner's request to nullify those voters' ballots *after the fact*. Doing so is plainly unconstitutional under *Anderson-Burdick*.[4]

---

[4]    Petitioner compares this case to *James v. Bartlett*, 359 N.C. 260 (2005). There, the North Carolina Supreme Court discounted provisional ballots that were cast outside of voters' assigned precincts. *Id.* at 271. *James* is nothing like this case. Unlike here, the election in *James* was the "first time in North Carolina history that State election officials counted out-of-precinct provisional ballots." *Id.* at 265. Relevant statutes and the Board's own regulations at the time indicated that "voters must cast ballots . . . in their precincts of residence." *Id.* at 267-68. And the Board's own general counsel had advised before the election that such ballots would not be counted. *Id.* at 265. When the Board counted out-of-precinct ballots anyway, the state supreme court rightly reversed. In contrast here, state law, the Board's regulations, and judicial decisions issued before the election all affirmed that the ballots Petitioner challenges *would* be counted.

For a separate reason, sustaining Petitioner's protests would also violate the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 90, 104-05 (2000) (per curiam). But were Petitioner to prevail, "the standards for accepting or rejecting" ballots would "vary" for wholly arbitrary reasons. *Id.* The vast majority of the ballots Petitioner seeks to invalidate were cast by voters (1) whose registration records are missing driver's license or social security numbers, and (2) voted *before* election day (either absentee, or early in-person). He has not challenged voters who voted *on election day*—and who also lacked a driver's license or social security number in their records. *See, e.g.*, *RNC*, 120 F.4th at 398 (noting allegation that 225,000 registered voters were missing this data in their records). By seeking only to invalidate pre-election day votes, Petitioner would force the Board to arbitrarily "valu[e] one person's vote over that of another." *Bush*, 531 U.S. at 104-05; *see Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018) ("Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters.").

In sum, the "retroactive invalidation" of votes that Petitioner seeks would amount to "patent and fundamental unfairness"; severely burden ballot access without any meaningful countervailing state interest; and arbitrarily "value one person's vote over that of another." *Griffin*, 570 F.2d at 1079-80; *Pisano*, 743 F.3d 927 at 933; *Bush*, 531 U.S. at 104-05. Relief of this kind violates several federal civil-rights statutes, as well as the Fourteenth Amendment.

**C. Petitioner's protests are all unlikely to succeed on their merits.**

A preliminary injunction should also be denied because Petitioner is unlikely to succeed on the merits of any of his three election protests.

### i. Petitioner's HAVA protest is meritless.

Petitioner seeks to cancel the votes of roughly 60,000 voters who lack a recorded driver's license or social security number in the Board's voter registration database because, he claims, those registrations violated HAVA. But Petitioner has not established a violation of HAVA here.

To begin, Petitioner has not adequately alleged or shown facts that would establish a violation of law. Petitioner assumes that if a driver's license or social security number is not recorded in the Board's database that necessarily means the voters were improperly registered. D.E. 1-4 at 33. But that assumption is based on a false premise. Voters may lack this information in their records and still be legally registered. For example, voters who have not been issued a driver's license or social security number may nonetheless register to vote using a number assigned to them by the Board. 52 U.S.C. § 21083(a)(5)(A)(ii). In addition, voters may lack a recorded identification number in the Board's database because of a database-matching failure, for example, because of "routine data-entry errors by county workers." D.E. 1-5 at 16, 64-65, n.16. But HAVA does not treat such voters as improperly registered. *See* 52 U.S.C. § 21083(a)(5)(A), (b). Critically, Petitioner has failed to allege, let alone show, that any of the 60,000 voters he targets fall outside these circumstances where HAVA explicitly allows voters to register and vote without a driver's license or social security number in the State's voter registration database. D.E. 1-5 at 55-57. His claim fails for this reason alone.

Petitioner is also incorrect on the law. At the outset, Petitioner contends that HAVA does not apply here, because the statute governs only federal elections. But as discussed above, the North Carolina legislature has expressly applied and incorporated HAVA's federal-election requirements to state elections as well. *See supra* pp 4-5. HAVA is thus squarely at issue.

