**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24-cv-00724-M-RN**

| | |
|---|---|
| Jefferson Griffin, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>North Carolina State Board of Elections, )<br><br>*Defendant*, )<br><br>& )<br><br>Allison Riggs; North Carolina Alliance for )<br>Retired Americans; VoteVets Action Fund; )<br>Tanya Webster-Durham; Sarah Smith; )<br>Juanita Anderson, )<br><br>*Intervenor-Defendants*. )<br> | **JUSTICE RIGGS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.   Judge Griffin Protests the Election Results ................................................. 2

    B.   The State Board Dismisses Judge Griffin's Protests ................................... 4

    C.   Judge Griffin Seeks to Avoid Federal Court Jurisdiction By Filing an Unprecedented Writ of Prohibition ........................................................... 6

    D.   The State Board Removes the Action to this Court .................................... 7

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ...................................................................................................................... 8

   I.   **Judge Griffin Is Unlikely to Succeed on the Merits** ......................................... 8

    A.   Judge Griffin Failed to Serve the Voters Whose Ballots He Challenged .................. 9

    B.   Federal and State Law Bar Judge Griffin's Requested Relief ................................. 12

    C.   Each of Judge Griffin's Protests Lacks Merit ......................................... 15

  II.  The Balance of the Equities Favors the Voters, and the Public Interest Favors Certification ...................................................................................................... 27

CONCLUSION ................................................................................................................. 28

Intervenor-Defendant Allison Riggs files this Brief in Opposition to Plaintiff Jefferson Griffin's Motion for Preliminary Injunction, ECF No. 31.

## INTRODUCTION

The North Carolina voters chose Justice Riggs over Judge Griffin for the N.C. Supreme Court Associate Justice term that began on January 1, 2025.

At Judge Griffin's request, the counties have already conducted a full machine recount and partial hand recount. Those recounts confirmed Justice Riggs' victory. Judge Griffin also filed a series of protests challenging over 60,000 votes, but the State Board of Elections dismissed half of those protests on December 13, 2024, and the rest on December 27, 2024.

Judge Griffin has now exhausted his options before the State Board. Under North Carolina law, the State Board must certify the results by January 10, 2025 unless Judge Griffin appeals to the Wake County Superior Court and obtains a stay.

Rather than appeal to Superior Court, Judge Griffin filed a Petition for Writ of Prohibition directly in the N.C. Supreme Court. The explicit purpose of that unprecedented filing was to avoid federal court jurisdiction. Judge Griffin asked the N.C. Supreme Court to "correct the vote count" while declaring that the U.S. Constitution, the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), the Voting Rights Act (VRA), and the Civil Rights Act permit the sort of mass disenfranchisement that Judge Griffin seeks here.

Now that the State Board has properly removed that Petition to this Court, Judge Griffin asks this Court for a preliminary injunction that would bar the State Board from certifying Justice Riggs' victory for as long as this case is pending. The Court should deny that request. Judge Griffin cannot show that he is likely to succeed in throwing out tens of thousands of votes cast by his fellow North Carolinians in compliance with official guidance. And the public interest does not favor runner-up candidates who seek to undo the will of the voters.

1

# BACKGROUND

## A. Judge Griffin Protests the Election Results

Shortly after the November 5, 2024 general election, Judge Griffin filed over three hundred election protests in N.C. county boards of elections. A protest is an administrative filing available to candidates who allege "a violation of the election law or other irregularity or misconduct" that "cast[s] doubt on the apparent results of the election." N.C. Gen. Stat. § 163-182.10(d)(2). Judge Griffin's protests were "based on six categories of allegations that certain general election voters' ballots were invalid." Decision & Order at 2, *In re Election Protests of Griffin* (N.C. State Bd. Elecs. Dec. 13, 2024) ("Order"), ECF No. 1-5 at 41. Three of those categories are relevant here.

### i. Allegedly Incomplete Registrations

The first category of protests challenged 60,273 ballots allegedly "cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number." Order at 3. These challenges raise the same HAVA issues already pending before this Court in *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-00547-M-RJ.

As this Court knows, those HAVA issues trace back to an administrative complaint filed with the State Board in October 2023. The Board resolved that complaint by implementing "changes to the voter registration application form." Minutes of Meeting at 4 (N.C. State Bd. Elecs. Nov. 28, 2023), archived at https://perma.cc/CCW2-YX7R. The Board "did not approve the requested remedy to contact all existing registered voters whose electronic records do not show a driver's license number or last four digits of a Social Security number." Order at 4, *In re HAVA Complaint of Snow* (N.C. State Bd. Elecs. Dec. 6, 2023), archived at https://perma.cc/5KPY-SQP5. The Board explained that "the law's purpose of identifying the registrant upon initial registration is already accomplished because any voter who did not provide a driver's license number or the

last four digits of a Social Security number would have had to provide additional documentation to prove their identity before being allowed to vote." *Id.* at 4–5.

Nearly a year later, in August 2024, the N.C. Republican Party sued on the same grounds, alleging "that 225,000 people, including 'possible non-citizens' and other ineligible voters, registered to vote using the previous form." *Republican Nat'l Comm. v. N.C. State Bd. Elections*, 120 F.4th 390, 399 (4th Cir. 2024). The plaintiffs did not seek a temporary restraining order or preliminary injunction.

On November 19, 2024—two weeks after the election—Judge Griffin filed protests raising the same HAVA arguments. He claims to have identified 60,273 ballots that were cast (a) before election day and (b) by voters whose registration records with the State Board "do not contain data in one or more of the following data fields: (1) Driver's License Number; or (2) Last Four Digits of Social Security Number." Aff. Ryan Bonifay ¶ 10.a, ECF No. 1-5 at 3289.

### ii.    U.S. Citizens Whose Parents Are N.C. Residents

Judge Griffin next challenged 266 ballots allegedly "cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States." Order at 3.

