# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

JEFFERSON GRIFFIN,

    Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

    Defendant,

    and

ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, and JUANITA ANDERSON

    Intervenor-Defendants.

Case No. 5:24-cv-00724-M

**NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.    Judge Griffin challenged thousands of votes after falling short in the North Carolina Supreme Court election ........................................................................... 2

    II.    Judge Griffin did not sufficiently notify the voters he seeks to disenfranchise ................. 4

    III.    The State Board rejected Judge Griffin's first three challenges. ......................................... 5

    IV.    Judge Griffin challenges the State Board's rejection of his protests. ................................ 6

    V.    Judge Griffin's efforts threaten to disenfranchise Intervenors and their members and constituents. ....................................................................................................... 7

LEGAL STANDARD ................................................................................................... 8

ARGUMENT ................................................................................................................. 9

    I.    Judge Griffin's after-the-fact effort to change North Carolian's election rules is barred by laches ................................................................................................................... 9

    II.    Judge Griffin has not demonstrated a likelihood of success on the merits. .................... 12

        A.    Judge Griffin seeks relief that would violate the constitutional rights of voters. .... 12

            1.    Substantive Due Process ................................................................................. 12

            2.    Procedural Due Process ................................................................................... 15

            3.    Right to Vote .................................................................................................... 17

            4.    Equal Protection ............................................................................................... 19

        B.    Judge Griffin's requested relief violates federal election and civil rights statutes. . 21

            1.    National Voter Registration Act ..................................................................... 21

            2.    Civil Rights Act ............................................................................................... 23

    III.    All equitable factors weigh heavily against granting the extraordinary relief Judge Griffin seeks. ..................................................................................................... 25

    IV.    This case belongs in federal court. .................................................................................. 28

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ...................................................................22

*Ass'n of Cmty. Orgs. For Reford Now v. Edgar*,
    56 F.3d 791 (7th Cir. 1995) .......................................................................22

*Bauer v. Elrich*,
    8 F.4th 291 (4th Cir. 2021) .......................................................................30

*Bennett v. Yoshina*,
    140 F.3d 1218 (9th Cir. 1998) ...................................................................14

*Bush v. Gore*,
    531 U.S. 98 (2000) ......................................................................19, 20, 21

*Democracy N.C. v. N.C. State Bd. of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ....................................................15, 16, 17

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) .....................................................................27

*Donald J. Trump for President, Inc. v. Sec'y of Pa.*,
    830 Fed. Appx. 377 (3d Cir. 2020) ............................................................27

*Frazier v. Prince George's County*,
    86 F.4th 537 (4th Cir. 2023) ......................................................................9

*Fusaro v. Cogan*,
    930 F.3d 241 (4th Cir. 2019) .....................................................................18

*In re Ga. Senate Bill 202*,
    No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ...............24

*Gray v. Sanders*,
    372 U.S. 368 (1963) .................................................................................20

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978) ...............................................................13, 14, 26

*Gunn v. Minton*,
    568 U.S. 251 (2013) .............................................................................29, 30

Case 5:24-cv-00724-M-RN    Document 42    Filed 01/01/25    Page 3 of 38

*Hendon v. N.C. State Bd. of Elections*,
710 F.2d 177 (4th Cir. 1983) ..................................................................9, 10, 11, 14

*Hoblock v. Albany Cnty. Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005)......................................................................................13

*Hole v. N.C. Bd. of Elections*,
112 F. Supp. 2d 475 (M.D.N.C. 2000) ....................................................................26

*Hunter v. Hamilton Cnty. Bd. of Elections*,
635 F.3d 219 (6th Cir. 2011) ..................................................................................20

*Hutchinson v. Miller*,
797 F.2d 1279 (4th Cir. 1986) ................................................................................29

*King v. Whitmer*,
505 F. Supp. 3d 720 (E.D. Mich. 2020)..................................................................11

*Koerber v. Fed. Election Comm'n*,
583 F. Supp. 2d 740 (E.D.N.C. 2008)......................................................................8

*Lake v. Hobbs*,
643 F. Supp. 3d 989 (D. Ariz. 2022) ......................................................................10

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019)................................................................................................22

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ............................................................................26, 27

*Libertarian Party of Va. v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) ............................................................................17, 19

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*,
512 F. Supp. 3d 1354 (M.D. Ga. 2021) ..................................................................21

*Marcellus v. Va. State Bd. of Elections*,
No. 3:15CV481, 2015 WL 5285819 (E.D. Va. Sept. 9, 2015)................................11

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*,
No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ............................21

*Ne. Ohio Coal. for Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012) ............................................................................13, 15

*Project Vote v. Blackwell*,
455 F. Supp. 2d 694 (N.D. Ohio 2006)...................................................................22

iii

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ...........................................................21

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
  872 F.2d 75 (4th Cir. 1989) ...........................................................28

*RNC v. N.C. State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) ...........................................23, 28, 29, 30

*Snowden v. Hughes*,
  321 U.S. 1 (1944)...........................................................26

*Soules v. Kauaians for Nukolii Campaign Comm.*,
  849 F.2d 1176 (9th Cir. 1988) ...........................................................12

*Trump v. Wis. Elections Comm'n*,
  983 F.3d 919 (7th Cir. 2020) ...........................................................9, 10

*United States v. Anderson*,
  481 F.2d 685 (4th Cir. 1973), *aff'd,* 417 U.S. 211 (1974) ...........................12

*United States v. White*,
  927 F.3d 257 (4th Cir. 2019) ...........................................................15

*Voters Organized for the Integrity of Elections v. Baltimore City Elections Bd.*,
  214 F. Supp. 3d 448 (D. Md. 2016) ...........................................................9

*Voto Latino v. Hirsch*,
  712 F. Supp. 3d 637 (M.D.N.C. 2024) ...........................................15, 16, 17

*Waldrep v. Gaston Cnty. Bd. of Elections*,
  575 F. Supp. 759 (W.D.N.C. 1983) ...........................................................11

*Wasserberg v. N.C. State Bd. of Elections*,
  Case No. 5:24-cv-578-M (E.D.N.C. Oct. 31, 2024), ECF No. 38 ...........................30

*White v. Daniel*,
  909 F.2d 99 (4th Cir. 1990) ...........................................................9

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008)...........................................................25

*Wise v. Circosta*,
  978 F.3d 93 (4th Cir. 2020) ...........................................................26

*Wood v. Raffensperger*,
  501 F. Supp. 3d 1310 (N.D. Ga.), *aff'd on other grounds*, 981 F.3d 1307 (11th
  Cir. 2020) ...........................................................10, 27

iv

**Statutes**

28 U.S.C. § 1331 ........................................................................................................28

28 U.S.C. § 1443 ........................................................................................................30

52 U.S.C. § 10101 ......................................................................................................23

52 U.S.C. § 20501 ......................................................................................................21

52 U.S.C. § 20507 ................................................................................................21, 22

52 U.S.C. § 21083 ........................................................................................................3

N.C. Gen. Stat. § 163-22 ...........................................................................................11

N.C. Gen. Stat. § 163-55 .....................................................................................18, 19

N.C. Gen. Stat. § 163-57 ...........................................................................................19

N.C. Gen. Stat. § 163-82.4 ..........................................................................................3

N.C. Gen. Stat. § 163-82.7 .................................................................................19, 24

N.C. Gen. Stat. § 163-82.11 .......................................................................................23

N.C. Gen. Stat. § 163-82.14 .......................................................................................22

N.C. Gen. Stat. § 163-166.16 .....................................................................................24

