IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00724-M

JEFFERSON GRIFFIN,

    Plaintiff,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

    Defendant,

ALLISON RIGGS,

    Intervenor-Defendant, and

NORTH CAROLINA ALLIANCE
FOR RETIRED AMERICANS et al.,

    Intervenor-Defendants.

ORDER

This matter comes before the court on Plaintiff Jefferson Griffin's ("Griffin") motion for preliminary injunction [DE 31]. In this removed state action, a sitting state court judge seeks a writ of prohibition (a form of judicial relief authorized by the state constitution) from the state supreme court that would enjoin the state board of elections from counting votes for a state election contest that were cast by voters in a manner allegedly inconsistent with state law. Should a federal tribunal resolve such a dispute? This court, with due regard for state sovereignty and the independence of states to decide matters of substantial public concern, thinks not. For that reason, the court abstains from deciding Griffin's motion under *Burford*, *Louisiana Power*, and their progeny and remands this matter to North Carolina's Supreme Court. *See Burford v. Sun Oil Co.*,

1

319 U.S. 315, 332 (1943); *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 29 (1959).

## I. Introduction and Procedural History

Griffin is a Judge on North Carolina's Court of Appeals (the state's intermediate appellate court) and candidate for Seat 6 on North Carolina's Supreme Court (the state's court of last resort). DE 1-4 at 16.[1] Griffin ran in the 2024 general election as a Republican against Allison Riggs ("Riggs"), the Democratic candidate who is currently a sitting Justice on the North Carolina Supreme Court. *Id.* at 17. After a full count of votes, machine recount, and partial hand recount, the canvassed results show Riggs leading Griffin by 734 votes, but Defendant North Carolina State Board of Elections (the "State Board") has not yet certified the results. *See* DE 32 at 3; DE 39 at 7.

Griffin indicates that he "became aware of numerous irregularities with ballots cast during the election." DE 32 at 3. As a result, he "filed election protests" with county boards of election "in each of North Carolina's 100 counties." DE 1-4 at 18. Three protests are the subject of this action:

1. First, Griffin challenges the votes of over 60,000 individuals who, at some point over the past 20 years, registered to vote in North Carolina without providing either their driver's license numbers or the last four digits of their social security numbers. *Id.* at 19. According to Griffin, this past registration error contravenes state law and renders illegitimate the resulting votes from these individuals. *See id.* (citing N.C.G.S. §§ 163-82.1 & 163-82.4 for proposition that "unless someone is lawfully registered to vote, he cannot vote").

---

[1] All pin cites to materials in the record will refer to the page numbers that appear in the footer appended to those materials upon their docketing in the CM/ECF system, and not to any internal pagination.

2

2. Second, Griffin challenges absentee ballots cast by 267 individuals who admittedly have never resided in North Carolina (or anywhere in the United States). *Id.* at 20. Notwithstanding state law granting this group of individuals (whose parents are either uniformed-service or overseas voters) the right to vote in North Carolina, *see* N.C.G.S. § 163-258.2(e), Griffin asserts that counting their votes violates the North Carolina Constitution, DE 1-4 at 19-20.

3. Third, Griffin challenges the votes of approximately 5,500 overseas absentee voters who did not provide copies of their photo identification with their absentee ballots, which he contends violates state law. *Id.* at 20-21; *see also* N.C.G.S. § 163-230.1.

The State Board subsequently assumed jurisdiction over Griffin's three protests. *Id.* at 21. After a public hearing on December 11, 2024, the State Board issued a written decision that rejected Griffin's challenges on various grounds:

1. The State Board concluded that Griffin failed to properly serve potentially affected voters because, instead of serving them with copies of his protests, he mailed them postcards with the message that their "vote may be affected by one or more protests" and a QR code that linked to a website containing the hundreds of protests ongoing in North Carolina, at which point the voter would have to sift through spreadsheets of names attached to each protest to determine whether their vote had been challenged and in which protest. DE 1-5 at 46-50. The State Board found that this method of service violated a rule that it had promulgated as well as the procedural due process rights of voters. *Id.* at 50-54.

2. The State Board found that even if it credited Griffin's state law arguments in connection with his first challenge, which targets the 60,000 voters who had allegedly

3

registered to vote without providing their driver's license numbers or the last four digits of their social security numbers, granting him relief by discarding that group of votes would violate the voters' substantive due process rights, state law, and federal statutory law, including the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). *Id.* at 60-67.

3. The State Board also rejected each of Griffin's challenges on its merits. *Id.* at 54-60, 69-79.

North Carolina law provides that a party aggrieved by a decision of the State Board "has the right to appeal the final decision to the Superior Court of Wake County within 10 days of the date of service" of the State Board's decision. N.C.G.S. § 163-182.14(b). "Unless an appealing party obtains a stay of the certification from the Superior Court of Wake County within 10 days after the date of service," the election results "shall issue." *Id.* Rather than follow the appeal process provided by state law, Griffin filed this action directly in the North Carolina Supreme Court, seeking a writ of prohibition that would enjoin "the State Board [] from counting unlawful ballots cast in the 2024 general election." DE 1-4 at 14.

In his petition for a writ of prohibition, Griffin addresses his three challenges on their merits, each of which entail alleged violations of either state election law or the state Constitution. *See id.* at 33-40, 44-45, 47-50, 53-59. Griffin next argues that the State Board and Riggs' invocation of various federal laws in defense to his challenges are inapposite. *Id.* at 40-46, 50-51, 59-60, 67-74. He also responds to the procedural defects raised by the State Board. *Id.* at 60-67.