When Petitioner addresses HAVA, his arguments are unpersuasive. Petitioner is correct that HAVA generally prohibits a State from accepting or processing a voter-registration application unless it includes a driver's license number or the last four digits of a social-security number. 52 U.S.C. § 21083(a)(5)(A)(i)(I)-(II). But Petitioner proceeds as if this were HAVA's only provision. D.E. 1-4 at

25

35.  To the contrary, as discussed, HAVA elsewhere allows some voters to register and cast ballots absent this information.  For example, voters who have not been issued a driver's license or social security number may register to vote.  Moreover, HAVA permits a voter to register when they provide one of these numbers but that number does not validate against other government databases.  52 U.S.C. § 21083(a)(5)(A)(iii).  In North Carolina, when a number does not validate, it is not retained and the voter's database record will lack a number.  D.E. 1-5, p. 56.  Thus, there are voters within this group who *did* provide a driver's license or social security number when registering, but because it did not validate, the statewide database lacks an entry in that data field.  *Id.*  In addition, when voters register by mail, HAVA allows voters whose registration application lacks an identification number to cast ballots by providing a HAVA ID.  And the Board requires a HAVA ID for individuals who are voting for the first time and who, at the time of registration, did not provide a driver's license number or the last four digits of their social security number.  *See supra* p 4.  Thus, no voter could have cast a ballot without at least first presenting election officials with a HAVA ID—just as federal law requires.

Petitioner is thus left to argue that North Carolina state law seeking to *implement* HAVA somehow imposes more requirements than HAVA does.  But these arguments fail.  As discussed above, the North Carolina legislature has applied HAVA to state elections and maintains a unified voter-registration system for both federal and state contests.  *See supra* pp 4-5.  HAVA, not state law, thus provides the relevant rule of decision.

In sum, Petitioner's claim under HAVA is fatally flawed.

ii.     **Petitioner's "never resident" protest is meritless.**

Petitioner also seeks to cancel the votes of citizens living abroad who have never resided in the United States but whose parents resided in North Carolina before moving abroad.  D.E. 1-4 at 41. In 2011, the North Carolina legislature enacted a statute specifically granting this group of citizens the right to vote in North Carolina.  N.C. Gen. Stat. § 163-258.2(1)(e).

26

Petitioner claims that this statute is unlawful because the North Carolina Constitution requires that voters have "resided in the State of North Carolina for one year . . . preceding an election." D.E. 1-4 at 45 (quoting N.C. Const. art. VI, § 2(1)). But a North Carolina court recently rejected this exact argument. In *Kivett v. North Carolina State Board of Elections*, a state trial court held that the plaintiffs in that case "failed to persuade this court that they are more likely than not to succeed" in proving that the provision is unconstitutional. No. 24 CV 031557-910 (Wake Cnty. Sup. Ct.), Order ¶ 6, *supersedeas denied*, No. P24-735 (N.C. Ct. App.), *pet. for writ of supersedeas and disc. review pending*, No. 281P24 (N.C.).

The state court's conclusion was correct. To start, Petitioner misstates the constitutional provision. For elections to state offices, the North Carolina Constitution guarantees that "[a]ny person who has resided in the State of North Carolina for one year . . . preceding an election . . . shall be entitled to vote at any election held in this State." N.C. Const., art. VI, § 2(1). This provision does not *forbid* anyone from voting. Instead, it *guarantees* that certain persons have the right to vote in North Carolina. The state statute granting a small subset of overseas voters the right to vote is thus entirely consistent with the constitutional provision.

Even if this Court were to adopt Petitioner's reading of the state constitution, contrary to the only state court to have construed it, that reading would stand in considerable tension with federal law. Specifically, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court held that a one-year residency requirement violated the Equal Protection Clause. *Id.* at 334. While "bona fide residence requirements" are still valid, the Court explicitly rejected such a long temporal residency requirement. *Id.*; *accord Lloyd v. Babb*, 296 N.C. 416, 439, 251 S.E.2d 843, 858 (1979). If the state constitutional provision on which Petitioner relies were to be read as a residency requirement, it is durational and would violate the federal constitution.