North Carolina law authorizes those overseas citizens to vote in North Carolina elections. *See id.* at 31 (citing N.C. Gen. Stat. § 163-258.2(1)e). But in October 2024, the N.C. Republican Party filed a state court lawsuit challenging that authorization. The Wake County Superior Court denied the plaintiffs' request for a preliminary injunction, finding that they had "failed to make a threshold showing that they are likely to succeed on the merits." Order Denying Pls.' Mot. at 4 ¶ 2, *Kivett v. N.C. State Bd. Elections*, No. 24CV031557-910 (N.C. Super. Ct. Oct. 21, 2024) (attached). The plaintiffs immediately appealed, and the N.C. Court of Appeals unanimously denied their Petition for Writ of Supersedeas. Order, *Kivett v. N.C. State Bd. Elections*, No. P24-

3

735 (N.C. Ct. App. Oct. 29, 2024) (attached). Then, four days before the election, the plaintiffs filed their Petition for Writ of Supersedeas in the N.C. Supreme Court, which did not intervene before the election. *See* Pls.' Pet. Writ Supersedeas & Discret. Rev., *Kivett v. N.C. State Bd. Elections*, No. 281P24 (N.C. filed Nov. 1, 2024) (attached). (Justice Riggs is recused from that Petition, which is pending.)

The November 2024 general election thus proceeded under the same "statutes have been the law of North Carolina for thirteen years and have been faithfully implemented in 43 elections." Order at 31. But once the results were tallied, Judge Griffin filed a series of protests arguing that the law should be changed and 266 votes retroactively thrown out.

### iii. Military and Overseas Citizen Voters

In the final category of protest relevant here, Judge Griffin challenged 1,409 ballots "cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form." Order at 3. While the N.C. Administrative Code provides that these voters are "not required to submit a photocopy of acceptable photo identification," 8 N.C. Admin. Code 17.0109(d), Judge Griffin argued in his protests that military and overseas voters who cast ballots in compliance with this rule should not have their votes counted.

### B. The State Board Dismisses Judge Griffin's Protests

On December 13, 2024, the State Board served its Decision and Order on the three categories of protests now before this Court. The Board dismissed those protests on several overlapping grounds.

First, the Board dismissed all three protests because Judge Griffin "failed to serve the registered voters [he] seek[s] to challenge in [his] protests in a manner that would comply with the North Carolina Administrative Code and be consistent with the requirements of constitutional due

process." Order at 6. The Board's regulations required Judge Griffin "to 'serve' the voters with 'copies of all filings.'" *Id*. at 7 (quoting N.C. Admin. Code 2.0111). Judge Griffin instead mailed postcards with a QR code link to a N.C. Republican Party website. And that "postcard never states clearly that the recipient's right to vote is being challenged." *Id*. at 11. This attempt at service "does not comport with the plain text of the rule or the constitutional due-process requirements to serve an affected party." *Id*. at 10.

Second, the Board held that "substantive due process protections under the U.S. Constitution" bar all of Judge Griffin's protests. *Id*. at 23. Those protests seek to throw out ballots cast by eligible voters who followed the rules. Even if those rules were later found to be improper, "it would violate the federal constitution's guarantee of substantive due process to apply such a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots." *Id*. at 39.

Third, the Board found that each of the three categories of protests must be dismissed for additional reasons specific to that category. For the bulk of the protests—those challenging the 60,273 ballots cast by voters with allegedly incomplete registration records—the Board found that the protests should be dismissed for five other reasons:

(1) they "include insufficient allegations and evidence to establish probable cause to believe that their challenged voters failed to provide one of these identification numbers on their voter registration application," *id*. at 15;

(2) the State "Board and [this Court], examining this very issue prior to and during this election, determined that any previous failure to implement this federal requirement cannot be held against already-registered voters casting ballots in this election," *id*. at 18;

(3) "North Carolina law forbid[s] this type of election protest," because "an error by election officials in the processing of voter registration cannot be used to discount a voter's ballot," *id*. at 22–23;

(4) granting "the relief they request . . . would violate state and federal voter registration laws," *id*. at 25; and

(5) the protests are "unlawful under state law because [they] would undermine the clear intent of the legislature with regard to how a voter may have their eligibility to vote challenged in an election," *id*. at 27.

As for the protests targeting the children of North Carolina residents, the Board concluded that it could not "ignore a statute of the General Assembly under the theory that the State Board should deem that statute unconstitutional." *Id*. at 29.

Finally, the Board concluded that the military and overseas citizen protests must be dismissed because Judge Griffin's arguments (1) go against the statutory scheme, which "includes no requirement for covered voters to include a photocopy of their photo ID," *id*. at 36; (2) contradict the Board's rule, promulgated through "permanent rulemaking," that "makes it clear that the county boards of elections may not impose the photo ID requirement on such voters," *id*.; and (3) "may likely be in conflict with" the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), *id*. at 39 (quoting Letter from David Beirne, Director of the Department of Defense Federal Voting Assistance Program, to Commissioner Edgardo Cortes, Virginia Department of Election (Feb. 6, 2017), archived at https://perma.cc/2BSZ-VUJ4).

### C. Judge Griffin Seeks to Avoid Federal Court Jurisdiction By Filing an Unprecedented Writ of Prohibition

North Carolina law provides that any person seeking review of a State Board decision must file a petition for review in Wake County Superior Court. *See* N.C. Gen. Stat. § 163-22(*l*); *see also id*. § 163-182.14(b). Judge Griffin instead took the unprecedented step of petitioning for the "extraordinary remedy" of a writ of prohibition directly with the N.C. Supreme Court. *Holly Shelter R. Co. v. Newton*, 133 N.C. 132, 45 S.E. 549, 550 (1903). He asked the Supreme Court to "correct the vote count," reject "[a]ll arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested," reject "[a]ll arguments under the state or federal

constitution that affected persons who cast ballots were improperly served or are due additional process," and reject "[a]ll other arguments that the ballots cannot be discounted without violating the federal or state constitution." Pet. Writ Prohibition at 70–71, ECF No. 1-4.

Judge Griffin admitted that he filed that Petition for Writ of Prohibition in the N.C. Supreme Court to try to avoid federal court jurisdiction. He explained that he cannot file "a petition for judicial review in superior court from the State Board's dismissal of his election protests" because "the Board and Justice Riggs will remove the case to federal court." *Id.* at 12. Judge Griffin claimed that his extraordinary efforts to avoid federal court jurisdiction were appropriate because, "just a few months ago, the State Board used this same removal tactic to place a state lawsuit concerning the Board's incomplete-voter registrations in the hands of the federal courts." *Id.* at 13. At the same time, Judge Griffin fails to cite the precedential Fourth Circuit opinion holding that the State Board's removal was "proper" under both 28 U.S.C. §§ 1441 and 1443(2). *Republican Nat'l Comm.*, 120 F.4th at 408.