N.C. Gen. Stat. § 163-166.25 .....................................................................................19

N.C. Gen. Stat. § 163-166.40 .....................................................................................19

N.C. Gen. Stat. § 163-182.12 .......................................................................................5

N.C. Gen. Stat. § 163-226 ..........................................................................................19

N.C. Gen. Stat. § 163-230.1 .........................................................................................3

N.C. Gen. Stat. § 163-258.1 .........................................................................................3

N.C. Gen. Stat. § 163-258.3 .......................................................................................19

**Other Authorities**

8 N.C. Admin. Code 2.0111 ...................................................................................4, 16

8 N.C. Admin. Code 17.0109 .................................................................................4, 15

N.C. Const. art. VI, § 1 ................................................................................................18

N.C. Const. art. VI, § 2 ................................................................................................18

U.S. Const. amend. XIV, § 1 .......................................................................................19

vi

**INTRODUCTION**

Before voting began in the 2024 election, the rules for casting and counting ballots were set and clear. Millions of North Carolina voters went to the polls and cast ballots according to those rules, including in the race for associate justice on the North Carolina Supreme Court. These voters had every reason to expect their ballots to count—they abided by the rules, did as election officials instructed them, and their votes were tabulated. Nonetheless, Judge Jefferson Griffin—having come up short in his race for a seat on the state supreme court—now seeks to change the rules of the election months after it took place and disenfranchise tens of thousands of North Carolinians, all without a shred of evidence that any were unqualified to vote. In other words, after playing the game and losing, Judge Griffin now wants to rewrite the rulebook.

This months-long effort by Judge Griffin to reverse his defeat at the ballot box now comes before this Court in the form of a motion for preliminary injunction seeking to bar the State Board of Elections ("State Board") from performing its duty to certify the results of the election. But the motion falls woefully short of satisfying the heavy burden it must meet to obtain the extraordinary relief Judge Griffin demands. To start, his belated effort to change North Carolina's voting rules is barred by laches. Courts across the country have widely rejected similar post-election efforts to challenge rules and procedures that long predate the election. Judge Griffin has never explained why he could not have raised these challenges ahead of the election, and no good reason exists. Ordinary voters, including Intervenors, should not pay the price for his inexcusable delay.

On the merits, Judge Griffin has no prospect of success—a host of federal laws and constitutional guarantees bar the widescale disenfranchisement he seeks to inflict on voters. Indeed, Judge Griffin's effort to simply erase votes in the hope that it improves his electoral performance runs roughshod over basic constitutional notions of due process, equal protection,

1

and the fundamental democratic right to vote. On top of all that, the relief he seeks would also force the State Board to violate various federal laws, including the National Voter Registration Act ("NVRA") and Civil Rights Act of 1965 ("CRA"), both of which Congress enacted to prevent the sort of arbitrary disenfranchisement Judge Griffin seeks. This Court is the proper venue for resolving these disputed federal questions.

Finally, the equities weigh overwhelmingly against granting Judge Griffin's motion. The right to vote is one of the most fundamental and sacred rights we enjoy as Americans. While his defeat in a close election is surely a bitter pill, Judge Griffin's sheer desire to alter the outcome of his election does not outweigh the severe harm he seeks to impose on ordinary voters who followed the rules, including Intervenors. Moreover, Judge Griffin's electoral loss is not the sort of irreparable harm that warrants judicial intervention in the state's certification process—it is an ordinary function of our democratic society. The Court should deny his motion, permit the certification process to move forward, and allow the voices of North Carolina voters to be heard.

## BACKGROUND

### I. Judge Griffin challenged thousands of votes after falling short in the North Carolina Supreme Court election.

In the 2024 general election, millions of voters across North Carolina cast their ballots under well-established rules and settled instructions about how to vote. After voting ended and the ballots counted, it became clear that incumbent Justice Allison Riggs had prevailed over Judge Griffin in the race for Associate Justice on the North Carolina Supreme Court. Rather than accept the will of the voters, Judge Griffin filed over 300 election protests all across the state. These sweeping protests collectively sought to disenfranchise over 60,000 North Carolinians.

Judge Griffin's protests fall into six categories. The first and largest targets 60,273 absentee and early voters, including Intervenors Tanya Webster-Durham, Sarah Smith, and Juanita

2

Anderson, based on information allegedly missing in their registration file ("HAVA Challenge").[1] *See* NCSBE Order at 3 (App. 40), ECF No. 1-5. Under the Help America Vote Act ("HAVA"), when a person registers to vote, states attempt to collect the applicant's driver's license number or the last four digits of the applicant's social security number. *See* 52 U.S.C. § 21083(a)(5)(A). While North Carolina law incorporates HAVA's requirements, *see* N.C. Gen. Stat. § 163-82.4(a), (b), in the past, the state registration form did not explicitly require provision of driver's license or social security numbers, and the state accepted registrants' otherwise complete applications. *See* NCSBE Order at 24–27 & n.16 (App. 61–64). Thus, in many cases, these voters have been registered and voted without incident *for decades*. *See infra* Background § V. Even though these voters have long been registered to vote—and have complied with North Carolina's strict photo identification law when voting, N.C. Gen. Stat. § 163-230.1(f1)—Judge Griffin seeks to retroactively invalidate their votes if their registration files lack a driver's license or social security number. *See* Griffin Br. Supp. Election Protests at 2–6 (App. 7–11) ("Griffin Protest Br."), ECF No. 1-5.

Judge Griffin's second category of challenges—the "Overseas Voter Challenge"—takes aim at 266 citizens living abroad, NCSBE Order at 3 (App. 40), who are expressly entitled to vote in the state under the Uniform Military and Overseas Voters Act ("UMOVA"), as enacted by the General Assembly over 13 years ago. *See* N.C. Gen. Stat. § 163-258.1, *et seq*. These kinds of voters have participated in dozens of elections without issue for more than a decade. But Judge Griffin now believes these citizens should not be disenfranchised because, in his view, they are not residents of the state. *See* Griffin Protest Br. at 6–18 (App. 11–23).

---

[1] Notably, however, Judge Griffin has not presented individualized evidence that any one of these voters has failed to comply with any voter registration requirement.

The third category of challenges targets 1,409 overseas voters who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and who, in doing so, complied with all relevant federal and state laws for returning their absentee ballot. *See* Griffin Protest Br. at 18–22 (App. 23–27); NCSBE Order at 3 (App. 40). Judge Griffin argues these voters' ballots should be discarded because he believes that they should have provided a copy of their photo identification with their ballot, notwithstanding that the State Board has prescribed rules for UOCAVA voters that exempt them from this requirement ("UOCAVA ID Challenge"). *See* 8 N.C. Admin. Code 17.0109. The State Board's rules have exempted covered UOCAVA voters from such a requirement since at least 2020. *Id.*

The remaining three categories of protests challenge: (1) voters allegedly ineligible to vote due to felony conviction ("Felon Voter Challenges"); (2) voters allegedly dead as of election day ("Deceased Voter Challenges"); and (3) voters allegedly not registered to vote in North Carolina at all ("Unregistered Voter Challenges"). NCSBE Order at 3 (App. 40).

## II.     Judge Griffin did not sufficiently notify the voters he seeks to disenfranchise.

Under the State Board's rules for election protests, Judge Griffin was expressly required to "serve copies of all filings on every person with a direct stake in the outcome of this protest," including "all such voters" the protestor is seeking to disenfranchise. 8 N.C. Admin. Code 2.0111.