Griffin seeks various forms of relief, including the discarding of votes from voters covered by each of his three challenges and declaratory relief rejecting various conclusions of the State Board. *Id.* at 83-84. He sought this relief directly from the North Carolina Supreme Court, rather

4

than file an appeal in the Superior Court of Wake County, because of his concern that the State Board would "try to strip [that court] of jurisdiction to decide this case by improperly removing it to federal court." *Id.* at 24. The day after Griffin filed his petition, the State Board removed it to this court. DE 1.

In its notice of removal, the State Board invokes this court's subject-matter jurisdiction under 28 U.S.C. § 1441(a), which permits removal of claims arising under federal law, and 28 U.S.C. § 1443(2), which authorizes removal when a party has been sued for refusing to act on the ground that performing the act would contravene federal civil rights law. *Id.* at 1-2. The day after the State Board removed this matter to federal court, Griffin filed a motion for temporary restraining order ("TRO"), which sought a court order prohibiting the certification of the results for Seat 6. DE 13; DE 14. This court denied Griffin's motion because the alleged harm he described was not so immediate that he required a TRO "before [the State Board could] be heard in opposition." Text Order dated December 20, 2024.

Riggs promptly sought intervention in this matter and, after denial of the TRO, so did the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (the "NCARA parties"). DE 7; DE 8; DE 24; DE 25. The court granted both motions for intervention. *See* Text Order dated December 26, 2024.

On December 23, Griffin filed the instant motion for preliminary injunction, along with a consent motion to expedite briefing on the preliminary injunction motion. DE 31; DE 33. The court granted the consent motion and ordered expedited briefing, and additionally ordered the State Board, in responding to Griffin's motion, to show cause why this matter should not be remanded to the North Carolina Supreme Court for lack of subject-matter jurisdiction. *See* Text Order dated

December 26, 2024. The court also offered Griffin the opportunity to respond to the State Board's arguments regarding subject-matter jurisdiction in his reply. *Id.*

All parties complied with the court's briefing schedule. DE 39; DE 40; DE 42; DE 47; DE 48; DE 49.[2] In addition, Former Senate Majority Leader Thomas Daschle, former House Majority Leader Richard Gephardt, and former Representatives Christopher Shays, Jim Greenwood, Robert Wexler, Wayne Gilchrest, and Steve Israel (the "Former Members of Congress") moved the court for leave to file an amicus brief, DE 37, as did the North Carolina League of Women Voters, DE 41. The court grants those motions for leave, has considered the respective briefs, and notes the extent to which they aided in the court's decisional process.

Unless this court (or another) issues an order enjoining the State Board from certifying the election for Seat 6, those results will issue on January 10, which will render moot Griffin's protests. *See* DE 39 at 2. Griffin's motion for preliminary injunction is fully briefed, the court has considered each filing, and this matter is ready for disposition.[3]

## II.    Legal Framework

This matter, which involves a state, not federal, election, involves potential practical implications but a crucial theoretical distinction, which has in turn led some of the parties (and amici) to at times conflate what precisely is at issue. In the context of a federal election, the States and Congress enjoy dual sovereignty. U.S. CONST. art 1 § 4, cl. 1. The "States have a major role to play in structuring and monitoring the [national] election process." *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They must "prescribe the time, place, and manner of

---

[2] In lieu of incorporating his arguments pertaining to subject-matter jurisdiction into his reply, DE 47, Griffin separately filed a motion to remand (and supporting memorandum), DE 48; DE 49. For practical purposes, the court considers these as one filing, and not a new motion to which the State Board must be offered an opportunity to respond, because the State Board has already briefed its position on subject-matter jurisdiction in response to the court's show cause order. DE 39.

[3] Considering the short timeline between now and certification, as well as the lack of factual disputes presented by this matter, the court finds that a hearing is not necessary.

electing Representatives and Senators" for the national Congress. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013). But this grant of authority to States for federal elections only goes "so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997).

Elections for state office are different because "the Constitution was also intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise." *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.). Put another way, "Article I, Section IV does not give Congress the power to directly regulate state voter registration procedures in state elections or state ballot issues." *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000). And "[a]bsent the invocation by Congress of its authority under the Fourteenth [or Fifteenth] Amendment[s]," the states retain "the power to fix the time, place, and manner of the election of [their own] officials." *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). Due respect for States' authority to set forth rules governing their own elections reflects the constitutional (and commonsense) principle that "[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution . . . the nature of their own machinery for filling local public offices." *Mitchell*, 400 U.S. at 125 (opinion of Black, J.).[4]

Pursuant to its authority under the Civil War Amendments, Congress has passed laws that apply in the context of *both* state and federal elections, including the Civil Rights Act and the Voting Rights Act. 52 U.S.C. § 10101; 52 U.S.C. § 10301. Congress has also enacted a series of

---

[4] Of course, state regulation of state and local elections remains subject to federal constitutional constraints. *E.g.*, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 215 (1986).

laws that govern *only* federal elections, notably here the NVRA and HAVA.  52 U.S.C. § 20501;

52 U.S.C. § 21081.  "The NVRA requires States to provide simplified systems for registering to

vote in *federal* elections, i.e., elections for federal officials, such as the President, congressional

Representatives, and United States Senators."  *Young v. Fordice*, 520 U.S. 273, 275 (1997)

(emphasis in original).  Likewise HAVA, which seeks to establish minimum standards of election

administration, "applies only to federal elections."  *Bay Cnty. Democratic Party v. Land*, 347 F.