Petitioner disagrees, claiming that *Dunn* turns an unconstitutional durational residency requirement into a "bona fide" residency requirement that prohibits persons who have never resided

27

in North Carolina from voting. D.E. 1-4 at 48. But as noted, nothing in the state constitution *requires* voters to have resided in North Carolina for any amount of time. Thus, nothing forecloses the state legislature from enfranchising this small subset of overseas voters.[5]

### iii. Petitioner's UOCAVA protest is meritless as well.

Petitioner finally seeks to cancel the votes of a third group of voters—military and overseas voters who followed North Carolina statutory law and the Board's guidance by not including a photocopy of their identification with their absentee ballot. D.E. 1-4 at 53. But under the rules in place at the time of the election, "[m]ilitary and [o]verseas . . . voter[s]" were "not required to submit a photocopy of acceptable photo identification" or an affidavit explaining their reason for not doing so. 08 N.C. Admin. Code 17.0109(d). Petitioner apparently fails to comprehend that absentee ballots in North Carolina can be submitted under two different sets of rules—one for civilian residents, and one for overseas and military voters. For civilian residents, absentee ballots must be cast under Article 20 of Chapter 163 of the General Statutes. Under that article, all absentee ballots must "accompanied by a photocopy of [an] identification" or an "affidavit." N.C. Gen. Stat. § 163-230.1(f1). By its own terms, however, this requirement is limited to only a certain category of voters. The statute states that "ballots [voted] *under this section* shall be accompanied by a photocopy of identification." *Id.* (emphasis added).

But the voters subject to Petitioner's protest did not cast ballots under that section. Instead, Petitioner challenges military and overseas voters who submitted absentee ballots under the rules found in Article 21A. The North Carolina General Assembly enacted UMOVA in Article 21A

---

[5] Petitioner strangely claims that his rule would only affect non-military overseas voters in state contests—not military voters, or votes cast in federal contests. D.E. 1-4 at 37. But he presents no principled limit on his arguments that could possibly explain this position. Petitioner cannot limit the logical scope of his legal arguments through bare assertions. And by asking to disenfranchise only a subset of identically situated overseas voters, Petitioner again requests relief that would violate the Equal Protection Clause. *See supra* p 24.

explicitly to implement a federal law, UOCAVA, which requires states to allow military and overseas voters to register, request ballots, and vote by mail in federal elections using specific federal forms. *See* 52 U.S.C. §§ 20301-11.  In implementing UOCAVA through UMOVA in Article 21A, the General Assembly chose to allow military and overseas voters to vote in both federal *and state* elections under the same sets of rules.  *See, e.g.*, N.C. Gen. Stat. § 163-258.3; *supra* p 5.

Neither UOCAVA nor UMOVA require military and overseas voters to provide a photocopy of an identification with their absentee ballots.  Rather, UMOVA calls for a voter's identity to be verified through other means, which do not require photocopied identification.  *See, e.g.*, N.C. Gen. Stat. §§ 163-258.4(e), -258.13, -258.17(b).  In short, these voters correctly cast their absentee ballots under UMOVA's rules and were under no obligation to include a photocopy of identification with their absentee ballots.  *See* D.E. 1-5 at 43, 72-79.[6]

## CONCLUSION

For the foregoing reasons, the State Board of Elections respectfully submits that this Court should retain jurisdiction and deny the motion for a preliminary injunction.

This 1st day of January, 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602

---

[6]     Petitioner also suggests that Article 21A might violate the state constitution. D.E. 1-4 at 59. Because Petitioner does not provide any citations to support this argument, it is abandoned. *Root v. Robinson*, No. 5:20-cv-00239-M, 2021 WL 2601045 at *3 n.3 (E.D.N.C. June 24, 2021).

Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for Respondent*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

Undersigned counsel certifies that this memorandum of law complies with Local Rule

7.2(f)(3) in that the brief, including headings, footnotes, citations, and quotations, contains no more

than 30 pages.

This 1st day of January 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General