### D. The State Board Removes the Action to this Court

On December 19, 2024, the State Board filed a Notice of Removal in the N.C. Supreme Court. ECF No. 1. The Board correctly explained that removal is proper under 28 U.S.C. § 1441 because the "petition is a civil action bringing claims arising under the laws of the United States." *Id.* at 2. Removal is also proper under 28 U.S.C. § 1443(2) because "Judge Griffin has brought a civil action seeking relief for Defendant's refusal to do an 'act on the ground that [the act] would be inconsistent' with 52 U.S.C. § 10101(a)(2), 52 U.S.C. § 10307(a), and 52 U.S.C. § 20507(c)(2)(A)." *Id.* (alteration in original) (quoting 28 U.S.C. § 1443(2)).

Judge Griffin did not move to remand. Instead, on December 20, 2024, he moved in this Court for a "temporary restraining order prohibiting [the Board] from certifying the election results for the November 2024 general election." ECF No. 13. The Court denied that motion by Text

7

Order that same day.[1]  Judge Griffin then moved for "a preliminary injunction prohibiting [the Board] from certifying the election results for the November 2024 general election for Seat 6 of the North Carolina Supreme Court until the merits of Petitioner's Petition are decided, either by this Court or, if the case is remanded, by the North Carolina Supreme Court."  ECF No. 31.

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Pierce v. N.C. State Bd. Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Judge Griffin "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

## ARGUMENT

The Court should deny Judge Griffin's Motion for Preliminary Injunction because he is unlikely to succeed on the merits.  In addition, the balance of the equities and public interest favor a swift resolution of this election dispute.

### I.  Judge Griffin Is Unlikely to Succeed on the Merits

The State Board was right to dismiss Judge Griffin's protests.  As the Board explained, multiple federal and state laws bar each of those protests.  Judge Griffin cannot show, as he must, that the Board was wrong about all those bases for dismissal.

---

[1] Despite seeking a temporary restraining order in this Court, Judge Griffin also filed three new Wake County Superior Court actions—one for each of the three categories of protests at issue—along with three motions for temporary restraining orders.  Judge Griffin filed those actions and motions on December 20, 2024, and the State Board immediately removed them to this Court.  This second set of actions and motions is pending as *Griffin v. North Carolina State Board of Elections*, No. 5:24-cv-00731-BO-RJ (E.D.N.C.).

**A. Judge Griffin Failed to Serve the Voters Whose Ballots He Challenged**

Voters have a due process right to notice that their ballots are being challenged. *See, e.g.*, *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 674 (M.D.N.C. 2024); *Democracy N.C. v. N.C. State Bd. Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020). North Carolina ensures that voters receive this notice by requiring protestors to "*serve copies of all filings* on every person with a direct stake in the outcome of this protest," including—for a protest concerning voter eligibility— the targeted voters. 8 N.C. Admin. Code 2.0111 (emphasis added). Election protests that do not "substantially comply" with this requirement are properly dismissed. N.C. Gen. Stat. §§ 163-182.9; 163-182.10.

Judge Griffin affirmed that he read and understood this obligation to serve affected parties:

PROTESTOR CERTIFICATION

15. By signing this protest application, you affirm the following:
I, Jefferson Griffin (*full name*), swear, under penalty of perjury, that the information provided in this protest filing is true and accurate to the best of my knowledge, and that I have read and understand the following:

*(initial)*

I have reviewed the statutes and administrative rules governing election protests, including all deadlines.
My protest must originate with a filing at the county board of elections.
I must timely serve all Affected Parties.
I must prove by *substantial evidence* either the existence of a defect in the manner by which votes were counted or results tabulated or the occurrence of a violation of election law, irregularity, or misconduct, either of which were sufficient to cast doubt on the apparent results of the election.
It is a crime to interfere unlawfully with the conduct and certification of an election.
It is a crime to interfere unlawfully with the ability of a qualified individual to vote and to have that vote counted in the election.
The facts I allege in connection with this protest are true and accurate to the best of my knowledge, and I have a good faith basis to protest the conduct and results of the election.

*E.g.*, ECF No. 1-5 at 358. Yet Judge Griffin did not serve affected voters with physical copies of his protest filings. Rather, the N.C. Republican Party mailed postcards stating, "your vote may be affected by one or more protests filed in relation to the 2024 General Election," and instructing the recipient to scan a QR code using a smartphone. ECF No. 1-5 at 178.

9

That QR code led to a N.C. Republican Party website containing links to hundreds of protests filed by four candidates. Recipients who did not discard the postcard and were able to navigate the QR code and website would then have to sift through spreadsheet printouts, which were not organized alphabetically, to determine whether and why their votes "may be affected" by the various protests. *See* Order at 9. The postcard did not attach copies of the protests or any other legal document, state that Judge Griffin was challenging the recipient's eligibility to vote, identify the basis of the challenge, state which protest applied to the recipient, or provide a website address for those unable to use a QR code through a smartphone.

The Board correctly determined that this postcard failed to satisfy federal constitutional due process requirements for service on affected voters. At a minimum, the method of service must amount to "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). And "when notice is a person's due, process which is a mere gesture is not due process" at all. *Id.* at 315. The postcards here—which fail to include categories of critical information or attach relevant filings—fail to meet this standard and are, at most, a "mere gesture."

Judge Griffin contends he met the due process requirements outlined in *Mullane*. Griffin Br. at 18. But *Mullane* dealt with notice to a class of *potential* beneficiaries of a trust, many of whom were "unknown," "nonresidents" of the state, or had interests that were "conjectural or future." 339 U.S. at 317. Here, in contrast, all the challenged voters are North Carolina voters who have a "direct stake in the outcome of [Judge Griffin's] protest[s]." 8 N.C. Admin. Code. 2.0111. And there is no suggestion that Judge Griffin could not locate the challenged voters. Under these circumstances, Judge Griffin failed to provide constitutionally required notice to affected voters.