Judge Griffin did no such thing. Instead, he purported to notify each challenged voter by sending them a postcard. The card—which was addressed to the voter "or current resident"— contained a QR code that mobile smartphone users could scan and then be redirected to the North Carolina Republican Party webpage. Griffin Postcard (App. 175), ECF No. 1-5. This meant that, even if a voter did receive a postcard, recipients without internet access, smartphones, or familiarity with QR code technology could not access any additional information. If a voter received the notice and was able to navigate through the QR code, they were led to a website

4

containing over *three hundred* links to Judge Griffin's various protests. But neither the postcard nor webpage informed the voter about the basis upon which their ballot was being challenged—voters were left to guess. *See id*. The postcard itself merely informed voters that the website could tell them "what protest *may* relate to you," *id.* (emphasis added), without providing any further details, including failing to clearly state that a voter *was* challenged, or explaining that the voter may be disenfranchised. Instead of providing the required notice to challenged voters, Judge Griffin's half-baked efforts put the burden on *voters* to determine—weeks after they cast their ballots—whether and how their votes are being challenged.

## III.    The State Board rejected Judge Griffin's first three challenges.

The State Board agreed to take jurisdiction over three of the six categories of challenges pursuant to N.C. Gen. Stat. § 163-182.12, including the HAVA Challenge, Overseas Voter Challenge, and UOCAVA ID Challenge. The State Board concluded that the remaining three categories of challenges—Felon Voter Challenges, Deceased Voter Challenges, and Unregistered Voter Challenges—were best left to the counties to adjudicate in the first instance.[2]

On December 13, the State Board issued a written opinion rejecting Judge Griffin's protests over which it had taken immediate jurisdiction. On the threshold issue of service, a majority of the State Board determined that Judge Griffin had not properly served notice to each challenged voter "in a manner that would comply with the North Carolina Administrative Code and be consistent with the requirements of constitutional due process." NCSBE Order at 6 (App. 43).

---

[2] On December 20, the State Board considered appeals that had been filed by Judge Griffin to review the determinations counties had made to count votes identified in these three categories of protests. Upon determining that only 292 votes were at issue (largely because some protests had been withdrawn and some protests implicated multiple voters), a majority of the State Board voted to dismiss the appeals because the total number of votes at issue was far below the 734-vote margin between the two candidates and therefore not outcome determinative. On December 27, the State Board issued its written decision on these challenges. *See* Griffin Notice, ECF No. 38.

5

The Board then rejected each of the three protests on the merits. First, a majority of the State Board rejected the HAVA Challenge, concluding that counting ballots cast by voters challenged in this category is not a violation, irregularity, or misconduct in the conduct of the election. *Id.* at 17 (App. 54). In doing so, the majority emphasized the fundamental unfairness—rising to the level of a violation of due process and federal law—of disenfranchising voters who have been told for years that they are lawfully registered to vote. *Id.* at 18–29 (App. 55–66) (citing, among other things, HAVA, the National Voter Registration Act ("NVRA"), and state and federal case law). Second, a majority of the State Board rejected Judge Griffin's Overseas Voters Challenge, concluding that the General Assembly explicitly authorized these individuals to vote in state elections, and emphasizing that such voters had previously been permitted to vote for 13 years and in 43 elections. *Id.* at 29–31 (App. 66–68). Finally, the State Board unanimously rejected Judge Griffin's UOCAVA ID Challenge, concluding that state law and relevant regulations explicitly exempt military and overseas voters from providing identification when returning their absentee ballot. *Id.* at 32–37 (App. 69–74). For both the Overseas Voter Challenge and the UOCAVA ID Challenge, the Board again concluded that accepting Judge Griffin's protests would give rise to a federal due process violation. *Id.* at 32, 39 (App. 69, 76).

## IV. Judge Griffin challenges the State Board's rejection of his protests.

On December 18, Judge Griffin filed a petition for a writ of prohibition with the North Carolina Supreme Court. *See generally* Notice of Removal Ex. A, ECF No. 1-4. In his petition, he asked the Court to immediately issue a temporary stay of both the State Board's certification of his election contest and the requirement that Judge Griffin file an appeal of the State Board's decision within 10 days of service of the State Board's decision. *Id.* at 1–2. The next day, the State Board removed the action to this Court. *See generally* Notice of Removal, ECF No. 1. Two days

later, Judge Griffin filed three separate petitions for judicial review of the State Board's December 13 order in Wake County Superior Court. *See Griffin v. N.C. State Bd. of Elections*, Case No. 5:24-cv-00731-BO (E.D.N.C.), ECF Nos. 1-4, 1-8, 1-12 ("*Griffin II*"). Each petition challenges one of the three categories of election protests dismissed by the Board—the HAVA Challenge, Overseas Voter Challenge, and UOCAVA ID Challenge, respectively—and seeks the same relief as Judge Griffin's writ of prohibition. *See id.* Because the three petitions raise the same legal issues as those in the instant case, and because they raise questions of federal law, the State Board again removed the action to federal court and noticed the case as related to this action. *See* Notice of Removal, *Griffin II*, ECF No. 1; Notice of Related Case, *Griffin II*, ECF No. 2.

The North Carolina Alliance for Retired Americans ("Alliance"), VoteVets Action Fund ("VoteVets"), and individual Alliance members Webster-Durham, Smith, and Anderson, moved to intervene in both actions to protect their and their members' right to have their votes counted. This Court granted the motion to intervene. *See* Dec. 26, 2024 Text Order.

Last week, Judge Griffin filed the instant motion seeking a preliminary injunction to prevent the State Board from certifying the 2024 election results for Associate Justice of the North Carolina Supreme Court. *See* Mem. Supp. Mot. for Prelim. Inj., ECF No. 32 ("Br.").

## V. Judge Griffin's efforts threaten to disenfranchise Intervenors and their members and constituents.

Judge Griffin's protests seek to disenfranchise Intervenors and their members, even though each of these voters cast their ballots according to established procedures for voting in the 2024 election. Indeed, each of the individual intervenors presented their driver's license at early voting sites, had their registrations confirmed, and voted, just as they had done for years without issue. Decl. of Tanya Webster-Durham ¶¶ 3, 6, 7, ECF No. 24-2 ("Webster-Durham"); Decl. of Sarah Smith ¶¶ 3, 5, 6, ECF No. 24-3 ("Smith"); Decl. of Juanita Anderson ¶¶ 3, 5, 6, ECF No. 24-4

("Anderson"). And although they are among the voters targeted by Judge Griffin's HAVA Challenge, none of them recall receiving Judge Griffin's postcard. Webster-Durham ¶ 8; Smith ¶ 7; Anderson ¶ 7. Even if they had, none of them would have been able to use the QR code. Webster-Durham ¶ 9; Smith ¶ 8; Anderson ¶ 8.

The Alliance, which represents roughly 58,000 members across North Carolina, is concerned that many more of its retirees are subject to Judge Griffin's HAVA Challenge due to their advanced age and the likelihood that they registered to vote decades ago, including before the enactment of HAVA or its North Carolina analog. Decl. of William Dworkin ¶¶ 2, 8, ECF No. 24-1 ("Dworkin"). Moreover, Judge Griffin's challenges single out absentee and early in-person voters—groups that make up a disproportionate share of the Alliance's membership. *Id.* ¶ 10.

Finally, Judge Griffin's challenges threaten to disenfranchise VoteVets' constituents—veterans, servicemembers, and their families—who participated in the 2024 election according to UOCAVA, UMOVA, and related procedures, with the rightful expectation that their ballots would be counted under established law. Decl. of Peter Mellman ¶ 13, ECF No. 24-5 ("Mellman").