Supp. 2d 404, 436 (E.D. Mich. 2004); *accord Broyles v. Texas*, 381 F. App'x 370, 373 n.1 (5th

Cir. 2010).

        After passage of HAVA, North Carolina's General Assembly enacted a series of laws to

implement HAVA and adopt equivalent requirements in the context of state and local elections.

*E.g.*, N.C.G.S. §§ 163-82.4, 162-82.11, & 163-166.12.  As a result, and as a practical matter,

"North Carolina has a unified registration system for both state and federal elections."  *Republican*

*Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024) ("*RNC*").

But that unified system is a choice that the people of North Carolina made through their elected

representatives; nothing in federal law compels North Carolina to adopt HAVA's procedures for

state and local elections.  *See Mitchell*, 400 U.S. at 125; *Dobrovolny*, 100 F. Supp. 2d at 1028.

Thus, to the extent North Carolina election law for state and local elections mirrors or parallels

federal law, that symmetry "is state-created, not federal."  *Crowley v. Nevada ex rel. Nevada Sec'y*

*of State*, 678 F.3d 730, 735 (9th Cir. 2012).

**III.    Analysis**

        a.   Subject-Matter Jurisdiction

        As the court previously explained in a recent election-related lawsuit, "[t]here exist two

possible paths to establishing subject matter jurisdiction in this action.  First, the claims could raise

8

a federal question under 28 U.S.C. § 1331, which would permit removal under 28 U.S.C. § 1441(a). Second, the action could implicate a federal law providing for equal rights in terms of racial equality, which would authorize removal under 28 U.S.C. § 1443(2)." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00547, 2024 WL 4523912, at *2 (E.D.N.C. Oct. 17, 2024), *rev'd and remanded*, 120 F.4th 390 (4th Cir. 2024). Extensive repetition of the relevant history of subject-matter jurisdiction is unnecessary here. *See id.* at *2-7.

       b.   Removal under 28 U.S.C. § 1441

This court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. If a plaintiff initiates a civil action "in a State court of which" a federal district court has "original jurisdiction," that action "may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Where a plaintiff's claims all arise under state law, those claims will only present a federal question over which a district court may maintain original jurisdiction "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 (1986); *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 13 (1983).

In assessing whether a plaintiff's claim necessarily raises an issue of federal law, the court follows the well-pleaded complaint rule: "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). In this context, *complaint* really means *claim*; a federal question is not

9

presented on the face of a complaint unless it is an "essential element[] of the plaintiff's—and only the plaintiff's—claim." *Capitol Broad. Co., Inc. v. City of Raleigh, N. Carolina*, 104 F.4th 536, 540 (4th Cir. 2024). In other words, "[i]t is *not* enough that federal law becomes relevant by virtue of a defense." *Burrell v. Bayer Corp.*, 918 F.3d 372, 381 (4th Cir. 2019) (emphasis in original) (internal quotation mark omitted). This is true even where a plaintiff "'goes beyond a statement of [his] cause of action and anticipates or replies to a probable defense,' even if that defense itself raises a federal question." *Capitol Broadcasting*, 104 F.4th at 539–40 (quoting *Gully v. First Nat. Bank*, 299 U.S. 109, 113 (1936)).

At the outset, the court finds that Griffin's petition in the North Carolina Supreme Court constitutes a "civil action" within the meaning of Section 1441. Review of dictionaries, both contemporaneous with passage of Section 1441 and more recent, reflect a capacious definition of the term: a civil action is a judicial proceeding in which a party seeks a decree to redress a private right. *E.g.*, *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) (concluding that "action" meant "any proceeding in a court of justice") (quoting Black's Law Dictionary 1488, 1603 (4th ed.1951) (internal ellipses omitted)); *In Re Teter*, 90 F.4th 493, 499 (6th Cir. 2024) (observing that civil action "is a generous term" and "encompass[es] the old categories of actions at law and suits in equity," i.e., "all types of actions other than criminal proceedings") (quoting Black's Law Dictionary (5th ed. 1979)); *Black v. Black*, No. 1:22-CV-03098, 2023 WL 3976422, at *3 (D. Colo. Apr. 5, 2023) (noting that a "civil action is simply a civil judicial proceeding") (quoting Black's Law Dictionary (11th ed. 2019) (cleaned up)).

Griffin's petition for a writ of prohibition squares with that definition: it is an original civil (not criminal) judicial proceeding through which he seeks to vindicate his private (not public) rights. The petition therefore qualifies as a civil action subject to removal under Section 1441.

*See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (holding that state court proceeding created by state law that entailed quasi-appellate review of administrative board decision was removable where claims in proceeding included federal constitutional challenge); *Casale v. Metro. Transp. Auth.*, No. 05-CV-4232, 2005 WL 3466405, at *7 (S.D.N.Y. Dec. 19, 2005) (explaining that "technicalities of local procedure, such as what an action or pleading is called, do not affect federal question jurisdiction and removability").[5]

Although the court finds that the form of Griffin's petition permits removal to federal court under Section 1441, it concludes that the substance of the petition does not, in that it could not "have been brought in federal court originally." *Sonoco Prod. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003). The State Board contends that Griffin's petition to the North Carolina Supreme Court presents a federal question, but Griffin's "claims" (such as they are) falter at the first step of the *Gunn* test: no issue of federal law is *necessarily* raised.