The Board also correctly determined that the postcard failed to satisfy 8 N.C. Admin. Code 2.0111. In arguing otherwise, Judge Griffin first asks the Court to disregard 8 N.C. Admin. Code 2.0111's service requirements, arguing that N.C. Gen. Stat. § 163-182.10(b) burdens county boards of elections, not protestors, with serving copies of protests on affected parties. *See* Griffin Br. at 17. This argument misstates the law. Section 163-182.10(b) requires county boards to "give notice of *the protest hearing* to . . . those persons likely to have a significant interest in the resolution of the protest" (emphasis added), not to serve the protest documents on the voter. Indeed, a separate sentence of N.C. Gen. Stat. § 163-182.10(b) states that "[e]ach person given notice shall also be given a copy of the protest or a summary of its allegations." The General Assembly could have drafted the statute to state that county boards must provide notice of the hearing *and* serve the protests, but it chose not to—presumably because the protestor must serve his protest on the affected parties.[2]

Rather than requiring county boards to serve copies of protest filings, N.C. Gen. Stat. § 163-182.10(e) mandates that the State Board "promulgate rules providing for adequate notice to parties," and N.C. Gen. Stat. § 163-182.9(c) mandates that the Board "prescribe forms for filing protests." Consistent with this express statutory authority—and the general authority for rulemaking under N.C. Gen. Stat. § 163-22(a)—the Board properly established rules requiring protesters such as Judge Griffin to serve affected parties with copies of their protests. This requirement was approved in turn by the Rules Review Commission—a legislatively appointed

---

[2] This framework is not unique. Under the N.C. Administrative Procedure Act, for example, "the party that files the petition [commencing a contested case] shall serve a copy of the petition on all other parties," but the "Office of Administrative Hearings" gives the parties to a contested case "a notice of hearing." N.C. Gen. Stat. § 150B-23(a), (b); *see also* N.C. R. Civ. P. 3-4 (requiring plaintiffs filing a complaint to serve the complaint in accordance with the Rules of Civil Procedure).

body tasked with ensuring that rules adopted are "within the authority delegated to the agency by the General Assembly." *Id.* §§ 143B-30.1(a); 150B-21.9(a)(1).

Judge Griffin argues in the alternative that the N.C. Republican Party's postcards satisfied 8 N.C. Admin. Code 2.0111's service requirement because the Board uses similar mailers in other contexts. Griffin Br. at 17–18. But Judge Griffin relies on two statutes that expressly discuss the issuance of "cards," neither of which implicates a voter's right to have their ballot counted. *See* N.C. Gen. Stat. § 163-82.8(c) (discussing "a voter registration card" containing certain information); N.C. Gen. Stat. § 163-82.14(d)(2) (discussing a confirmation mailing in the form of a "preaddressed return card"). Here, in contrast, challenged voters must be served with "copies of all [protest] filings," 8 N.C. Admin. Code 2.0111, which Judge Griffin failed to do.[3]

### B. Federal and State Law Bar Judge Griffin's Requested Relief

Every voter targeted by Judge Griffin complied with settled election law when they voted. Judge Griffin's effort to throw out their ballots violates both federal and state law.

Judge Griffin seeks to brush aside the U.S. Constitution as irrelevant to a North Carolina election, but "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). As a matter of federal constitutional law, it "is settled that if the election process reaches the point of 'patent and fundamental unfairness,' the due process clause may be violated." *Hendon v. N.C. State Bd. Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). That level of unfairness exists—and "a court will strike down an election on substantive due process grounds"—if "two elements are present: (1) likely reliance by voters

---

[3] At best, the North Carolina Republican Party's postcards with QR codes were an attempt at electronic service of the relevant filings. But that method of service would be permitted only if "affirmatively authorized by the Affected Part[ies]," 8 N.C. Admin. Code 2.0111, and Judge Griffin has presented no evidence that any affected voters consented to service by QR code.

on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998). Those elements are satisfied when, for example, "the losing candidate contest[s] the validity of the absentee ballots" cast in accordance with officially sponsored election procedure. *Lecky v. Virginia State Bd. Elections*, 285 F. Supp. 3d 908, 917 (E.D. Va. 2018). Even if that procedure turns out to have been flawed in hindsight, a "state's retroactive invalidation" of those absentee ballots "violate[s] the voters' rights under the fourteenth amendment." *Griffin*, 570 F.2d at 1070.

All three of Judge Griffin's protests seek that sort of retroactive invalidation. In each case, these voters did everything asked of them to vote. But now, Judge Griffin argues that they should have done more—ensure that county boards updated their registration records, affirmatively established residency in North Carolina, or submit photo identification—even though official guidance made clear that none of these steps was necessary.

This request to change the rules after the votes have been cast and counted also violates the Equal Protection Clause of the U.S. Constitution. Even in state elections, "the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election." *Kim v. Bd. Educ. Howard Cnty.*, 93 F.4th 733, 741 (4th Cir. 2024) (quoting *Hadley v. Junior Coll. Dist. Metro. Kansas City, Mo.*, 397 U.S. 50, 56 (1970)); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 n.78 (1973) (noting "the protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population"). Accordingly, a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*

*v. Gore*, 531 U.S. 98, 104–05 (2000) (per curiam); *see also Lecky*, 285 F. Supp. 3d at 920 ("Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters.").  Yet Judge Griffin seeks to selectively disenfranchise tens of thousands of voters.

Moreover, federal statutes prohibit Judge Griffin's requested relief.  The NVRA prohibits bulk de-registering voters within 90 days of an election.  52 U.S.C. § 20507(c)(2)(A).  The Civil Rights Act prohibits a state from applying different standards, practices, or procedures to voters within a jurisdiction, or denying the right to vote based on an immaterial requirement.  52 U.S.C. § 10101(a)(2).  And the VRA prohibits state actors from discounting the ballots of eligible voters.  52 U.S.C. § 10307(a).  The State Board correctly held that "[r]etroactively removing . . . voters from the list of voters eligible to cast a ballot in the election would violate" these provisions.  Order at 27; *see also* Notice of Removal ¶ 5, ECF No 1.

Judge Griffin claims that these statutes "are clearly inapplicable to a state election and cannot serve as the basis of removal," Griffin Br. at 9, but he makes no real effort to distinguish the Fourth Circuit's holding that "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions of the NVRA for the registrants at issue here." *Republican Nat'l Comm.*, 120 F.4th at 401.  Judge Griffin argues instead that he "is only seeking to correct the vote count," not to have anyone "removed from the voter rolls."  Griffin Br. at 13.  This argument presents a "distinction without a difference," because the effect of having one's vote disregarded "is the same as not being eligible to vote." *Majority Forward v. Ben Hill Cty. Bd. Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021) (cited in Order at 26–27 n.17).  Untimely deregistration is prohibited in any form and by any name, whether it is called "list

maintenance," a voter "challenge," or an election protest. *Id.*; *see also N.C. State Conf. of NAACP v. Bipartisan Bd. Elections & Ethics Enf't*, 2018 WL 3748172, at *5-10 (M.D.N.C. Aug. 7, 2018).