## LEGAL STANDARD

"A preliminary injunction is [an] extraordinary remedy involving the exercise of very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Koerber v. Fed. Election Comm'n*, 583 F. Supp. 2d 740, 744 (E.D.N.C. 2008) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1992)) (cleaned up). The court considers the following factors in deciding whether to grant a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff if injunctive relief is denied; (2) the likelihood of harm to the defendant if injunctive relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Id.* An injunction "can be granted only if every factor is

8

met." *Frazier v. Prince George's County*, 86 F.4th 537, 544 (4th Cir. 2023) ("*[D]enying* a preliminary injunction only takes the rejection of a single factor." (emphasis in original)).

<u>**ARGUMENT**</u>

Judge Griffin fails to satisfy any of the factors for a preliminary injunction. He has no likelihood of succeeding on the merits because the relief he seeks is barred by laches, as well as a host of federal laws that prohibit the mass disenfranchisement of voters he demands. And, in any event, he fails to show any election irregularity to substantiate his protests. The equities also weigh overwhelmingly against Judge Griffin, who seeks to vitiate the fundamental rights of thousands of North Carolinians who registered and voted according to longstanding election rules.

**I.      Judge Griffin's after-the-fact effort to change North Carolian's election rules is barred by laches.**

Judge Griffin's petition is barred by the equitable doctrine of laches. Laches bars a claim where there is a "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Voters Organized for the Integrity of Elections v. Baltimore City Elections Bd.*, 214 F. Supp. 3d 448, 454 (D. Md. 2016) (cleaned up). Lack of diligence exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (citation omitted). Prejudice can be inferred by the "plaintiff's delay" or by showing evidence of harm. *Id.* "The greater the delay, the less the prejudice required to show laches, and vice versa." *Id.*

"The same imperative of timing and the exercise of judicial review applies with much more force on the back end of elections." *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 925 (7th Cir. 2020) (applying laches to bar post-election challenge). This Circuit has therefore "imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182

9

(4th Cir. 1983). And for good reason—the "failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (cleaned up). Courts across the country take this well-recognized approach. *See, e.g.*, *Trump*, 983 F.3d at 926; *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1324 (N.D. Ga.) (concluding laches barred suit that could have been filed months ahead of election rather than weeks after it), *aff'd on other grounds*, 981 F.3d 1307 (11th Cir. 2020).

Judge Griffin seeks precisely the kind of post-election relief that courts do not countenance. After losing his election, Judge Griffin retroactively challenges the validity of election procedures that he admits "were all well-established at the time of the November 2024 general election." Br. at 2. "None of these requirements are new," *id.*—quite the opposite, they have all been in place for *years*. There is thus no question that Judge Griffin could have brought his challenges well before the election. Nor can he offer any justification for his unreasonable delay. Instead, Judge Griffin gambled on the election results and now seeks to enlist the judiciary to disenfranchise tens of thousands of voters to hand him an election he lost. This sort of after-the-fact attack on the will of the voters runs afoul of the very foundations of the democratic process. Indeed, this case is a perfect example of a candidate's attempt to "misuse [] the judicial system to baselessly cast doubt on the electoral process in a manner that is conspicuously consistent with the [candidate's] political ends." *Lake v. Hobbs*, 643 F. Supp. 3d 989, 1010 (D. Ariz. 2022).

Judge Griffin's unreasonable delay severely harms Defendants and North Carolina voters. Take for example intervenors Anderson, Smith, and Webster-Durham, whose registrations Judge Griffin now argues violates state and federal requirements; each of them has been registered in North Carolina and successfully voted for years, dating as far back as 2009. Anderson ¶¶ 4–5;

10

Smith ¶¶ 4–5; Webster-Durham ¶¶ 4–5. But if Judge Griffin's tardy challenge to their registrations is successful, Intervenors would retroactively and unexpectedly have their most recent votes for state supreme court justice erased. By choosing the wait-and-see approach, Judge Griffin seeks relief that would prejudice the voting rights of thousands of ordinary voters like Intervenors. *See King v. Whitmer*, 505 F. Supp. 3d 720, 732 (E.D. Mich. 2020) ("Plaintiffs' delay prejudices [the] Defendants . . . This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified."). The State Board will also be prejudiced by Judge Griffin's belated protests, which would force the Board to disenfranchise lawful voters after they have cast their ballots, violate a host of laws, and fail to carry out its nondiscretionary duty to timely certify the election. *See* N.C. Gen. Stat. § 163-22(a); (h).

Laches also bars Judge Griffin's claims under Circuit precedent. In *Hendon*, the Fourth Circuit declined to grant relief because the plaintiff, who like Judge Griffin narrowly lost his election, failed to challenge the constitutionality of the decades-old election procedures in question until after the election had concluded. 710 F.2d at 182. District courts within the Fourth Circuit have followed this precedent. *See Waldrep v. Gaston Cnty. Bd. of Elections*, 575 F. Supp. 759, 760 (W.D.N.C. 1983) (denying relief to a losing candidate who filed a lawsuit challenging longstanding practice of counting certain votes because he made no showing that he was "unable" to bring the challenge before the election); *Marcellus v. Va. State Bd. of Elections*, No. 3:15CV481, 2015 WL 5285819, at *6 (E.D. Va. Sept. 9, 2015) (denying preliminary injunction to change ballot format based on laches because candidate waited until months after their nomination to challenge ballot format they were already aware of).

11

The same outcome is required here. Because Judge Griffin challenges rules that were in place well before the 2024 general election, he was required to assert them prior to the election. And it is indisputable that Judge Griffin's belated petition substantially prejudices Defendants and all North Carolina voters who cast their ballots in reliance on the state's longstanding election rules and practices. His unreasonable delay in bringing these challenges alone precludes relief. Holding otherwise would "encourage sandbagging on the part of wily plaintiffs." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988) (citing *Hendon*, 710 F.2d at 182).

## II. Judge Griffin has not demonstrated a likelihood of success on the merits.

Judge Griffin is unlikely to succeed on the merits of his petition. Not only does the relief he seeks violate the U.S. Constitution's guarantees of due process, equal protection, and the right to vote, it is also barred by the NVRA and the Materiality Provision of the CRA. Nor does Judge Griffin ever show that any individual voter was ineligible to vote. Because he plainly cannot satisfy this first and most important factor, the Court should deny the motion.

### A. Judge Griffin seeks relief that would violate the constitutional rights of voters.

#### 1. Substantive Due Process

This past fall, the challenged voters cast their ballots under longstanding rules and with settled expectations about how to vote, Intervenors included. Yet Judge Griffin now seeks to disenfranchise them after the election has passed based on a novel misreading of North Carolina law. But substantive due process prohibits the post-election disenfranchisement of voters who reasonably relied on established voting procedures to exercise their most "fundamental political right." *United States v. Anderson*, 481 F.2d 685, 699 (4th Cir. 1973), *aff'd,* 417 U.S. 211 (1974). This doctrine was first clearly articulated in a factually analogous case, where the First Circuit found it was unconstitutional to discard votes after an election was over where the plaintiff argued they were cast in accordance with purportedly unlawful procedures that were established prior to

12

the election and reasonably relied upon by voters. *See Griffin v. Burns*, 570 F.2d 1065, 1067, 1074 (1st Cir. 1978). In that case, election officials distributed absentee ballots to those who requested them in a primary election for a city council in Rhode Island. *Id.* at 1067. A losing primary candidate subsequently challenged the validity of these ballots on the theory that Rhode Island law did not permit absentee voting in primary elections, notwithstanding years of practice to the contrary. *See id.* at 1067–68. After a divided state supreme court agreed with the losing candidate's interpretation of state law and invalidated the ballots, several individual voters sued in federal court to enjoin the invalidation of their ballots. *See id.* at 1068.