Griffin seeks a writ of prohibition, a form of judicial relief authorized by the North Carolina Constitution. N.C. CONST. art. IV, § 12(1). To obtain such a writ, he must show that the State Board is poised to act in a manner "at variance with . . . the law of the land." *State v. Allen*, 24 N.C. 183, 189 (1841).[6] As recounted previously, Griffin's theory is that the State Board's

---

[5] The court notes Griffin's reliance on *Barrow v. Hunter*, 99 U.S. 80 (1878), but agrees with the Fifth Circuit that *Barrow's* distinction between actions "tantamount to the common-law practice of moving to set aside a judgment for irregularity" and actions "tantamount to a bill in equity to set aside a decree for fraud," *Barrow*, 99 U.S. at 83, may no longer be "good law for the purposes of 28 U.S.C. § 1441" because the basis for that distinction "relied on an interpretation of removal which may well be no longer valid" and does not reflect "the modern view of removal," *Matter of Meyerland Co.*, 910 F.2d 1257, 1261 (5th Cir. 1990). In addition, *Barrow* on its facts does not control this scenario, where Griffin filed an original action directly in North Carolina's Supreme Court rather than follow the appellate procedure designated by state law. *See* N.C.G.S. § 163-182.14(b).

[6] This showing is necessary but not sufficient; Griffin also must show that his grievance could not be "redressed, in the ordinary course of judicial proceedings, by appeal." *State v. Whitaker*, 114 N.C. 818, 19 S.E. 376, 376 (1894); *see also State v. Inman*, 224 N.C. 531, 542, 31 S.E.2d 641, 646–47 (1944) (explaining that state Supreme Court "uniformly denie[s]" petitions for writs of prohibition "where there is other remedy," such as an appeal); *Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*, 183 N.C. 43, 110 S.E. 524, 525 (1922) (emphasizing that state Supreme Court will not 'allow a litigant . . . to withdraw his case from the tribunal where the statute has placed it" by filing writ when alternative remedy is available). This is a merits issue that the court need not reach at this point.

imminent certification of the election results for Seat 6 entail its disregard of the state Constitution and several state laws, which he raised in his three protests to the State Board (and which he restates in his petition for a writ of prohibition). *See generally* DE 1-4; DE 33.

First, Griffin challenges the votes of voters who initially registered to vote in North Carolina without providing their driver's license numbers or the last four digits of their social security numbers, in alleged violation of state law. *See* N.C.G.S. § 163-82.4. Next, Griffin challenges the votes of voters who have never resided in North Carolina, which involves an apparent conflict between state law and the North Carolina Constitution. N.C. CONST. art. VI, § 1; N.C.G.S. § 163-258.2(e). Lastly, he contests the votes of absentee voters who failed to include a copy of their photo ID with their absentee ballot, which he argues contravenes state law. *See* N.C.G.S. § 163-230.1.

An issue of federal law is not "a necessary element" of Griffin's first challenge, and his right to relief does not "necessarily turn[] on some construction of federal law." *Franchise Tax Bd.*, 463 U.S. at 9, 14. That challenge can be resolved with exclusive reference to state law. *See* N.C.G.S. § 163-82.4. The relevant provision of North Carolina law states that a voter registration form "shall request the applicant's . . . [d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." N.C.G.S. § 163-82.4(a)(11). Per Griffin, if individuals do not provide one of those numbers, they have not been "lawfully registered" and therefore "cannot vote." DE 1-4 at 19 (citing in addition N.C. CONST. art. VI, § 3(1)). This first challenge does not reference or require consultation of federal law.[7]

---

[7] Section 163-82.4 is distinguishable in a key respect from the state statute at issue in *RNC*, which incorporated by express reference a federal standard. *See RNC*, 2024 WL 4523912, at *9 (evaluating N.C.G.S. § 163-82.11(c), which required State Board to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of [HAVA]").

The State Board asserts that Griffin's challenge to voters' registrations would "require[]" this [c]ourt to construe HAVA," DE 39 at 11, but that is incorrect. After Congress passed HAVA, North Carolina's General Assembly enacted parallel legislation, establishing a uniform system of registration for both state and federal elections. *See RNC*, 120 F.4th at 401. But that uniform system does not eliminate the legal distinction between federal elections, which Congress may regulate (*see* 52 U.S.C. § 21081), and state elections, which Congress (with limited exception) may not (*see Mitchell*, 400 U.S. at 125). And this matter involves a state election, so HAVA, even if practically relevant, is legally irrelevant.

As the Fourth Circuit observed under analogous circumstances in *Vlaming*, the fact that relevant provisions of state law may be "coextensive with [] analogous federal [] provisions" does not mean that a state law argument necessarily raises an issue of federal law. *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 307 (4th Cir. 2021). "Although [North Carolina] courts may rely on federal law to decide a state [law] question, there is no requirement that they must" and "[n]othing prevents [Griffin] from prevailing on his state [law arguments] on exclusively state grounds." *Id.* at 308. Thus, because North Carolina's Supreme Court "is not required to rely on federal law" to resolve Griffin's first challenge, "no federal question is necessarily raised." *Id.*

As other courts have concluded, "[t]he fact that State law may look to federal law does not mean that federal law is a necessary element," and "the fact that the same set of alleged facts could trigger federal issues [], does not mean that a substantial question of federal law is *necessarily* raised; it only points to parallel federal and state cases arising from the same set of facts." *Sage v. Tacoma Sch. Dist. No. 10*, No. 3:17-CV-5277, 2017 WL 6033015, at *2 (W.D. Wash. Dec. 6, 2017) (emphasis in original); *accord Beavers v. City of Jackson*, 439 F. Supp. 3d 824, 829 (S.D. Miss. 2020). Phrased another way, "[w]hether a state court will adopt as the meaning of the state's

13

[law] the federal courts' interpretation of parallel language in the United States Co[de] is a matter of state law." *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 13 (1st Cir. 2004).