*     *     *

Candidates such as Judge Griffin who seek to bring "grievances based on election laws" have a "duty" to "bring their complaints forward for pre-election adjudication." *Hendon*, 710 F.2d at 182. Judge Griffin cannot "gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)).[4]

### C. Each of Judge Griffin's Protests Lacks Merit

#### i. Judge Griffin Cannot Establish That Voters with Allegedly Incomplete Voter Registrations Should Have Their Ballots Discarded

Judge Griffin presents no evidence that a single challenged voter is ineligible to vote, because his argument relies on an "unwarranted inference" about the State Board's data. *See* Order at 15–16. He claims that voters "never legally registered to vote" because a driver's license or social security number is not saved in the Board's database. Griffin Br. at 12. But as the Board clarified in its Decision and Order, that database does not establish that even *one* voter was not actually eligible to vote, even under Judge Griffin's flawed reading of the law. *See* Order at 17.

First, the data lacks a number for some voters because those voters had no driver's license or social security number when he or she registered. *See id.* at 15–16. Under federal and state law, a voter who lacks one of these numbers can still register to vote. *See id.*

---

[4] As the Supreme Court of Wisconsin put it when rejecting the Trump campaign's post-election effort to invalidate more than 220,000 ballots: "Our laws allow the challenge flag to be thrown regarding various aspects of election administration. The challenges raised by the Campaign in this case, however, come long after the last play or even the last game; the Campaign is challenging the rulebook adopted before the season began." *Trump v. Biden*, 394 Wis. 2d 629, 647, 951 N.W.2d 568, 577 (2020); *see also id.* at 629 n.12, 951 N.W.2d at 577 n.12 ("Granting the relief requested by the Campaign may even be unconstitutional.").

Second, some voters *did* include a number on their registration form, but the State Board deleted that number because elections staff could not match the number to outside databases. *Id.* at 15–16. When a registrant provides such a number but the number does not match with state or federal databases, that voter will be given another way to confirm their identity by providing a HAVA ID, and that information will no longer be found in the electronic registration record (even though the voter provided the information). *See id.* If the voter provides a HAVA ID, then their vote must count, even if staff were unable to verify their voter registration or driver's license number. N.C. Gen. Stat. § 163-166.12(d).

Third, many voters provided this information to elections officials since registering. County boards are responsible for registering eligible voters. N.C. Gen. Stat. § 163-82.1(b). Ultimately, once a voter completes a voter registration form, the *burden is on the county*, not the voter, to identify and address any errors in the registration. 52 U.S.C. § 21083(a)(5)(A)(iii); N.C. Gen. Stat. §§ 163-82.7(a), 163-82.11(d). If information on a registration form is missing, that omission does not invalidate the registration. Instead, the county board must "make a diligent effort to complete for the registration records any information requested on the form that the applicant does not complete." N.C. Gen. Stat. § 163-82.4. In 2024, for example, every voter who voted absentee in this election was required to provide this information on their absentee ballot request form, regardless of whether they provided it when they registered.[5] And as discussed next, every single voter Judge Griffin has protested had to provide a HAVA document when they first voted, which likely included either number. Moreover, many voters complied with North

---

[5] *See* 2024 N.C. Absentee Ballot Request Form ("You must provide your date of birth and **one** of the following: . . . A NC Driver's License or DMV ID card number [or] . . . The last 4 digits of your social security number"), archived at https://perma.cc/NC7N-E3HW.

Carolina's photo ID requirement in 2024 by producing their N.C. driver's license or non-operator identification. *See* N.C. Gen. Stat. § 163-166.16. Judge Griffin offers no reason why providing this information on an absentee ballot request form or presenting a photo ID would not count as a voter furnishing that information to the county board.

Indeed, if a county board erroneously registered voters without collecting their driver's license or social security numbers, federal and state law provide a specific remedy: voters are *required* to submit a photo ID or a document establishing their residency before they vote in their first election. *See* 52 U.S.C. § 21083(a)(5)(A), (b)(1)(A), (b)(1)(B), (b)(2)(A) (setting out rules for registration for federal elections and if county boards do not comply with HAVA registration procedures); N.C. Gen. Stat. § 163-166.12(a), (b) (applying HAVA to state elections). State law is clear: an issue with the voter's driver's license or social security number "*shall not prevent that individual from registering to vote and having that individual's vote counted*" if they present photo ID or HAVA ID when they vote. N.C. Gen. Stat. § 163-166.12(d) (emphasis added). Every voter complied with this requirement. As the State Board explained, "in all elections since April 2023, all such voters, whether they had provided an identification number at registration or presented an alternative form of ID when they first voted, have been asked to provide a valid photo ID under state law to prove their identity during every election." Order at 21. Thus, under the applicable legal scheme, each voter's vote must count.

Judge Griffin's arguments about what county boards should have done are not a basis to disenfranchise voters. Regardless of whether the allegedly incomplete voter registrations *should* have been accepted, they *were* accepted by county boards. The county boards processed applications from these voters, added them to the official rolls, and mailed them voter registration cards to "evidence" their "registration." N.C. Gen. Stat. § 163-82.8(d). The voter rolls, rather than

the voter registration application, is the official record of a voter's registration. *Id.* § 163-82.10(a). The official list maintained for federal elections is also the official list for state elections. *Id*. § 163-82.11(a), (c). Furthermore, North Carolina law requires the State Board to maintain this list in compliance with HAVA, *id.* § 163-82.11(c), and voters may be removed from this list only in accordance with the NVRA, *id.* § 163-82.14(a1).