The First Circuit ruled in favor of the voters, finding that "Rhode Island could not, constitutionally, invalidate the absentee and shut-in ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person." *Id.* at 1074. The Court recognized that while ballots could sometimes be invalidated after an election, such as in cases of fraud, doing so where voters simply followed the rules presented to them would be a "fundamental unfairness," resulting in a "flawed [electoral] process." *Id.* at 1076–77. As here, because voters "were doing no more than following the instructions of the officials charged with running the election," it was unreasonable to expect individual voters to "at their peril, somehow . . . foresee" a future interpretation of state law that would invalidate their ballots after the fact. *Id.* at 1075–76. To disenfranchise law-abiding, good faith voters in such circumstances would "present[] a due process violation." *Id.* at 1078.

Adopting the same reasoning of the court in *Griffin*, several other courts of appeals have since agreed that due process prohibits rejecting ballots where "state actions . . . induce[d] voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (citing *Griffin*, 570 F.2d at 1074, 1078–79); *see also Hoblock v. Albany Cnty. Bd. of Elections*, 422

F.3d 77, 98 (2d Cir. 2005) (citing *Griffin*, 570 F.2d at 1077) (affirming order to enjoin officials from tossing out ballots cast by voters mistakenly sent absentee ballots). And the Fourth Circuit has made clear that the principles set forth in *Griffin* are "settled" law within this Circuit. *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077).

Distilling *Griffin* and its progeny, the Ninth Circuit has explained that a substantive due process violation occurs "if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998) (further explaining *Griffin*'s concern with "the massive *ex post* disenfranchisement" who would have no reason to suspect any infirmity with their vote), *as amended on denial of reh'g and reh'g en banc* (June 23, 1998). This case satisfies both elements to a tee.

Start with the HAVA Challenge. Intervenors, like thousands of other voters, had no reason to foresee that their registrations would be called into doubt after the election. Webster-Durham ¶¶ 6–8; Smith ¶¶ 5–7; Anderson ¶¶ 5–7. Indeed, some of these voters have relied upon their existing registrations, long accepted by election officials, to vote for *decades* across *dozens* of elections. *E.g.*, Smith ¶ 4. And many others have been registered since *before* any requirement existed to provide the information that Judge Griffin insists is missing from their registrations. Dworkin ¶ 8. Yet Judge Griffin now seeks to retroactively disenfranchise them *en masse*.

The same goes for voters subject to the Overseas Voters and UOCAVA ID Challenges. As to the former, North Carolina has permitted these voters to cast ballots under UMOVA for the past 13 years—nearly twice as long as the "long-standing practice" at issue in *Griffin*. *Compare* NCSBE Order at 31 (App. 68), *with Griffin*, 570 F.2d at 1075, 1079. These voters had no reason

14

to think that, after such sustained and unchallenged practice under the plain text of UMOVA, their ballots would suddenly be called into doubt. *See* Mellman ¶¶ 12–13. Similarly, it is undisputed that voters subject to the UOCAVA ID Challenge voted in compliance with procedures that have been in place since at least 2020. 8 N.C. Admin. Code 17.0109(d) (eff. Jan. 1, 2020) (exempting "covered voter[s]" casting ballots "pursuant to G.S. 163, Article 21A" from photo ID requirements). It would be a gross injustice to punish these voters—many of them servicemembers—for "state actions" that "induce[d]" them to, in Judge Griffin's misguided view, "miscast their votes." *Husted*, 696 F.3d at 597.

In sum, the Constitution's substantive due process protections prohibit Judge Griffin's after-the-fact effort to disenfranchise voters who followed the rules everyone reasonably believed governed the 2024 election.

### 2.     Procedural Due Process

Judge Griffin's petition, if successful, would also violate procedural due process. A due process analysis requires weighing "(1) [voters'] liberty interest; (2) the risk of an erroneous deprivation of that interest under current procedures; and (3) the government's interest and burden of providing any additional procedure that would be required." *United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (citation omitted).[3]

---

[3] There is some disagreement as to what standard governs procedural due process claims in the election context. *Compare Democracy N.C.*, 476 F. Supp. 3d at 226 (applying *Eldridge*), *with Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 666 (M.D.N.C. 2024) (applying the *Anderson-Burdick* standard). Intervenors urge application of the *Eldridge* standard here because this case is more analogous to *Democracy N.C.*, in that voters had no opportunity to be heard before their possible

None of the more than 60,000 voters targeted by Judge Griffin's challenges received adequate notice because Judge Griffin failed to "serve copies of all filings on every person with a direct stake in the outcome of this protest," including "all such voters" challenged. 8 N.C. Admin. Code 2.0111. As a result, the voters challenged by Judge Griffin were effectively deprived of any meaningful opportunity to be heard before the local boards of election and the State Board. Discarding any of these challenged votes would unconstitutionally deprive these voters of their liberty interest in having their votes counted. *Democracy N.C.*, 476 F. Supp. 3d at 227–28 (holding the "protected liberty interest" in the counting of votes is deprived when a ballot is rejected without giving the voter "notice or an opportunity to be heard").

Judge Griffin's insistence that he provided voters with adequate notice rings hollow. None of the steps he took—a postcard addressed to the voter or "current resident" with a QR code that, (if a voter was able to access it) led to the North Carolina Republican Party website containing over 300 links to various protest filings—were sufficient to provide actual, or even constructive, notice to voters that their eligibility was being challenged. *Supra* Background § II. In fact, Judge Griffin's paltry effort to notify voters of his challenges stated only that a voter's vote "may be affected" by "one or more protests" without any further detail, putting the burden on *voters* to determine—weeks after they cast their ballots—whether and how their votes are being challenged. *Id.* Intervenors' experiences illustrate the insufficiency of Judge Griffin's meager effort—none recall receiving a postcard and, even if they had, not one had the technology or ability to use the QR code provided. Webster-Durham ¶¶ 8, 9; Smith ¶¶ 7, 8; Anderson ¶¶ 7, 8. They ultimately

---

disenfranchisement. Regardless, Judge Griffin's protests cannot survive scrutiny under either standard. *See Voto Latino*, 712 F. Supp. 3d at 652–53 (enjoining deficient notice provision under *Anderson-Burdick* standard); *see also infra* Argument § II.A.3.

16

only learned of their possible disenfranchisement through the Alliance. Webster-Durham ¶ 8; Smith ¶ 7; Anderson ¶ 7. Undoubtedly, countless other voters remain unaware that Judge Griffin has placed their votes on the veritable chopping block.

Courts have rejected similarly lax efforts to provide notice as contrary to procedural due process. In *Voto Latino v. Hirsch*, plaintiffs challenged North Carolina's same day registration address verification process, which called for removing the applicant's ballot from the count if a single-card address verification is returned as undeliverable. 712 F. Supp. 3d at 652–53. Following an analysis of voting-related due process challenges across the country, the court struck down the verification process, which would result in "the removal of a cast ballot without any notice or possibility of cure" and imposed "a substantial burden" on voters. *Id.* at 670–73, 678–79 (applying *Anderson-Burdick* test). So too here—voters like Intervenors never received notice their ballot was being challenged and stand to be disenfranchised through no fault of their own. The threat of mass rejection of ballots without giving voters adequate notice or an opportunity to be heard flies in the face of the Constitution's due process protections and should be rejected. *See id.* at 667, 670 (holding plaintiffs were likely to prevail on a challenge to the adequacy of notice afforded to certain same-day registrants); *see also Democracy N.C.*, 476 F. Supp. 3d at 225–29 (applying *Eldridge* and finding plaintiffs likely to succeed on procedural due process claim where state did not afford mail-in absentee voters notice or opportunity to cure ballot defects).