In this regard, the court appreciates but disagrees with the considered view of the amici Former Members of Congress. DE 37; DE 37-1. Amici concede that HAVA "only applies to federal elections," but contend nonetheless that because the State Board "uses a single voter form," the outcome of Griffin's challenge "will also dictate whether [the 60,000 voters] can vote in federal elections." DE 37-1 at 7-8. This contention conflates a potential practical implication with an important legal distinction. The people of North Carolina have chosen to implement a uniform system for both state and federal election registration. *RNC*, 120 F.4th at 401. But that legislative choice, itself a creature of state law, does not transform state law issues with state elections into federal questions for federal courts merely because resolution of the state law issues, by implication, could also inform litigation in the context of a federal election. Any symmetry between North Carolina law (for state elections) and HAVA (for federal elections) "is state-created, not federal," *Crowley*, 678 F.3d at 735, and no court's interpretation of Section 163-82.4 would *control* or *bind* future unrelated proceedings involving analogous provisions of HAVA.

A case from the Fifth Circuit is instructive. *See American Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012). There, the plaintiff sued the defendant in both federal and state court. *Id.* at 541. The federal case alleged antitrust "violations of Sections 1 and 2 of the Sherman Act," whereas the state case involved a state law antitrust claim alleging "monopolization in violation of [] the Texas Free Enterprise and Antitrust Act of 1983." *Id.* The Texas antitrust law provided that its provisions "shall be construed to accomplish [its] purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with [its] purpose." *Id.* at 542 (citing Tex. Bus. & Com. Code § 15.04). The defendant removed

14

the state case to federal court, the plaintiff sought remand, and the federal district court remanded the matter. *Id.* at 541.

In affirming the decision of the district court, the Fifth Circuit observed that, notwithstanding the plaintiff's parallel lawsuits and parallel claims under federal and state law, "nothing in the plain language of the [Texas antitrust law] requires that federal law control Texas's interpretation of its state antitrust statute." *Id.* at 542. The Fifth Circuit also rejected an argument (similar to that made by amici) about the practical implications: even if a federal court's conclusion on the Sherman Act claims suggested that the plaintiff's "parallel state antitrust case would suffer a similar fate," that does not compel the conclusion that the plaintiff somehow "g[a]ve up or alter[ed] its particular rights to pursue its state-law remedies in state court." *Id.* at 544. In sum, the Fifth Circuit agreed with the district court that "the mere fact that a federal standard is to be referenced [] in determining whether there has been a state-law violation" does not "cause[] a state-law claim to 'necessarily raise a stated federal issue.'" *Id.* at 543 (quoting *Grable*, 545 U.S. at 314).

The same is true here. Nothing in Section 163-82.4 "requires that [HAVA] control [North Carolina's] interpretation of its state [election] statute." *Id.* at 542. Further, the practical implications of a state court's interpretation of Section 163-82.4, or even its "reference[]" to HAVA in making such an interpretation, does not cause Griffin's first challenge "to necessarily raise a stated federal issue." *Id.* at 543 (internal quotation marks omitted). Because Griffin's first challenge does not require resort to HAVA, it does not necessarily raise a question of federal law. *See Grable*, 545 U.S. at 314.

Griffin's second challenge also does not raise an issue of federal law. That challenge, targeting voters who have never resided in North Carolina, involves an apparent conflict between

state law (which grants this group of individuals the right to vote) and the state Constitution (which includes a bona fide residency requirement). DE 1-4 at 44-45 (citing N.C. CONST. art. VI, § 1); *see also* N.C.G.S. § 163-258.2(e). No party (including the State Board, Riggs, the NCARA parties, or amici) have argued that Griffin's second challenge involves an issue of federal law, and the court discerns none. *See* DE 37-1; DE 39; DE 40; DE 41-1; DE 42.

That leaves Griffin's third challenge, which contests approximately 5,500 overseas absentee ballots that voters submitted without including a copy of their photo IDs. DE 1-4 at 53-57. The State Board argues that this challenge raises an issue of federal law because a state law addressing overseas absentee voting incorporates by reference a federal requirement found in a federal statute. DE 39 at 12 (citing N.C.G.S. § 163-258.6(b), which references 52 U.S.C. § 20303). But the State Board's argument represents a defense to Griffin's claim, which is that counting the votes of these voters would violate a separate state statute, which does not reference federal law. *See* DE 1-4 at 54; DE 49 at 15 (both addressing N.C.G.S. § 163-230.1).

Under the well-pleaded complaint rule, a state law claim only raises an issue of federal law if it "is a necessary element" of the state claim. *Franchise Tax Bd.*, 463 U.S. at 13; *Caterpillar*, 482 U.S. at 392. "It is *not* enough that federal law becomes relevant by virtue of a defense." *Burrell*, 918 F.3d at 381 (emphasis in original) (internal quotation mark omitted). Here, the State Board's invocation of state law (that references federal law) only becomes relevant by way of its defense, so it is not a necessary element of Griffin's third challenge.