Once a voter is on the voter rolls, the Board must count the votes of all eligible voters who appear on that list of eligible voters. This is true not only under federal law, 52 U.S.C. § 10307(a), but well-settled state law as well. In *Woodall v. W. Wake Highway Comm'n*, 176 N.C. 377 (1918), a losing candidate argued that "the votes of electors otherwise qualified should be rejected, because the registrars failed to administer the oath to them, and they were allowed to vote without being challenged." *Id.* at 388. The Court rejected this argument, explaining that a "vote received and deposited" is "presumed to be a legal vote" even if "the voter may not have complied entirely with the requirements of the registration law." *Id.* at 389. In such a case, it "devolves upon the party contesting [the vote] to show that it was an illegal vote, and this cannot be shown by proving merely that the registration law had not been complied with." *Id.* Put simply, "[w]here a voter has registered, but the registration books show that he had not complied with all the minutiae of the registration law, his vote will not be rejected." *Id.* The *Woodall* decision is one of a robust line of cases prohibiting exactly what Judge Griffin seeks to do here: disenfranchise qualified voters who have cast ballots based on alleged technical defects in their registrations. *See, e.g.*, *Overton v. Mayor & City Comm'rs of City of Hendersonville*, 253 N.C. 306, 315, 116 S.E.2d 808, 815 (1960) (collecting cases).

This principle is also enshrined in North Carolina's statutes. Once a county board approves a voter's registration, the state's voter registration system becomes the official record of the

18

registration; under N.C. Gen. Stat § 163-82.10(a), the voter's registration form is merely "backup to the official registration record of the voter." The county boards' approvals of the 60,273 voters' registrations are thus legally binding under federal and state law; it cannot be undone except when a voter is *ineligible* (or requests to be removed). *See* 52 U.S.C. §§ 20507(a)(3), (4), 21083(a)(2)(A)(i), (ii); N.C. Gen. Stat. § 163-82.1(c); *see also* N.C. Gen. Stat. §§ 163-82.14(a) (list maintenance is limited to removing "the names of ineligible voters from the official lists of eligible voters"), 163-82.14(a1) (requiring compliance with the NVRA), 163-85(b) & (c) (setting out the grounds for challenging a voter's registration). And, as described above, Judge Griffin has not set forth *any* evidence of ineligibility, nor any evidence that would allow the official registration of those 60,273 voters to be undone.

While Judge Griffin invokes the cure provision in N.C. Gen. Stat. § 163-82.4(f), *see* Griffin Br. at 12, that provision applies *before* a voter is registered, not after an application is accepted by the county boards and the applicant is officially registered. *See* N.C. Gen. Stat. §§ 163-82.1(b), (c), 163-82.7(a), (c), (d), 163-82.10(a). Additionally, that cure provision applies only when the voter is "notified of the omission and given the opportunity to complete" the voter registration form "at least by 5:00 P.M. on the day before the county canvass as set in G.S. 163-182.5(b)." *Id*. § 163-82.4(f). Here, no notice or opportunity to cure was given to the voters Judge Griffin challenges. Judge Griffin seeks for the Court to invalidate votes *post facto*—votes of individuals who have been on voter rolls for decades—without such an opportunity, and after their applications were accepted by the county boards.

Judge Griffin also argues that the Board "admitted" that it violated the law. Griffin Br. at 11. But this argument mischaracterizes the Board's December 2023 Order resolving the administrative complaint. That Order changed the registration form to require voters to do one of

three things: (1) provide a driver's license; (2) provide a social security number; or (3) check a box affirmatively stating they have not been issued either number. *See* Order at 4, *In re HAVA Complaint of Snow* (N.C. State Bd. Elecs. Dec. 6, 2023). This alteration, which clarified for the county boards how they should respond when a voter leaves that section blank, was consistent with the State Board's discretion under state law. But it in no way was an admission, as Judge Griffin claims, that this Board "violat[ed] the law." Griffin Br. at 11; *cf. Republican Nat'l Comm.*, 120 F.4th at 402 n.3 ("We are not convinced that Defendants conceded to a violation of HAVA, but we need not reach that issue.").

Regardless, the State Board expressly (and unanimously) decided that no action was necessary for previously registered voters, such as the 60,273 voters challenged here, because they have proven their identity in the manner required by HAVA. Counting those votes is authorized—not prohibited—by HAVA and corresponding state law.

### ii. Judge Griffin Cannot Establish That Children of North Carolinians Stationed or Living Abroad Are Ineligible to Vote

When the General Assembly enacted the Uniform Military and Overseas Voter Act (UMOVA) in 2011, it unanimously expanded voting rights to voters living abroad. In doing so, the General Assembly provided that various categories of military-overseas voters could use unique procedures to register and vote absentee that are unavailable to civilian voters. *See* N.C. Gen. Stat. §§ 163-258.6–258.15; Order at 30.

For overseas voters who do not satisfy North Carolina's general residency requirement, state law "assign[s]" overseas voters a North Carolina residence: either "the last place of residence of the voter in" North Carolina or, for the children of former North Carolina residents, "the address of the last place of residence in [North Carolina] of the parent or legal guardian of the voter." N.C. Gen. Stat. § 163-258.5. This law ensures that North Carolina citizens retain the right to vote even

if living abroad. In expanding voting rights in state elections in this way, the General Assembly mirrored action taken by Congress for federal elections. *See* 52 U.S.C. § 20302(a).

The voters UMOVA covers include those who (1) are "outside the United States"; (2) never left the United States (i.e., are not described in § 163-258.2(1)(c) or (d)); (3) satisfy North Carolina's voter eligibility requirements "except for a State residency requirement"; (4) have "a parent or legal guardian" who was last "eligible to vote [in North Carolina] before leaving the United States; and (5) have "not previously registered to vote in any other state." N.C. Gen. Stat. § 163-258.2(1)e.

Judge Griffin claims these voters cannot satisfy the "residence" requirement in Article VI of the N.C. Constitution, but rather than attacking the constitutionality of the statute directly, he argues that UMOVA may simply be interpreted "to avoid" a "serious constitutional defect." Griffin Br. at 14. But constitutional avoidance is a doctrine of statutory *construction*, to be applied only when choosing between "one of two reasonable constructions." *N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160, 814 S.E.2d 54, 62 (2018). It is not a means to rewrite a statute. *See Wilkie v. City of Boiling Springs Lake*, 370 N.C. 540, 547, 809 S.E.2d 853, 858 (2018) ("It is well settled that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning.").

Judge Griffin contends that the State Board's reading of UMOVA "misinterpret[s]" the statute to provide an exception to what he contends is the "state constitution's bona fide residency requirement." Griffin Br. at 14. But Judge Griffin does not explain what he contends is the *correct* reading of the statute, much less what the intent of the General Assembly could have been in passing such a statute. *See C Invs. 2, LLC v. Auger*, 383 N.C 1, 8, 881 S.E.2d 270, 276 (2022) ("According to well-established North Carolina law, the intent of the Legislature controls the

interpretation of a statute.").  UMOVA expanded suffrage to the very people Judge Griffin is now

trying to disenfranchise: overseas voters who do not satisfy the residency requirement in N.C. Gen.