### 3. Right to Vote

Any post-election changes to the state's election laws and practices that result in the disenfranchisement of tens of thousands of voters would also severely burden the right to vote in violation of the First and Fourteenth Amendments. Under the applicable *Anderson-Burdick* test the Court must "weigh[] the severity of the burden the challenged [practice] imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian*

17

*Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (first citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); then citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Where a challenged process severely burdens voters' rights, it can only survive if it is narrowly drawn to advance a compelling state interest. *See Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019).

It is unquestionable that Judge Griffin's attempt to discard tens of thousands of ballots severely burdens each of the affected voters' fundamental right to the franchise. Rejecting these voters' ballots after they have already been cast in accordance with law and practice would not just substantially burden their right to vote—it would revoke it entirely. On the other side of the equation, there is no State interest, let alone a compelling one, in disenfranchising thousands of voters after they have already voted. Consider Judge Griffin's HAVA challenge. Not only has Judge Griffin failed to sufficiently demonstrate these voters have actually failed to provide any required registration information, *see supra* Background § V; *infra* Argument § II.B.2., but these registrations have been accepted by officials for years, sometimes even decades.

Moreover, there is no reason to believe any one of these voters was ineligible to vote. To be an eligible voter, North Carolina requires only that an individual is a United States citizen who is over the age of 18 and meets the state's residency requirement. *See* N.C. Const. art. VI, §§ 1, 2; N.C. Gen. Stat. § 163-55.[4] As for his HAVA Challenge, Judge Griffin does not provide any evidence—or even suggest—that any of the more than 60,000 voters in question were not eligible to vote. Individual Intervenors, for instance, are all citizens over the age of 18 and have resided in North Carolina for years. Webster-Durham ¶¶ 1, 2; Smith ¶¶ 1, 2; Anderson ¶¶ 1, 2. Similarly, Judge Griffin does not claim that any of the voters subject to his UOCAVA ID Challenge is not a

---

[4] While there are some bases for disqualification from voting, like certain felonies, none are relevant to the challenges at issue here.

qualified voter. And Judge Griffin's disagreement with UMOVA cannot override the General Assembly's determination that dependents and children of North Carolinians living overseas have the right to vote in the State.

Accordingly, Judge Griffin's belated desire to change the rules governing an election he lost is not the sort of "compelling state interest" that warrants disenfranchising thousands of unassuming North Carolinians. *Alcorn*, 826 F.3d at 717.[5]

### 4.    Equal Protection

Judge Griffin's protests would also require the State Board to violate the Equal Protection Clause of the U.S. Constitution. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. That right extends beyond just "initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). Once a state "grant[s] the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05.

In North Carolina, all voters are subject to the same eligibility requirements and registration rules. N.C. Gen. Stat. §§ 163-55; 163-57. Once an applicant has been deemed qualified to vote and had their registration accepted, *id.* § 163-82.7, the voter may choose how to cast their ballot, whether that is by voting in person before election day, in person on election day, by mail domestically, or by mail overseas. *Id.* § 163-166.25 (in-person voting); *id.* § 163-166.40 (early voting); *id.* § 163-226 (absentee voting); *id.* § 163-258.3 (military and overseas voting). Once

---

[5] Judge Griffin's relief fails scrutiny even under a more modest standard of review. Judge Griffin has identified no state interest that warrants the after-the-fact disenfranchisement of voters who followed all established voting rules.

19

voters comply with the rules governing their chosen method of voting and ballots have been cast, North Carolina law affords equal weight to all ballots and all voters, regardless of voting method.

But Judge Griffin's HAVA Challenge seeks to disenfranchise only voters who cast ballots by mail or early in-person, while election day voters are safe. *E.g.*, Affs. of Ryan Bonifay ¶¶ 11–17 (App. 378–79, 438–39, 453–54, 490–91), ECF No. 1-5. In other words, Judge Griffin's HAVA Challenge treats voters—all of whom have now cast ballots and are therefore identically situated—differently based solely on the method of voting they happened to choose, violating the "fundamental" principle that "equal weight" should be "accorded to each vote and [] equal dignity owed to each voter." *Bush*, 531 U.S. at 104; *see also Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The Court has consistently recognized that all qualified voters have a constitutionally protected right 'to cast their ballots and have them counted,'" as "'the right to have one's vote counted' has the same dignity as 'the right to put a ballot in a box.'" (cleaned up)). The result is that voters like Webster-Durham, Smith, and Anderson will have their votes thrown out simply because they happened to vote early in-person. *See* Webster-Durham ¶ 7; Smith ¶ 6; Anderson ¶ 6. Had they voted a couple of days later on election day, their ballots would be safe and unchallenged. Judge Griffin's selective challenges of early and absentee voters thus violate the Equal Protection Clause because North Carolina has "grant[ed] the right to vote on equal terms" to all voters, regardless of their chosen method of voting and it "may not, by later arbitrary and disparate treatment, value" the votes of election day voters "over that of [others]." *Bush*, 531 U.S. at 104–05.

The "constitutional concern" about equal protection is particularly acute in circumstances like this one implicating post-election "discretion in areas relevant to the . . . counting of ballots." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011) (citations omitted). This is because the initial count of the ballots is already known. *Id.* (noting that it is "particularly

'necessary to protect the fundamental right of each voter' to have his or her vote count on equal terms" during post-election review of provisional ballots (citation omitted)). Here, the ballots at issue have been counted and repeatedly recounted. Judge Griffin has fallen short each time. To change this result, Judge Griffin seeks to violate the core constitutional principle that "equal weight" must be "accorded to each vote" and "equal dignity" must be "owed to each voter." *Bush*, 531 U.S. at 104.

### B. Judge Griffin's requested relief violates federal election and civil rights statutes.

#### 1. National Voter Registration Act

The NVRA bars Judge Griffin's HAVA Challenge for two distinct reasons. *First*, the NVRA prohibits efforts to systematically remove voters from the voter rolls within close proximity of an election. *See* 52 U.S.C. § 20507(c)(2)(A). Systematic removals under the NVRA include attempts to remove voters *en masse* without any "individualized inquiry" into a voter's qualifications, as Judge Griffin seeks to do here. *See N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018). Judge Griffin's contention—that he does not seek to remove voters from the rolls and instead only wants to discard their ballots, Notice of Removal Ex. A, Pet. for Writ of Prohibition at 29, ECF No. 1-4—is a "distinction without a difference," *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021) (rejecting this argument). After all, the entire purpose of the NVRA is to ensure that the "right to exercise the[] *franchise* … not be sacrificed." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (emphasis added); *see also* 52 U.S.C. § 20501(a)(1)–(2); (b)(2). That purpose is entirely defeated if a voter's ballot can be tossed out after an election based on perceived registration errors, even while nominally leaving the voter on the registration rolls. Simply put, Judge Griffin cannot make an

21

end-run around the NVRA by seeking to divorce registration from voting: "Registration is indivisible from election." *Ass'n of Cmty. Orgs. For Reford Now v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (explaining states cannot circumvent NVRA protections "by separating registration from voting").