The last argument for federal question jurisdiction, raised by the State Board and the NCARA parties, is that Griffin's petition raises a federal question because he seeks a declaration that the State Board's "arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin are rejected." DE 1-4 at 83; see also DE 39 at 13; DE

16

42 at 35-36. This argument fails for the same reason: the State Board's arguments about federal laws were invoked as defenses to Griffin's protests. *See* DE 1-5 at 60-67. By raising those same arguments in his petition, and seeking a declaration that they "are rejected," DE 1-4 at 83, Griffin is merely "anticipat[ing] or repl[ying] to a probable defense" that the State Board would also make before the state Supreme Court. *Capitol Broadcasting*, 104 F.4th at 540. Plaintiffs may "go[] beyond a statement of the[ir] cause of action" and anticipate federal defenses in their pleadings without converting their state law claims into federal questions. *Gully*, 299 U.S. at 113.

Under the circumstances, it was understandable that Griffin would raise the State Board's federal defenses in his petition: the State Board had just cited them as bases for rejecting his protests. DE 1-5 at 60-67. By attempting to "anticipate[] and rebut[ those] defense[s]," Griffin did not inject a federal question into his petition. *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 302 (4th Cir. 2016). "[E]ven if the complaint begs the assertion of [federal] defense[s] . . . that does not" transform Griffin's protests into claims "arising under federal law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 446 (4th Cir. 2005).

In sum, the court finds that none of the three challenges in Griffin's petition necessarily raise an issue of federal law, and his request for a declaration rejecting the State Board's federal law arguments is simply an anticipatory effort at rebutting predictable federal defenses. Therefore, Griffin's petition does not arise under the laws of the United States, this court would not have had original jurisdiction over it, and removal under Section 1441 was improper. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1441(a).

  c. <u>28 U.S.C. § 1443(2)</u>

Removal is independently authorized for any civil action that involves an "act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the

17

ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). The second portion of that provision is relevant here, known as the refusal clause. *Stephenson v. Bartlett*, 180 F. Supp. 2d 779, 785 (E.D.N.C. 2001) (explaining that refusal clause "provides that state officers can remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent with any law providing for civil rights") (internal brackets and quotation marks omitted).

Although the plain terms of Section 1443(2) appear to capture any number of recognized civil rights, "[t]he Supreme Court has limited the meaning of a 'law providing for equal rights' in § 1443 to only those concerning racial equality." *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 309 (4th Cir. 2021). In *Rachel*, the Supreme Court concluded that the statutory language "must be construed to mean any law providing for specific civil rights *stated in terms of racial equality*." *State of Ga. v. Rachel*, 384 U.S. 780, 792 (1966) (emphasis added). On the other hand, laws that "are phrased in terms of general application available to all persons or citizens," and not in "specific language of racial equality," do not grant removal jurisdiction under Section 1443. *Id.* Although "the plain text of the statute suggests a broader interpretation," this court "must take the Supreme Court at its word and faithfully apply its precedent." *Vlaming*, 10 F.4th at 310. The Fourth Circuit has recently clarified that the NVRA "provides a proper basis for removal under Section 1443(2)." *RNC*, 120 F.4th at 408.

The court first finds that, contrary Griffin's primary argument against removal under Section 1443(2), he did seek a writ of prohibition against the State Board because of its "refus[al]" to do something: the refusal to sustain his challenges and discard the votes of tens of thousands of voters. *See* DE 49 at 26. Had the State Board adopted Griffin's arguments and removed the in-question votes from the current tally, i.e., had the State Board taken affirmative action, Griffin would not have sought a writ of prohibition from the state Supreme Court. Thus, it is the State

Board's "inaction," not its "action," that prompted Griffin's petition. *City & Cnty. of San Francisco v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, No. 02-CV-03462, 2002 WL 1677711, at *4 (N.D. Cal. July 24, 2002); *see also id.* (noting that "the remand suit must challenge a failure to act or enforce state law").

Having concluded that the State Board refused to act within the meaning of Section 1443(2), the court turns next to whether that refusal was based on the State Board's belief that, had it acted, it would have violated federal civil rights law stated in terms of racial equality. 28 U.S.C. § 1443(2); *Rachel*, 384 U.S. at 792. The State Board rejected Griffin's challenges in part based on its position that "[r]etroactively removing these voters from the list of voters eligible to cast a ballot in the election would violate [the NVRA]." DE 1-5 at 67. The NVRA "provides a proper basis for removal under Section 1443(2)." *RNC*, 120 F.4th at 408. Accordingly, the State Board refused to "act on the ground that [action] would be inconsistent with [federal civil rights] law," and removal is permitted. 28 U.S.C. § 1443(2).

In reaching this conclusion, the court notes that it does not agree with the State Board that the NVRA precludes it from acting in the context of a state election. *See Young*, 520 U.S. at 275 (explaining that NVRA establishes procedures for federal elections). But that is ultimately a merits (not jurisdictional) issue; defendants seeking removal under Section 1443(2) must only make a "colorable claim" based on their "good faith belief" that their "conduct, if violative of state law," was required by a "federal statutory duty." *White v. Wellington*, 627 F.2d 582, 586 (2d Cir. 1980)[8]; *see also Cavanagh v. Brock*, 577 F. Supp. 176, 180 (E.D.N.C. 1983) (holding that a "colorable federal defense in the removal papers suffices to make removal—and therefore jurisdiction— proper pursuant to § 1443(2)"). And in analogous circumstances, the Fourth Circuit and Supreme

---

[8] By operation of North Carolina law, the court presumes the State Board acts in good faith. *City of Raleigh v. Riley*, 64 N.C. App. 623, 636, 308 S.E.2d 464, 473 (1983).