Stat. § 163-57(1) but who are otherwise eligible to vote.  Those voters are "assigned" a residential

address in North Carolina and thus may vote under North Carolina law.  *Id.* § 163-258.5.

      In truth, Judge Griffin is asserting a facial challenge to the constitutionality of UMOVA.

But he cannot carry that heavy burden.  Legislation is presumptively constitutional, constitutional

limitations on the General Assembly "must be explicit," and a violation of that limitation must be

"proved beyond a reasonable doubt."  *Harper v. Hall*, 384 N.C. 292, 323, 886 S.E.2d 393, 414

(2023).  In any event, Judge Griffin's constitutional arguments are flawed and misunderstand the

requirements for residence under North Carolina law.

      The term "resided" is not defined in the N.C. Constitution.  The N.C. Supreme Court has

therefore "held . . . without variation that residence within the purview of this constitutional

provision [Article VI] is synonymous with domicile." *Owens v. Chaplin*, 228 N.C. 705, 708, 47

S.E.2d 12, 15 (1948) (collecting cases); *see also Hall v. Wake Cty. Bd. Elections*, 280 N.C. 600,

605, 187 S.E.2d 52, 55 (1972) ("Residence as used in Article VI of the North Carolina Constitution

of 1970 continues to mean domicile.").  Domicile does not merely mean where someone

temporarily "lives." *See Hall*, 280 N.C. at 606, 187 S.E.2d at 55 ("One who lives in a place for a

temporary purpose . . . effects no change of domicile.").  Rather, domicile is an individual's

"permanent" home.  *Id.* North Carolina law therefore recognizes "three kinds" of domicile:

"domicile of origin, domicile of choice, and domicile by operation of law." *Thayer v. Thayer*, 187

N.C. 573, 122 S.E.2d 307, 308 (N.C. 1924).  It is true that someone who has never lived in North

Carolina cannot make North Carolina his or her domicile *of choice*. *Id.*  But an individual need

not live in North Carolina for the state to be their domicile of origin or domicile by law.

**Domicile of origin.** At birth, a person inherits their parents' or legal guardian's domicile as their "domicile of origin." *Id.*; *see also Hall*, 280 N.C. at 608, 187 S.E. 2d at 57. This is true even if the person is born away from home and never relocates to their guardian's domicile. It is therefore "entirely logical that on occasion, a child's domicile of origin will be in a place where the child has never been." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Nevertheless, Judge Griffin posits North Carolina cannot be the domicile of origin of an overseas voter who has never lived in the United States by arguing—without any supporting authority—that a child's domicile of origin expires when they become a legal adult. Judge Griffin is wrong. Domicile of origin does not expire upon reaching majority, suddenly leaving a U.S. citizen without a domicile anywhere in the United States. Such a result would contravene the basic principle that "[t]he law permits no individual to be without a domicile." *Hall*, 280 N.C. at 608, 187 S.E.2d at 57. Thus, domicile of origin, like any domicile, "once acquired is presumed to continue until it is shown to have been changed." *Reynolds v. Lloyd Cotton Mills*, 177 N.C. 412, 99 S.E.2d 240, 244 (1919); *see also Lloyd v. Babb*, 296 N.C. 316, 251 S.E.2d 843 (1979) (holding that college students may retain their domicile of origin while living away from home). Moreover, "[w]here a change of domicile is alleged, the burden of proving it rests upon the person making the allegation." *Reynolds*, 177 N.C. 412, 99 S.E.2d at 244; *Hall*, 280 N.C. at 608, 187 S.E.2d at 57. Judge Griffin has made no evidentiary showing that any overseas voter has changed their domicile of origin since becoming an adult.

**Domicile by operation of law.** "A domicile by operation of law is one which the law determines or attributes to a person without regard to his intention or the place where he is actually living." *Thayer*, 187 N.C. 573, 122 S.E.2d at 308. As discussed above, the "covered" voters permitted to vote in accordance with UMOVA are voters to which the General Assembly

deliberately expanded the franchise—overseas voters who would not satisfy the residency requirement in N.C. Gen. Stat. § 163-57(1), but who still are domiciled in North Carolina by law and "assigned" a North Carolina residence in accordance with § 163-258.5. Accordingly, an overseas American who has never *lived* in North Carolina can nevertheless be domiciled in (and therefore reside in) North Carolina for purposes of Article VI. *See Thayer*, 122 S.E.2d at 308; *Hall*, 280 N.C. at 606, 187 S.E.2d at 55; N.C. Gen. Stat. § 163-258.2(1)e.

### iii. Judge Griffin Cannot Establish Overseas Voters Were Required to Provide Photo Identification When Casting Their Ballots

Finally, Judge Griffin seeks to invalidate more than a thousand votes of overseas voters by creating a new, post-election photo identification requirement. This shameless attempt to change settled law and disenfranchise military servicemembers, their families, and other North Carolinians overseas should be rejected.

Judge Griffin argues that overseas voters were required "to submit a photocopy of their photo identification" with their ballots, Griffin Br. at 15, yet he fails to cite state law providing the opposite: "A voter who is casting a ballot pursuant to [UMOVA] is not required to submit a photocopy of acceptable photo identification under Paragraph (a) of this Rule or claim an exception under G.S. 163-166.16(d)." 8 N.C. Admin. Code 17.0109(d).

Judge Griffin argues that all votes cast in reliance on this rule should be thrown out because the "General Assembly never delegated to the Board the power" to implement such a requirement—which Judge Griffin contends "override[s] state constitutional and statutory requirements." Griffin Br. at 16. Judge Griffin is wrong about the scope of the authority delegated to the Board.

"The State Board of Elections is the State official responsible for implementing [UMOVA] and the State's responsibilities under the Uniformed and Overseas Citizens Absentee Voting Act."

N.C. Gen. Stat. § 163-258.4(a).  UOCAVA requires "Each State" to permit military and overseas voters to register, request a ballot, and cast a vote through federally prescribed forms.  *See* 52 U.S.C. § 20302(a)(1)-(4).  As confirmed by the Board, "[t]hese federally prescribed forms and their instructions, like [UMOVA], do not include a requirement for covered voters to include a photocopy of photo identification."  Order at 38.