Moreover, Judge Griffin's challenges would indisputably be barred if raised during the 90-day quiet period leading up to an election, 52 U.S.C. § 20507(c)(2)(A), which exists to ensure that voters are not "removed [from the rolls] days or weeks before Election Day" because they "will likely not be able to correct" any erroneous removals "in time to vote." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). That congressional protection would be gutted if losing candidates could simply convert pre-election registration challenges into post-election ballot challenges. *Cf. Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (explaining state law is preempted to the extent it serves as an obstacle to the accomplishment of federal legislation). Ultimately, the result to voters, including Intervenors and their constituents is the same—they will not be able to participate in the franchise and have their vote count in the 2024 general election.

*Second*, the NVRA prohibits non-uniform and discriminatory systematic removals of voters from the voter rolls. 52 U.S.C. § 20507(a)(3); N.C. Gen. Stat. § 163-82.14(a1). Because, as explained, Judge Griffin's HAVA challenge targets only voters who voted by mail or in person during early voting, it discriminates against voters based on their voting method. *Cf. Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (concluding an Ohio law that required pre-registration, training, and affirmation requirements for only compensated voter registration workers violated NVRA's uniform and non-discriminatory provision because it imposed barriers to the registration process but only for certain groups of individuals).

Judge Griffin seeks to avoid the NVRA's strictures altogether by emphasizing that he seeks state, rather than federal, office. Pet. for Writ of Prohibition at 11. But he ignores that, under state law, North Carolina can only have a "single system for storing and managing the official list of registered voters in the State," and that system "shall serve as the official voter registration list for the conduct of *all elections* in the State." N.C. Gen. Stat. § 163-82.11(a) (emphasis added). In the maintenance of this singular system, North Carolina is "bound by the provisions of the NVRA for the registrants at issue," *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024), regardless of whether disenfranchisement is sought for an election for federal or state office.

### 2. Civil Rights Act

Judge Griffin's HAVA challenge, if granted, would also violate the Civil Rights Act of 1964. Under the CRA's Materiality Provision, "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an *error or omission* on any record or paper relating to any *application, registration*, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Here, the purportedly missing driver's license and social security number information is immaterial in this context— North Carolina long ago deemed each of the challenged voters were qualified to vote and each voter complied with the necessary identification requirements to cast a ballot. *E.g.*, Webster-Durham ¶¶ 4–7; Smith ¶¶ 4–6; Anderson ¶¶ 4–6.

Judge Griffin argues that the Materiality Provision is irrelevant here because HAVA requires voters to provide a driver's license number or social security information. *See* Pet. for Writ of Prohibition at 55. But he ignores that each of the challenged voters had their voter registration applications approved by North Carolina election officials, meaning those officials "ma[d]e a tentative determination that the applicant is qualified to vote at the address given" and

23

later confirmed the applicant's qualification after verifying their address. *See* N.C. Gen. Stat. § 163-82.7 (setting forth requirements for determining an applicant's qualification to vote). Moreover, the vast majority of these challenged voters likely presented a driver's license when casting their ballots to satisfy North Carolina's voter ID requirements, rendering the alleged lack of such information even more immaterial. *Id.* § 163-166.16; *see also* Webster-Durham ¶ 7; Smith ¶ 6; Anderson ¶ 6. Simply put, Judge Griffin fails to explain why voters should have their right to vote denied for omitting information that North Carolina election officials plainly did not need to conclusively determine that the voter was qualified to vote. *See, e.g.*, *In re Ga. Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *8 (N.D. Ga. Aug. 18, 2023) (concluding the rejection of ballots based on whether the voter provided their date of birth on absentee ballots was a violation of the Materiality Provision because such information is not material to determining the voter's qualifications under Georgia law).

Moreover, Judge Griffin has not even demonstrated a violation of HAVA or its implementing state analog. While Judge Griffin asserts that the over 60,000 voters "ha[ve] never provided the statutorily required information to become lawful voter registrants," Pet. for Writ of Prohibition at 6, his only support is the absence of this information from a file the State Board provided to Judge Griffin that appears to be a list of registered voters in the state. *See, e.g.*, Aff. of Ryan Bonifay ¶¶ 11–14 (App. 1755). Judge Griffin has not shown that these voters never provided the purportedly required information. And there are many potential explanations for why a voter's registration file may be incomplete that does not stem from the voter failing to provide the information when they registered. For instance, data entry or transcription errors may lead to an applicant's driver's license or social security number not being saved to a registration file, even where voters provided them. *See* NCSBE Order at 24–25 n.16 (App. 61–62). Others may have

supplied the requisite numbers in a previous application under a different registration record than the one challenged, or may have registered to vote well before HAVA even asked applicants to provide such information. *See id.* And many other voters likely also provided this purportedly missing information when they voted, like Intervenors who each supplied their driver's licenses to poll workers. *See* Webster-Durham ¶ 7; Smith ¶ 6; Anderson ¶ 6. In short, Judge Griffin's HAVA challenge also fails on its face because Judge Griffin has not sufficiently shown that any of the challenged voters actually failed to provide the allegedly required information.

## III. All equitable factors weigh heavily against granting the extraordinary relief Judge Griffin seeks.

In addition to being unlikely to succeed on the merits of his claims, Judge Griffin cannot show that he will be irreparably harmed by the certification of an election he lost nearly two months ago. His vague allusions to election integrity, *see e.g.*, Br. at 8–9, are sharply outweighed by the foundational rights of the voters he seeks to disenfranchise. To the extent they can be fairly characterized as "interests" at all, they are entirely self-inflicted; his disputes with existing law could have been addressed months ago had Judge Griffin, a sophisticated party and jurist, not tied the filing of his lawsuit to the outcome of his election. No equitable consideration entitles Judge Griffin to override the will of North Carolina's voters.

### A. Judge Griffin will not be irreparably harmed by denying the injunction.

"A [party] seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Because Judge Griffin has not shown a likelihood of success on the merits, his assertion that he will suffer irreparable harm is unfounded. But even if the Court concludes that Judge Griffin's protests are likely to succeed, he is not entitled to a preliminary injunction because the harm he complains of does not constitute irreparable injury. Moreover, granting an injunction

here would upend the status quo and disrupt the state's election apparatus. The Court should decline to do so, especially in light of the weaknesses of Judge Griffin's claims.

Judge Griffin's theory of irreparable harm boils down to his mistaken belief that "without judicial review, [he] will lose the election." Br. at 8. But Judge Griffin *already* lost the election at the ballot box, and in any event, it is well established that political candidates have no right to win elected office. *See Snowden v. Hughes*, 321 U.S. 1, 7 (1944); *see also Hole v. N.C. Bd. of Elections*, 112 F. Supp. 2d 475, 478 (M.D.N.C. 2000) (candidate's electoral loss "does not constitute the type of irreparable harm envisioned by a consideration of a motion for preliminary injunction"). While his "loss in an election" is surely "a disappointment" for Judge Griffin, it "cannot be considered as irreparable harm for preliminary injunction analysis." *Id.* at 478–79. Rather, it is the voters who will be irreparably harmed should their votes—cast in reliance of existing registrations and longstanding election rules—be tossed aside after the administration of a lawful election. *See Griffin*, 570 F.2d at 1067.