Court have indicated that a defendant's invocation of federal law will only fail to provide a jurisdictional basis on removal if the theory is "so attenuated and unsubstantial as to be absolutely devoid of merit; wholly insubstantial; obviously frivolous; plainly unsubstantial; or no longer open to discussion." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 206 (4th Cir. 2022) (citing *Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974)); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). The court may not agree with the State Board as to the applicability of the NVRA, but considering North Carolina's unified system of registration and election administration, the State Board's argument in favor of removal is not absolutely devoid of merit or insubstantial. The court therefore finds that removal under Section 1443(2) is permitted on that basis and does not reach the State Board's arguments related to the Voting Rights Act or Equal Protection Clause.

      d. *Burford & Louisiana Power*[9]

"Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, . . . refuse to enforce or protect legal rights" out of "proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford v. Sun Oil Co.*, 319 U.S. 315, 317–18 (1943). This form of judicial "abstention is an exception to the general rule that federal courts must decide cases over which they have jurisdiction." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). The doctrine is grounded in two considerations: (1) the flexibility inherent in "traditional equity practice," but more importantly

---

[9] Griffin raises *Pullman* as a basis for abstention. DE 49 at 6-8. The court finds that doctrine is relevant, but that *Burford* and *Louisiana Power* provide more compelling bases for abstention under the circumstances. Such a conclusion is fully consistent with the principle of party presentation, meaning that the court must "address only the issues raised by the parties," *Short v. Hartman*, 87 F.4th 593, 604 (4th Cir. 2023), because once "an issue [such as abstention] is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.* (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

(2) "the notion of comity," meaning the "'belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'" *Erie Ins. Exch. v. Maryland Ins. Admin.*, 105 F.4th 145, 149 (4th Cir. 2024) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)).

Distilled to its essence, the doctrine of *Burford* abstention instructs that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks omitted) ("*NOPSI*").

"Another doctrine . . . allows abstention in cases raising issues intimately involved with the State's sovereign prerogative." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007). In *Louisiana Power*, the Supreme Court recognized that certain "decisive issues of state law" that are "intimately involved with sovereign prerogative" should be decided in the first instance by the State's courts. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28–29 (1959). Rather than make "a dubious and tentative forecast" on unsettled questions of state law that implicate state sovereignty, the court should abstain and defer to state courts on the question. *Id.* at 29. Such a course of action "does not constitute abnegation of judicial duty" but rather constitutes "a wise and productive discharge of it." *Id.*

21

To be sure, *Burford* and *Louisiana Power* are not talismanic incantations that free a federal district court of its "virtually unflagging" obligation to exercise subject-matter jurisdiction when it has it. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Just as a court "will not take jurisdiction if it should not," the court "must take jurisdiction if it should." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821). Abstention is therefore reserved for the rare and exceptional cases.

Determining whether a matter represents one of those rare cases for which abstention is warranted is no easy task. What is a *difficult* question of state law? A policy problem of *substantial* public import? How *intimately* involved must a state law issue be with considerations of sovereignty? As these nebulous terms suggest, there exists no "formulaic test for determining when dismissal [or remand] under *Burford* [or *Louisiana Power*] is appropriate." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996). And "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987). "Overlapping rationales motivate these doctrines and considerations that support abstaining under one will often support abstaining under another." *Martin*, 499 F.3d at 364. With that said, abstention doctrines do not permit "*ad hoc* judicial balancing of the totality of state and federal interests in a case" and a court must tether its analysis to "specific doctrines that apply in particular classes of cases." *Id.* (italics in original).

Considering the relevant standards, the court finds that abstention under *Burford* and *Louisiana Power* is appropriate in this case for four reasons: (1) the issues raised in Griffin's protests reflect unsettled questions of state constitutional and statutory law and bear directly on North Carolina's right to self-government, (2) there is an existing dispute resolution process designated by state law, which a federal court should be hesitant to disrupt, (3) Griffin's claims

22

arise purely under state law, and (4) the federal interest in this case is tenuous, and a state tribunal is competent to protect federal constitutional rights. Taken together, those factors counsel in favor of abstention.

First, Griffin's protests raise unsettled questions of state law: whether individuals who registered to vote without providing either their driver's license numbers or the last four digits of their social security numbers may vote in state elections, whether state law granting the right to vote to individuals who have never resided in North Carolina (Section 163-258.2(e)) conflicts with the state Constitution's bona fide residency requirement, and whether North Carolina's voter ID law applies to absentee ballots submitted by overseas voters in state elections. *See* DE 1-4 at 19-21 (summary of three challenges). In responding to Griffin's motion for preliminary injunction, the State Board has identified one trial court-level decision addressing the same substance as Griffin's second protest. DE 39 at 27. That hardly reflects a consensus view on the issues raised by the petition. *See Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (finding that "*close* issue of state law involving competing interpretations of North Carolina's statutes governing election procedures" that "state courts" have not "settled . . . conclusively" supported abstention under *Pullman*) (emphasis in original); *see also Martin*, 499 F.3d at 364 (observing that abstention doctrines often contain "[o]verlapping rationales").