The General Assembly also directed the Board to develop "standardized absentee-voting materials . . . in coordination with other states."  N.C. Gen. Stat. § 163-258.4(d).  The identification exception found in 8 N.C. Admin. Code 17.0109(d) aligns with this directive, as "a review of the Federal Voting Assistance Program's (FVAP) comprehensive 2024–2025 Voting Assistance Guide reveals no instruction from any state to its UOCAVA voters stating that they must comply with a photo ID requirement when requesting or voting their ballot."  Order at 38.

In addition, UMOVA itself does not require photo identification.  Instead, it requires only that an overseas voter authenticate their identity through either "the declaration specified in G.S. 163-258.13 or the declaration on the federal postcard application and federal write-in absentee ballot."  N.C. Gen. Stat. § 163-258.17(b) (confirming that any other form of authentication "is not required for execution of a document under this Article.").  The declaration authorized by UMOVA requires an overseas voter to authenticate their "identity, eligibility to vote, [and] status as a covered voter."  N.C. Gen. Stat. § 163-258.4(e).  No photo identification is required to be provided with this declaration.  *See id.*  Similarly, the federal postcard application and federal write-in absentee ballot "require the voter to provide their name, birthdate, and their driver's license number or social security number," but do not require photo identification.  Order at 33.  "Nowhere in [UMOVA] is there any reference to a covered voter supplying a photocopy of a photo ID with their absentee ballot." *Id.*

Judge Griffin responds that N.C. Gen. Stat. § 163-258.17(b) does not "exempt an overseas voter from the photo-identification requirement" because, according to him, it concerns "authentication" required for "execution of a document" rather than authentication of the voter's identity. Griffin Br. at 16. But N.C. Gen. Stat. § 163-258.17(b) does not concern authenticating a *document* (including an overseas ballot); it concerns a military-overseas voter's obligation to authenticate their identity and eligibility when *executing* their military-overseas ballot. *See* N.C. Gen. Stat. § 163-258.17(b) (providing that either the declaration specified in N.C. Gen. Stat. § 163-258.13 or the declaration on federal postcard application and federal write-in absentee ballot are the only authentications that may be required "for *execution* of a document under this Article." (emphasis added)); *see also id*. § 163-258.4 (Board must prescribe form and content of a declaration "for use by a covered voter to swear or affirm specific representations pertaining to the voter's identity" among other matters).

In any event, "[i]f a voter's mistake or omission in the completion of a document under" UMOVA "does not prevent determining whether a covered voter is eligible to vote, the mistake or omission does not invalidate the document." *Id*. § 163-258.17(a). Thus, even if a photo ID *were* required of military-overseas voters as Judge Griffin contends, their votes must be counted so long as the county board can determine each voter's eligibility. As discussed above, all military-overseas ballots come with a declaration swearing to each voters' eligibility, including their identity. *Id*. §§ 163-258.4(e), 163-258.13. Judge Griffin offers no allegations or evidence that any military or overseas voter's failure to include a photo ID prevented the county boards from determining the voter was eligible.

## II. The Balance of the Equities Favors the Voters, and the Public Interest Favors Certification

While Judge Griffin argues that the "Board will not be harmed" if the Court enters a preliminary injunction forestalling certification of the election, Griffin Br. at 8, he ignores the fundamental constitutional rights of the voters. *See Ill. State Bd. Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("The political franchise of voting . . . is regarded as a fundamental political right" because it is "preservative of all rights."). Judge Griffin also ignores the public interest in an expedient, final resolution regarding one of seven seats on North Carolina's highest court—an interest in which he expressed grave concern until recently. *See, e.g*., Pet. Writ Prohibition at 19 ("The candidates and the public have a vital interest in this election receiving finality as expeditiously as possible.").

True, state law contemplates the potential for a brief stay of an election result, but any stay necessarily *disrupts* the status quo: a "certificate" of an election "shall be issued" 10 days after the final decision of the State Board on an election protest. *See* N.C. Gen. Stat. § 163-182.15. Therefore, a stay in the context of an election protest is the exception rather than the rule; it may be issued only when a petitioner can show that he "*is likely to prevail in the appeal*." *Id*. § 163-182.14(b) (emphasis added). Judge Griffin is thus wrong to say that his request for a preliminary injunction would "simply maintain the status quo." Griffin Br. at 8.[6]

---

[6] In his December 23, 2024 brief, Judge Griffin states that he "will in short order file a motion to remand" and asks this Court to "enter a preliminary injunction to preserve existing conditions pending a determination of its own jurisdiction." Griffin Br. at 10. Judge Griffin has not filed that motion. Nor does he explain why his objections to this Court's support an injunction preventing the State Board from certifying the election. To be sure, Judge Griffin's "protests will be mooted" without an injunction. Griffin Br. at 2. But the prospect of irreparable harm alone is not enough to justify relief. *See Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) (all four injunction factors must be satisfied).

The public's interest in a quick, final resolution of this race is considerably greater here than for the run-of-the mill election. While North Carolina law provides for Justice Riggs to holdover in her current position until the election is finalized, N.C. Const., art. VI, § 10; N.C. Gen. Stat. § 128-7, Judge Griffin has questioned whether Justice Riggs will be able to "exercise the duties of her office" in cases of "great public significance." Pet. Writ Prohibition at 12 (acknowledging right to holdover but pressing that the N.C. Supreme Court "expressed grave concern about letting an improperly elected official exercise the duties of her office in cases of great public significance"). The risk that someone (including Judge Griffin) might argue that the final decisions on North Carolina law by the N.C. Supreme Court could be invalidated on the theory that Justice Riggs is an "improperly elected official" is too grave a harm to the public's interest to delay in reaching finality in this election. That risk is particularly unacceptable for election protests that seek to disenfranchise thousands of North Carolina voters by changing the rules after the election concludes.

## CONCLUSION

The Court should deny Judge Griffin's Motion for Preliminary Injunction.

Dated: January 1, 2025                    Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

/s/ *Raymond M. Bennett*
Raymond M. Bennett
N.C. State Bar No. 36341
Samuel B. Hartzell
N.C. State Bar No. 49256
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
(919) 755-2100
ray.bennett@wbd-us.com
sam.hartzell@wbd-us.com

*Counsel for North Carolina Associate Justice Allison Riggs*