Contrary to Judge Griffin's assertions otherwise, his extraordinary request seeks to disrupt the status quo, not maintain it. In election cases, it is "the state's action" that "establishes the status quo." *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (en banc); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (defining status quo as "the last uncontested status between the parties which preceded the controversy") (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). Here, the status quo is that long-established procedures of North Carolina election law were used to conduct an election, which will now be certified in the normal course pursuant to state law. Br. at 7 (acknowledging that "[s]tate law" "requires the Board to certify election results 13 days after the Board's final decision on an election protest."). Disrupting these established processes will upend existing state law, run counter to well-

26

established principles preventing election officials from tossing out ballots cast after election day, and prevent North Carolina from enfranchising its citizens.

Judge Griffin's inexcusable delay in seeking relief also weighs against any finding of irreparable harm. "Given the extraordinary nature" of a preliminary injunction, relief "is not warranted" here because Judge Griffin "has not shown that he availed himself of opportunities to avoid the injuries of which he now complains." *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (cleaned up); *supra* Argument § I.

**B. The balance of equities weighs decidedly against Judge Griffin.**

The balance of equities and public interest cut sharply against granting a preliminary injunction. Far beyond just burdening the parties to this lawsuit, Judge Griffin's requests would wreak havoc on North Carolina's elections processes and violate the fundamental constitutional and statutory rights of thousands of North Carolina voters, including Intervenors. "The public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C.*, 769 F.3d at 247 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)); *id.* at 244 (observing that "even one disenfranchised voter—let alone several thousand—is too many"). Judge Griffin seeks exactly the opposite—disenfranchisement of tens of thousands North Carolinians. A chorus of courts has refused to issue injunctions under similar circumstances. *See, e.g.*, *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 Fed. Appx. 377, 390 (3d Cir. 2020) (rejecting request to enjoin certification and disenfranchise voters); *Wood*, 501 F. Supp. 3d at 1331 (denying request to enjoin Georgia from certifying election results because "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways"). This Court should do the same and reject Judge Griffin's request to "prohibit the counting of" thousands of votes. Br. at 3.

27

The balance of the equities tips further against Judge Griffin in light of his unjustified delay in bringing suit. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction and noting that a party's "delay is [] quite relevant to balancing the parties' potential harms"). As explained, Judge Griffin's challenges could have been brought and resolved well in advance of the 2024 general election without a risk of after-the-fact disenfranchisement of thousands of voters. *See supra* Argument § I.

Finally, Judge Griffin's reliance on a smattering of inapposite cases does not support his request to disenfranchise tens of thousands of voters. *See* Br. at 9 (citing *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006); *Bush*, 531 U.S. at 105; *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *James v. Bartlett*, 359 N.C. 260, 270, 607 S.E.2d 638 (2005)). None of these cases supports enjoining the certification of an election that was run on valid and long-standing voting rules or retroactively disenfranchising thousands of voters. Any supposed "cloud of illegitimacy" over this election, Br. at 9, is solely due to Judge Griffin's post-election barrage of misbegotten legal challenges.

## IV.    This case belongs in federal court.

Lastly, Intervenors briefly address why this matter belongs in federal court. *See* Dec. 26, 2024 Text Order. To start, Judge Griffin's suit satisfies the requirements for federal question jurisdiction under 28 U.S.C. § 1331 because it presents federal issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *RNC*, 120 F.4th at 400 (quoting *Gunn v. Minton*, 568 U.S. 251, 257 (2013)).

First, there is no doubt that questions of federal law are "necessarily raised" here. The State Board found that various federal authorities, both constitutional and statutory, barred Judge Griffin's protests. *See* NCSBE Order at 26–27, 38 (App. 63–64, 75). To obtain relief, Judge Griffin

28

will need to prevail on those questions of federal law. To wit, Judge Griffin explicitly seeks a judicial declaration that "[a]ll arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin [be] rejected." Pet. for Writ of Prohibition at 70; *see also id.* at 71 (further asking for a declaration rejecting the State Board's federal constitutional findings). In other words, any effort by Judge Griffin to reverse the State Board's rejection of his protests will "necessarily require application of [various federal statutes]," as well as the U.S. Constitution, "to the facts of [his] case." *RNC*, 120 F.4th at 400 (quoting this Court's decision); *see also Gunn*, 568 U.S. at 259; Br. at 11 (arguing the State Board "erroneously applied state *and federal law* to deny Judge Griffin's protests") (emphasis added). Second, the application of these various federal laws to the facts of this case is "actually disputed," as shown by the competing briefing on these issues before the State Board and here. *See generally* NCSBE Order; Pet. For Writ of Prohibition. Third, the dispute over federal law here is clearly substantial. In *RNC*, the Fourth Circuit "readily agree[d]" with this Court that "[t]here is a substantial federal interest in protecting the right to vote and in ensuring the integrity of elections." 120 F.4th at 404 (quoting this Court's opinion). That conclusion applies with equal force here.

Finally, nothing about this case threatens to disrupt the federal-state balance approved by Congress. As the Fourth Circuit recently held in a case raising related questions under HAVA and the NVRA, the "federal statutory questions" at issue here are properly heard by federal district courts. *RNC*, 120 F.4th at 405. And, as in that earlier case, the "viability" of Judge Griffin's state law arguments "depend [upon] a court's adopting [his] preferred reading of [several] federal statutes" that the State Board found precluded relief for Judge Griffin here. *Id.* To be sure, run of the mill disputes over state elected offices may not typically raise significant questions of federal law. *Cf. Hutchinson v. Miller*, 797 F.2d 1279, 1280 (4th Cir. 1986). But there is nothing typical

about the extraordinarily broad and punitive relief Judge Griffin seeks—the widescale disenfranchisement of tens of thousands of voters, notwithstanding numerous guarantees in federal statutory and constitutional law. The unprecedented and extreme nature of Judge Griffin's challenges means that maintaining federal jurisdiction here poses little risk of "disrupting the federal-state balance approved by Congress," *Gunn*, 568 U.S. at 258, or bringing a "flood of state law claims into federal court," *Bauer v. Elrich*, 8 F.4th 291, 298 (4th Cir. 2021).

Removal is further proper under 28 U.S.C. § 1443(2). As the above discussion shows, Judge Griffin seeks relief that imperils the federal constitutional and statutory rights of thousands of North Carolina voters, including Intervenors Webster-Durham, Smith, and Anderson, as well as the members and constituents of the Alliance and VoteVets. This includes relief that would compel the State Board to disenfranchise voters in violation of "law[s] providing for equal rights." 28 U.S.C. § 1443(2) (permitting removal in such cases). As the Fourth Circuit held just two months ago, the NVRA and CRA are plainly laws that satisfy § 1443's definition of a law providing for equal rights. *See RNC*, 120 F.4th at 405; *see also Wasserberg v. N.C. State Bd. of Elections*, Case No. 5:24-cv-578-M (E.D.N.C. Oct. 31, 2024), ECF No. 38 (denying motion to remand where CRA barred State Board from granting relief on state law claim). Each of those laws similarly bars the State Board from granting Judge Griffin the relief he seeks, and thus serves as a proper basis for removal under § 1443(2). *See supra* Argument § II.

## CONCLUSION

For the reasons above, Judge Griffin's motion for a preliminary injunction should be denied.

Dated: January 1, 2025          Respectfully submitted,

/s/ Narendra K. Ghosh
Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

Lalitha D. Madduri**
Christopher D. Dodge*
Tina Meng Morrison*
Makeba A.K. Rutahindurwa**
James J. Pinchak**
Julie Zuckerbrod*
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
mrutahindurwa@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

*Participating via Notice of Special Appearance
**Notice of Special Appearance Forthcoming*

*Counsel for Intervenor-Defendants the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

31