In *Johnson v. Collins Entertainment*, the Fourth Circuit found that it would "contravene[] *Burford* principles" for a federal district court to attempt to answer "disputed questions of state [] law that so powerfully impact the welfare of [the State's] citizens." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999). *Johnson* involved state gambling regulations, which "lie[] at the heart of the state's police power." *Id.* This matter involves the right to vote in a state election and the outcome of a state contest for a seat on the state supreme court, which lie at the heart of

state sovereignty and right to self-government. *Mitchell*, 400 U.S. at 125. The court finds that a citizen's right to participate in electing representatives for state government and a state's right to interpret state law in that context is no less (and likely more so) inextricably intertwined with a citizenry's welfare than the gambling regulations at issue in *Johnson*.

Likewise in *Louisiana Power*, Justice Frankfurter admonished that federal judges should hesitate to make "a dubious and tentative forecast" on unsettled questions of state law that implicate state sovereignty. *Louisiana Power*, 360 U.S. at 29. That advice maps onto this case: Griffin's protests raise novel questions of state law, and the answers to those questions could sway the outcome of a state election and affect the right to vote for tens of thousands of individuals in future *state* elections. *See NOPSI*, 491 U.S. at 361 (where "importance" of state law issues "transcends the result in the case then at bar," *Burford* abstention may be appropriate).

Second, North Carolina law designates an appellate procedure for disputes over decisions of the State Board. N.C.G.S. § 163-182.14(b). That procedure reflects the view of the General Assembly that election disputes should, after review by the State Board, proceed to the Superior Court of Wake County. *See id.* Because in these circumstances "timely and adequate state-court review is available," this court should refrain from "interfer[ing] with the [] orders of state administrative agencies," such as the State Board. *NOPSI*, 491 U.S. at 361. As the Fourth Circuit similarly concluded in *Johnson*, "[f]ederal equitable intervention" in this case "risks the disruption of state efforts to establish a coherent policy with respect to [state elections]" and "threatens the creation of a patchwork of inconsistent" interpretations of state election law. *Johnson*, 199 F.3d at 723.

Taking the third and fourth factors together, the court further finds that the primacy of state law issues in this matter, and the relatively tenuous federal interest, militate in favor of abstention

as well. *See Johnson*, 199 F.3d at 723 (explaining that "the predominance of state law issues affecting state public policy" should "counsel[] caution on the part of federal court"). As the court summarized previously, Griffin's challenges consist of contentions that arise exclusively under state law. *See supra* at 9-17. A federal court is poorly positioned to resolve those contentions in the first instance, particularly where such resolution (even if practically relevant) would not legally implicate federal elections. *See Moore v. Sims*, 442 U.S. 415, 429 (1979) ("State courts are the principal expositors of state law.").

The federal interest in this action also pales in comparison with the predominance of state law issues. The State Board has cited the NVRA as a basis for removal, which the court has credited. *See supra* at 17-20. But the NVRA's connection to this state election is somewhat dubious. *See Young*, 520 U.S. at 275. The State Board has also invoked federal constitutional concerns such as procedural and substantive due process, but a state court is competent to enforce federal constitutional rights. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609, n.21 (1975). Just as importantly, a state court could resolve Griffin's protests on the merits of their state law arguments, obviating the need for disposition of the federal constitutional issues. That consideration also tilts the scales towards abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941); *see also Martin*, 499 F.3d at 364 (observing that abstention doctrines often contain "[o]verlapping rationales").[10]

If our system of federalism is to exist in more than name only, it means that this court should abstain in this case, under these circumstances. "As every schoolchild learns, our

---

[10] In weighing these third and fourth factors, the court is cognizant that it may not engage in "*ad hoc* judicial balancing of the totality of state and federal interests in a case." *Martin*, 499 F.3d at 364. Rather than engage in such ad hoc balancing, the court finds that those respective interests are directly relevant to answering whether the state law questions are difficult, the manner in which they transcend the case at bar, and whether they reflect substantially important state policy. *See NOPSI*, 491 U.S. at 361; *Louisiana Power*, 360 U.S. at 29; *Johnson*, 199 F.3d at 723.

Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This dual-system reflects that "the perpetuity and indissolubility of the Union[] by no means implies the loss of distinct and individual existence, or of the right of self-government by the States." *Texas v. White*, 74 U.S. 700, 725 (1868). The right of self-government must include "all the functions essential to separate and independent existence"; otherwise "there could be no such political body as the United States." *Lane Cnty. v. State of Oregon*, 74 U.S. 71, 76 (1868).

The court ends as it began: a sitting state court judge seeks a writ of prohibition (a form of judicial relief authorized by the state constitution) from the state supreme court that would enjoin the state board of elections from counting votes for a state election contest that were cast by voters in a manner allegedly inconsistent with state law. A federal tribunal should "wise[ly] and productive[ly] discharge" its "judicial duty" by abstaining in such circumstances, *Louisiana Power*, 360 U.S. at 29, because "timely and adequate state-court review is available," *NOPSI*, 491 U.S. at 361; N.C.G.S. § 163-182.14(b). The issues of state law raised in this action are not just difficult and "disputed," *Johnson*, 199 F.3d at 720, they also go to the heart of North Carolina's sovereign right "to establish and maintain [its] own separate and independent government[]," *Mitchell*, 400 U.S. at 125. At bottom, the court finds that abstention under *Burford* and *Louisiana Power* is warranted.

26

## IV. Conclusion

The court has removal jurisdiction under 28 U.S.C. § 1443(2) but abstains from reaching the merits of Griffin's motion for preliminary injunction and remands this matter to the North Carolina Supreme Court.

SO ORDERED this __6th__ day of January, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE